**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: On-Line Travel Company (OTC) / Hotel Booking Antitrust Litigation | ) ) ) ) ) ) | Case No.     3:12-cv-3515-B |

**MOTION TO DISMISS AND MEMORANDUM OF LAW BY DEFENDANTS BOOKING.COM B.V., BOOKING.COM (USA), INC., EXPEDIA, INC., HOTELS.COM LP, ORBITZ WORLDWIDE, INC., PRICELINE.COM INC., TRAVELOCITY.COM LP, TRAVELSCAPE LLC, BEST WESTERN INTERNATIONAL, INC., CARLSON HOTELS, INC., CHOICE HOTELS INTERNATIONAL, INC., HILTON WORLDWIDE, INC., HYATT HOTELS CORPORATION, INTERCONTINENTAL HOTELS GROUP RESOURCES, INC., KIMPTON HOTEL & RESTAURANT GROUP, LLC, MARRIOTT INTERNATIONAL, INC., STARWOOD HOTELS & RESORTS WORLDWIDE, INC., TRUMP INTERNATIONAL HOTELS MANAGEMENT, LLC, WYNDHAM HOTEL GROUP, LLC, WYNDHAM WORLDWIDE CORPORATION, AND EYEFORTRAVEL, LTD.**

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND .......................................................................................4

I.  The Parties .........................................................................................................4

II.  Summary of the Complaint's Allegations ........................................................5

A.  The Emergence of OTCs Has Promoted Comparison Shopping, Price Transparency, and Interbrand Hotel Competition. ...................................5

1.  The Models Through Which OTCs Facilitate Hotel Bookings. ..................6

2.  The Alleged Conspiratorial Agreements. ....................................7

3.  Certain Defendants' Advertisements of Rate Guarantees. .........................9

B.  The Putative Class Members' Claims for Relief ....................................10

ARGUMENT ...........................................................................................................10

I.  The Allegations Are Consistent with Fierce Interbrand Competition. ..............11

II.  Intrabrand Restrictions on Distribution Channels Are Permitted to Help Suppliers Promote Interbrand Competitiveness. .................................................12

III.  The Complaint Does Not Plead Facts Sufficient To Indicate Any Unlawful Vertical Agreement Between Any Hotel and Any Distributor.........................14

A.  Plaintiffs' RPM Allegations Fail Because the Complaint Does Not Adequately Allege a "Resale" Under the Antitrust Laws. ....................15

1.  The "Agency Model" Transactions Cannot Constitute RPM...................17

2.  The Complaint Fails to Allege Facts Indicating that the OTCs Resell Rooms Under the "Merchant Model." ....................................18

B.  Plaintiffs' RPM and MFN Allegations Fail Under the Rule of Reason. ...............21

1.  No Alleged Facts Support the Existence of a Plausible Product Market. ..............................................................................24

2.  Plaintiffs' Proposed Geographic Market Is Implausible and Lacks Any Supporting Facts. ...........................................................25

3.  Plaintiffs Fail to Allege Facts Showing that Any Defendant Possesses Market Power in the Alleged Relevant Market. ......................26

IV.  The Complaint's Fanciful Assertions of Purported OTC-Centered and "Industry-wide" Conspiracies Fall Short of the Required Pleading Standard. ...............27

A.  The Complaint's Allegations of a Horizontal Conspiracy Among the OTC Defendants To Impose Rate Parity on the Hotels Fail as a Matter of Law. ..........28

1.  There Are No Facts Suggestive of a Horizontal Agreement. ...................29

2. Conclusory Allegations of "Parallel Conduct" by the OTC Defendants Provide No Basis for Inferring a Conspiracy. .......................30

3. Plaintiffs Lack Antitrust Standing to Challenge a Horizontal Agreement Among the OTC Defendants To Impose "Rate Parity" on Hotels. ...........................................................................................33

B. There Are No Facts Alleged That Plausibly Support the Existence of an "Industry-Wide" Conspiracy Among the Hotel and OTC Defendants. ................36

1. The Complaint's Allegations of "Parallel Conduct" Fail to Plead a Conspiracy. ................................................................................36

2. Plaintiffs Do Not Allege Facts That Support the Existence of an Industry-Wide Conspiracy Among Hotels and OTCs. ...........................38

3. An Alleged Conspiracy Between Hotels and OTCs to Eliminate Price Competition Is Economically Implausible. ....................................40

C. Allegations Relating to European Investigations Do Not Make Plausible the Existence of a Conspiracy in the United States. .............................................41

V. The Complaint Fails to Plead a Claim Under State Antitrust Laws. .................................42

VI. Plaintiffs Fail to Plead Viable Consumer Protection Claims. ............................................43

A. Plaintiffs Attack as "Deceptive and Misleading" Statements That They Otherwise Acknowledge To Be Accurate. .............................................................43

B. Plaintiffs Cannot Plead Any Injury That Resulted From Defendants' "Best Price" or "Low Price" Guarantees. ..........................................................................44

C. Plaintiffs' Wholesale Invocation of Statutes from Thirty-Eight Jurisdictions Is Deficient as a Matter of Law. .......................................................45

D. Plaintiffs Have Failed to Plead Their Consumer Protection Claims with the Specificity Required by Rule 9(b). ........................................................................46

E. Plaintiffs Cannot Proceed With Claims Under State Laws for Which They Have No Representative Plaintiff. .............................................................................47

F. Plaintiffs' Claims Must Be Dismissed Where the Asserted State Statute Bars Class Action Treatment. ...................................................................................48

VII. Plaintiffs Fail to Plead the Necessary Elements to Support Tolling the Applicable Statute of Limitations. ......................................................................................................49

A. The Complaint Does Not Allege Facts to Show Concealment and Confirms that Plaintiffs' Claims Are Based on Publicly Available Information. ...............................................................................................................50

B. Plaintiffs Do Not Plead Adequate Due Diligence. .............................................52

C. The Statutes of Limitations Respecting Plaintiffs' State Law Claims Should Not Be Tolled. .............................................................................................53

CONCLUSION ...................................................................................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*324 Liquor Corp. v. Duffy,*
  479 U.S. 335 (1987) ....................................................................................................... 13

*7-UP Bottling Co. v. Archer Daniels Midland Co. (In re Citric Acid Litig.),*
  191 F.3d 1090 (9th Cir. 1999) ....................................................................................... 30

*Ad-vantage Tel. Directory Consultants v. GTE Directories Corp.,*
  849 F.2d 1336 (11th Cir. 1987) ................................................................................. 18, 19

*Apani Sw., Inc. v. Coca-Cola Enterprs.,*
  300 F.3d 620 (5th Cir. 2002) ..................................................................................... 23, 25

*Apex Oil Co. v. DiMauro,*
  822 F.2d 246 (2d Cir. 1987) ........................................................................................... 33

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................................... 11, 45

*Associated General Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
  459 U.S. 519 (1983) ................................................................................................... 33, 35

*Atl. Richfield Co. v. USA Petroleum Co.,*
  495 U.S. 328 (1990) ......................................................................................................... 2

*Bearden v. Honeywell Int'l, Inc.,*
  No. 3:09-1035, 2010 WL 3239285 (M.D. Tenn. Aug. 16, 2010) ................................... 49

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................................*passim*

*Berry v. Indianapolis Life Ins. Co.,*
  600 F. Supp. 2d 805 (N.D. Tex. 2009) ..................................................................... 20, 48

*Berry v. Indianapolis Life Ins. Co.,*
  608 F. Supp. 2d 785 (N.D. Tex. 2009) .......................................................................... 47

*Bldg. Materials Corp. of Am. v. Rotter,*
  535 F. Supp. 2d 518 (E.D. Pa. 2008) ............................................................................. 23

*Blue Cross & Blue Shield United v. Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995) ................................................................................. 22

*Brooke Grp. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ................................................................................................ 28

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
    485 U.S. 717 (1988) ............................................................................................ 2, 13

*Campos v. Ticketmaster Corp.*,
    140 F.3d 1166 (8th Cir. 1998) ..................................................................... 34, 35, 36

*Cascades Computer Innovation LLC v. RPX Corp.*,
    No. 12-CV-01143-YGR, 2013 WL 316023 (N.D. Cal. Jan. 24, 2013) .................. 40

*City of Columbus, Ohio v. Hotels.com, L.P.*,
    693 F.3d 642 (6th Cir. 2012) ................................................................................. 16

*City of Goodlettsville v. Priceline.com, Inc.*,
    844 F. Supp. 2d 897 (M.D. Tenn. 2012) ............................................................... 21

*City of San Antonio v. Hotels.com*,
    No. SA-06-CA-381-OG (W.D. Tex May 27, 2008) ............................................... 52

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
    433 U.S. 36 (1977) ............................................................................................ 12, 13

*Corr Wireless Commc'ns, LLC v. AT&T, Inc.*,
    893 F. Supp. 2d 789 (N.D. Miss. 2012) ................................................................ 37

*Cosmetic Gallery, Inc. v. Schoeneman Corp.*,
    495 F.3d 46 (3d Cir. 2007) .................................................................................... 30

*Cranfill v. Scott & Fetzer Co.*,
    773 F. Supp. 943 (E.D. Tex. 1991) ....................................................................... 26

*Day v. Taylor*,
    400 F.3d 1272 (11th Cir. 2005) ......................................................................... 16, 20

*Dema v. Tenet Physician Servs.-Hilton Head, Inc.*,
    678 S.E. 2d 430 (S.C. 2009) ................................................................................. 48

*In re Digital Music Antitrust Litig.*,
    812 F. Supp. 2d 390 .............................................................................................. 49

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*,
    123 F.3d 301 (5th Cir. 1997) ................................................................................. 23

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007) ...................................................................31, 33, 42

*In re Energy Transfer Partners Natural Gas Litig.*,
    No. 4:07-CV-3349, 2009 WL 2633781 (S.D. Tex. Aug. 26, 2009).......................52

*In re Flash Memory Antitrust Litig.*,
    643 F. Supp. 2d 1133 (N.D. Cal. 2009)..............................................................48

*Friedlander v. PDK Labs, Inc.*,
    465 S.E. 2d 670 (Ga. 1996) .................................................................................49

*Frith v. Guardian Life Ins. Co.*,
    9 F. Supp. 2d 734 (S.D. Tex. 1998).....................................................................46

*Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*,
    789 F. Supp. 760 (S.D. Miss. 1992) ..........................................................27, 36, 39

*Gaetzi v. Carling Brewing Co.*,
    205 F. Supp. 615 (E.D. Mich. 1962) ...................................................................52

*Gephardt v. Mortgage Consultants, Inc.*,
    Civ. No. JFM-10-1537, 2011 WL 531976 (D. Md. Feb. 8, 2011) .........................44

*Gianino v. Alacer Corp.*,
    846 F. Supp. 2d 1096 (C.D. Cal. 2012)................................................................46

*In re Grand Theft Auto Video Game*,
    251 F.R.D. 139 (S.D.N.Y. 2008)..........................................................................46

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007).........................................................30, 43

*Home Health Licensing Specialists Inc. v. Leavitt*,
    No. 3:07-CV-2150-B, 2008 WL 4830543 (N.D. Tex. Nov. 7, 2008) ........11, 29, 39

*Ill. Corporate Travel, Inc. v. Am. Airlines, Inc.*,
    806 F.2d 722 (7th Cir. 1986) ...........................................................15, 16, 18, 19

*Ill. Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ...........................................................................................35

*Imperial Point Colonnades Condo., Inc. v. Mangurian*,
    549 F.2d 1029 (5th Cir. 1977) ............................................................................50

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) .......................................................32, 33, 37, 38

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
    626 F.3d 1327 (11th Cir. 2010) ................................................................22, 23, 40

*Kansas Reins. Co. v. Cong. Mortg. Corp.*,
    20 F.3d 1362 (5th Cir. 1994) ..................................................................... 50

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ................................................................................. 50

*Kowalski v. Chicago Tribune Co.*,
    854 F.2d 168 (7th Cir. 1988) ..................................................................... 19

*Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*,
    901 F.2d 404 (5th Cir. 1990) ..................................................................... 53

*Larry R. George Sales Co. v. Cool Attic Corp.*,
    587 F.2d 266 (5th Cir. 1979) ..................................................................... 29

*In re Late Fee & Over-Limit Fee Litig.*,
    528 F. Supp. 2d 953 (N.D. Cal. 2007) ........................................................ 33

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ..........................................................................*passim*

*In re LTL Shipping Servs. Antitrust Litig.*,
    No. 1:08-MD-01895-WSD, 2009 WL 323219 (N.D. Ga. Jan. 29, 2009) ............. 33

*M.S. Wholesale Plumbing, Inc. v. Univ. Sports Publ'ns Co.*,
    No. 4:07CV00730, 2008 U.S. Dist. LEXIS 124000 (E.D. Ark. May 22, 2008) .................... 48

*Gorbey ex rel. Maddox v. Am. Journal of Obstetrics & Gynecology*,
    849 F. Supp. 2d 162 (D. Mass 2012) ........................................................ 45

*Martinelli v. Petland, Inc.*,
    No. CV-09-529-PHX-DGCI, 2010 WL 376921 (D. Ariz. Jan. 26, 2010) ............. 45

*Marty's Floor Covering Co. v. GAF Corp.*,
    604 F.2d 266 (4th Cir. 1979) ................................................................19, 21

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013) ..................................................................... 33

*McCarthy v. Recordex Service, Inc.*,
    80 F.3d 842 (3d Cir. 1996) ....................................................................... 35

*McCormack v. Nat'l Collegiate Athletic Ass'n*,
    845 F.2d 1338 (5th Cir. 1988) ................................................................... 34

*McKinney v. Bayer Corp.*,
    744 F. Supp. 2d 733 (N.D. Ohio 2010) .................................................................49

*Monsanto Co. v. Spray-Rite Serv. Corp*,
    465 U.S. 752, 768 (1984) .......................................................................................39

*Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
    524 F.3d 726 (6th Cir. 2008).................................................................................25

*Morrison v. Murray Biscuit Co.*,
    797 F.2d 1430 (7th Cir. 1986).........................................................................17, 21

*Muenster Butane, Inc. v. Stewart Co.*,
    651 F.2d 292 (5th Cir. 1981).............................................................................24, 26

*In re Nat'l Ass'n of Music Merchs.*,
    MDL No. 2121, 2012 WL 3637291 (S.D. Cal. Aug. 20, 2012)......................30, 31

*New England Carpenters Health Benefits Fund v. McKesson Corp.*,
    573 F. Supp. 2d 431 (D. Mass. 2008).....................................................................22

*Norris v. Hearst Trust*,
    500 F.3d 454 (5th Cir. 2007).................................................................................20

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*,
    883 F.2d 1101 (1st Cir. 1989).................................................................................22

*Ozark Heartland Elecs., Inc. v. Radio Shack*,
    278 F.3d 759 (8th Cir. 2002).................................................................................17

*PSKS, Inc. v. Leegin Creative Leather Prods.* (*Leegin II*),
    615 F.3d 412 (5th Cir. 2010)..........................................................................*passim*

*In re Public Offering Antitrust Litig.*,
    No. 98 Civ. 7890, 2004 WL 350696 (S.D.N.Y. Feb. 25, 2004)..............................35

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) ..................................................................................23

*R.D. Imports Ryno Indus., Inc. v. Mazda Distribs. (Gulf), Inc.*,
    807 F.2d 1222 (5th Cir. 1987).................................................................................26

*Rick-Mik Enters. v. Equilon Enters.*,
    532 F.3d 963 (9th Cir. 2008).................................................................................22

*Rio Grande Royalty Co. v. Energy Transfer Partners*,
    786 F. Supp. 2d 1190 (S.D. Tex. 2009)...................................................................31

*Ryko Mfg. Co. v. Eden Servs.*,
   823 F.2d 1215 (8th Cir.1987) ................................................................ 15, 16, 18, 21

*In re Samsung DLP Television Class Action Litig.*,
   No. 07-8141 (GEB), 2009 WL 3584352 (D.N.J. 2009) .......................................... 46

*Saucier v. Countrywide Home Loans*,
   64 A.3d 428, 442 (D.C. 2013) ....................................................................... 44

*Schafer v. State Farm Fire & Cas. Co.*,
   507 F. Supp. 2d 587 (E.D. La. 2007) ............................................................... 37

*Schroeder v. Wildenthal*,
   No. 3:11-CV-0525-B, 2011 WL 6029727 (N.D. Tex. Nov. 30, 2011) ...................... 50

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
   130 S. Ct. 1431 (2010) .................................................................................. 49

*Simpson v. Union Oil Co.*,
   377 U.S. 13 (1964) ................................................................................... 16, 21

*Spahr v. Leegin Creative Leather Prods., Inc.*,
   No. 2:07-CV-187, 2008 WL 3914461 (E.D. Tenn. Aug. 20, 2008) ..................... 22, 23

*State Oil Co. v. Kahn*,
   522 U.S. 3 (1997) ......................................................................................... 1

*Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs.*,
   200 F.3d 307 (5th Cir. 2000) ......................................................................... 10

*Tanaka v. Univ. of S. Cal.*,
   252 F.3d 1059 (9th Cir. 2001) ....................................................................... 23

*Texas v. Allan Constr. Co.*,
   851 F.2d 1526 (5th Cir. 1988) ....................................................................... 51

*In re Ticketmaster Corp. Antitrust Litig.*,
   929 F. Supp. 1272 (E.D. Mo. 1996) ............................................................... 36

*Timberlake v. A.H. Robins Co.*,
   727 F.2d 1363 (5th Cir. 1984) ....................................................................... 52

*In re Toshiba Am. HD DVD Mktg. & Sales Practices Litig.*,
   No. 08-939, 2009 WL 2940081 (D.N.J. Sept. 11, 2009) ...................................... 46

*Total Benefits Planning Agency Inc. v. Anthem Blue Cross & Blue Shield*,
   630 F. Supp. 2d 842 (S.D. Ohio 2007) ............................................................ 25

*Trane U.S. Inc. v. Meehan*,
  563 F. Supp. 2d 743 (N.D. Ohio 2008) ........................................................................... 17, 19

*In re Travel Agent Comm'n Antitrust Litig.*,
  583 F.3d 896 (6th Cir. 2009) ................................................................................................. 30

*United States v. Gen. Elec. Co.*,
  272 U.S. 476 (1926) ............................................................................................... 15, 17, 19

*Valuepest.com of Charlotte, Inc. v. Bayer Corp.*,
  561 F.3d 282 (4th Cir. 2009) ............................................................................... 15, 18, 19, 22

*Vaughn Med. Equip. Repair Serv., LLC v. Jordan Reses Supply Co.*,
  No. 10-00124, 2010 WL 3488244 (E.D. La. Aug. 26, 2010)................................................. 22

*Vendever LLC v. Intermatic Mfg. Ltd.*,
  No. 3:11-CV-00201-B, 2011WL 4346324 (N.D. Tex. Sept. 16, 2011) .................................. 11

*Vernon v. City of Dall.*,
  No. 3:08-CV-1068-B, 2009 WL 2486033 (N.D. Tex. Aug. 13, 2009) ................................... 52

*Walker v. Sunrise Pontiac-GMC Truck, Inc.*,
  249 S.W.3d 301 (Tenn. 2008) ............................................................................................... 49

*In re Wellbutrin XL Antitrust Litig.*,
  260 F.R.D. 143 (E.D. Pa. 2009) ............................................................................................. 43

*In re Wellbutrin XL Antitrust Litig.*,
  756 F. Supp. 2d 670 (E.D. Pa. 2010)..................................................................................... 49

*Whiting v. AARP*,
  701 F. Supp. 2d 21 (D.D.C. 2010)......................................................................................... 44

*Williamson Oil Co. v. Philip Morris USA*,
  346 F.3d 1287 (11th Cir. 2003) ............................................................................................. 30

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  401 U.S. 321 (1971) ............................................................................................................... 50

**Statutes**

15 U.S.C. § 1 ....................................................................................................................*passim*

15 U.S.C. § 15(b)........................................................................................................................ 50

Ga. Code Ann. § 10-1-399(a) (2013) ........................................................................................ 48

La. Rev. Stat. Ann. § 51:1409 (2012)........................................................................................ 48

Mont. Code Ann. § 30-14-133(1) (West 2013) .................................................................48

S.C. Ann. Code §39-5-140(a) (2012) .............................................................................48

Tenn. Code Ann. § 47-18-102(2) (2013) .........................................................................49

**Other Authorities**

ABA Section of Antitrust Law, Antitrust Law Devs. I (7th ed. 2012) ...........................22

BLACK'S LAW DICTIONARY (7th ed. 1999) .................................................................16

Am. Bar Assoc., Joint Comments Of The American Bar Association Section Of Antitrust Law
    And Section Of International Law On The Proposal Of The European Commission For A
    Revised Block Exemption Regulation And Guidelines On Supply And Distribution
    Agreements (2009) ..............................................................................................41

Fed. R. Civ. Proc. 9(b) ...........................................................................................46, 47

Fed. R. Civ. Proc. 12(b)(6) ....................................................................................20, 50

## INTRODUCTION

This case is about whether a hotel has the right to set prices for its own rooms.  Plaintiffs assert that the antitrust laws are violated if a hotel establishes terms pursuant to which it and its distribution channels (including Online Travel Companies ("OTCs")) market rooms to customers.  Plaintiffs assert the novel proposition that a hotel must compete against itself: Plaintiffs would have the Court infer an antitrust violation because a hotel ensures that its many distribution channels offer a specific room in a specific location for a specific date at the same price.  In effect, Plaintiffs ask the Court to repudiate antitrust law's well-established focus on interbrand pricing and the rule that a business need not compete against itself in setting the price of its own product.

The most important things to understand about the Complaint are:  (1) Plaintiffs **never** allege that any Hotel Defendants conspired with each other to set the prices of their hotel rooms; and (2) Plaintiffs' allegations of parallel conduct relate to lawful behavior that advances the interests of each individual company.  *First*, Plaintiffs acknowledge—indeed they document— hotel pricing that is consistent with vigorous hotel competition.  For example, the Complaint lists nine different hotels, offering different prices on an array of different room options over a two-day period in Boston.  (Consol. Am. Compl. ("CAC") ¶ 128.)  For that same period, the Complaint lists ten different hotels all offering different prices for their respective rooms in Miami.  (*Id.*)  That competition between hotels—"***inter**brand*" competition—is the primary focus of the antitrust laws:  "[T]he antitrust laws are designed primarily to protect interbrand competition, from which lower prices can later result."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 895 (2007) ("*Leegin I*") (quoting *State Oil Co. v. Kahn*, 522 U.S. 3, 15 (1997)).  The Complaint fails to allege any facts suggesting anything other than that each hotel

makes its own, unilateral decisions about how to price its rooms in vigorous competition with other hotel brands. That does not violate the antitrust laws.

*Second*, having failed to allege any "horizontal" conspiracy affecting interbrand price competition—and, indeed, illustrating the effects of that competition—the eighty-plus page Complaint alleges facts showing nothing more than a series of lawful, bilateral "vertical" contracts between certain hotels and the OTCs that market each hotel's rooms in one distribution channel: online sales.[1]  Plaintiffs claim that these hotel-OTC distribution agreements—which Plaintiffs term "Resale Price Maintenance" ("RPM") and "rate parity" or "Most Favored Nation" ("MFN") agreements—reduce **intra**brand competition by requiring the OTCs to market a hotel's rooms at the prices established by that hotel.  These allegations do not state a claim under antitrust law.

The Supreme Court has made clear that "the primary purpose of the antitrust laws" is to protect **inter**brand competition, which can be stimulated and enhanced when manufacturers limit **intra**brand competition.  *Leegin I*, 551 U.S. at 889–90 (explaining procompetitive effects of vertical restraints); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 343 n.13 (1990) (recognizing "procompetitive potential" of vertical restraints).  There is nothing anticompetitive, much less unlawful, about a hotel setting specific pricing terms for its distributors so that it can compete effectively with other hotels, communicate a consistent message to its customers, and efficiently deliver its product to the public.

---

[1]  Vertical agreements are those "between firms at different levels of distribution," while horizontal agreements are those "between competitors." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988).

Plaintiffs' attempt to label these procompetitive practices as illegal RPM and MFN agreements fails as a matter of law for at least two reasons that are evident on the face of the Complaint. *First*, RPM agreements can exist only between a seller of a product or service and a downstream distributor who actually purchases the product or service, takes title and risk of loss, and then resells that product or service downstream. But the OTCs are not alleged to do that. **Plaintiffs do not allege (nor could they) that the OTCs assume the risk of loss of hotel room inventory**. Instead, Plaintiffs make the conclusory assertion that OTCs in some cases purchase and resell hotel rooms, but allege no facts supporting that conclusion. Critically, they plead no factual allegations concerning risk of loss, the telltale criterion under antitrust law as to whether the economic substance of the distribution arrangement involves a resale. The facts alleged indicate that OTCs are simply distribution channels for the particular hotels that choose to utilize their services. *Second*, when they in fact exist, RPM and MFN provisions in vertical agreements are subject to the rule of reason, not the *per se* rule, under the antitrust laws. This requires that Plaintiffs plead facts supporting specific relevant market(s), market power, and adverse economic impacts that could outweigh the recognized procompetitive justifications of the alleged agreements. The Complaint is devoid of any factual allegations, much less sufficient ones, addressing these material elements of a rule of reason claim. Those pleading failures require dismissal under *Twombly* and Fifth Circuit precedent.

Knowing that their vertical restraint allegations are insufficient to make out a rule of reason claim, Plaintiffs seek to invoke the *per se* rule through unsupported assertions that these unrelated vertical agreements between particular hotels and particular OTCs are part of either (i) coordinated and parallel conduct driven by the "incumbent" OTCs to protect their business from "smaller price-cutting online travel agencies" or (ii) an "industry-wide" practice employed by

3

hotels and OTCs.  But Plaintiffs allege no facts supporting either theory.  Neither Plaintiffs'

labeling of these agreements as an "industry-wide RPM scheme," nor their assertion that

purportedly "parallel" contractual provisions indicate some overarching "conspiracy," satisfies

the pleading standards required by the Supreme Court and the Fifth Circuit.

Plaintiffs' state law claims also fail as a matter of law.  The state antitrust claims fail for

the same reasons discussed above, and the consumer protection claims collapse for multiple

reasons, including Plaintiffs' failure to plead a representation that was inaccurate, deceptive, or

misleading.  The Complaint's girth cannot mask these failings.

## FACTUAL BACKGROUND

### I.    The Parties

Plaintiffs are twenty-four individuals residing in thirteen different states, each alleging

that he or she reserved a room at one or more of the Hotel Defendants' properties through one of

the OTC Defendants' websites.  (CAC ¶¶ 13-36.)  Plaintiffs' alleged hotel room reservations

span from April 2008 until April 2013.  (*Id.*)

Defendants are twenty-two separate entities headquartered across the United States and

Europe.  They include (i) twelve hotel chains—the "Hotel Defendants"—that own hotels,

manage or operate hotels, and/or license their brands to hotels that offer rooms for rental, (*id.* ¶¶

47-58), (ii) nine OTCs—the "OTC Defendants"—that operate Internet websites and call centers

that facilitate, among other things, hotel room reservations by consumers, (*id.* ¶¶ 37-45),[2] and

---

[2] Defendant Sabre Holdings Corporation is identified as an "OTC Defendant," which it is not.
Rather, a subsidiary of Sabre Holdings Corporation operates a global distribution system
("GDS"), which is a computerized reservation network that connects content suppliers (such as
airlines, hotels, and car rental firms) with travel agents (online and offline) and travel
management companies (organizations that provide specialized travel related services to the
corporations).  A GDS does not interact directly with consumers.  Likewise, the Expedia, Inc.

(continued…)

4

(iii) EyeForTravel, Ltd., a travel industry news company headquartered in the United Kingdom, which is alleged to have "sponsor[ed] conferences in the United States" (*id*. ¶¶ 60, 86-103).[3] The Complaint fails to identify as putative co-conspirators any of the thousands of independent hotels or the many other hotel chains, or travel agents (online or offline) that also facilitate room reservations.

## II.   Summary of the Complaint's Allegations

### A.   The Emergence of OTCs Has Promoted Comparison Shopping, Price Transparency, and Interbrand Hotel Competition.

Hotels offer room reservations through a variety of distribution channels in addition to their own websites. These channels include the websites of OTC Defendants, other online sites (including those that specialize in travel and those that do not), travel management companies, traditional brick-and-mortar travel agencies, and other advertising sources such as newspapers and magazines. Some of these distribution channels are exclusively online, but many are a mixture of online, telephone, and in person. Out of all these distribution channels, the Complaint focuses exclusively on the rates published by OTCs for non-package online hotel room reservations where the identity of the hotel is disclosed before the reservation is booked.[4]

---

(continued…)

and Orbitz Worldwide, Inc. entities named in the Complaint are holding companies and not direct providers of OTC bookings.

[3] As reflected in the Complaint, EyeforTravel is not a travel agency or a hotel, and Plaintiffs do not include it in their definitions of "Online Travel Agency Defendants" or "Hotel Defendants." (CAC ¶¶ 46, 59, 60.)

[4] Some OTCs offer what is called "opaque" services, where the identity of the hotel is not known to the customer until the booking is complete. The customer foregoes knowing the exact name of the hotel in exchange for special discounted rates. The Complaint's definition of the class excludes transactions made through such opaque services.

Plaintiffs allege that online reservations are a relatively "new distribution channel," resulting in "huge efficiency gains" for consumers.  (CAC ¶ 3.)  As the Complaint concedes, online booking websites "permit travelers to easily search many different hotel types and locations," and enable consumers to "comparison shop" and "evaluate different properties."  (*Id.* ¶¶ 3, 139.)  By visiting any one of the many travel search websites, consumers can quickly compare hotel pricing and amenities across locations, brands, and properties.

Consumers' ability to efficiently locate and compare different hotel offerings through OTC websites and other distribution channels has resulted in exponentially increased interbrand competition among competing hotels.  This is amply demonstrated by the charts in the Complaint itself, which show hotel room prices ranging from $56 to $525 on a given day, varying within a given city (*e.g.*, hotel rooms in Dallas shown at $74, $120, $279, $159, $139, $259, $149), and even across the same hotel brand (*e.g.*, Hilton pricing shown at $185, $459, $139, $99, $129, $339).  (*See id.* ¶ 128.)

These charts show nothing suggesting any agreement (actual or alleged) among competing hotels to fix the prices of hotel rooms across brands.  Lacking support for such a claim, the Complaint's focus is instead on the alleged requirement of "rate parity":  that a hotel makes the ***same*** room reservation available at the ***same*** rate for the ***same*** night through all of its online distribution channels.  (*Id.*)  In other words, Plaintiffs object to the fact that a particular Hotel Defendant allegedly lists the same room rate for the same hotel room reservation on a given night, whether the room is booked through the hotel's own website or through an OTC website.

1.    The Models Through Which OTCs Facilitate Hotel Bookings.

The Complaint alleges that hotels and OTCs structure their distribution relationships "through several different business models," three of which it purports to explain:

6

- *Agency Model or Retail Model*:  a fee-based model, whereby Plaintiffs allege that an OTC "charge[s] a 'service fee' to hotel operators" for facilitating a reservation, but "the consumer pays the hotel for the room directly" (CAC ¶ 67);[5]

- *Merchant Model*:  under this model, Plaintiffs allege that there are "two independent but related transactions"—one between the hotel and the OTC, and a second between the OTC and the consumer (*id*. ¶ 68); and

- *Wholesale Model*:  whereby Plaintiffs allege "smaller price-cutting online travel agencies obtain access to rooms through wholesalers … at a wholesale rate." (*Id*. ¶ 69.)  Plaintiffs allege that "[t]he online travel agencies then, like in the Merchant Model, re-sell the rooms to consumers at higher retail, keeping the difference as profit." (*Id*.)

Plaintiffs' claims—based on allegedly anticompetitive RPM and "rate parity" agreements (*see id*. ¶ 1)—appear directed at only the "Agency" and "Merchant" models.  The Complaint does not include any claim for bookings made through the "Wholesale Model." (*Id*. ¶¶ 69, 149-50.)

### 2.    The Alleged Conspiratorial Agreements.

Although far from clear, the Complaint appears to plead three distinct but interrelated "conspiracies" to establish and enforce allegedly unlawful RPM and "rate parity" (MFN) provisions in the distribution agreements between individual Hotel and OTC Defendants.  (CAC ¶¶ 1-2.)

*First,* the Complaint's central theory is that the bilateral distribution agreements between individual pairs of Hotel and OTC Defendants are unlawful RPM and MFN agreements.  Plaintiffs do not plead the terms of or identify any specific bilateral distribution agreement, but rather generalize the terms of a "typical" agreement:

> A typical RPM agreement between an online travel agency and a hotel provided at least two restrictive terms.  First, the Hotel would agree that it would establish the 'Best Available Rate' or 'Lowest Rate' for a non-packaged room and publish

---

[5] For instance, Booking.com runs solely an agency model hotel reservation platform.

> that rate.  That published rate was the price the internet travel agency could use
> when selling rooms to consumers.  The second restrictive term provided that the
> published rates offered by the Online Travel Agency Defendants would be as
> favorable as the published rate offered to (a) any online travel agency competitor
> and (b) the rates published on the internet site operated by the hotel itself.

(*Id.* ¶ 77.)

*Second,* Plaintiffs assert a horizontal conspiracy among the OTC Defendants to "exact" RPM agreements from hotels in order to "protect their market power."  (*Id.* ¶ 4; *id.* ¶ 73 (alleging that the "incumbent" OTC Defendants were "motivated to implement an illegal RPM scheme to combat new or more efficient internet retailers"); *see also id.* ¶¶ 74, 117.)

*Finally,* Plaintiffs assert that "[d]uring the period late 2003 and 2004," the OTC Defendants and the Hotel Defendants "entered into an industry-wide agreement to not compete among each other based on price discounts off their published website room prices."  (*Id.* ¶ 76.) In other words, Plaintiffs appear to assert that the OTC Defendants and Hotel Defendants banded together to adopt RPM and "rate parity" terms in their separate distribution agreements, which served to set a price floor for a given room's published rate across all online booking channels. (*Id.*)  The beginning date of the claimed conspiracy is alleged to be "unknown," and the Complaint is unclear whether the conspiracy resulted from "an express or tacit agreement."  (*Id.* ¶¶ 75-79.)  The Complaint does not allege that the Hotel Defendants agreed among themselves to fix the prices of rooms across different hotels or that the purported RPM scheme affected other distribution outlets such as travel management companies, brick-and-mortar travel agents, or other online travel search and comparison sites.

The Complaint also does not identify any communications or meetings among the alleged conspirators to these purported conspiracies.  Plaintiffs point only to a series of travel industry trade conferences—produced by Defendant EyeForTravel and attended by, among others, representatives from airlines, GDSs, hotels, online and offline travel agencies, and graduate

school professors—where presentation agenda items referred to "rate parity" and maintaining "consistency across . . . distribution channels." (*See id.* ¶¶ 87-100.)

While the Court need not reach the issue to grant the motion, the Complaint also reveals that Plaintiffs misrepresent the discussion at the EyeforTravel conferences in a futile effort to bolster their claims. Specifically, the Complaint asserts that a conference included discussion of (in Plaintiffs' words) "tactics 'for restriction of free pricing.'" (*Id.* ¶ 91.) But the Complaint then quotes the actual agenda topic, which was "RM strategies for ***restriction free pricing***" or pricing free of restrictions. (*Id.*) (emphasis added). Further, the Complaint alleges that the panel featured speakers from airlines, not hotels. (*Id.*)

3.    Certain Defendants' Advertisements of Rate Guarantees.

Plaintiffs assert that certain Defendants' advertisement of "best price" or "low price" guarantees is deceptive because Defendants knew their price was "the ***only*** price available even among competitors."[6] (CAC ¶ 130.) The "guarantees" pled in the Complaint make no representations about how the published rates are set and only alert consumers that the published rates are as low as any other rate offered online. (*Id.* ¶¶ 130-32.) The *Orbitz Low Price Guarantee* is illustrative: "If you book a qualifying prepaid hotel rate on the Orbitz Website, and then find the same room, in the same hotel, for the same dates, at a lower price online, before taxes and fees, we'll refund the difference and give you a $50 discount on a future hotel booking." (*Id.* ¶ 130(e).) Plaintiffs do not allege that this representation was untrue or that Orbitz (or any other Defendant) breached its offer. Instead, Plaintiffs merely assert that these advertisements are somehow "illusory." (*Id.* ¶ 224.)

---

[6] Plaintiffs do not allege that Sabre or EyeforTravel advertised rate guarantees.

B.       The Putative Class Members' Claims for Relief

Plaintiffs assert antitrust and state consumer protection claims based on the alleged "overcharges" they suffered from these so-called rate parity agreements and the allegedly misleading "best price" or "low price" guarantees.  They purport to bring these claims on behalf of a putative nationwide class and justify their ten-plus year class period because Defendants "fraudulently conceal[ed]" the rate parity provisions.  (CAC ¶¶ 149-50; 161-62.)

Plaintiffs plead the following specific Counts:  (i) violation of 15 U.S.C. § 1, asserting that "the uniform adoption and enforcement of 'rate parity' and Most Favored Nation clauses by the [OTC] Defendants is a horizontal *per se* price fixing agreement" (*id*. ¶ 169); (ii) violation of 15 U.S.C. § 1 (agreements to unreasonably restrain trade), which Plaintiffs bring "in the alternative if the conduct at issue [in Count I] is not a *per se* violation" (*id*. ¶ 179); (iii) violation of the antitrust laws of twenty-five states and the District of Columbia (*id*. ¶¶ 195-220); and (iv) violation of the consumer protection laws of thirty-seven states and the District of Columbia (*id*. ¶¶ 223-225).

## ARGUMENT

To state a Section 1 violation under the Sherman Act, a plaintiff must allege:  (1) an agreement, conspiracy, or combination among two or more independent business entities; (2) that is intended to harm or unreasonably restrain competition; and (3) that actually causes injury to competition.  *See* 15 U.S.C. § 1; *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs.*, 200 F.3d 307, 312 (5th Cir. 2000).

A complaint may not merely recite the elements of the cause of action.  "To survive a motion to dismiss, a complaint must contain sufficient ***factual matter***, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (emphasis added)).  "'Labels

and conclusions' . . . will not do." *Twombly*, 550 U.S. at 555. "'[N]aked assertion[s]' devoid of 'further factual enhancement'" are no better. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see also Vendever LLC v. Intermatic Mfg. Ltd.*, No. 3:11-CV-00201-B, 2011 WL 4346324, at *7 (N.D. Tex. Sept. 16, 2011) (Boyle, J.) ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." (quoting *Twombly*, 550 U.S. at 557)); *Home Health Licensing Specialists Inc. v. Leavitt*, No. 3:07-CV-2150-B, 2008 WL 4830543, at *9 (N.D. Tex. Nov. 7, 2008) (Boyle, J.) (dismissing Sherman Act conspiracy claim where the complaint included "no facts alleging a conscious commitment to anything").

## I.     **The Allegations Are Consistent with Fierce Interbrand Competition.**

The Complaint makes one thing absolutely clear:  consumers seeking to book a room in any given city, on any given night, have a vast number of options from which to choose, based on brand, location, room size, and price.  Stripped of its conclusory assertions, the Complaint contains allegations that are wholly consistent with intense competition, not any plausible antitrust violation.  *See Twombly*, 550 U.S. at 557.  The twelve pages of charts included in Plaintiffs' Complaint illustrate the competitive options offered by hotels:

| Brand | City | Date | Room | Rate |
|---|---|---|---|---|
| Country Inn & Suites, (by Carlson) | Boston | June 8-9 | One King | $ 101.14 |
| Comfort Inn & Suites Boston /Airport | Boston | June 8-9 | One Queen Suite | $ 189.00 |
| Ramada Inn Boston | Boston | June 8-9 | One Queen | $ 199.00 |
| Westin Boston Waterfront | Boston | June 8-9 | Traditional King | $ 224.10 |
| Best Western University Hotel | Boston | June 8-9 | Double-Double | $ 249.00 |
| Hyatt Regency Boston | Boston | June 8-9 | One King | $ 269.00 |
| InterContinental Boston | Boston | June 8-9 | Deluxe One King (City View) | $ 336.00 |
| Hilton Boston Back Bay | Boston | June 8-9 | Standard King | $ 339.00 |
| Marriott Boston Copley Place | Boston | June 8-9 | Water view Room | $ 449.00 |
| Super 8 Chicago Northlake O'Hare South | Chicago | June 8-9 | One King | $ 56.09 |
| Hilton Rosemont Chicago O'Hare | Chicago | June 8-9 | One King | $ 99.00 |
| JW Marriott Chicago | Chicago | June 8-9 | One King/Two Double | $ 289.00 |
| Hotel Monaco Chicago (Kimpton) | Chicago | June 8-9 | King Deluxe | $ 329.00 |
| Trump International Hotel & Tower Chicago | Chicago | June 8-9 | Deluxe King | $ 525.00 |

| Comfort Inn & Suites Miami Airport | Miami | June 8-9 | One King | $ 95.95 |
| Country Inn & Suites by Carlson Miami Kendall | Miami | June 8-9 | One King | $ 103.00 |
| InterContinental at Doral Miami | Miami | June 8-9 | King Deluxe | $ 119.00 |
| Days Inn - Miami International Airport | Miami | June 8-9 | One King | $ 119.00 |
| Hilton Miami Airport | Miami | June 8-9 | One King | $ 129.00 |
| Best Western Atlantic Beach Resort | Miami | June 8-9 | One King | $ 139.50 |
| Doral Golf Resort & Spa Miami (Trump) | Miami | June 8-9 | One King | $ 159.00 |
| Hyatt Regency Miami | Miami | June 8-9 | One King | $ 169.00 |
| Four Points by Sheraton Miami Beach | Miami | June 8-9 | Standard King | $ 179.00 |
| JW Marriott Marquis Miami | Miami | June 8-9 | Deluxe Room | $ 212.00 |

It is therefore unsurprising that in the eighty-plus pages of the Complaint, there is not a *single* allegation that Defendants conspired to fix interbrand room prices. In short, the Complaint concedes the intense competition among hotels in pricing and marketing their individual product lines, which is the kind of interbrand competition that the antitrust laws are designed to protect. *See Leegin I*, 551 U.S. at 890; *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 52 n.19 (1977) ("[W]hen interbrand competition exists . . . it provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product."). Plaintiffs' inability to allege facts indicating reduced interbrand competition across the hotel industry underscores the implausibility of their conspiracy allegations, which fail under *Twombly*.

## II.     Intrabrand Restrictions on Distribution Channels Are Permitted To Help Suppliers Promote Interbrand Competitiveness.

To compete effectively against other hotels, each hotel must find a way to market its rooms to travelers inundated with information and choices. As the Complaint acknowledges, hotels use a variety of sales channels to reach potential guests. (CAC ¶ 139.) The Supreme Court has recognized that, to protect and enhance the paramount competition between a seller and its competitors, the seller must carefully manage how its offerings are sold across various distribution channels (*i.e.*, "intrabrand"). *See Leegin I*, 551 U.S. at 890 (observing that

restrictions on distributors, including "[m]inimum resale price maintenance, can stimulate interbrand competition—the competition among manufacturers selling different brands of the same type of product—by reducing intrabrand competition—the competition among retailers selling the same brand" (citing *Sylvania*, 433 U.S. at 51–52)).

Accordingly, the antitrust laws permit a seller to harmonize its distribution networks to avoid "free-riding" and "undercutting" by discounters, and to motivate the sales effort. *See id.* at 890 (concluding that sellers may enter into vertical agreements to "stimulate interbrand competition" even if the use of those agreements "tends to eliminate intrabrand price competition"). Indeed, courts regularly find that these so-called "vertical restraints" have *procompetitive* effects (for example, the sales force may offer other non-price benefits and services and work harder to beat the interbrand competition). *See id.*; *see also Sylvania*, 433 U.S. at 55 (explaining how vertical restrictions overcome free-rider effects and encourage retailers to "invest[] in capital and labor" and "engage in promotional activities"); *Bus. Elecs. Corp.*, 485 U.S. at 724 ("[Vertical restraints have] real potential to stimulate interbrand competition, 'the primary concern of antitrust law.'" (quoting *Sylvania*, 433 U.S. at 52 n.19)); *324 Liquor Corp. v. Duffy*, 479 U.S. 335, 341-42 (1987) ("[A] vertical restraint imposed by a **single** manufacturer or wholesaler may stimulate interbrand competition even as it reduces intrabrand competition.").

As the Complaint alleges, the advent of the Internet has provided hoteliers with yet another distribution platform for their arsenal—one with tremendous efficiencies and transparency that enhances the already fierce pricing competition between hotels. (*See* CAC ¶ 3 ("Making hotel reservations via the internet allowed consumers great advantages, including being able to comparison shop by seeking the lowest price being offered by different hotels as

13

well as by different online travel agencies.").)  However, with this increased transparency, and access to information about *all* brands in a one-stop shop ("simply on a click of the finger" (*id.* ¶ 4)), it became even more important for each hotel to manage its distribution networks to ensure consistency in how its product was being presented to the market.

The OTC Defendants are a subset of this enhanced distribution platform for hoteliers. OTCs operate much like the brick-and-mortar travel agencies that have been serving the same function for decades—as a conduit for hotels to market their rooms to travelers.  Accordingly, just as they do with traditional travel agents and as acknowledged by the Complaint, hotels control the prices for their rooms, and their distributors make those rooms available to consumers.  (*See id.* ¶ 77.)  OTCs enable consumers to "online shop" for the city, location, room-type, and rate that they want, with the offerings of many hotel brands in plain view.  (*See, e.g., id.* ¶¶ 3, 66.)  Like an open-air market, each hotel must show its wares in a manner most likely to convince the consumer that its offering is the best.

Plaintiffs' allegations demonstrate that whatever intrabrand limitations an individual hotel implemented regarding its distribution channels have not curtailed the intense competition *among* hotels, especially on price.

## III.   The Complaint Does Not Plead Facts Sufficient to Indicate Any Unlawful Vertical Agreement Between Any Hotel and Any Distributor.

Plaintiffs plead the existence of purportedly unlawful vertical RPM and MFN agreements between individual Hotel and OTC Defendants.  These allegations fail as a matter of law.  *First*, Plaintiffs do not plead the facts necessary to indicate a "resale" by any OTC of any hotel room. *Second*, even assuming that the bilateral agreements between individual hotels and OTCs *were* RPM and MFN agreements, Plaintiffs fail to plead facts sufficient to state a claim under the rule of reason, the analytical framework applied to these types of vertical agreements.

14

A.      **Plaintiffs' RPM Allegations Fail Because the Complaint Does Not Adequately Allege a "Resale" Under the Antitrust Laws.**

As the name suggests, a "resale" is a fundamental, material element of a resale price maintenance claim.  Plaintiffs' legal theory attempts to portray the hotel industry as a traditional retail distribution model, such as a Best Buy or Target reselling electronics goods manufactured by Sony or Panasonic.  In those examples, retailers (1) purchase a product from a manufacturer or wholesaler; (2) maintain an inventory of the product; (3) bear the risk of loss if the product is not resold; and (4) set the product's ultimate sales price.  This is not what happens with the online distribution of hotel room reservations, where a hotel, and only a hotel, bears the risk of loss if the rooms are not rented each night.  Plaintiffs allege no facts to the contrary.

Under the antitrust laws, a hotel can lawfully set a price and require its consignee, broker, or agent to quote that price.  *See United States v. Gen. Elec. Co.*, 272 U.S. 476, 482-85 (1926) (affirming dismissal of a bill in equity against company that set the prices for its distributors' sale of lamps in consignment arrangement); *Valuepest.com of Charlotte, Inc. v. Bayer Corp.,* 561 F.3d 282, 288 (4th Cir. 2009) ("If one of the benefits of manufacturing a good is to set the price by which it is sold, then it is only sensible not to deprive the manufacturer of its right if, for reasons of efficiency, it chooses to use agents that are loyal to it rather than employees."); *Ill. Corporate Travel, Inc. v. Am. Airlines, Inc.*, 806 F.2d 722, 729 (7th Cir. 1986) ("[T]he manufacturer or supplier has the same uninhibited power to set the agent's price that he has to set the price to be charged by an employee.").

Courts do not rely on the labels used by the parties or a plaintiff in determining whether a particular distributor acts as a reseller under the antitrust laws.  *See Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1224 (8th Cir.1987) ("[W]e are bound neither by [the parties'] characterization of the distributor relationship, nor by language in the distributorship contract disclaiming [agency

status] . . . ."); *see also Simpson v. Union Oil Co.*, 377 U.S. 13, 16 (1964) (finding resale arrangement despite parties' designation of Simpson as an agent and agreement as one of "consignment"); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (finding "independent dealers" to be in a relationship of "genuine agency" for the purposes of assessing (and affirming dismissal of) RPM claim).[7]  Rather, courts look to whether the distributor takes on the economic risks associated with a resale, such as maintaining an inventory and bearing the financial risk of loss of the product until the product is delivered.  As the court in *Ryko* summarized:

> If a distributor deals with his supplier as an 'independent businessman' who bears most or all of the risks on transactions with purchasers, then an agency or consignment agreement is ineffective to insulate the manufacturer from antitrust liability for fixing resale prices.  However, where the manufacturer bears the financial risks of transactions with the customers . . . it is likely that the distributor is merely an agent for the manufacturer.

823 F.2d at 1223 (citations omitted).

Plaintiffs fail to state a claim of any unlawful RPM agreement because they do not allege facts indicating that the OTC Defendants take on the economic risks of a reseller of hotel rooms under either the "Agency Model" or the "Merchant Model" referenced in the Complaint.[8]  (CAC ¶¶ 67-68.)

---

[7] Courts recognize that the term "agent" has many different meanings under the law.  *E.g.*, BLACK'S LAW DICTIONARY 64–65 (7th ed. 1999) (listing more than 30 different types of "agents").  Whether a company is an "agent" turns on the analysis required under the specific applicable law.  Compare *Illinois Corporate Travel*, 806 F.2d at 726 (explaining that travel companies are agents rather than resellers under antitrust law because they do not assume the risk of loss from the product) with *City of Columbus, Ohio v. Hotels.com, L.P.*, 693 F.3d 642, 649 (6th Cir. 2012) (affirming dismissal of a tax liability complaint finding that travel companies did not qualify, under tax ordinance terms, as a "managing agent" because they are not hotel proprietors, do not operate, own, or maintain hotels, and do not "perform the functions" of an operator or proprietor).

[8] Although the Complaint discusses three OTC "business models," the RPM assertions appear limited to the "Agency Model" and the "Merchant Model."  (*See* CAC ¶¶ 70, 73.)  The Complaint does not allege which models applied to any of the Plaintiffs' purported bookings.

1.     The "Agency Model" Transactions Cannot Constitute RPM.

The law is well-settled that there is no resale (and therefore no RPM) when a principal instructs its agent on the price of the principal's product.  *Gen. Elec. Co.*, 272 U.S. at 485 (no RPM when company set prices for its distributors' sale of lamps in consignment relationship); *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430, 1437 (7th Cir. 1986) (antitrust laws "allow a seller to tell his sales agents what price to charge"; thus, defendant could set prices for food broker); *see also Ozark Heartland Elecs., Inc. v. Radio Shack*, 278 F.3d 759, 763 (8th Cir. 2002) (holding no resale and therefore no RPM claim); *Trane U.S. Inc. v. Meehan*, 563 F. Supp. 2d 743, 751 (N.D. Ohio 2008) (dismissing RPM claim for failure to plead facts supporting a resale).

The Complaint's allegations confirm that there is no resale when a consumer books a room under the "Agency Model."  The Complaint alleges that OTCs function "merely as service providers collecting a fixed transaction fee from the hotels" for facilitating a customer's booking of a room.  (CAC ¶ 68.)  The "[OTC] Defendants charge a 'service fee' to hotel operators on a transaction basis for booking customers into rooms at a given hotel, and the consumer pays the hotel for the room directly."  (*Id.* ¶ 67.)  These allegations confirm that hotels maintain control over room inventory and solely bear the risk of loss for rooms that are not booked on a given night.  Plaintiffs allege no facts to the contrary.  Indeed, the Complaint does not even make a conclusory allegation of a resale under the Agency Model.

The Seventh Circuit's decision in *Illinois Corporate Travel*, rejecting RPM claims related to airline control of prices quoted by travel agents, is on all fours.  806 F.2d at 726.  In *Illinois Corporate Travel*, the court concluded that travel service operators were not "re-sellers" for antitrust purposes—because they bore "no risk of unfilled seats or of the many problems from

mechanical difficulties to weather, that may make the airline unable to deliver transportation as promised."[9] *Id.* at 725. Similarly here, even as pled, the economic substance of the transaction under the Agency Model confirms the Hotel Defendants (not the OTCs) control room inventory and bear the risk of unfilled rooms. Thus, "[i]n both substance and form," an OTC never engages in a resale in booking a room under the Agency Model, and there can be no RPM claim. *Ryko Mfg. Co.*, 823 F.2d at 1224 ("In both substance and form, Eden acts as Ryko's agent in effecting purchase order sales between Ryko and the NAP customers, and Ryko therefore cannot be held liable for fixing the price of equipment so sold.").

> ### 2.   The Complaint Fails to Allege Facts Indicating that the OTCs Resell Rooms Under the "Merchant Model."

Plaintiffs' allegations fare no better under the "Merchant Model." There are no ***factual*** allegations indicating that the economics relevant to whether a resale occurs are any different under the "Merchant Model" than under the "Agency Model."

Nor could there be. According to the Complaint, the only difference in the economic substance between the two models is that the OTCs collect payment from the consumer under the "Merchant Model." (*See* CAC ¶¶ 67-68, 72.) Even accepting Plaintiffs' characterization of these models, the law is clear that the mere collection of payments by a distributor (here, the OTCs) instead of the supplier (here, the hotels) does not alter the economic substance of the

---

[9] As Judge Easterbrook further observed in *Illinois Corporate Travel*, "[t]he relation of travel agent to airline is not substantially different from the relation of broker to real estate owner, of brokerage house to investor, or of travel agent to hotel, rental car company, or other provider of travel services." *Id.* at 725; *see also Valuepest.com*, 561 F.3d at 290 ("In this inquiry, courts have considered most important how business risks were allocated between the parties."); *Advantage Tel. Directory Consultants v. GTE Directories Corp.*, 849 F.2d 1336, 1346 (11th Cir. 1987) (finding no resale where "publisher retains the 'risk' that not enough yellow pages advertisements will be 'distributed'").

transaction, nor constitute a "resale" for purposes of antitrust analysis.  For example, the Supreme Court found no resale by the distributor in *General Electric Co.* even though the distributor collected payments from customers for lamps and remitted the net amount due to GE. 272 U.S. at 482.  *See also Valuepest.com*, 561 F.3d at 293-94 (rejecting allegations of RPM even where distributor billed customers); *Marty's Floor Covering Co. v. GAF Corp.*, 604 F.2d 266, 269 (4th Cir. 1979) (concluding that distributor billing did not transform manufacturer's pricing to consumer into RPM).

More fundamentally, the Complaint alleges no facts indicating that the OTCs bear any of the economic risks for unsold rooms of a reseller under the "Merchant Model."  For instance, it does not allege (nor could it) that hotels cede control over their inventory (the hotel rooms) until the room is provided to the consumer.  *See, e.g.*, *Ill. Corp. Travel*, 806 F.2d at 725 (travel service operators do not hold inventory of seats, so "[t]ravel service operators do not resell air travel"); *Trane*, 563 F. Supp. 2d at 751 ("In practice . . . the analysis often focuses on which party bears most or all of the risk on the transactions with purchasers.") (citing cases).  This failure to allege facts indicating that OTCs bear the financial risk of loss from unsold hotel rooms is fatal to any RPM claim.  *See, e.g.*, *Kowalski v. Chi. Tribune Co.*, 854 F.2d 168, 170, 172 (7th Cir. 1988) (finding no resale where newspaper distributors did not bear risk of lost newspapers or nonpayment by subscribers); *Ad-vantage Tel. Directory Consultants*, 849 F.2d at 1346-47 (finding no RPM where yellow pages advertising sales representatives did not bear risk that sufficient advertisements would be sold to make directory profitable).

The Eleventh Circuit's decision in *Day v. Taylor* is instructive.  In *Day*, the plaintiffs brought RPM claims against U-Haul for setting the prices at which its "independent dealers" rent

U-Haul equipment.  400 F.3d at 1276.  In affirming the district court's dismissal of the RPM

claims on a motion to dismiss, the court made several observations pertinent here:

- Whether U-Haul's independent dealers were reselling U-Haul equipment was a "question of law which depends on the nature of that relationship."

- The court was "not bound by the legal conclusions in the complaint" about the nature of the relationship between U-Haul and its independent dealers.

- "Because U-Haul continues to bear the costs of ownership of the equipment, it can fairly be said to retain ownership of that equipment."

*Id. at* 1277-78.  Under the facts alleged in the Complaint, the OTCs in this case do not resell

hotel rooms any more than the U-Haul dealers resold U-Haul equipment.

Nor can Plaintiffs salvage their RPM claim with the conclusory assertion that, under the

"Merchant Model," each OTC "first purchases and takes title to inventories of hotel rooms . . .

and (ii) then re-sells the rooms to consumers . . . ."  (CAC ¶ 68.)  A complaint "devoid of any

factual allegations supporting [plaintiffs'] formulaic recitation of at least one of the legal

elements" is insufficient under *Twombly.  Berry v. Indianapolis Life Ins. Co.,* 600 F. Supp. 2d

805, 814-15 (N.D. Tex. 2009) (Boyle, J.); *see also Twombly*, 550 U.S. at 545 (Plaintiffs are

"'obligat[ed] to provide the 'grounds' of [their] 'entitle[ment] to relief' [which] requires more

than labels and conclusions"); *Norris v. Hearst Trust,* 500 F.3d 454, 464 (5th Cir. 2007) ("A

naked allegation of conspiracy or agreement, without more specific factual allegations, is not to

be accepted as sufficient to state a claim under Section 1 of the Sherman Act . . . To withstand a

Rule 12(b)(6) motion, the complaint must allege 'more than labels and conclusions' . . . .").

Plaintiffs provide no factual allegations in support of this naked assertion of a transfer of title to OTCs.[10]

Moreover, even if title did pass, the result is the same where the OTC does not bear the risk of loss associated with a resale transaction. "The lesson of *Simpson* is that locus of title is not itself a sufficient basis on which to determine antitrust liability." *Ryko Mfg. Co.*, 823 F.2d at 1227 (citing *Simpson,* 377 U.S. at 21-22). Rather, "[t]he real issues are whether [the distributor] bears significantly greater economic risks" of the kind associated with a resale. *Id.*; *see also Murray Biscuit Co.*, 797 F.2d at 1436 ("Passage of title has lost its magic in commercial law; why should it retain it in antitrust law?") (citation omitted); *Marty's Floor Covering Co.*, 604 F.2d at 269 (concluding that even where "there was perhaps a technical transfer of title," plaintiff failed to adequately allege resale because defendant controlled and quoted prices and product was delivered directly by defendant). Because the Complaint does not and cannot plead facts demonstrating a resale under the antitrust laws, the RPM claims must be dismissed.

**B.    Plaintiffs' RPM and MFN Allegations Fail Under the Rule of Reason.**

Even if Plaintiffs could plead a factually-supported claim of vertical "resale" price maintenance, the Complaint still would fail as a matter of law.

Neither the alleged RPM nor the alleged MFN provisions restrict ***inter***brand price competition, and they are analyzed under the rule of reason. The Supreme Court in *Leegin* held

---

[10] While the Court need not reach the issue here, the conclusory allegation that, under the Merchant Model, an OTC "first purchases and takes title to inventories of hotel rooms at negotiated rates," and "then re-sells the rooms to consumers at higher retail [prices], keeping the difference as profit," (CAC ¶ 68), is at odds with several recent court decisions which have examined this model in detail. *See, e.g.*, *City of Goodlettsville v. Priceline.com, Inc.,* 844 F. Supp. 2d 897, 907 (M.D. Tenn. 2012) ("[T]he evidence demonstrates that OTCs do *not* purchase or take title to hotel rooms and do not pay the hotels before a booking is made.") (emphasis in original).

that the rule of reason, not the *per se* rule, applies to a Section 1 claim based on an alleged RPM agreement.[11]   Similarly, MFNs are also evaluated under the rule of reason and uniformly have been found to be procompetitive.[12]   *See Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) (stating that MFNs are "the sort of conduct that the antitrust laws seek to encourage.  It is not price-fixing.").  Indeed, no court reaching the merits of a claim has *ever* held an MFN to be anticompetitive.  *See* ABA Section of Antitrust Law, Antitrust Law Devs. I 223 (7th ed. 2012) (noting that "[c]ourts have not found MFN provisions to be illegal"). This case is no exception.  Even as alleged, nothing in the provisions prevents a hotel from lowering the price of its rooms on its own website and across its distribution channels to compete against other hotel brands.  Here, the Complaint alleges no facts indicating that the RPM or MFN clauses are anything but commonplace provisions benefiting consumers.

These claims cannot survive a motion to dismiss unless a plaintiff alleges, among other things, (1) an unreasonable restraint of trade, (2) in a legally sufficient relevant antitrust market.

---

[11] Since *Leegin*, **every** federal court to consider antitrust claims challenging RPM agreements has applied the rule of reason.  *See, e.g.*, *PSKS, Inc. v. Leegin Creative Leather Prods.*, 615 F.3d 412, 415-17 (5th Cir.  2010) ("*Leegin II*"); *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1333-34 (11th Cir. 2010); *ValuePest.com*, 561 F.3d at 287; *Rick-Mik Enters. v. Equilon Enters.*, 532 F.3d 963, 975-76 (9th Cir. 2008); *New England Carpenters Health Benefits Fund v. McKesson Corp.*, 573 F. Supp. 2d 431, 435 (D. Mass. 2008); *Spahr v. Leegin Creative Leather Prods., Inc.*, No. 2:07-CV-187, 2008 WL 3914461, at *8 (E.D. Tenn. Aug. 20, 2008); *Vaughn Med. Equip. Repair Serv., LLC v. Jordan Reses Supply Co.*, No. 10-00124, 2010 WL 3488244 at *1, *16-17, *20 (E.D. La. Aug. 26, 2010).

[12] MFN commitments are commonplace features of arms-length contracts and have been found to be procompetitive because they help the buyer receive the lowest price that the seller chooses to offer for a given product.  *See Marshfield Clinic*, 65 F.3d at 1415; *see also Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101, 1110 (1st Cir. 1989) ("[The alleged MFN provision] was a bona fide policy to ensure that Blue Cross would not pay more than any competitor paid for the same services. . . . [S]uch a policy of insisting on a supplier's lowest price—assuming that the price is not 'predatory' or below the suppliers' incremental cost—tends to further competition on the merits . . . .").

*See Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (affirming dismissal of Sherman Act claim for failure to properly allege a plausible relevant market and the existence of anticompetitive effects within that relevant market).  Plaintiffs make neither allegation here.

The critical first step in any rule of reason analysis is defining a relevant market, because a court assesses the competitive effects of a challenged agreement within that relevant market. *Apani Sw., Inc. v. Coca-Cola Enterps.*, 300 F.3d 620, 627 (5th Cir. 2002); *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 307 (5th Cir. 1997).  A legally sufficient relevant market includes both "the relevant product and geographic markets."  *Leegin II*, 615 F.3d at 417.  A court must dismiss a claim where a plaintiff "fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor."  *Leegin II*, 615 F.3d at 417-18 (citing *Apani Sw.*, 300 F.3d at 628).[13]

Plaintiffs must also allege facts indicating "that the defendant[s'] activities, on balance, adversely affected competition in the ***appropriate*** product and geographic markets."  *Apani Sw.*, 300 F.3d at 627 (emphasis added).  This requires Plaintiffs to plead facts that support their theory of competitive harm and show that one or more defendants possessed market power in the

_____

[13] Other courts have also dismissed challenges to vertical restraints on this basis.  *See, e.g.*, *Jacobs*, 626 F.3d at 1336 (affirming dismissal for failure to define relevant market); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-39 (3d Cir. 1997) (same); *Spahr*, 2008 WL 3914461, at *11 (dismissing complaint for failure to allege absence of interchangeable substitute products in the proposed market); *Bldg. Materials Corp. of Am. v. Rotter*, 535 F. Supp. 2d 518, 525 (E.D. Pa. 2008) (granting motion to dismiss for failure to define relevant market where market definition as pleaded was a "legal conclusion couched as a factual allegation" (internal quotations and citations omitted)).

relevant market and were therefore able to harm the competitive process.  *See Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292, 298 (5th Cir. 1981); *Leegin II*, 615 F.3d at 418.

Plaintiffs ignore this important starting point and offer only insufficient, general allegations of a subset of Defendants' shares in a "market" different from that pled in their Complaint.

1.   <u>No Alleged Facts Support the Existence of a Plausible Product Market.</u>

Plaintiffs define their relevant product market as "the direct online sale of hotel room reservations, which includes bookings through any of the Defendants' websites."  (CAC ¶ 138.) This purported market is legally insufficient because it ignores the myriad other distribution channels and methods available to consumers seeking to book a hotel room.[14]   Despite acknowledging that at least 40% of U.S. room reservations are made through alternate channels not subject to the alleged RPM or MFN provisions, (*see id*. ¶ 138), Plaintiffs make no attempt to address these alternative channels, including specifically why significant numbers of hotel consumers would not turn to them if they were unhappy with the terms offered through online channels.[15]

Plaintiffs' efforts to gerrymander a relevant product market including only those booking channels challenged in their Complaint misses the mark.  The relevant question is whether other channels are reasonable substitutes for these online channels.  The Fifth Circuit rejected a similar

---

[14] Plaintiffs' conclusory assertion that some undefined group of consumers might prefer online distribution channels is insufficient to render this market plausible.  Plaintiffs do not allege facts to support the suggestion that no significant number of consumers would switch to other distribution channels in the face of an anticompetitive price increase.

[15] The Complaint alleges "unique" characteristics to justify its product market, (*see* CAC ¶ 139), but then excludes distribution firms that possess those same characteristics, such as brick-and-mortar travel agencies, while at the same time including individual hotel websites that lack those characteristics.  These inconsistencies are unexplained.

24

attempt to limit a proffered market to products distributed only by "independent retailers" (excluding national retail chains) and found that plaintiffs had "not alleged facts that could establish why independent retailers do not compete with larger chain stores in the distribution of . . . products." *Leegin II*, 615 F.3d at 418. Likewise here, Plaintiffs allege no facts to justify artificially limiting the alleged relevant market to online distribution channels, excluding other channels that facilitate reservations for the same hotel rooms.

2.   Plaintiffs' Proposed Geographic Market Is Implausible and Lacks Any Supporting Facts.

The Complaint also alleges a geographic market—"the United States" (CAC ¶ 144)—that is unsupported by facts and that does not "correspond[] to the commercial realities" of the hotel industry. *See Apani Sw.*, 300 F.3d at 626, 628-29 (affirming dismissal for failure to plead a plausible geographic market). Plaintiffs do not allege a single fact to support their allegation of a national market, and that alone is sufficient to warrant dismissal of their rule of reason claim. Moreover, it is hard to imagine a product more subject to local, rather than national, supply and demand than a hotel room. A consumer seeking a hotel room in Dallas will not view a hotel room in New York as an adequate substitute. In addition, not all Hotel Defendants compete in all of the varying local markets, which reflect a range of different competitive factors, including the presence of independent hotels and different shares of online and offline sales.

Plaintiffs' failure to plead a geographic market that is tied to the commercial realities of the hotel industry requires dismissal of their RPM and MFN allegations. *See Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 733-35 (6th Cir. 2008); *Total Benefits Planning Agency Inc. v. Anthem Blue Cross & Blue Shield*, 630 F. Supp. 2d 842, 852 (S.D. Ohio 2007) (dismissing complaint alleging the geographic market for health insurance as the "area of Indiana, Ohio, and Kentucky").

3.   Plaintiffs Fail to Allege Facts Showing that Any Defendant Possesses
Market Power in the Alleged Relevant Market.

The Complaint also fails to plead facts indicating that **any** Defendant has market power in the alleged relevant market.  *See Leegin II*, 615 F.3d at 418 ("A market-power screen is thus compatible with *Leegin* and our precedent."); *Muenster Butane, Inc.*, 651 F.2d at 298 (holding that a plausible allegation of "substantial market power" is a "preliminary hurdle in all restricted distribution (vertical restraint) cases").   Absent market power, any alleged artificial price increase relating to any single hotel room would lead only to that hotel losing sales to its competitor hotels.  *See R.D. Imports Ryno Indus., Inc. v. Mazda Distribs. (Gulf), Inc.*, 807 F.2d 1222, 1225 (5th Cir. 1987) ("Without market power, a competitor can do nothing to diminish competition.") (citation omitted).

Proof of market power typically begins with a showing of substantial market share.  *See Cranfill v. Scott & Fetzer Co.*, 773 F. Supp. 943, 953 (E.D. Tex. 1991).  The Complaint purports to define the relevant product market as "the direct online sale of hotel room reservations, ***which includes bookings through any of the Defendants' websites***."  (CAC ¶ 138.) (emphasis added)  There are **no** allegations of the shares of any Defendant or any group of Defendants within the alleged market.  Nor is there any allegation of the share of any Hotel Defendant in any market segment whatsoever.  Instead, the Complaint alleges individual shares for three OTC Defendants (as well as an estimate for the OTC Defendants as a whole) in a segment—the "online travel agencies hotel room market"—that is different from the market that has been alleged.  In sum, the Complaint names twenty-two Defendants but does not allege the market share of any Defendant or group of Defendants within the alleged market, and even when it presents irrelevant shares, it does so for a small subset of Defendants.

Moreover, the share allegations in the Complaint are flawed because they are not local. The purpose of the market power inquiry is to determine whether any Defendants have the power to increase the price of hotel rooms above a competitive level in a defined market area. To make this determination, any alleged market power must be measured at the local level because that is where the Defendants would be tested by competitive alternatives (*e.g.*, a consumer looking for a room in Dallas would not compare rates for rooms in New York City). The Complaint does not allege market shares for any Defendant in any local area.

Plaintiffs' failure to allege any facts sufficient to meet the market-power screen for the alleged market warrants dismissal of their RPM and MFN allegations. *See Leegin II*, 615 F.3d at 418-19 (affirming dismissal where Plaintiff failed to plead market power); *Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 769 (S.D. Miss. 1992) (finding dismissal appropriate where a "complaint fails to allege a specific figure representing the percentage of market share held by" any defendant), *aff'd* 986 F.2d 1418 (5th Cir. 1993).

In sum, the lack of alleged facts to support a rule of reason claim means that Plaintiffs' antitrust challenge to the RPM and MFN provisions should be dismissed. *See Leegin II*, 615 F.3d at 419-20.

## IV.    The Complaint's Fanciful Assertions of Purported OTC-Centered and "Industry-wide" Conspiracies Fall Short of the Required Pleading Standard.

Having demonstrated with their pricing charts the absence of any conspiracy to fix prices across hotels, and unable to support illegality in the vertical agreements between individual hotels and OTCs, Plaintiffs strain to manufacture an antitrust claim by alleging two separate and inconsistent agreements. Plaintiffs first assert that the OTC Defendants conspired, leveraging their "substantial market power" to "impose" and "enforce" RPM and MFN agreements on the Hotel Defendants. (CAC ¶¶ 5, 6, 73-76.) They then assert, albeit with even less clarity, that the

Hotel and OTC Defendants conspired to adopt the same RPM and MFN agreements that they allege were already in place from the first asserted conspiracy.[16]   (*Id.* ¶ 79.)   It is facially implausible that there would be two separate conspiracies to accomplish the same result.   If, as alleged, the OTCs conspired and imposed RPM and MFN provisions on the Hotel Defendants, there would be no reason for either the Hotel Defendants or the OTC Defendants to enter a separate conspiracy.   Put simply, in one of these alleged conspiracies, hotels are the victims.   In the other, hotels are participants.   This incoherence flows from the lack of any alleged facts to support either asserted conspiracy.

### A.    The Complaint's Allegations of a Horizontal Conspiracy Among the OTC Defendants To Impose Rate Parity on the Hotels Fail as a Matter of Law.

The allegations of a purported "horizontal" conspiracy among the OTC Defendants are deficient.   Plaintiffs assert that, in order to protect their margins, the "incumbent" OTC Defendants were "motivated to implement an illegal RPM scheme to combat new or more efficient internet retailers."   (CAC ¶¶ 5, 73.)   In other words, Plaintiffs posit that the OTC Defendants banded together to "exact agreements" from hotels to impose "rate parity" so that smaller OTCs were precluded from gaining a foothold in the market by offering a lower room rate on their websites.   (*Id.* ¶ 73.)   Absent from these allegations are ***facts*** from which such a conspiratorial agreement may be established directly or plausibly inferred.   "A general allegation of conspiracy . . . without a statement of the facts constituting the conspiracy, is a mere

---

[16]  One example of the lack of clarity of the Complaint is the fact that it alleges that the OTC/hotel conspiracy resulted from either "an express or tacit" agreement.   (CAC ¶ 79.)   As the Supreme Court has explained, Section 1 of the Sherman Act requires more than a "tacit" agreement.   Situations in which competitors undertake parallel conduct by reacting to each other in the marketplace—so-called "tacit collusion"—do not violate Section 1.   *Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993).

allegation of a legal conclusion and is inadequate of itself to state a cause of action." *Home Health Licensing Specialists,* 2008 WL 4830543, at *9 (quoting *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 273 (5th Cir. 1979)); *accord Twombly,* 550 U.S. at 556-557 ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").

1.    There Are No Facts Suggestive of a Horizontal Agreement.

Plaintiffs do not meet their burden of pleading direct and/or circumstantial facts that plausibly support the existence of an illegal agreement among competitors. *See Twombly*, 550 U.S. at 556. In fact, the Complaint does not identify a single communication or meeting between any of the allegedly conspiring OTC Defendants. Plaintiffs offer no facts regarding *who* reached *what* agreement with *whom*, or even *when* any agreement between OTC Defendants was allegedly reached and *how* it was carried out. Rather, Plaintiffs provide only a theory as to *why* the OTC Defendants may have been "motivated" to conspire, and then offer little more than the allegation that, in "late 2003 and 2004," the OTC Defendants began entering into so-called "RPM agreements" with major hotel chains and the Hotel Defendants. (*See* CAC ¶¶ 73, 75-76, 169.)

At most, the Complaint alleges an "opportunity" to conspire by pointing to a set of travel industry trade conferences that Plaintiffs allege were attended by representatives from the OTC Defendants (among many others). (*Id.* ¶¶ 80-103.) Plaintiffs allege that Defendants used these industry conferences "[t]o facilitate and maintain the agreements" and allowed Defendants to "openly discuss pricing strategies including the 'need to use rate parity' and to do so 'in all channels.'" (*Id.* ¶ 80.)

Courts uniformly hold, however, that mere opportunity for competitors to meet, including at trade industry events, provides insufficient facts to render an alleged agreement plausible. *See*

*7-UP Bottling Co. v. Archer Daniels Midland Co. (In re Citric Acid Litig.)*, 191 F.3d 1090, 1098
(9th Cir. 1999) ("Gathering information about pricing and competition in the industry is standard
fare for trade associations," and "[i]f we allowed conspiracy to be inferred from such activities
alone, we would have to allow an inference of conspiracy whenever a trade association took
almost any action.").   Indeed, "[a]ttendance at industry trade shows and events is presumed
legitimate and is not a basis from which to infer a conspiracy, without more."   *In re Graphics
Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007).[17]

There is not a single allegation that any (let alone all) of the OTC representatives actually
attended any specific meeting, or an allegation regarding what they discussed, let alone that any
or all reached an agreement.   Plaintiffs' vague references to sign-up lists and agendas (some of
which the Complaint misrepresents) highlight the deficiency of their allegations.

> 2.   Conclusory Allegations of "Parallel Conduct" by the OTC Defendants
>      Provide No Basis for Inferring a Conspiracy.

The Complaint's conclusory allegations of purportedly "parallel" conduct by the OTC
Defendants are also insufficient to state a claim.   (CAC ¶¶ 76-77 (alleging that, in "late 2003 and
2004," the OTC Defendants began entering into so-called "RPM agreements" with major hotel
chains, and that those agreements were similarly structured).)

---

[17] *See also In re Nat'l Ass'n of Music Merchs.*, MDL No. 2121, 2012 WL 3637291, at *2 (S.D.
Cal. Aug. 20, 2012) (holding that attendance at trade shows is "normal business activity, and
doesn't imply any kind of illegality"); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896,
911 (6th Cir. 2009) (attendance at industry conferences "is more likely explained by
[defendants'] lawful, free-market behavior"); *Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495
F.3d 46, 53 (3d Cir. 2007) ("We have previously noted that proof of opportunity alone is
insufficient to sustain an inference of conspiracy . . . ."); *Williamson Oil Co. v. Philip Morris
USA*, 346 F.3d 1287, 1319 (11th Cir. 2003) (noting that it had previously "unambiguously held"
that "the mere opportunity to conspire among antitrust defendants does not, standing alone,
permit the inference of conspiracy" (internal quotations and citations omitted)).

To support an inference of the existence of an agreement, allegations of parallel conduct must be "placed in a context that raises a suggestion of a preceding agreement," and plaintiffs must allege "additional facts that 'ten[d] to exclude independent self-interested conduct as an explanation for defendants' parallel behavior.'" *Twombly*, 550 U.S. at 552, 557 (citation omitted)*; see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) (holding that allegations of parallel conduct, such as similar contractual language, do not constitute plausible grounds to infer a conspiracy). Absent those allegations, the Complaint must be dismissed. *See Rio Grande Royalty Co. v. Energy Transfer Partners*, 786 F. Supp. 2d 1190, 1199 (S.D. Tex. 2009) (dismissing Section 1 claim because plaintiff failed sufficiently to allege facts showing the absence of independent action among defendants and their natural gas customers); *In re Nat'l Ass'n of Music Merchs.*, 2012 WL 3637291, at *2 (dismissing Section 1 claim and holding that attendance at trade shows and "independent responses to public advocacy without an agreement, even if consciously parallel to other entities' activity," is simply permissible, parallel conduct).

First, the Complaint does not identify when any—let alone all—of the OTC Defendants actually entered into an "RPM Agreement" with any hotel, whether those agreements were staggered or done all at once, or any facts related to the negotiations or terms of any OTC Defendant's individual vertical distribution agreement with a hotel supplier. The Complaint also fails to explain how, if at all, this purportedly "parallel" conduct is tied to the EyeforTravel conferences—the sole "opportunity" alleged for the OTC Defendants to have conspired.[18]

---

[18] The EyeforTravel industry conferences referenced in the Complaint are alleged to have taken place in May 2004, October 2005, October 2006, an unspecified date in 2007, and October 2008—long after this purportedly "parallel" conduct began. (*See* CAC ¶¶ 87, 90, 94, 97, 99.) Notably, only two OTC Defendants are even alleged to have attended the May 2004 conference. (*Id.* ¶ 87.)

Second, as set forth above, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice" to survive a motion to dismiss. *Twombly*, 550 U.S. at 556. Allegations of parallelism—even "conscious parallelism" (*i.e.*, when firms are alleged to have knowledge that others in the industry are pursuing similar strategic courses)—are insufficient to support a viable claim. *Id*. at 553-54. Plaintiffs must provide factual allegations that rise to the level of a persuasive "plus factor" because "without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." *Id*. at 557. Plaintiffs' sparse circumstantial allegations that the OTC Defendants adopted RPM and MFN provisions in their separate hotel supply agreements, at unspecified intervals over a two-year period, is a near textbook example of insufficient pleading.

The Complaint fails to provide any context or factual allegation suggestive of a preceding, underlying agreement among the OTC Defendants. Instead, Plaintiffs ask the Court to infer a conspiracy from the allegation that "all the [OTC] Defendants have the same clause in most or all of their contracts with the Hotel Defendants." (CAC ¶ 7.) Courts have rejected this very type of allegation, recognizing that "one cannot plausibly infer a horizontal agreement among [competitors] from the mere fact that each . . . entered into a similar . . . agreement" with other industry participants. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327 (3d Cir. 2010). These kinds of allegations "evince[] nothing more than a series of vertical relationships." *Id*.; s*ee also In re Elevator Antitrust Litig.*, 502 F.3d at 51. That is especially true where the claimed agreements were adopted over a multi-year period, as Plaintiffs allege. Indeed, that "'refute[s] rather than support[s]' allegations of conspiracy." *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007) (citation omitted); *see also In re LTL Shipping Servs. Antitrust Litig.*, No. 1:08-MD-01895-WSD, 2009 WL 323219, at *17-18 (N.D. Ga. Jan.

32

29, 2009) (refusing to infer agreement where price changes occurred over a "far too broad" multi-year period).

Finally, Plaintiffs ignore "obvious alternative explanation[s]," for the existence of similar contractual provisions. *Twombly*, 550 U.S. at 567. In *Leegin*, for example, the Supreme Court identified the desire to encourage investment and to prevent free riding by others as legitimate, unilateral reasons for adopting vertical, intrabrand restrictions, such as the RPM and MFN provisions alleged here. 551 U.S. at 891-92. Indeed, the addition of these contractual provisions to individual vertical hotel-OTC supply agreements is just as suggestive of independent and rational business judgment as it is of any underlying conspiracy. And conduct that is "in line" with "rational and competitive business strategy unilaterally prompted by common perceptions of the market" is not suggestive of a conspiracy. *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013) (quoting *Twombly*, 550 U.S. at 554). This is true regardless of whether a defendant "knew" its competitors were engaging in similar conduct. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987) (citation omitted).

3. <u>Plaintiffs Lack Antitrust Standing to Challenge a Horizontal Agreement Among the OTC Defendants To Impose "Rate Parity" on Hotels.</u>

Even had Plaintiffs adequately pled a horizontal agreement among the OTCs (which they have not), Plaintiffs lack standing to challenge such an agreement under the antitrust laws. In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 540-44 (1983) ("*AGC*"), the Supreme Court set forth the analytical framework for determining whether a plaintiff has standing to pursue an action under the antitrust laws, requiring the examination of "such factors as (1) whether the plaintiff's injuries or their causal link to the defendant are speculative, (2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative

recoveries, or complex damage apportionment." *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1341 (5th Cir. 1988) (citing *AGC*).

Plaintiffs lack antitrust standing to challenge the alleged horizontal agreement among the OTCs because the alleged purpose of that conspiracy was to force the hotels to accept RPM and MFN provisions in their distribution agreements. Leaving aside for the moment that the claim lacks merit, under this theory, it is the hotels and not consumers who would be the "proper plaintiffs." *Id.*

Courts in similar situations have held that consumers lack antitrust standing because of the indirectness of the alleged harm, the risk of multiple lawsuits, duplicative recovery, and complex damage apportionment. For example, in *Campos v. Ticketmaster Corp.*, 140 F.3d 1166 (8th Cir. 1998), the plaintiffs used Ticketmaster as an intermediary in purchasing concert tickets from third-party concert promoters, just as the Plaintiffs here allegedly used the OTCs to book hotel rooms. Like Plaintiffs here, the plaintiffs in *Ticketmaster* "claimed standing to sue based on their payment of monopoly overcharges, in the form of service and handling fees, for Ticketmaster's distribution services." *Id.* at 1168. The Eighth Circuit held that, although Ticketmaster collected the fees from consumers for facilitating the transaction, it was the third-party venues or concert promoters (not the consumer plaintiffs) who would have standing to assert such a claim. *Id.* at 1169-70. The Court further held that the consumer plaintiffs were "indirect purchasers," who lacked standing under *Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977).[19] *See also In re Public Offering Antitrust Litig.*, No. 98 Civ. 7890, 2004 WL 350696, at *2 (S.D.N.Y. Feb. 25, 2004) (finding that plaintiffs, purchasers of securities through underwriters,

---

[19] The district court below held that the plaintiffs lacked standing under *AGC* as well. *See Campos,* 140 F.3d at 1168. The Eighth Circuit did not reach that issue.

did not have standing to challenge allegedly "fixed" underwriter fees because they did not participate in the underwriting services market); *McCarthy v. Recordex Service, Inc.*, 80 F.3d 842, 845, 849 (3d Cir. 1996) (concluding that, even if the entire overcharge is borne by the plaintiff consumer, antitrust standing is not appropriate if the overcharge was the result of an antecedent transaction).

Furthermore, Plaintiffs have not plausibly alleged (*i.e.*, other than with conclusory assertions), that they would actually be harmed, directly or indirectly, by the conduct alleged in the Complaint. Instead, the Complaint makes clear that competition exists across hotels and any asserted injury by Plaintiffs would be inherently and impermissibly speculative under *AGC*, providing an independent reason why Plaintiffs lack standing.

The Court in *Ticketmaster* addressed this issue and concluded that the price to attend the concert, which included the "actual purchase price of concert tickets … and the cost of the [Ticketmaster] service fees," would not have been affected by "Ticketmaster's domination of ticket distribution," because in the absence of that domination, a venue "would be able to charge that price itself," which was "obviously a price that the market will bear . . . ." 140 F.3d at 1172. As in *Ticketmaster*, Plaintiffs here allege that the hotels set the price that consumers pay (CAC ¶ 77), which is "obviously a price that the market will bear." Indeed, Plaintiffs allege that the "retail rates" on hotels' own websites, which do not rely on the services of an OTC (whether at competitive or inflated prices) are "virtually identical" to the "retail rates" on the OTCs' websites. (*Id.* ¶ 7.) To paraphrase the Eighth Circuit, the only effect then of any alleged conspiracy among the OTCs, would be to induce the hotels to "cede to [the OTCs] a portion of that price in the form of supracompetitive service fees." *Campos*, 140 F.3d at 1172. In these circumstances consumers, including Plaintiffs, lack antitrust standing given the speculative

nature of the harm asserted.  *See also In re Ticketmaster Corp. Antitrust Litig.*, 929 F. Supp.

1272, 1277-78 (E.D. Mo. 1996) (rejecting consumer claims against Ticketmaster as speculative

and presenting complex apportionment of damages issues), *rev'd on other grounds by Campos*,

140 F.3d 1166.

### B.    There Are No Facts Alleged That Plausibly Support the Existence of an "Industry-Wide" Conspiracy Among the Hotel and OTC Defendants.

Plaintiffs allege a distinct, but contradictory, conspiracy in which the Hotel Defendants

were participants.   At its core, Plaintiffs' Complaint attempts to spin separate, bilateral

distribution agreements into an overarching, "industry-wide" conspiracy among all of the Hotel

and OTC Defendants.  This theory is equally deficient.  *See, e.g., Futurevision Cable Sys.*, 789 F.

Supp. at 772-73 (dismissing alleged industry-wide conspiracy based on similar vertical contracts

and other parallel conduct as "not grounded in well-pleaded facts" and "far too general").

### 1.    The Complaint's Allegations of "Parallel Conduct" Fail to Plead a Conspiracy.

"Without more, parallel conduct does not suggest conspiracy, and a conclusory

allegation of agreement at some unidentified point does not supply facts adequate to show

illegality."   *Twombly*, 550 U.S. at 556-57.    Thus, Plaintiffs' allegation of an

"industry-wide RPM scheme" cannot rely on the allegation that the Hotel Defendants entered

into similar agreements with their distributors regarding how to price their rooms.  But, Plaintiffs

have alleged no other facts even suggesting an agreement among the Hotel Defendants, and the

notion of any such agreement is inherently implausible.   The conclusory allegations of an

industry-wide conspiracy therefore fail to support Plaintiffs' claim.  *Schafer v. State Farm Fire

& Cas. Co.*, 507 F. Supp. 2d 587, 596 (E.D. La. 2007) (holding that, in the absence of factual

allegations "which set forth that the parallel conduct is a result of a conspiracy," there is no

reason to infer an agreement among defendants) (citing *Twombly*); *Corr Wireless Commc'ns,*

*LLC v. AT&T, Inc.*, 893 F. Supp. 2d 789, 801 (N.D. Miss. 2012) ("Independent parallel conduct, or even conduct among competitors that is consciously parallel, does not alone establish the contract, combination, or conspiracy required by § 1.").

As noted above, an inference of conspiracy from parallel conduct is unwarranted where, as here, the Complaint alleges conduct "that could just as well be independent action."  As the Supreme Court has explained, it is ordinary and rational for sellers to set their own prices and require that their distributors not undercut them in the marketplace.  *See Leegin I*, 551 U.S. at 890-92.  Parallel pursuit of such legitimate self-interest by suppliers, such as the Hotel Defendants, cannot support an inference of conspiracy or an "industry-wide RPM scheme." (CAC ¶ 5.)

Plaintiffs concede that each hotel had an independent economic incentive to utilize the additional distribution platform provided by the OTCs.  (*Id.* ¶¶ 71, 73.)  In that sense, Plaintiffs' allegations of an industry-wide conspiracy involving horizontal agreements at two levels of commerce are similar to the claims the Third Circuit rejected in *In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010).  In *Insurance Brokerage*, the plaintiffs alleged that the brokers colluded with the insurers, from whom they had demanded, and obtained, similar vertical agreements that provided the brokers with contingent commissions in exchange for steering clients to the insurers.  *Id.* at 311.  The plaintiffs also alleged that the insurers entered into a horizontal agreement not to compete with each other for the brokers' business.  *Id.* at 312-13.  The Third Circuit, however, held that because the plaintiffs had alleged that the insurers were largely dependent on the brokers for access to the brokers' pools of clients, each insurer had an independent incentive to enter into a strategic partnership with a broker.  *Id.* at 327-28.

As a result, the allegedly similar, vertical agreements did not permit the inference of a horizontal agreement among insurers. *Id.*

Here, Plaintiffs' allegation that hotels and OTCs entered into similar distribution agreements is plausibly explained by each party's independent economic interest and Plaintiffs must allege facts that "tend[] to exclude the possibility of [such] independent action." *Twombly*, 550 U.S. at 554; *see supra,* at 33. Plaintiffs, however, have failed to do so.

> 2. <u>Plaintiffs Do Not Allege Facts That Support the Existence of an Industry-Wide Conspiracy Among Hotels and OTCs.</u>

Because mere allegations of parallel conduct are not enough, Plaintiffs must allege additional facts for their claims to survive under *Twombly*. *See* 550 U.S. at 552. Plaintiffs fail to do so. For example, just as with the OTC conspiracy allegation, the Complaint does not identify a single communication or meeting between any of the allegedly conspiring Hotel and OTC Defendants. Nor does it identify ***how*** or ***when*** these Defendants supposedly agreed among themselves to adopt RPM agreements, or plead with any specificity the parameters and scope of their purported "conspiracy." At most, the Complaint alleges an "opportunity" to conspire by pointing to the same set of EyeforTravel industry conferences that fail to support the alleged OTC conspiracy. (CAC ¶¶ 80-103.) But, again, there is not a single allegation that any specific hotel or OTC representative met or discussed anything improper at these travel industry conferences, let alone that all reached some conspiratorial agreement. As explained above, the "mere opportunity" for competitors to meet, including at trade industry events, is insufficient to render an agreement plausible. (*See supra*, at 30.)

Plaintiffs' allegations are particularly ineffective here because the conferences at the center of the purported "conspiracy" are alleged to have addressed business practices for hotels to compete more effectively against other hotels. (CAC ¶¶ 85-103.) For example, the

supposedly conspiratorial meetings are alleged to have concerned methods by which individual hotels could successfully manage revenue "across all [their] distribution channels" (*id.* ¶¶ 88, 93), and strategies for individual hotels to price their hotel rooms (*id.* ¶ 91), with the goal to "convey a clear brand message" for the hotel's own brand (*Id.* ¶ 97). These allegations are consistent with unilateral, competitive behavior on the part of ***individual hotels***, and cannot form the basis of a legally-sufficient allegation of conspiracy.[20]

Likewise, Plaintiffs offer no facts regarding EyeforTravel sufficient to raise a plausible inference that EyeforTravel had "a conscious commitment to a common scheme designed to achieve an unlawful objective" with the other Defendants. *Home Health Licensing Specialists*, 2008 WL 4830543, at *9 (internal quotations omitted). Nor do Plaintiffs allege facts that tend to exclude "independent self-interested conduct" as the explanation for EyeforTravel's claimed actions. *Twombly*, 550 U.S. at 557. Plaintiffs admit that part of EyeforTravel's business is producing "conferences in the United States for senior executives in the online travel industry." (CAC ¶ 60.) It is hardly sufficient to infer a conspiracy from engaging in one's own business.

---

[20] Those deficiencies are underscored by Plaintiffs' broad assertion of an agreement among all "Hotel Defendants and the Online Travel Agency Defendants" (CAC ¶ 79) while making only minimal references to many of the individual Defendants. The new Complaint adds a number of new Hotel Defendants, but mentions them only briefly—for example, Choice Hotels and its franchisees (7 paragraphs), Carlson Hotels (7 paragraphs), and Best Western International (6 paragraphs)—and fails (as it does with all Defendants) to allege facts indicating that they were part of the asserted industry-wide conspiracy. Conclusory allegations, no matter the number, are insufficient to meet their burden to allege facts indicating that each alleged participant made a "'conscious commitment to a common scheme.'" *Futurevision Cable Sys.*, 789 F. Supp., at 773 (dismissing complaint where conspirators were not referenced individually, and one alleged conspirator was only mentioned once in the complaint) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984)).

3.   An Alleged Conspiracy Between Hotels and OTCs to Eliminate Price
     Competition Is Economically Implausible.

The implausibility of Plaintiffs' allegations is underscored by the nonsensical economics that would be implicated by such an industry-wide conspiracy. Hotels have no incentive to maintain or elevate the margins of OTCs, which are a distribution cost for the hotels. The Complaint offers no explanation for why hotels would conspire for the purpose of decreasing their own margins by preventing the erosion of OTC margins as asserted in the Complaint. (*See* CAC ¶¶ 74, 117.) Firms do not conspire to make themselves worse off.

Courts reject Section 1 conspiracy cases at the motion to dismiss stage when they allege an implausible conspiracy. Indeed, in *Twombly*, the Supreme Court stated that, even where plaintiffs allege facts ***consistent*** with conspiracy, they must allege facts "plausibly suggesting . . . agreement" among the purported co-conspirators. 550 U.S. at 557. Here, Plaintiffs have failed in the first step of showing consistency and have not even approached plausibility. *See Jacobs*, 626 F.3d at 1342-43 (concluding that plaintiffs must "present allegations showing why it is more plausible that [a manufacturer] and its distributors—assuming they are rational actors acting in their economic self-interest—would enter into an illegal price-fixing agreement (with the attendant costs of defending against the resulting investigation) to reach the same result realized by purely rational profit-maximizing behavior"); *Cascades Computer Innovation LLC v. RPX Corp.*, No. 12-CV-01143-YGR, 2013 WL 316023, at *11-12 (N.D. Cal. Jan. 24, 2013) ("Where the facts alleged in the complaint demonstrate that an alleged conspiracy makes no economic sense, the claim must be dismissed."). The economic incoherence of Plaintiffs' allegations confirms the failure of the Complaint to allege facts sufficient to support the existence of the asserted industry-wide conspiracy.

### C.      Allegations Relating to European Investigations Do Not Make Plausible the Existence of a Conspiracy in the United States.

In lieu of allegations demonstrating the existence of an agreement, Plaintiffs cite to ongoing investigations by the U.K. Office of Fair Trading ("OFT") and Switzerland's Competition Commission.  (CAC ¶¶ 134-36.)  Neither of these allegations supports the existence of the horizontal conspiracies alleged here.

According to the Complaint, the OFT's investigation concerns the separate actions of *a single hotel company* and two OTCs,[21] not some industry-wide scheme between OTCs and hotels, and relates to conduct outside the United States.  Moreover, the OFT does not apply the rule of reason to vertical price agreements as required under U.S. law.  Instead, it follows the rigid European precedent of subjecting vertical price agreements to "de facto *per se* illegality."[22] Plaintiffs themselves have distinguished between the OFT proceeding and the U.S. litigation: "[T]he OFT investigation was about prices and conduct in Europe, not in the United States."  *See* Supplemental Response of Hagens Berman Sobol Shapiro LLP and Stanley Iola LLP Regarding Class Counsel Appointments, at 3 (Feb. 28, 2013) (Dkt. 42).

Similarly, Plaintiffs' vague allegations that Switzerland's Competition Commission announced that "it was investigating Booking.com, a subsidiary of Priceline, Expedia and Hotels.com," and that the Commission suspected an unspecified "illegal restraint" (CAC ¶ 136),

---

[21] *See* CAC ¶ 134; *OFT issues Statement of Objections against Booking.com, Expedia, and InterContinental Hotels Group*, Office of Fair Trading, (July 31, 2012) http://www.oft.gov.uk/news-and-updates/press/2012/65-12 ("OFT Statement").

[22] Am. Bar Assoc., Joint Comments Of The American Bar Association Section Of Antitrust Law And Section Of International Law On The Proposal Of The European Commission For A Revised Block Exemption Regulation And Guidelines On Supply And Distribution Agreements (2009) at 24, *available at* http://apps.americanbar.org/intlaw/leadership/policy/Comments%20for %20website_eur.pdf (criticizing European competition law for not following more lenient rule of reason approach under U.S. law).

do not create an inference of a vast, industry-wide conspiracy.  Plaintiffs make no attempt to demonstrate the relevance of the initiation of a narrow investigation in Switzerland to the claims alleged in this private suit in the United States.[23]

In any event, as numerous courts have held, allegations of foreign investigations do not provide a basis for inferring a conspiracy affecting the United States.  *See, e.g.*, *In re Elevator Antitrust Litig.*, 502 F.3d at 52 ("Without an adequate allegation of facts linking transactions in Europe to transactions and effects [in the United States], plaintiffs' conclusory allegations do not 'nudge[ their] claims across the line from conceivable to plausible.'" (quoting *Twombly*, 550 U.S. at 570)).  Plaintiffs' bare allegations of "British revelations" and the Swiss Competition Commission investigation—allegations which suggest nothing more than the commencement of an investigation, not that there has even been a violation—likewise fail to suggest the plausibility of the alleged industry-wide antitrust conspiracy in the United States.

## V.      The Complaint Fails to Plead a Claim Under State Antitrust Laws.

Plaintiffs allege that Defendants violated unspecified provisions of the antitrust laws in 25 states and the District of Columbia.  Each of these 26 jurisdictions uses federal precedent to interpret that jurisdiction's antitrust laws.[24]  Accordingly, Plaintiffs' state antitrust claims fail for the same reasons that their federal antitrust claims fail.[25]

---

[23]  The allegations regarding European investigations are entirely irrelevant as to defendant Kimpton, which does not operate any hotel properties in the United Kingdom or Europe.

[24]  *See* App. 1-2 (Chart A).  Even if *Leegin I* were not controlling, Plaintiffs' failure to plead facts sufficient to show a "resale" by the OTC Defendants is fatal to their antitrust claims under any of the states' laws.

[25]  In addition, there is no named plaintiff associated with eighteen jurisdictions whose laws the Plaintiffs invoke:  (1) Arizona, (2) the District of Columbia, (3) Kansas, (4) Maine, (5) Michigan, (6) Minnesota, (7) Mississippi, (8) New Mexico, (9) New Hampshire, (10) North Carolina, (11) North Dakota, (12) Oregon, (13) South Dakota, (14) Tennessee, (15) Utah, (16) Vermont, (17) (continued…)

VI.     **Plaintiffs Fail to Plead Viable Consumer Protection Claims.**

The Complaint's ancillary claims under various states' consumer protection laws, based on Defendants' alleged use of "best price" or "lowest price" advertisements to alert consumers that their published rates are as low as any other rate offered online, also fail.  (CAC ¶¶ 130-32.) The Complaint concedes that "there were no lower prices" available and that "no other competitor would offer a lower or better price."  (*Id.* ¶¶ 224, 78.)  Plaintiffs also fail to plead the distinct elements of different states' consumer protection statutes, and dismissal is appropriate.[26]

A.     **Plaintiffs Attack as "Deceptive and Misleading" Statements That They Otherwise Acknowledge To Be Accurate.**

Plaintiffs acknowledge these advertisements were true, and do not allege that any Defendant breached its promised guarantee.  (CAC ¶¶ 224, 78.)  Indeed, the allegation that the prices offered were the lowest available price constitutes the core of Plaintiffs' antitrust case. The Complaint thus makes clear on its face that the named plaintiffs got *exactly* what they were purportedly promised—the best or lowest price available online.   Plaintiffs suggest that, nevertheless, these assurances are misleading because they somehow represent that the price was not a "fixed price" or a "price that was the same as that offered by all other Online Travel Agency Defendants and the hotel itself."  (*Id.* ¶ 11.)  That makes no sense—the "best" or

---

(continued…)

West Virginia, and (18) Wisconsin.  Plaintiffs lack standing as to these states' antitrust laws. *See, e.g., In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 157 (E.D. Pa. 2009) (dismissing for lack of standing state antitrust claims for states where no plaintiff resides); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1026-27 (N.D. Cal. 2007) (same).

[26] For the Court's convenience, attached is a table identifying why dismissal is appropriate as to each of the consumer protection statutes alleged in the complaint.  App. 3 (Chart B).

"lowest" price assurances do not imply anything about how the prices are set;[27] rather, these statements merely provide assurance to the customer that the prices offered on that particular Defendant's website are at least as low as any other published price, and then provide a remedy to the consumer if the price quoted cannot meet that assurance.[28]  (*Id.* ¶ 11.)

Accordingly, there is no "deceptive or misleading" statement, and Plaintiffs have failed to state a claim under **any** consumer protection statute.  *See, e.g., Whiting v. AARP*, 701 F. Supp. 2d 21, 29-30 (D.D.C. 2010) (dismissing consumer protection claim where reasonable consumer would not have been misled because alleged misrepresentation accurately described defendants' health plan).[29]

### B.    Plaintiffs Cannot Plead Any Injury That Resulted From Defendants' "Best Price" or "Low Price" Guarantees.

While the elements of the consumer protection laws differ significantly from state to state, all of the state consumer protection statutes invoked by Plaintiffs require them to allege and prove a causal connection between Defendants' allegedly deceptive guarantees and the harm each plaintiff suffered.[30]   There must be a causal link between a plaintiff reading a price guarantee and his or her alleged injury.  *See Martinelli v. Petland, Inc.*, No. CV-09-529-PHX-

---

[27] Nor do Plaintiffs even allege that any of them understood the guarantees as implying anything of this nature.

[28] Moreover, there are no allegations that any Defendant failed to honor its guarantee, so there is no support for Plaintiffs' assertion that the guarantees "were illusory." (*See* CAC ¶ 224.)

[29] *See also Saucier v. Countrywide Home Loans*, 64 A.3d 428, 442 (D.C. 2013) ("[A] reasonable consumer generally would not deem an accurate statement to be misleading, and hence, such statement generally would not be actionable" under the D.C. statute); *Gephardt v. Mortgage Consultants, Inc.*, Civ. No. JFM-10-1537, 2011 WL 531976, at *3 (D. Md. Feb. 8, 2011) ("It is not deceptive to require consumers to depend upon the timely disclosed, truthful information . . . .").

[30] *See* App. 4 (Chart C.)

DGCI, 2010 WL 376921, at *8 (D. Ariz. Jan. 26, 2010) ( "[P]roximate causation is an essential element of claims brought under state consumer protection statutes.").  Plaintiffs do not allege any facts indicating that their injuries resulted from best price guarantees, or that they even read such guarantees in the first place.

Instead, Plaintiffs merely assert that, "[a]s a result of" the alleged misrepresentations, they "did not receive the best price or lowest price and were injured."  (CAC ¶ 225.)  This type of conclusory assertion fails under *Twombly*.  *See Martinelli*, 2010 WL 376921 at *8 (dismissing various consumer protection claims because statement that "Plaintiffs suffered damage '[a]s a direct result of the deceptive practices of the Defendants' fraudulent scheme'" did not adequately allege causation); *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Gorbey ex rel. Maddox v. Am. Journal of Obstetrics & Gynecology*, 849 F. Supp. 2d 162, 165-66 (D. Mass 2012) (dismissing complaint "because plaintiffs have not demonstrated a causal relationship between the defendants' allegedly unfair or deceptive acts and the plaintiffs' claimed injury").  These allegations also fail to meet *Twombly* and *Iqbal*'s plausibility threshold because the Complaint concedes that there were no "lower or better price[s]."  (*See* CAC ¶¶ 78, 224.)

    **C.**    **Plaintiffs' Wholesale Invocation of Statutes from Thirty-Eight Jurisdictions Is Deficient as a Matter of Law.**

Plaintiffs' state law claims also fail because the Complaint does not even attempt to allege the varying elements of the consumer protection statutes of the thirty-eight different jurisdictions.  *See In re Grand Theft Auto Video Game*, 251 F.R.D. 139, 147 (S.D.N.Y. 2008) ("Most of the courts that have addressed the issue have determined that the consumer-fraud . . . laws in the fifty states differ in relevant respects."); *Gianino v. Alacer Corp.*, 846 F. Supp. 2d 1096, 1100-01 (C.D. Cal. 2012) (canvassing "material" differences among state consumer

protection laws in elements required to make out a claim, including proof of deception, injury, reliance, and scienter).   Plaintiffs do not plead the required elements of those statutes or otherwise tailor their allegations to each statute; instead, they simply include a citation for each statute.   (*See* CAC ¶ 223.)   This is deficient as a matter of law.   *See, e.g.*, *In re Toshiba Am. HD DVD Mktg. & Sales Practices Litig.*, No. 08-939, 2009 WL 2940081, *14 (D.N.J. Sept. 11, 2009) (dismissing 44 consumer protection claims where plaintiffs "simply state[d] that Defendants have violated the laws of each of 44 states"); *In re Samsung DLP Television Class Action Litig.*, No. 07-8141 (GEB), 2009 WL 3584352, at *4 (D.N.J. 2009) (dismissing 44 consumer protection claims where plaintiffs "merely submitt[ed] a formulaic, heavily abridged, and cursory recitation of the elements of various consumer protection laws").

**D.**   **Plaintiffs Have Failed to Plead Their Consumer Protection Claims with the Specificity Required by Rule 9(b).**

Plaintiffs' consumer protection claims should also be dismissed for failure to satisfy Federal Rule of Civil Procedure 9(b), which applies because Plaintiffs' state law claims sound in fraud.   *See Frith v. Guardian Life Ins. Co.,* 9 F. Supp. 2d 734, 742 (S.D. Tex. 1998) ("Rule 9(b) extends to all averments of fraud . . . whatever may be the theory of legal duty—statutory, common law, tort, contractual, or fiduciary." (citation omitted)).   That rule demands that Plaintiffs answer the "who, what, when, where, and how" of each alleged misrepresentation, in order to provide "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation of why they were fraudulent."   *Berry v. Indianapolis Life Ins. Co.*, 608 F. Supp. 2d 785, 796 (N.D. Tex. 2009) (Boyle, J.) (internal quotations omitted).

Plaintiffs' Complaint does not begin to meet this standard.   Plaintiffs do not allege whether many of the named plaintiffs even ***saw*** a challenged statement, much less that the

statement caused them to book a particular room.  For example, there is no allegation that Plaintiffs Balk and Smith ever saw a "best price" or "lowest price" statement (*see* CAC  ¶¶ 13, 30), and while Plaintiff Wittenberg's alleged "usual practice" was "to look for 'best price' or 'low price' guarantees," there is no assertion that she saw any specific guarantee or that it caused her to choose the particular room alleged in the Complaint (*see id.* ¶ 36).  Similarly, the other named plaintiffs each allegedly only "recalls," "recalls seeing," "recalls being exposed to," or "was aware of" certain guarantees.  (*See id.* ¶¶ 14-36.)  These statements do not sufficiently establish the "who and what," and they do not even attempt to address the "when, where, and how" that Rule 9(b) requires.

Indeed, while the Complaint purports to assert these consumer claims against all Defendants, it gives even more cursory attention to the Hotel Defendants.  For example, none of the named plaintiffs allege that they saw or relied upon any "best price" or "lowest price" guarantee by any Hotel Defendant, and paragraph 11, one of the only assertions (albeit conclusory) that such representations were deceptive or misleading, does not refer to the Hotel Defendants.  As a result, the consumer protection claims must be dismissed.  *Berry*, 608 F. Supp. 2d at 796.

**E.     Plaintiffs Cannot Proceed With Claims Under State Laws for Which They Have No Representative Plaintiff.**

Plaintiffs' claims also fail because they have no named plaintiff for thirty of the thirty-eight jurisdictions' consumer protection statutes alleged in the Complaint.[31]  Plaintiffs cannot prosecute state law claims for states lacking a resident named plaintiff.  *See Berry*, 600 F. Supp. 2d at 824 (dismissing claims "for lack of a Plaintiff with standing" where plaintiffs did not have

---

[31] *See* App. 3 (Chart B).

"residency at the time of the alleged representations or at any time prior to the date of the filing of the Complaint"); *see also In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1164 (N.D. Cal. 2009)  ("Where, as here, a representative plaintiff is lacking for a particular state, all claims based on *that* state's laws are subject to dismissal.").

**F.      Plaintiffs' Claims Must Be Dismissed Where the Asserted State Statute Bars Class Action Treatment.**

Plaintiffs' consumer protection claims under the laws of Montana, South Carolina, Louisiana, Georgia, and Tennessee are barred as a matter of law because those statutes do not permit class action treatment. *See* <u>Montana</u>: Mont. Code Ann. § 30-14-133(1) (West 2013); *M.S. Wholesale Plumbing, Inc. v. Univ. Sports Publ'ns Co.*, No. 4:07CV00730, 2008 U.S. Dist. LEXIS 124000, at *10 (E.D. Ark. May 22, 2008) (excluding Montana consumers from the putative class because the Montana Consumer Protection Act precludes class actions); <u>South Carolina</u>: S.C. Ann. Code §39-5-140(a) (2012); *Dema v. Tenet Physician Servs.-Hilton Head, Inc.*, 678 S.E. 2d 430, 434 (S.C. 2009) (terms of the statute "prohibit[] a plaintiff from bringing a suit in a representative capacity"); <u>Louisiana</u>:   La. Rev. Stat. Ann. § 51:1409 (2012); *M.S. Wholesale Plumbing, Inc.*, 2008 U.S. Dist. LEXIS 124000, at *10; <u>Georgia</u>: Ga. Code Ann. § 10-1-399(a) (2013); *Friedlander v. PDK Labs, Inc.*, 465 S.E. 2d 670, 671 (Ga. 1996) (observing statute permits injured consumer to bring action "individually, but not in a representative capacity"); <u>Tennessee</u>: Tenn. Code Ann. § 47-18-102(2) (2013); *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 310 (Tenn. 2008).

The Supreme Court's decision in *Shady Grove* does not change this outcome.  *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431 (2010).  *Shady Grove* held that a general New York statutory prohibition against class actions in any case seeking monetary penalties could not limit or override a federal court's application of the Rule 23 requirements.

48

*See id.* at 1439-44.  However, as made plain by his concurrence, Justice Stevens joined the holding only because the statutory provision at issue "is a procedural rule that is not part of [the state's] substantive law."  *Id.* at 1448 (Stevens, J., concurring).[32]  Thus, consistent with several district courts which have subsequently applied *Shady Grove*, state law continues to apply where, as here, the provision barring class actions is not a separate procedural rule, but is instead part of the statute's substantive framework of rights and remedies.[33]  *See Bearden*, WL 3239285, at *10 (distinguishing *Shady Grove* and finding that the bar on class actions under Tennessee's Consumer Protection Act "is so intertwined with that statute's rights and remedies that it functions to define the scope of the substantive rights").

## VII.   Plaintiffs Fail to Plead the Necessary Elements to Support Tolling the Applicable Statute of Limitations.

Although the first case that became part of this consolidated action was brought on August 20, 2012, Plaintiffs seek to represent a class of hotel room purchasers who made purchases beginning on January 1, 2003.  (CAC ¶ 149.)  Many of these claims fall outside the applicable statute of limitations, which, depending on the claim, are between one and six years.[34]

---

[32] Rather, Justice Stevens agreed with the four Justices in dissent that a federal court in diversity must follow state procedural rules that "function as a part of the State's definition of substantive rights and remedies."  *Shady Grove*, 130 S. Ct. at 1448 (Stevens, J., concurring).  Accordingly, five Justices—a majority—took this view.

[33] *See McKinney v. Bayer Corp.*, 744 F. Supp. 2d 733, 742-49 (N.D. Ohio 2010) (applying state law and dismissing plaintiff's class action claim); *Bearden v. Honeywell Int'l, Inc.*, No. 3:09-1035, 2010 WL 3239285, at *8-10 (M.D. Tenn. Aug. 16, 2010) (applying state law and striking plaintiff's class allegations); *In re Wellbutrin XL Antitrust Litig.*, 756 F. Supp. 2d 670, 673-675 (E.D. Pa. 2010) ("Taken together, the five justices in the concurrence and the dissent concluded that the validity of Federal Rules of Civil Procedure turns, in part, on the rights afforded by the state rule that the Federal Rule displaces") (citing *Shady Grove*, 130 S. Ct. at 1449 (Stevens, J. concurring)); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 414-15 (same).

[34] The applicable statute of limitations for Plaintiffs' federal antitrust claims is four years, 15 U.S.C. § 15(b).  Purchases that are actionable inside the limitations period do not make

(continued…)

The time-barred claims should be dismissed.  *See, e.g.*, *Kan. Reins. Co. v. Cong. Mortg. Corp.*, 20 F.3d 1362, 1371 (5th Cir. 1994) (affirming dismissal, under Rule 12(b)(6), of a claim as time barred where the claim was filed after the applicable statute of limitations had run and where it was evident from the pleadings that the plaintiff was not entitled to tolling); *see also Schroeder v. Wildenthal*, No. 3:11-CV-0525-B, 2011 WL 6029727 at *2 (N.D. Tex. Nov. 30, 2011) (Boyle, J.) (concluding that dismissal under Rule 12(b)(6) is "warranted where an affirmative defense, such as the statute of limitations, is apparent on the face of the plaintiff's complaint"), *aff'd*, No. 11-11241, 2013 WL 703646 (5th Cir. Feb. 26, 2013).

To invoke the fraudulent concealment doctrine and avoid the dismissal of otherwise time-barred claims, Plaintiffs must plead sufficient facts to demonstrate two independent elements: *first*, that Defendants concealed their wrongdoing from Plaintiffs, and *second*, that Plaintiffs exercised due diligence to discover the facts that form the basis of their claim.  *Texas v. Allan Constr. Co.*, 851 F.2d 1526, 1528 (5th Cir. 1988).  Plaintiffs fail to plead sufficient facts as to either element and their conclusory allegations do not meet this burden.  (CAC ¶¶ 159-66.)

**A.    The Complaint Does Not Allege Facts to Show Concealment and Confirms that Plaintiffs' Claims Are Based on Publicly Available Information.**

Plaintiffs allege no acts of concealment by any Defendant.   To the contrary, the Complaint alleges that the Defendants publicly announced their best or low price guarantees.

---

(continued…)

purchases outside the limitations period actionable.  *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338-39 (1971); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 181 (1997) (antitrust plaintiff not permitted to "use an independent, new act as a bootstrap to recover for injuries caused by other predicate acts that took place outside the limitations period"); *Imperial Point Colonnades Condo., Inc. v. Mangurian*, 549 F.2d 1029, 1044 (5th Cir. 1977) ("[P]laintiffs may sue only for damages that result from acts committed by the defendants within the four years preceding commencement of suit").

(CAC ¶ 165.)  And the Complaint makes clear that Defendants affirmatively revealed the parity agreements to the public.  For example, Marriott International, Inc. is alleged to have publicly announced in November 2003 "a sweeping overhaul of its transient pricing, bringing parity to all Marriott distribution channels—offline and online."  (*Id.* ¶ 110.)  Defendant Hotels Starwood Hotels & Resorts Worldwide, Inc., Hyatt Hotels Corporation, and Best Western International, Inc. also are alleged to have made public their plans for parity across distribution channels.  (*Id.* ¶ 110 n.14.)  As discussed above, the actual pricing of hotel rooms was publicly available, including the intrabrand rate parity across distribution channels.  (CAC ¶¶ 122, 128.)

Moreover, Plaintiffs rely extensively on publicly available information, such as travel industry conference agendas, Securities and Exchange Commission ("SEC") filings, and published court decisions.  (*Id.* ¶¶ 87-100 (describing publicly available travel conference agendas and attendee lists), ¶ 66 n.2 (SEC filings), ¶¶ 120-23 (citing publicly available court opinions specifically discussing MFN provisions and rate parity).)  Given that public sources form the entirety of Plaintiffs' claims, the Complaint cannot support tolling of any statute of limitations.[35]  *See In re Energy Transfer Partners Natural Gas Litig.*, No. 4:07-CV-3349, 2009 WL 2633781, at *15 (S.D. Tex. Aug. 26, 2009) ("[I]t seems likely that the Fifth Circuit would conclude that the price manipulation was not inherently self-concealing.  Defendants' purported manipulative activity included open market trading that they accurately reported.").

_____

[35] Nor are the purported conspiracies "self-concealing."  (*Id.* ¶ 162.)  An alleged conspiracy cannot be self-concealing as a matter of law when the evidence on which Plaintiffs base their Section 1 claims was in the public's hands.  *See, e.g.*, *Gaetzi v. Carling Brewing Co.*, 205 F. Supp. 615, 623 (E.D. Mich. 1962) (holding that a subsidiary acting through a parent corporation does not constitute a self-concealing conspiracy because "the relationship existing between the two companies was well known or readily ascertainable").

## B.     Plaintiffs Do Not Plead Adequate Due Diligence.

Plaintiffs also fail to plead adequate facts supporting their exercise of due diligence in uncovering their causes of action.  This separately and independently requires that the Court reject Plaintiffs' request to toll the statute of limitations.  *See Timberlake v. A.H. Robins Co.*, 727 F.2d 1363, 1366 (5th Cir. 1984) (to toll the statute of limitations, "the plaintiff is under a duty to exercise reasonable diligence to discover his or her cause of action").

Plaintiffs fail to allege any reason why they could not have discovered their claims.  Nor could they plausibly have made such an allegation when their own Complaint confirms that Defendants' distribution practices were public information.  (CAC ¶¶ 75, 128.)[36]  Furthermore, Plaintiffs do not plead an event that triggered their knowledge of their claims.  Failure to plead a "triggering event" confirms that Plaintiffs were on notice of their claims outside the statute of limitations and cannot invoke the doctrine of fraudulent concealment.  For example, in *Vernon v. City of Dall.*, No. 3:08-CV-1068-B, 2009 WL 2486033, at*5-6 (N.D. Tex. Aug. 13, 2009) (Boyle, J.), this Court granted defendant's motion to dismiss out-of-time claims where "noticeably absent from [the] complaint [was] any reference to when [the plaintiff] became aware of the alleged fraudulent conduct and the facts supporting her cause of action  . . . when she became aware of her cause of action and the diligent steps she took toward discovering her claims."  *See also Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 901 F.2d 404, 413 (5th Cir. 1990) (summary judgment appropriate where "no fact issues regarding the [plaintiffs'] exercise of diligence in finding the grounds of their complaint were presented for resolution").

---

[36] For instance, Plaintiffs cite to the May 27, 2008, decision in *City of San Antonio v. Hotels.com,* No. SA-06-CA-381-OG (W.D. Tex May 27, 2008) in which the Court refers to "Most Favored Nation" clauses in Defendants' contracts and "rate parity."  (CAC ¶¶ 120-23.)  All of this was available to Plaintiffs more than four years before the filing of this litigation.

**C.     The Statutes of Limitations Respecting Plaintiffs' State Law Claims Should Not Be Tolled.**

For the same reasons, the statutes of limitations applicable to the state law claims, which run from one to six years, should not be tolled.[37]   In all forty-four states in which a state law claim is made in this case, a plaintiff must establish concealment by the defendant(s) and the exercise of due diligence by the plaintiff.[38]   Plaintiffs' failure to do so precludes tolling here.

## CONCLUSION

For the reasons set forth above, Plaintiffs have failed to allege a claim for which relief can be granted, and their Complaint should be dismissed against all Defendants with prejudice.

---

[37] *See* App. 5-6 (Chart D).

[38] *See* App. 6-7 (Chart E).

Respectfully Submitted,


By:   /s/  Jeffrey S. Cashdan
    Jeffrey S. Cashdan
    Christine A. Hopkinson
    Sarah E. Statz
    David M. Barnes
    KING & SPALDING LLP
    1180 Peachtree Street, N.E.
    Atlanta, GA  30309
    Telephone:  (404) 572-4600
    Facsimile:  (404) 572-5100
    jcashdan@kslaw.com
    chopkinson@kslaw.com
    sstatz@kslaw.com
    dbarnes@kslaw.com

    Attorneys for Defendant *InterContinental Hotels Group Resources, Inc.*

By:   /s/ Thomas O. Barnett
    Thomas O. Barnett
    Anne Y. Lee
    COVINGTON & BURLING LLP
    1201 Pennsylvania Avenue, NW
    Washington, DC 20004-2401
    Telephone: (202) 662-6000
    Facsimile: (202) 662-6291
    tbarnett@cov.com
    tisaacson@cov.com
    alee@cov.com

    Emily Johnson Henn
    COVINGTON & BURLING LLP
    333 Twin Dolphin Dr., Suite 700
    Redwood Shores, CA  94065
    Telephone:  (650) 632-4700
    Facsimile:  (650) 632-4800
    ehenn@cov.com

    Van H. Beckwith (S.B.O.T. # 02020150)
    Jessica B. Pulliam (S.B.O.T. #24037309)
    BAKER BOTTS LLP
    2001 Ross Avenue
    Dallas, TX 75201-2908
    Telephone:  (214) 953-6500
    Facsimile:  (214) 953-6503
    van.beckwith@bakerbotts.com
    jessica.pulliam@bakerbotts.com

    Attorneys for Defendants *Expedia, Inc., Hotels.com LP,* and *Travelscape LLC*

By: ___/s/ Robert E. Bloch_____
    Robert E. Bloch
    Richard Ben-Veniste
    MAYER BROWN LLP
    1999 K Street, N.W.
    Washington, D.C.  20006
    Telephone:  (202) 263-3203
    Facsimile:  (202) 263-5203
    rbloch@mayerbrown.com
    rben-veniste@mayerbrown.com

    Christopher J. Kelly
    MAYER BROWN LLP
    Two Palo Alto Square, Suite 300
    3000 El Camino Real
    Palo Alto, CA  94306-2112
    Telephone:  (650) 331-2000
    Facsimile:  (650) 331-2061
    cjkelly@mayerbrown.com

    Attorneys for Defendant *Starwood Hotels
    & Resorts Worldwide, Inc.*

By: ___/s/ Steven J. Kaiser_____
    George S. Cary
    Steven J. Kaiser
    CLEARY GOTTLIEB STEEN &
    HAMILTON LLP
    2000 Pennsylvania Avenue, NW
    Washington, D.C.  20006
    New York, NY  10017
    Telephone:  (212) 974-1554
    Facsimile:  (212) 974-1999
    gcary@cgsh.com
    skaiser@cgsh.com

    Attorneys for Defendants *Travelocity.com
    LP* and *Sabre Holdings Corporation*

By:    /s/   Ian Simmons         
Ian Simmons
Katrina M. Robson
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414
isimmons@omm.com
krobson@omm.com

Attorney for Defendant *Marriott International Inc.*

By:    /s/   Kevin J. Arquit         
Kevin J. Arquit
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017
Telephone:  (212) 455-2000
Facsimile:  (212) 455-2502
karquit@stblaw.com

Andrew M. Lacy
Abram J. Ellis
SIMPSON THACHER & BARTLETT LLP
1155 F. Street NW
Washington, DC 20004
Telephone:  (202) 636-5000
Facsimile:  (202) 636-5502
alacy@stblaw.com
aellis@stblaw.com

Bradley C. Weber (S.B.O.T. #21042470)
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, TX 75201-6776
Telephone:  (214) 740-8497
Facsimile:  (214) 756-8497
bweber@lockelord.com

Attorneys for Defendants *Priceline.com Incorporated, Booking.com B.V.,* and *Booking.com (USA), Inc.*

By:   /s/  Francis J. Burke, Jr.
    Francis J. Burke, Jr.
    SEYFARTH SHAW LLP
    One Century Plaza
    2029 Century Park East, Suite 3500
    Los Angeles, CA 90067-3021
    Telephone:  (310) 201-5214
    Facsimile:  (310) 282-6993
    fburke@seyfarth.com

    Attorney for Defendant *Trump International Hotels Management, LLC*

By:   /s/ Christopher S. Yates
    Christopher S. Yates
    Daniel M. Wall
    Brendan A. McShane
    Jason L. Daniels
    LATHAM & WATKINS LLP
    505 Montgomery Street, Suite 2000
    San Francisco, CA  94111
    Telephone:  (415) 391-0600
    Facsimile:  (415) 395-8095
    chris.yates@lw.com
    dan.wall@lw.com
    brendan.mcshane@lw.com
    jason.daniels@lw.com

    Attorneys for Defendant *Orbitz Worldwide, Inc.*

By:    /s/   Steven A. Newborn
    Steven A. Newborn
    Carrie M. Anderson
    WEIL, GOTSHAL & MANGES LLP
    1300 Eye Street, N.W., Suite 900
    Washington, D.C. 20005
    Telephone:  (202) 682-7000
    Facsimile:  (202) 857-0940
    steven.newborn@weil.com
    carrie.anderson@weil.com

    *Of Counsel:*
    James C. Egan, Jr.
    jim.egan@weil.com

    Vance L. Beagles
    WEIL, GOTSHAL & MANGES LLP
    200 Crescent Court, Suite 300
    Dallas, TX  75201
    Telephone: (214) 746-7700
    Facsimile: (214) 746-7777
    vance.beagles@weil.com

    Attorneys for Defendant *Hilton Worldwide, Inc.*

By:    /s/ Kay Lynn Brumbaugh
    Kay Lynn Brumbaugh (S.B.O.T. # 00785152)
    Jennifer L. Trousdale (S.B.O.T. # 24060749)
    ANDREWS KURTH LLP
    1717 Main Street, Suite 3700
    Dallas, TX 75201
    Telephone:  (214) 659-4400
    Facsimile:  (214) 659-4401
    kaylynnbrumbaugh@andrewskurth.com
    jennifertrousdale@andrewskurth.com

    Attorneys for Defendant *EyeforTravel, Ltd.*

By:    /s/  Marie L. Fiala
    Marie L. Fiala
    Ryan M. Sandrock
    SIDLEY AUSTIN LLP
    555 California Street
    San Francisco, CA  94104
    Telephone:  (415) 772-1200
    Facsimile:  (415) 772-7400
    mfiala@sidley.com
    rsandrock@sidley.com

    Attorneys for Defendant *Kimpton Hotel & Restaurant Group, LLC*

By: ___/s/ Ian R. Conner_____

    Eugene F. Assaf

    Edwin John U

    Ian R. Conner

    KIRKLAND & ELLIS LLP

    655 Fifteenth Street N.W.

    Washington, D.C. 20005-5793

    Telephone: (202) 879-5000

    Facsimile: (202) 879-5200

    eassaf@kirkland.com

    edwin.u@kirkland.com

    ian.conner@kirkland.com

    George W. Bramblett, Jr. (S.B.O.T. #02867000)

    Haynes and Boone, LLP

    2323 Victory Ave., Suite 700

    Dallas, TX  75219

    Telephone:  (214) 651-5000

    Facsimile:  (214) 651-5940

    george.bramblett@haynesboone.com

    Attorneys for Defendants *Wyndham Worldwide Corporation* and *Wyndham Hotel Group, LLC*

By:___/s/  Richard A. Illmer___ __

    Richard A. Illmer

    BROWN MCCARROLL L.L.P.

    2001 Ross Avenue, Suite 2000

    Dallas, Texas 75201

    Telephone:  (214) 999-6100

    Facsimile:  (214) 999-6170

    E-mail:  rillmer@brownmccarroll.com

    Albert Carrion Jr.

    BROWN MCCARROLL L.L.P.

    111 Congress, Suite 1400

    Austin Texas 78701

    Telephone: (512) 472-5456

    Facsimile: (512) 480-5006

    E-mail:  acarrion@brownmccarroll.com

    William C. MacLeod

    Stephen R. Freeland

    Kelley Drye & Warren LLP

    3050 K Street, N.W.

    Washington, D.C. 20007

    Telephone: (202) 342-8400

    Facsimile: (202) 342-8451

    wmacleod@kelleydrye.com

    sfreeland@kelleydrye.com

    Attorneys for Defendant *Carlson Hotels, Inc.*

By: ___/s/ J. Robert Robertson_____

    J. Robert Robertson
    Corey W. Roush
    Meghan C. Edwards-Ford
    HOGAN LOVELLS US LLP
    Columbia Square
    555 Thirteenth Street, NW
    Washington, DC 20004
    Telephone: 202-637-5600
    Fax: 202-637-5910
    robby.robertson@hoganlovells.com
    corey.roush@hoganlovells.com
    meghan.edwards-ford@hoganlovells.com

    Attorneys for Defendant *Choice Hotels International, Inc.*

By: ___/s/ Paul L. Stoller_____

    Paul L. Stoller
    Craig S. Ganz
    GALLAGHER & KENNEDY, P.A.
    2575 E. Camelback Road
    Phoenix, AZ 85016
    Telephone:  (602) 530-8000
    Facsimile:  (602) 530-8500
    paul.stoller@gknet.com
    craig.ganz@gknet.com

    William Frank Carroll (S.B.O.T. # 03892500)
    COX SMITH
    1201 Elm Street, Ste. 300
    Dallas, TX 75270
    Telephone:  (214) 698-7800
    Facsimile:   (214) 698-7899
    fcarroll@coxsmith.com

    Attorneys for Defendant *Best Western International, Inc.*

By: ___/s/ Daniel A. Sasse_____

    Daniel A. Sasse
    CROWELL & MORING, LLP
    3 Park Plaza, 20th Floor
    Irving, CA 92614-8505
    Telephone:  (949) 798-1347
    Facsimile:  (949) 263-8414
    dsasse@crowell.com

    Aryeh S. Portnoy
    CROWELL & MORING, LLP
    1001 Pennsylvania Ave. N.W.
    Washington D.C. 20004-2595
    Telephone:  (202) 624-2500
    Facsimile:  (202) 628-5116
    aportnoy@crowell.com

    Attorney for Defendant *Hyatt Hotels Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 1, 2013, all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system pursuant to Local Rule CV-5.1(d).


/s/  *Jessica B. Pulliam*
Jessica B. Pulliam

**Chart A - States Use Federal Antitrust Law to Interpret State Antitrust Law**

| STATE | STATUTE / CASE | RELEVANT LAW |
|---|---|---|
| ARIZONA | Ariz. Rev. Stat. Ann. § 44-1412 (2013) | "It is the intent of the legislature that in construing this article, the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes." |
| CALIFORNIA | *Marin Cnty. Bd. of Realtors, Inc. v. Palsson*, 549 P.2d 833, 835 (Cal. 1976) | Citing federal law in examining California antitrust claim. |
| | *Kaewsawang v. Sara Lee Fresh, Inc.*, No. BC360109 (Super. Ct. Los Angeles Cnty., May 6, 2013) | Expressly rejecting plaintiffs' claim that vertical price restraints should be subject to a *per se* rule and dismissing the antitrust claim under the rule of reason. |
| DISTRICT OF COLUMBIA | D.C. Code § 28-4515 (2013) | "[I]n construing this chapter, a court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes." |
| FLORIDA | Fla. Stat. § 542.32 (2013) | "[I]n construing this chapter, due consideration and great weight be given to the interpretations of the federal courts relating to comparable federal antitrust statutes." |
| | Fla. Stat. § 542.20 (2013) | "Any activity or conduct exempt under Florida statutory or common law or exempt from the provisions of the antitrust laws of the United States is exempt from the provisions of this chapter." |
| ILLINOIS | 740 Ill. Comp. Stat. Ann. 10/11 (West 2013) | "When the wording of this Act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act." |
| IOWA | Iowa Code § 553.2 (2013) | "This chapter shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter.  This construction . . . shall be made to achieve uniform application of the state and federal laws prohibiting restraints of economic activity and monopolistic practices." |
| KANSAS | 2013 Kan. Sess. Laws, Ch. 102, § 1(b)-(c) | "The Kansas restraint of trade act shall be construed in harmony with ruling judicial interpretations of federal antitrust law by the United States [S]upreme [C]ourt."  "An arrangement, contract, agreement, trust, understanding or combination is a reasonable restraint of trade or commerce if such restraint is reasonable in view of all of the facts and circumstances of the particular case and does not contravene public welfare." |
| MAINE | *Pease v. Jasper Wyman & Son*, No. Civ.A. CV-00-015, 2002 WL 1974081, at *8 n.13 (Me. Super. Ct. Aug. 9, 2002) | "[T]he language used in the Maine statute is 'almost identical' to the language used in the Sherman Act. The court will, therefore, use federal cases addressing the summary judgment standard in antitrust cases as a guide." |
| | *Davric Maine Corp. v. Rancourt*, 216 F.3d 143, 149 (1st Cir. 2000) | Citing federal law and affirming summary judgment dismissing state antitrust claims because Maine courts analyze Maine antitrust claims "according to the doctrines developed in relation to federal law." |
| MICHIGAN | Mich. Comp. Laws § 445.784 (2013) | "It is the intent of the legislature that in construing all sections of this act, the courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes, including, without limitation, the doctrine of per se violations and the rule of reason." |
| MINNESOTA | *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007). | "Minnesota antitrust law is generally interpreted consistently with federal antitrust law."  "As the purposes of Minnesota and federal antitrust law are the same, it is sensible to interpret them consistently." |
| MISSISSIPPI | *NAACP v. Claiborne Hardware Co.*, 393 So. 2d 1290, 1301 (Miss. 1980), *rev'd on other grounds*, 458 U.S. 886 (1982). | Describing Mississippi restraint of trade statute as "patterned" after the Sherman Act and noting that the Mississippi Supreme Court has "been influenced by the decisions of [the U.S. Supreme] Court in interpreting and applying" the state statute. |
| NEBRASKA | Neb. Rev. Stat. § 59-829 (2012) | "When any provision of [the state act] . . . is the same as or similar to the language of a federal antitrust law, the courts . . . shall follow the construction given to the federal law by the federal courts." |
| NEVADA | Nev. Rev. Stat. § 598A.050 (2012) | "The provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes." |
| NEW HAMPSHIRE | N.H. Rev. Stat. Ann. § 356:14 (2013) | "In any action or prosecution under this chapter, the courts may be guided by interpretations of the United States' antitrust laws." |
| | *Minuteman, LLC v. Microsoft Corp.*, 795 A.2d 833, 836 (N.H. 2002) | Recognizing that it has "long been the practice" to rely on federal antitrust law in analyzing New Hampshire antitrust law because the New Hampshire legislature "expressly encouraged a uniform construction with federal antitrust law." |

| STATE | STATUTE / CASE | RELEVANT LAW |
|---|---|---|
| NEW MEXICO | N.M. Stat. Ann. § 57-1-15 (2013). | New Mexico antitrust law "shall be construed in harmony with judicial interpretations of the federal antitrust laws." |
| NEW YORK | *Intellective, Inc. v. Mass. Mut. Life Ins. Co.*, 190 F. Supp. 2d 600, 617 (S.D.N.Y. 2002) | Noting that New York antitrust law was modeled on the Sherman Act and that courts "generally apply federal antitrust precedent in construing it." |
| | *People v. Tempur-Pedic Int'l, Inc.*, 944 N.Y.S.2d 518, 519 (N.Y. App. Div. 2012) | Citing *Leegin* and affirming dismissal of action to declare RPM agreements unlawful under New York antitrust law. |
| NORTH CAROLINA | *Rose v. Vulcan Materials Co.*, 194 S.E.2d 521, 530 (N.C. 1973). | Noting that the "body of law applying the Sherman Act" is "instructive in determining the full reach of [the North Carolina] statute." |
| | *R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.*, 199 F. Supp. 2d 362, 397 (M.D.N.C. 2002) | Granting summary judgment for defendants on state antitrust claims based on the allegations supporting failed federal claims. |
| NORTH DAKOTA | *AG Acceptance Corp. v. Glinz*, 684 N.W.2d 632, 639-41 (N.D. 2004) | Concluding grant of summary judgment on challenge to vertical restraint was appropriate where plaintiff did not establish seller possessed "significant market power" and citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984). |
| OREGON | Or. Rev. Stat. § 646.715(2) (2013) | Declaring legislative intent that federal court decisions interpreting federal antitrust law "shall be persuasive authority." |
| SOUTH CAROLINA | *Drs. Steuer & Latham, P.A. v. Nat'l Med. Enters.*, 672 F. Supp. 1489, 1521 (D.S.C. 1987) | Granting summary judgment for defendants on state antitrust claim where federal antitrust claim failed because state has "long adhered to a policy of following federal precedents" in antitrust cases. |
| SOUTH DAKOTA | S.D. Codified Laws § 37-1-22 (2012) | "It is the intent of the Legislature that in construing this chapter, the courts may use as a guide interpretations given by the federal or state courts to comparable antitrust statutes." |
| | *Byre v. City of Chamberlain*, 362 N.W.2d 69, 74 (S.D. 1985) | Noting that, in analyzing the state antitrust law, "great weight" should be given to federal law interpreting the Sherman Act. |
| TENNESSEE | *Tennessee ex. rel. Leech v. Levi Strauss & Co.*, No. 79-722-III, 1980 WL 4696, at *2 n. 2 (Tenn. Ch. Ct. Sept. 25, 1980). | "The State anti-trust statute passed in 1891 is quite similar to the Sherman Anti-Trust Act passed by Congress in 1890 [citation omitted].  Authorities which define the character of private damage suits under the federal anti-trust statutes, particularly the Sherman Act, are most persuasive." |
| | *Spahr v. Leegin Creative Leather Prods., Inc.*, No. 2:07-CV-187, 2008 WL 3914461, at *13-14 (E.D. Tenn. Aug. 20 2008) | "At issue in this case are minimum resale price maintenance agreements and, so far as this Court can tell, no Tennessee court has ever analyzed the application of the TTPA to such agreements. . . Plaintiffs have asserted no good reason why the Tennessee court would not follow the holding of the United States Supreme Court in *Leegin* and analyze resale price maintenance agreements under the rule of reason." |
| UTAH | Utah Code Ann. § 76-10-926 (West 2012) | "[C]ourts, in construing this act, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes." |
| VERMONT | *State v. Heritage Realty*, 407 A.2d 509, 511 (Vt. 1979) | Citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) for the proposition that an agreement among competitors to fix prices is unlawful per se under Vermont's antitrust statute. |
| WEST VIRGINIA | W. Va. Code § 47-18-16 (2013) | "This article shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes." |
| WISCONSIN | *State v. Waste Mgmt. of Wis., Inc.*, 261 N.W.2d 147, 153 & n.12 (Wis. 1978) | Noting that practices prohibited by the Sherman Act are also illegal under the state antitrust act and that construction of the state statute is controlled by federal decisions under the Sherman Act. |

**Chart B - Grounds for Dismissing Claims Under State Consumer Protection Statutes (● = Ground for dismissal)**

| | AK | AR | AZ | CA § 1750 | CA § 17200 | CA § 17500 | CO | CT | DE | D.C. | FL | GA | HI | ID | IL | IA | KS | KY | LA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| No false, misleading, or deceptive statement | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| No resident plaintiff | ● | ● | ● | | | | ● | ● | ● | ● | | ● | ● | ● | | | ● | ● | ● |
| Wholesale pleading insufficient | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| Causation inadequately pled | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| Class actions not permitted | | | | | | | | | | | | ● | | | | | | | ● |
| Failure to satisfy Rule 9(b) | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |

| | ME | MD | MA | MI | MN | MO | MT | NE | NH | NJ | NM | NY | NC | ND | OK | RI | SC | TN | UT | WA | WV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| No false, misleading, or deceptive statement | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| No resident plaintiff | ● | ● | ● | ● | ● | ● | | ● | | ● | | ● | ● | | | | | ● | ● | ● | ● |
| Wholesale pleading insufficient | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| Causation inadequately pled | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| Class actions not permitted | | | | | | | ● | | | | | | | | | | ● | ● | | | |
| Failure to satisfy Rule 9(b) | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |

**Chart C - State Law on the Required Element of Causation**

| STATE | RELEVANT STATUTE AND/OR CASE |
|---|---|
| ALASKA | Alaska Stat. § 45.50.531(a) (2013) |
| ARIZONA | *Dunlap v. Jimmy GMC,* 666 P.2d 83, 87 (Ariz. Ct. App. 1983) |
| ARKANSAS | Ark. Code Ann. § 4-88-113(f) (2012) |
| CALIFORNIA (§ 1750) | Cal. Civ. Code § 1780(a) (2013) |
| CALIFORNIA (§§ 17200 AND 17500) | *Kwikset Corp. v. Sup. Ct.*, 51 Cal. 4th 310, 322 (2011) |
| COLORADO | Colo. Rev. Stat. § 6-1-113(a), (c) (2013); *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.,* 62 P.3d 142, 146-47 (Colo. 2003) (*en banc*) |
| CONNECTICUT | Conn. Gen. Stat. § 42-110g(a) (2013) |
| DELAWARE | Del. Code Ann. tit. 6, § 2525(a) (2013); *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1077 (Del. 1983) |
| DISTRICT OF COLUMBIA | D.C. Code § 28-3905(k)(1) (2013); *see Smith v. Brown & Williamson Tobacco Corp.,* 108 F. Supp. 2d 12, 19 (D.D.C. 2000) |
| FLORIDA | Fla. Stat. § 501.211(2) (2013); *Rollins, Inc. v. Butland,* 951 So. 2d 860, 869-70 (Fla. Dist. Ct. App. 2006) |
| GEORGIA | Ga. Code Ann. § 10-1-399(a) (2013) |
| HAWAII | Haw. Rev. Stat. § 481A-3(a) (2013) |
| IDAHO | Idaho Code Ann. § 48-608(1) (2013) |
| ILLINOIS | 815 Ill. Comp. Stat. 505/10a (2013) |
| IOWA | Iowa Code § 714H.5 (2013) |
| KANSAS | Kan. Stat. Ann. § 50-634(d) (2012); *Finstad v. Washburn Univ.,* 845 P.2d 685, 691-92 (Kan. 1993) |
| KENTUCKY | Ky. Rev. Stat. Ann. § 367.220(1) (West 2012); *Schlenk v. Ford Motor Credit Co.,* 308 F.3d 619, 622 (6th Cir. 2002) |
| LOUISIANA | La. Rev. Stat. Ann. § 51:1409 (2012) |
| MAINE | Me. Rev. Stat. tit. 5, § 213(1) (2013); *VanVoorhees v. Dodge,* 679 A.2d 1077, 1082 (Me. 1996) |
| MARYLAND | Md. Code Ann. Com. Law § 13-408(a) (West 2013); *McGraw v. Loyola Ford, Inc.,* 723 A.2d 502, 512 (Md. Ct. Spec. App. 1999) |
| MASSACHUSETTS | Mass Gen. Laws Ch. 93A, §§ 9(1), 11 (2013) |
| MICHIGAN | Mich. Comp. Laws §§ 445.911(1)(b)(2), (3) (2013); *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.,* 155 F. Supp. 2d 1069, 1109 (S.D. Ind. 2001) |
| MINNESOTA | Minn. Stat. § 325F.68 (2013); *Baker v. Best Buy Stores, LP,* 812 N.W.2d 177, 182-83 (Minn. Ct. App. 2012) |
| MISSOURI | Mo. Rev. Stat. §407.025(1) (2013) |
| MONTANA | Mont. Code Ann. § 30-14-133 (2013) |
| NEBRASKA | Neb. Rev. Stat.§ 59.1609 |
| NEW HAMPSHIRE | N.H. Rev. Stat. Ann. § 358-A:10 (2013) |
| NEW JERSEY | N.J. Stat. Ann. § 56:8-19 (West 2013) |
| NEW MEXICO | N.M. Stat. Ann. § 57-12-10 (2012); *Brooks v. Norwest Corp.,* 103 P.3d 39, 51 (N.M. Ct. App. 2004) |
| NEW YORK | N.Y. Gen. Bus. Law § 349(h) (McKinney 2013); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 647 N.E.2d 741, 745 (N.Y. 1995) |
| NORTH CAROLINA | N.C. Gen. Stat.  § 75-16 (2013); *Forbes v. Par Ten Grp., Inc.,* 394 S.E.2d 643, 651 (N.C. Ct. App. 1990) |
| NORTH DAKOTA | N.D. Cent. Code § 51-15-09 (2011); *Ackre v. Chapman & Chapman, P.C.,* 788 N.W.2d 344, 352 (N.D. 2010) |
| OKLAHOMA | Okla. Stat. Ann. tit. 15, § 761.1(A) (2013) |
| RHODE ISLAND | R.I. Gen. Laws § 6-13.1-5.2 (2012) |
| SOUTH CAROLINA | S.C. Code Ann. § 39-5-140(a) (2012); *Havird Oil Co. v. Marathon Oil Co.,* 149 F.3d 283 (4th Cir. 1998) |
| TENNESSEE | Tenn. Code Ann. § 47-18-109(a)(1) (2013) |
| UTAH | Utah Code Ann. § 13-5-14 (West 2012) |
| WASHINGTON | Wash. Rev. Code  § 19.86.090 (2013) |
| WEST VIRGINIA | W. Va. Code § 46A-6-106(a) (2013) |

**Chart D - Statutes of Limitation for State Consumer Protection and Antitrust Statutes**

| STATE | TYPE OF CLAIM | STATUTE |
|---|---|---|
| **One Year Statutes of Limitation** | | |
| ARIZONA | Consumer Protection | Arizona Rev. Stat. Ann. § 12-541(5) (2013) |
| LOUISIANA | Consumer Protection | La. Rev. Stat. Ann. § 51:1409 (2012) |
| **Two Year Statutes of Limitation** | | |
| ALASKA | Consumer Protection | Alaska Stat. § 45.50.531(f) (2013) |
| GEORGIA | Consumer Protection | Ga. Code Ann. § 10-1-401(a) (2013) |
| HAWAII | Consumer Protection | Haw. Rev. Stat. § 657-7 (2013) |
| IDAHO | Consumer Protection | Idaho Code Ann. § 48-619 (2013) |
| IOWA | Consumer Protection | Iowa Code § 714H.5 (2013) |
| KENTUCKY | Consumer Protection | Ky. Rev. Stat. Ann. § 367.220(5) (West 2012) |
| MONTANA | Consumer Protection | Mont. Code Ann. § 27-2-211 (2013) |
| UTAH | Consumer Protection | Utah Code Ann. § 13-11-19(8) (West 2012) |
| WEST VIRGINIA | Consumer Protection | W. Va. Code § 55-2-12 (2013) |
| **Three Year Statutes of Limitation** | | |
| CALIFORNIA | Consumer Protection | Cal. Civ. Code § 1783 (West 2013) |
| COLORADO | Consumer Protection | Colo. Rev. Stat. § 6-1-115 (2013) |
| CONNECTICUT | Consumer Protection | Conn. Gen. Stat. § 42-110g(f) (2013) |
| DELAWARE | Consumer Protection | Del. Code. Ann. tit. 10, § 8106 (2013) |
| DISTRICT OF COLUMBIA | Consumer Protection | D.C. Code § 12-301(8) (2013) |
| ILLINOIS | Consumer Protection | 815 Ill. Comp. Stat. 505/10a (2013) |
| KANSAS | Antitrust and Consumer Protection | Kan. Stat. Ann. § 60-512 (2012) |
| MARYLAND | Consumer Protection | Md. Code Ann., Cts. & Jud. Proc. § 5-101 (West 2013) |
| MISSISSIPPI | Antitrust | Miss. Code Ann. § 15-1-49 (2013) |
| NEW HAMPSHIRE | Consumer Protection | N.H. Rev. Stat. Ann. § 358-A:3 (2013) |
| NEW YORK | Consumer Protection | N.Y. C.P.L.R. § 214(2) (Consol. 2013) |
| OKLAHOMA | Consumer Protection | Okla. Stat. tit. 12, § 95 (2013) |
| SOUTH CAROLINA | Antitrust and Consumer Protection | S.C. Code Ann. § 39-5-150 (2012) |
| TENNESSEE | Antitrust | Tenn. Code. Ann. § 28-3-105 (2013) |
| **Four Year Statutes of Limitation** | | |
| ARIZONA | Antitrust | Ariz. Rev. Stat. Ann. § 44-1410 (2013) |
| CALIFORNIA | Antitrust and Consumer Protection | Cal. Bus. & Prof. Code § 16750.1 (West 2013) (antitrust); Cal. Bus. & Prof. Code § 17208 (West 2013) (consumer protection) |
| DISTRICT OF COLUMBIA | Antitrust | D.C. Code § 28-4511(b) (2013) |
| FLORIDA | Antitrust and Consumer Protection | Fla. Stat. § 95.11(3)(f) (2013) |
| ILLINOIS | Antitrust | 740 Ill. Comp. Stat. 10/7 (2013) |
| IOWA | Antitrust | Iowa Code § 553.16(1) (2013) |
| MASSACHUSETTS | Consumer Protection | Mass. Gen. Laws ch. 260, § 5A (2013) |
| MICHIGAN | Antitrust | Mich. Comp. Laws § 445.781 (2013) |
| MINNESOTA | Antitrust | Minn. Stat. § 325D.64 (2013) |
| NEBRASKA | Antitrust and Consumer Protection | Neb. Rev. Stat. § 25-206 (2012) (antitrust); |

5

| STATE | TYPE OF CLAIM | STATUTE |
|---|---|---|
| | | Neb. Rev. Stat. § 59-1612 (2012) (consumer protection) |
| NEVADA | Antitrust | Nev. Rev. Stat. § 598A.220 (2012) |
| NEW HAMPSHIRE | Antitrust | N.H. Rev. Stat. Ann. § 356:12 (2013) |
| NEW MEXICO | Antitrust and Consumer Protection | N.M. Stat. Ann. § 57-1-12 (2012) |
| NEW YORK | Antitrust | N.Y. Gen. Bus. Law § 340 (McKinney 2013) |
| NORTH CAROLINA | Antitrust and Consumer Protection | N.C. Gen. Stat. § 75-16.2 (2013) |
| NORTH DAKOTA | Antitrust | N.D. Cent. Code § 51-08.1-10(1) (2011) |
| OREGON | Antitrust | Or. Rev. Stat. § 646.800(2) (2013) |
| RHODE ISLAND | Consumer Protection | R.I. Gen. Laws § 6-36-23 (2012) |
| SOUTH DAKOTA | Antitrust | S.D. Codified Laws § 37-1-14.4 (2012) |
| UTAH | Antitrust | Utah Code Ann. § 76-10-925 (West 2012) |
| WASHINGTON | Consumer Protection | Wash. Rev. Code § 19.86.120 (2013) |
| WEST VIRGINIA | Antitrust | W. Va. Code § 47-18-11 (2013) |
| **Five Year Statutes of Limitation** | | |
| ARKANSAS | Consumer Protection | Ark. Code Ann. § 4-88-115 (2012) |
| MISSOURI | Consumer Protection | Mo. Rev. Stat. § 516.120 (2013) |
| TENNESSEE | Consumer Protection | Tenn. Code. Ann. § 47-18-110 (2013) |
| **Six Year Statutes of Limitation** | | |
| MAINE | Antitrust and Consumer Protection | Me. Rev. Stat. tit. 14, § 752 (2013) |
| MICHIGAN | Consumer Protection | Mich. Comp. Laws § 445.911(7) (2013) |
| MINNESOTA | Consumer Protection | Minn. Stat. § 541.05 (2013) |
| NEW JERSEY | Consumer Protection | N.J. Stat. Ann. § 2a:14-1 (West 2013) |
| NORTH DAKOTA | Consumer Protection | N.D. Cent. Code § 28-01-16 (2011) |
| VERMONT | Antitrust | Vt. Stat. Ann. tit. 12, § 511 (2013) |
| WISCONSIN | Antitrust | Wis. Stat. § 133.18(2) (2013) |

## Chart E - State Law on Fraudulent Concealment

| STATE | RELEVANT CASE |
|---|---|
| ALASKA | *Russell v. Municipality of Anchorage*, 743 P.2d 372, 376 (Alaska 1987) |
| ARIZONA | *Anson v. Am. Motors Corp.*, 747 P.2d 581, 587-88 (Ariz. Ct. App. 1987) |
| ARKANSAS | *Dellano Inc. v. Peace*, 237 S.W.3d 81, 84 (Ark. 2006) |
| CALIFORNIA | *Snapp & Assocs. Ins. Servs. Inc. v. Robertson*, 117 Cal. Rptr. 2d 331, 334-35 (Cal. Ct. App. 2002) |
| COLORADO | *First Interstate Bank v. Piper Aircraft Corp.*, 744 P.2d 1197, 1201 (Colo. 1987) |
| CONNECTICUT | *Mountaindale Condo. Ass'n, Inc. v. Zappone*, 757 A.2d 608, 615-16 (Conn. App. Ct. 2000) |
| DELAWARE | *Walls v. Abdel-Malik*, 440 A.2d 992, 996 (Del. 1982) |
| DISTRICT OF COLUMBIA | *Fred Ezra Co. v. Psychiatric Inst.*, 687 A.2d 587, 592 n.3 (D.C. 1996) |
| FLORIDA | *Doe v. Cutter Biological*, 813 F. Supp. 1547, 1555 (M.D. Fla. 1993) *aff'd*, 66 F.3d 342 (11th Cir. 1995) |
| GEORGIA | *Brinsfield v. Robbins*, 183 Ga. 258, 270, 188 S.E. 7 (1936) |
| HAWAII | Haw. Rev. Stat. § 657-20 (2013); *Jou v. Schmidt*, 184 P.3d 817, 821 (Haw. Ct. App. 2008) |
| IDAHO | *Stout v. Cunningham*, 196 P. 208, 210 (Idaho 1921) |

| STATE | RELEVANT CASE |
|---|---|
| ILLINOIS | *People v. Coleman*, 206 Ill. 2d 261, 290 (2002) |
| IOWA | *Christy v. Miulli*, 692 N.W.2d 694, 702 (Iowa 2005) |
| KANSAS | *Friends Univ. v. W.R. Grace & Co.*, 608 P.2d 936, 941 (Kan. 1980) |
| KENTUCKY | *Hazel v. Gen. Motors Corp.*, No. 97-5086, 142 F.3d 434, 1998 WL 180522, at *2-*4 (6th Cir. Apr. 8, 1998) |
| LOUISIANA | *In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 982 F. Supp. 388, 396-97 (E.D. La. 1997) |
| MAINE | *Taylor v. Philip Morris Inc.*, No. Civ.A. CV-00-203, 2001 WL 1710710, at *6 (Me. Super. Ct. May 29, 2001) |
| MARYLAND | *Thelen v. Mass. Mut. Life Ins. Co.*, 111 F. Supp. 2d 688, 694 (D. Md. 2000) |
| MASSACHUSETTS | *Frank Cook, Inc. v. Hurwitz*, 406 N.E.2d 678, 684 (Mass. App. Ct. 1980) |
| MICHIGAN | *McNaughton v. Rockford State Bank*, 246 N.W. 84, 86 (Mich. 1933) |
| MINNESOTA | *Hanna Mining Co. v. InterNorth, Inc.*, 379 N.W.2d 663, 667 (Minn. Ct. App. 1986) |
| MISSOURI | *Batek v. Curators of Univ. of Missouri*, 920 S.W.2d 895, 900 (Mo. 1996) |
| MISSISSIPPI | *Windham v. Latco of Miss., Inc.*, 972 So. 2d 608, 610 (Miss. 2008) |
| MONTANA | *Pederson v. Rocky Mt. Bank*, 272 P.3d 663, 665 (Mont. 2012) |
| NEBRASKA | *Upah v. Ancona Bros. Co.*, 521 N.W.2d 895, 902-03 (Neb. 1994) |
| NEW HAMPSHIRE | *Bricker v. Putnam*, 512 A.2d 1094, 1096 (N.H. 1986) |
| NEW JERSEY | *Fuqua v. Bristol-Myers Squibb Co.*, No. 11-6043, 2013 WL 781615, at *7 (D.N.J. Feb. 15, 2013) |
| NEW MEXICO | *Continental Potash, Inc. v. Freeport-McMoran, Inc.*, 858 P.2d 66, 74 (N.M. 1993) |
| NEW YORK | *Simcuski v. Saeli*, 44 N.Y.2d 442, 450 (1978) |
| NEVADA | *Pooler v. R.J. Reynolds Tobacco Co.*  2001 WL 403167, at *2 (Nev. Dist. Ct. 2001) |
| NORTH CAROLINA | *Kucmierz v. Four Oaks Bank & Trust Co.*, No. COA09-491, 690 S.E.2d 559, *2-3 (N.C. Ct. App. Jan. 19, 2010); *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 59 (N.C. Ct. App. 2001) |
| NORTH DAKOTA | N.D. Cent. Code § 28-01-24 (2011); *Linke v. Sorenson*, 276 F.2d 151, 153 (8th Cir. 1960) |
| OKLAHOMA | *Jarvis v. City of Stillwater*, 732 P.2d 470, 472-73 (Okla. 1987); *Alexander v. Oklahoma*, 382 F.3d 1206, 1217-18 (10th Cir. 2004) |
| OREGON | *Chaney v. Fields Chevrolet Co.*, 503 P.2d 1239, 1241-42 (Or. 1972) |
| RHODE ISLAND | *Martin v. Howard*, 784 A.2d 291, 299-00 (R.I. 2001) |
| SOUTH CAROLINA | *American Legion Post 15 v. Horry County*, 674 S.E.2d 181 (S.C. Ct. App. 2009) |
| SOUTH DAKOTA | *Hinkle v. Hargens*, 81 N.W.2d 888, 891 (S.D. 1957). |
| TENNESSEE | *Shadrick v. Coker*, 963 S.W.2d 726, 736 (Tenn. 1998) |
| UTAH | *Russell Packard Dev. v. Carson*, 108 P.3d 741, 749 (Utah 2005) |
| VERMONT | *Silva v. Stevens*, 589 A.2d 852, 857-58 & n.5 (Vt. 1991) |
| WASHINGTON | *August v. U.S. Bancorp*, 190 P.3d 86, 95-96 (Wash. Ct. App. 2008) |
| WISCONSIN | *Boehm v. Wheeler*, 223 N.W.2d 536, 542 (Wis. 1974); *Doe v. Archdiocese of Milwaukee*, 700 N.W.2d 180, 199-200 (Wis. 2005) |
| WEST VIRGINIA | *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 1986 WL 957, at *15 (S.D. W. Va. May 3, 1986), *aff'd* 828 F.2d 211 (4th Cir. 1987) (same, under W.Va. Code Ann. § 47-18-11) |

7