## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| ONLINE TRAVEL COMPANY (OTC) | § | Consol. Civil Action No. 3:12-cv-3515-B |
| HOTEL BOOKING ANTITRUST | § | |
| LITIGATION | § | |
| | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendants, who include major U.S. hotel chains and online travel agencies ("OTAs") in the United States, jointly move to dismiss this putative class action brought by consumers claiming they paid inflated prices on hotel rooms booked online. Defendants first challenge the Consolidated Amended Complaint's ("Complaint") (doc. 85) three antitrust law claims, which charge Defendants with engaging in an industry-wide conspiracy to uniformly adopt resale price maintenance agreements, containing most favored nation clauses, in an effort to eliminate price competition among hotel room booking websites. Defendants also seek to dismiss the Complaint's state consumer protection law claim, which alleges that Defendants deceptively published "best price" or "lowest price" guarantees on their websites while knowing that "best" price was the same fixed rate offered across all hotel booking websites.

To survive this motion, the Complaint's factual allegations (taken as true) must plausibly establish the essential elements of each claim. Because it finds the Complaint fails to plausibly allege (1) a price-fixing conspiracy for the three antitrust law claims and (2) proximate causation for the

consumer protection law claim, the Court **GRANTS** Defendants' Joint Motion to Dismiss (doc. 108), and **DISMISSES WITHOUT PREJUDICE** all four counts of the Complaint.[1]

## I.

## BACKGROUND

A.    *Factual Background*[2]

The relevant conduct at issue in this case took place in the U.S. market for "direct online sale of hotel room reservations." (Compl., Doc. 85, ¶ 138.) Hotels have long sold rooms to consumers through various channels of distribution, including "telephone or walk up reservations." (*Id*. ¶ 139.) With the rise of the internet, an important new channel presented itself: the online bookings market. In this market, a hotel can offer a single room to consumers through multiple online outlets, including its own website or any of the websites operated by OTAs. OTAs—which are entities "organized to effectuate travel plans, reservations and purchases via the worldwide web"—were an unknown concept just a short time ago, but have "seen explosive growth" in recent years. (*Id.* ¶ 65.) This growth, in large part, is attributable to the value OTAs offer consumers; they "allow consumers to rent hotel rooms in many different hotels throughout the country and the world" (*Id.* ¶ 66) and "easily search many different hotel types and locations in their desired areas" (*Id.* ¶ 139), and "[m]any . . . have reviews provided by consumers with which to evaluate different properties." (*Id.*)

---

[1] As such, the Court finds the supplemental motions filed by Choice Hotels International, Inc. (doc. 107) and Sabre Holdings Corporation (doc. 110) to be **MOOT**.

[2] The background that follows is drawn from the Complaint, with all non-conclusory factual allegations "accepted as true." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Occupying the largest sector of the online hotel bookings industry in the United States are the two main groups of defendants in this case. The first group includes twelve "collectively . . . dominant hotel chains in the United States" (the "Hotel Defendants").[3] (*Id.* ¶ 140.) The second group is made up of nine OTAs (the "OTA Defendants"),[4] four of which—Expedia, Orbitz, Priceline and Travelocity—"accounted for 94% of" all OTA-hotel bookings in 2011. (*Id.* ¶ 46.) A third category of defendants is solely occupied by EyeforTravel, Ltd. ("EyeforTravel"), a travel industry news company based in the U.K. that allegedly facilitated the price-fixing conspiracy in this case through its annual industry conferences. (*Id.* ¶ 60.)

Collectively, Defendants are charged with entering into an industry-wide conspiracy to impose "rate parity" across hotel room booking websites. Put differently, Defendants allegedly conspired to eliminate, on an industry-wide basis, *intra*-brand competition—that is, competition among each hotel's online distribution channels, including its own website and OTA-run websites. (*Id.* ¶ 78.) Here are just two examples set out in the Complaint (*Id.* ¶ 128) illustrating the rate parity Defendants' conspiracy allegedly created:

---

[3] Hotel Defendants include Choice Hotels Internation, Inc. ("Choice Hotels"), Intercontinental Hotels Group Resources, Inc. ("IHG"), Starwood Hotels & Resorts Wordwide, Inc. ("Starwood"), Marriott International, Inc. ("Marriott"), Trump International Hotels Management, LLC ("Trump"), Hilton Worldwide, Inc. ("Hilton"), Kimpton Hotel & Restaurant Group, LLC ("Kimpton"), Wyndham Worldwide Corporation ("Wyndham Worldwide"), Wyndham Hotel Group, LLC ("Wyndham Hotels"), Carlson Hotels, Inc. ("Carlson"), Best Western International, Inc. ("Best Western"), and Hyatt Hotels Corporation ("Hyatt"). (Compl. ¶¶ 47-58.)

[4] OTA Defendants include Sabre Holdings Corporation ("Sabre"), Expedia, Inc. ("Expredia"), Orbitz Worldwide, Inc. ("Orbitz"), Priceline.com Incorporated ("Priceline"), Travelocity.com LP ("Travelocity"), Bookings.com B.V. ("Bookings"), Booking.com (USA), Inc. ("Bookings USA"), and Travelscape, LLC ("Travelscape"). (Compl. ¶¶ 37-46.)

Dallas Marriott, 1 King Bed or 2 Double Beds, June 1-2, 2013 (posted 4/25/13):

| Expedia | $159 |
|---|---|
| Hotels.com | $159 |
| Orbitz | $159 |
| Priceline | $159 |
| Travelocity | $159 |
| Booking.com | $159 |
| Marriott's website | $159 |

Hilton Dallas/Park Cities, 1 King Bed, June 1-2, 2013 (posted 4/25/13):

| Expedia | $139 |
|---|---|
| Hotels.com | $139 |
| Orbitz | $139 |
| Priceline | $139 |
| Travelocity | $139 |
| Booking.com | $139 |
| Hiton's website | $139 |

According to the Complaint, "[t]he exact date the conspiracy began is unknown, but it is believed to have started in 2003." (*Id.* ¶ 75.) Before this time, each OTA Defendant grew its market share by offering online consumers discount rates "below the rate published by hotels." (*Id.* ¶ 74.) Soon however, OTA Defendants apparently became "concerned that further discounting by competing [OTAs] could erode their margins." (*Id.*) Hotel Defendants were similarly "concerned that they would lose more market share to [OTAs] if there was price disparity between the published hotel room rate and an [OTA's] website rate." (*Id.*) Accordingly, the Complaint claims that "[i]n 2002 and 2003, in trade press, at industry conferences and on conference calls with stock analysts,

[OTAs] and hotels began to discuss 'rate parity.'" (*Id.* ¶¶ 75, 78.) It was through these "discussions at industry trade meetings and in private communications where Defendants jointly discussed, urged and agreed to adoption of rate parity 'in all channels'" that the conspiracy formed. (*Id.* ¶ 79.)

The conspiracy or agreement that ultimately came out of these purported discussions involved "an express or tacit agreement" among all Defendants. (*Id.*) Holding this wider conspiracy together were at least two additional agreements. First, the OTA Defendants entered into a horizontal agreement[5] not to compete with each other, apparently formed in the same sort of express or tacit way as the larger conspiracy. (*Id.*) Second, each Hotel Defendant signed vertical written contracts known as resale price maintenance ("RPM") agreements with each OTA Defendant. (*Id.*) The "typical RPM agreement between" each OTA-Hotel Defendant pair "provided at least two restrictive terms." (*Id.* ¶ 77.) The first term mandated that the hotel "would establish" and publish "the 'Best Available Rate' or 'Lowest Rate' for a non-packaged room . . . [and] [t]hat published rate was the price the [OTA] could use when selling rooms to consumers." (*Id.*) The second relevant term—known as the most favored nation ("MFN") clause—"provided that the published rates offered by the [OTA] would be as favorable as the published rate offered to (a) any [OTA] competitor and (b) the rates published on the internet site operated by the hotel itself." (*Id.*)

Thus, each RPM agreement ensured first, that each OTA would not discount below each hotel website's published rate, and second, that each hotel was providing each OTA with its lowest

---

[5] The terms "horizontal" and "vertical" agreements are used to indicate the business relationships between the agreeing parties: "[r]estraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988).

online rate. As the industry began to uniformly adopt these RPM agreements starting in "late 2003 and 2004," the conspiracy's plan to impose rate parity began to materialize. (*Id* ¶ 76.)

Defendants also allegedly conspired to ensure this rate parity remained in place. Hotel Defendants "threatened other [OTAs] with legal action and/or refused to allow [OTAs], such as Skoosh.com, to sell rooms if [that OTA] refused to . . . maintain resale prices at the agreed rate in compliance with the RPM scheme." (*Id.* ¶ 104.) Likewise, the OTA Defendants' took their own steps to ensure the RPM agreements were being honored, "employ[ing] market managers who monitor closely a hotel's rates across all channels, and if a preferential rate was given to one over he other that hotel could face dire penalties." (*Id.* ¶ 129) (quotation marks omitted.)

With the "RPM scheme" ensuring rate parity remained in tact, the OTA Defendants began to "offer a near identical 'best price' guarantee—knowing that it is the *only* price available even among competitors." (*Id.* ¶ 130.) A couple examples include Travelocity's advertisement guaranteeing the "Best Price: If you find a lower rate, we'll pay the difference and send you $50," and Orbitz's "Low Price Guarantee: If you book a qualifying prepaid hotel rate on the Orbitz Web site, and then find the same room, in the same hotel, for the same dates, at a lower price online . . . we'll refund the difference and give you a $50 discount on future hotel booking." (*Id.*) The Hotel Defendants made "similar promises," for example, Marriott's "Best Rate Guarantee: Book a Marriott rom using any Marriott reservation channel," online or otherwise, and "[i]f within 24 hours of making your reservation, you find a lower hotel rate for the same hotel, room type and reservation dates, . . . we'll match the rate + give you an extra 25% discount on the room." (*Id.* ¶ 131.)

     B.    *European Investigations and Procedural History*

In 2012—nearly a decade after the conspiracy allegedly formed—Defendants began facing public scrutiny. On July 31, 2012, the British Office of Fair Trade ("OFT") publically announced its "Statement of Objection" to "separate arrangements" between two OTA Defendants (Bookings.com and Expedia) and one Hotel Defendant (IHG), which the OFT claimed infringed U.K. competition law.[6] Similarly, Switzerland's Competition Commission announced on December 11, 2012 that it "was investigating" three OTA Defendants (Booking.com, Expedia, and Hotels.com), and "stated that it suspects that the rate parity agreements 'could constitute illegal restraints.'" (*Id.* ¶ 136.)

The first civil complaint in this case was filed on August 20, 2013—twenty days after the OFT's announcement. (Resp. 69) (citing *Turik v. Expedia, Inc.*, No. 12-cv-4365 (N.D. Cal.).) A number of related suits were subsequently filed in district courts nationwide, including *Smith v. Orbitz*, filed in this Court on August 27, 2012 (doc. 1). Pursuant to 28 U.S.C. § 1407, the U.S. Judicial Panel of Multidistrict Litigation transferred the related suits to this Court for consolidated pretrial proceedings, and on February 26, 2013, the Court ordered (doc. 35) the cases consolidated.

On March 1, 2013, Plaintiffs filed the Consolidated Amended Complaint (doc. 85) on behalf of themselves and a putative class of individuals "throughout the United States who during the period January 1, 2003, through May 1, 2013, paid for a [non-packaged] room reserved from any of Defendants' online websites." (Compl. ¶ 149.) Plaintiffs seek recovery for the supra-competitive prices—that is, prices inflated above sustainable levels in a competitive market—they allegedly paid

---

[6] Press Release, "OFT issues Statement of Objections against Booking.com, Expedia and Intercontinental Hotels Group," (July 31, 2012), *available at* http://www.oft.gov.uk/news-and-updates/press/2012/65-12#.UtlerhDnbcs. Though not cited directly in the Complaint, the Court agrees with Plaintiffs that it may take judicial notice, under Federal Rule of Evidence 201, of facts related to the investigation that are "not subject to reasonable dispute." FED. R. EVID. 201; *see also* (Resp. 69) (asking the Court to take judicial notice of facts from the above-cited press release).

for non-packaged hotel rooms booked through Defendants' websites. The Complaint asserts four counts for Defendants': (1) *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) agreements unreasonably restraining trade (under the rule of reason or "quick look" test) in violation of Section 1 of the Sherman Act; (3) violation of state antitrust laws; and (4) violation of state consumer protection laws. (*Id.* ¶¶ 167-225.)

On July 1, 2013, Defendants collectively filed a Joint Motion to Dismiss (doc. 108). The Joint Motion raises various deficiencies with the eighty-five page Complaint warranting, in Defendant's view, full or partial dismissal of all four counts. However, after the Plaintiffs filed their response (doc. 113), to which Defendants replied (doc. 121), the central issues here narrowed. The parties further clarified and argued their positions in a hearing before the Court on December 17, 2013. (Transcript of Motion Hearing for Proceedings held on December 17, 2013 ("Mot. Hearing"), Doc. 133.) Having considered the parties' positions and the relevant law, the Court is prepared to issue its resolution.

## II.

### LEGAL STANDARD—RULE 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal for failure to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6). In reviewing a Rule 12(b)(6) motion, the Court must "constru[e] all factual allegations in the light most favorable to the plaintiffs." *Kopp v. Klien*, 722 F.3d 327, 333 (5th Cir. 2013). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Similarly, the Court is not "bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

For a complaint to survive a Rule 12(b)(6) motion, it must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A facially plausible complaint does more than plead "facts that are 'merely consistent with' a defendant's liability." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Rather, a facially plausible complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* If the allegations raise no entitlement to relief, "this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Cuviller v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Tombly*, 550 U.S. at 557).

## III.

## ANALYSIS

The Complaint's four counts are based on two general categories of misconduct on the part of the Defendants. First, Defendants allegedly entered into an industry-wide conspiracy to restrain competition in the U.S. market for "direct online sale of hotel room reservations." (Compl. ¶ 138.) In Counts I and II, the Complaint asserts that this anticompetitive conduct violated Section 1 of the Sherman Act, 15 U.S.C. § 1. Drawing on this same anticompetitive conduct, Count III alleges that Defendants violated various state anti-trust laws. Second, Defendants' advertisements guaranteeing that their respective websites offered the "best" or "lowest" price online—when that price was the same across all online channels—were purportedly deceptive/unfair to consumers. On this basis, Count IV asserts that Defendants violated state consumer protection statutes.

Defendants challenge all four counts on a number of grounds. They point out multiple deficiencies in both the antitrust law and consumer protection claims before arguing that all four counts warrant partial dismissal in accordance with each claim's applicable statute of limitations.

Rather than address all issues raised by Defendants, the Court focuses only on those shortcomings dispositive to this Motion. Specifically, the Court focuses on whether the Complaint plausibly alleges (1) an agreement or conspiracy for purposes of the antitrust law claims and (2) the two essential elements of Plaintiffs' consumer protection claim.

 A. *Section 1 of the Sherman Act Claims (Counts I & II)*

To state a § 1 claim, a plaintiff generally must establish three elements: "(1) the defendants engaged in a conspiracy; (2) that restrained trade; (3) in the relevant market." *Golden Bridge Tech. Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008).

For the first element, Plaintiffs rely on allegations purportedly showing that all Defendants entered into an industry-wide conspiracy to impose rate parity in the online hotel bookings market. Within this broad conspiracy are two sub-agreements: a horizontal agreement not to compete among the OTA Defendants and the individual RPM agreements between each OTA-Hotel Defendant pair. While the Complaint also hints at an agreement between Hotel Defendants to impose rate parity in the online bookings market in accordance with the wider conspiracy, Plaintiffs have made clear that they are not alleging "a horizontal conspiracy between the Hotel Defendants" to restrain *inter*-brand competition on hotel room prices.[7] (Resp. 44.) In addition, Plaintiffs clarified that their antitrust claims are based on the industry-wide conspiracy, rather than either of the two individual sub-agreements holding the broader scheme together.[8] Thus, while the Complaint contains facts

---

[7] Inter-brand competition is price competition among competitors. An example of Hotel Defendants agreeing horizontally to fix inter-brand competition would be if Defendants Hilton, Marriot, and Best Western agreed to set prices on their King size bedrooms in Dallas at $149/night.

[8] (*See* Resp. 27) ("The crux of the conspiracy has both horizontal and vertical components that must be considered holistically, for without either component, the scheme would fail.")

directly showing that pairs of Hotel-OTA Defendants individually entered into written RPM agreements, Plaintiffs' antitrust claims rest entirely on the circumstantial facts purportedly showing that Defendants entered into an "express or tacit" industry-wide conspiracy not to compete.

The issue, then, comes down to whether the Complaint's circumstantial facts plausibly allege an industry-wide conspiracy to restrain competition in the online hotel bookings market. Plaintiffs certainly may rely on circumstantial facts to establish the first element of their § 1 claims,[9] but these facts must be enough to surmount the pleading bar set by the Supreme Court in *Twombly*. Thus, before addressing the Complaint's allegations, the Court first considers *Twombly*'s standard for pleading a § 1 conspiracy.

### 1.    Legal Standard: Pleading a Plausible § 1 Conspiracy

As mentioned, the first pre-requisite to liability under § 1 is the existence of a "contract, combination, . . . or conspiracy." 15 U.S.C. § 1. This statutory language "leaves no doubt that Congress made a purposeful choice to accord different treatment to unilateral and concerted conduct." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775 (1984). In other words, § 1 "does not reach independent decisions, even if they lead to the same anticompetitive result as an actual agreement among market actors." *White v. R.M. Packer Co., Inc.*, 635 F.3d 571, 575 (1st Cir. 2011). Thus, while conscious parallelism—"a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions"—and a tacit agreement—an implicit agreement reached through the

---

[9] *See Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) ("[C]onspiracies are rarely evidenced by explicit agreements . . . .").

parties' conduct rather than express communications[10]—may appear similar from an outside perspective, only the latter is unlawful. *Twombly*, 550 U.S. at 553-54 (quotation marks and brackets omitted). In short, "'the crucial'" distinction § 1 requires courts to make is between "conduct stem[ming] from 'independent decision[-making] or from an agreement, tacit or express.'" *Id.* at 553 (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)) (internal brackets omitted).

Before *Twombly*, this distinction between concerted and unilateral conduct was more often fleshed out at the summary judgment and trial stages of litigation.[11] Relying on the "no set of facts" language from *Conley v. Gibson*, 355 U.S. 41 (1957), courts could permit § 1 complaints to move forward on ambiguous circumstantial facts. For example, allegations showing that a group of competitors engaged in parallel business practices could seemingly move forward under *Conley*, even though—when placed in isolation—the allegations are merely "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive perceptions of the market." *Id.* at 554. Finding this "no set of facts" standard "best forgotten as incomplete," *id.* at 563, *Twombly* concluded that courts should "tak[e] care to require that allegations reach the level suggesting conspiracy" in

---

[10] An example of a tacit agreement comes from *Interstate Circuit v. United States*, 306 U.S. 208 (1939), in which a group of motion picture distributors "who never communicated directly with one another, nonetheless had entered into a tacit agreement with one another by acting in accordance with [a] letter's demands, because the letter [sent to each distributor by two movie theater operators] made it clear that all eight had received the letter, the economic context made it clear that all eight needed to act uniformly or all would lose business, and all eight did in fact impose the conditions." *White*, 635 F.3d at 576 (summarizing *Interstate Circuit*).

[11] *See Twombly*, 550 U.S. at 554 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984) and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) for the proposition that plaintiffs must put forth evidence at later stages of § 1 litigation to either "exclude" or "rule out the possibility that the defendants were acting independently").

an effort to "avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope that the discovery process will reveal evidence' to support a § 1 claim." *Id.* at 559-60 (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

With that reasoning in mind, *Twombly* held that a § 1 complaint must contain "enough factual matter (taken as true) to *suggest* that an agreement was made . . . , not merely parallel conduct that could just as well be independent action." *Id.* at 557 (emphasis added). To illustrate, the defendants in *Twombly*, a group of major telecommunication providers, allegedly entered into anti-competitive agreements intended to protect each defendant's regional service monopoly. The complaint, though it contained a couple additional allegations,[12] relied on the fact that defendants adopted the same, parallel business patterns following the passage of the Telecommunications Act of 1996, which (unsuccessfully) attempted to facilitate competition in the defendants' respective regional service areas. Based on this seemingly suspicious parallel behavior, plaintiffs filed suit, claiming defendants conspired to (i) inhibit the growth of upstart providers and (ii) refrain from competing in each other's respective territory.

The Court found the allegations of a § 1 conspiracy among the defendants implausible. The Court began its analysis by finding that "[t]he nub of the complaint" consisted of allegations related to defendants' parallel behavior. *Id.* at 565. In other words, the complaint failed to provide any "further circumstances pointing toward a meeting of the minds," or "further factual enhancements"

---

[12] Other allegations, which only the dissent found significant, include: a quote from the former executive of one defendant as saying that entering neighboring territory "might be a good way to turn a quick dollar but that doesn't make it right"; and an allegation that defendants "communicate amongst themselves through numerous industry associations." *Twombly*, 550 U.S. at 574 (Stevens, J., dissenting). The majority, somewhat summarily, rejected both these allegations. *See id.* at 567 n.12, 568 n.13.

- 13 -

that pushed the allegations out of "neutral territory." *Id.* at 557. Such "factual enhancements" in this context, according to the Court, may consist of "parallel behavior that would probably not result" absent an agreement or "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason."[13] *Id.* at 556 n.4 (quotation marks and internal citations omitted).

Next, the Court analyzed the parallel conduct allegations and rejected plaintiffs' contention that this allegedly suspicious behavior suggested an agreement. On the contrary, "common economic experience" showed that defendants' parallel resistance of the upstart service providers was nothing "more than the natural, unilateral reaction of each [firm]." *Id.* at 565-66. Similarly, there was "an obvious alternative explanation," or "natural explanation for" defendants' allegedly suspicious failure to enter each other's regional service areas: "the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing." *Id.* at 568. And despite general allegations to the contrary, the Court noted that "the complaint itself" offered "reasons to believe that" the defendants' behavior was just as likely the product of self-interested behavior. *Id.* In sum, the Court concluded that the complaint "did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior." *Iqbal*, 556 U.S. at 680 (summarizing *Twombly*).

2.     <u>Analysis: Plausibility of the Conspiracy Allegations</u>

---

[13] Courts (and the parties here) sometimes refer to these "factual enhancements" as "plus factors," defined as "facts that tend to ensure that courts punish concerted action—an actual agreement—instead of the unilateral, independent conduct of competitors." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010) (brackets and quotations omitted). However, the term "plus factors" is actually drawn from cases at the later stages of litigation, where a different sort of analysis—sometimes inappropriately applied at the motion to dismiss stage—is conducted. *See Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33, 46 (2013). To avoid confusion, this Court follows *Twombly*'s language by using "factual enhancements."

Plaintiffs contend that their § 1 conspiracy allegations go well beyond the insufficient pleadings in *Twombly*. Plaintiffs concede that at center is the Defendants' parallel conduct—the uniform adoption of similar RPM agreements and the resulting rate parity these agreements created in the online market for each Hotel Defendants' rooms. (Resp. 13-14.) But they contend that the Complaint contains many more "factual enhancements" that place the parallel conduct in a context suggesting a conspiracy. (*Id.* at 14.) Specifically, Plaintiffs' identify the following enhancements: (i) online hotel bookings price competition before the alleged agreement formed; (ii) OTA Defendants' market power; (iii) Defendants' common motives; (iv) inter-firm communications, including pricing discussions, at the EyeforTravel Conferences;[14] (v) coordinated pricing effort; (vi) absent collective action, Defendants' actions would go against their business interests, (vii) Defendants' coercion and enforcement of the RPM agreements; (viii) other industry players would like to offer lower prices, but cannot due to the restrictive agreements; and (ix) government investigations. (*Id.* at 14-21.)

Defendants, on the other hand, argue that Plaintiffs' allegations amount to the nothing more than parallel business activity of firms in the online hotel bookings market. (Reply 6.) After pointing out the shortcomings with Plaintiffs' main factual enhancements, Defendants argue that the purported enhancements fail to plausibly suggest an agreement. (*Id.* at 7-13.) Instead, Defendants explain that the alleged parallel behavior is simply the result of each Defendants' independent effort to protect their business interests by rationally adopting similar vertical distribution agreements. (*Id.* at 13-15.) The Court agrees, and for the reasons that follow, it finds that the Complaint fails to allege sufficient facts to suggest that Defendants conspired to fix prices on hotel rooms sold online.

---

[14] This enhancement was actually two enhancements identified by Plaintiffs, but since they entail the same overlapping factual allegations, the Court combined them so that it may address both at once.

i.      *Parallel conduct allegations do not suggest a conspiracy*

Like in *Twombly*, the real "nub" of the Complaint in this case is Defendants' parallel business

behavior—the adoption of similar RPM agreements seen across pairs of OTA and Hotel Defendants.

And like in *Twombly*, Defendants' parallel adoption of similar business strategies is not suspicious or

suggestive of an agreement. On the contrary, common economic experience and the Complaint itself

offer a natural or "obvious" explanation for why the Hotel Defendants on one side, and OTA

Defendants on the other, individually entered into the same two-term RPM agreements.

For the Hotel Defendants, an RPM agreement allowing them to control the prices at which

their rooms were sold online made perfect economic sense. As a general matter, it is quite natural

for a seller to want to control the online price of its product. Take, for example, an analogy offered

by Defendants: a car owner who puts his car on Craigslist wants to sell his car at the price he thinks

the market is willing to pay, and "the people of Craigslist don't get to call [the seller] up out of the

blue and say, congratulations, I sold your car for $100." (Mot. Hearing 41-42.) This natural desire

to control online pricing is even more apparent in the hotel industry. A fancy hotel, for example, may

value the ability to control online pricing to protect its brand's high-end image. More generally,

hotels across the industry may find that controlling minimum resale prices is the "only feasible" way

to effectuate a profitable price discrimination strategy—that is, a strategy to "sell the same product

[i.e., hotel room], costing the same to make and sell, at different prices to different consumers."[15] *In*

---

[15] The Seventh Circuit, through Judge Posner, explains that "[p]rice discrimination is in fact quire
common in competitive industries" in which "competitive products," such as hotel rooms, "are not perfect
substitutes to all consumers." *Brand Name Prescription Drugs*, 288 F.3d at 1030-31. But "price discrimination
would be feasible only if the [supplier] could prevent (or at least limit) arbitrage—the erasure of a price
difference not attributable to a cost difference . . . by a middleman's buying from the favored customers and
reselling to the disfavored." *Id.* at 1031. The RPM agreements are arguably each Hotel Defendant's effort to
prevent or limit arbitrage created by OTAs buying rooms at cheaper prices and reselling to disfavored

*re Brand Name Prescription Drugs Antitrust Litig.*, 288 F.3d 1028, 1030-31 (7th Cir. 2002) (Posner, J.). In fact, the Complaint itself shows that the hotel industry was aware of and discussed price discrimination strategies.[16] It even acknowledges Hotel Defendants' self-interest in controlling online prices, quoting a non-defendant hotel executive as saying "[w]e want to be able to control our prices in all channels." (Compl. ¶ 126.) This all points to a self-interested explanation for why each Hotel Defendant entered into RPM agreements with a provision allowing them to "establish" a "'Lowest Rate'" at which each OTA offered their rooms to consumers: this contractual term gave hotels a right they highly value, the right to control online pricing for their rooms.

For OTA Defendants, the reason they would individually seek out the two-term RPM agreements on an individual basis is more obvious. Having given up the right to discount prices below each Hotel Defendant's published rate, each OTA Defendant would naturally want an assurance that competitors will also be prohibited from offering a lower price than the published rate. That is precisely what each OTA Defendant got in return according to the Complaint—an MFN clause assuring the OTA Defendant that the minimum rate it must publish will not be undercut by the hotel itself or an OTA competitor.

Plaintiffs disagree that natural economic forces drove Defendants to individually adopt similar RPM agreements. As part of their "factual enhancements," Plaintiffs argue first that Defendants shared a common motive to eliminate price competition in the online market, and second that,

---

customers at a lower price than that disfavored customer is willing to pay.

[16] (*See* Compl. ¶ 91) (citing a topic discussion at an industry trade conference: "How is customer behavior affected by changes in price and pricing strategy? And how can this information be used by RM departments to increase profits?").

without a conspiracy, the RPM agreements went against Defendants' business interests. But neither of these conclusory assertions, which the Court need not accept as true, actually suggest a conspiracy.

Like in *Twombly*,[17] Plaintiffs' conclusory assertion that Defendants shared a common motive is, at best, merely consistent with a conspiracy. True, both the Hotel and OTA Defendants would benefit from the elimination of price competition in the sale of hotel rooms online. (Compl. ¶ 74.) But these "common motives" just as well explain why Hotel Defendants (because each wanted to control online prices for its own rooms) and OTA Defendants (because each wanted an assurance the minimum price it must publish would not be undercut) individually entered into RPM agreements. Just because Defendants' rational business interests can be recast in a suspicious light does not mean the allegations actually suggest a conspiracy was formed.[18]

Likewise, Plaintiffs' contention that Defendants' actions go against Defendants' business interests is also as an unsupported conclusion. Plaintiffs first argue that "[a]bsent the conspiracy, those who would set high prices would be undercut by those who wanted to discount." (Resp. 19.) Not true. Absent the conspiracy, individual pairs of Defendants could unilaterally adopt and enforce the same RPM agreements, preventing any discounting as it relates to the published rates covered in each respective RPM agreement. Next, Plaintiffs argue that it would be in the Hotel Defendants' best interest to compete with the OTAs so that the hotel's website offers the lowest prices, rather than enter into an agreement promising not to undercut the OTAs. But this conclusive assertion is

---

[17] *Twombly*, 550 U.S. at 550-51 (noting that plaintiffs alleged the defendants shared a "compelling common motivatio[n]").

[18] *See In re Late Fee & Over-Limit Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007) ("As one court put it, if 'a motive to achieve higher prices' were sufficient, every company in every industry could be accused of conspiracy because they all 'would have such a motive,'" quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 133 (3d Cir. 1999)).

undermined both by common economic experience and facts in the Complaint itself. First, the free-rider theory of economics may explain why Hotel Defendants agree not to undercut OTAs on price. As applied to this case, the free-riding theory posits that the hotel will suffer a loss if the OTA fails to invest in "genuinely useful" services (e.g., a more powerful price-comparison search engine), because of the OTA's concern that consumers will use the OTA's service to find a suitable hotel room, only to then go to another' website (i.e., the entity taking a free-ride off the OTA's services, such as the hotel) and purchase the room at a discount value, cutting the OTA out of the deal.[19] Second, the Complaint itself offers an alternative factor: each Hotel Defendant would prefer to compromise with each OTA Defendant and provide each OTA with the assurance of an MFN clause, rather than risk the competitive disadvantage of not reaching an agreement.[20]

   ii.      *"Factual Enhancements" fail to suggest a conspiracy*

   In light of the above discussion, Plaintiffs' eight remaining "factual enhancements" must place the ambiguous parallel conduct allegations in a context that raises the suggestion of a conspiracy. As explained below, however, three of these "enhancements" are nothing more than additional parallel conduct allegations, one is irrelevant to the issue at hand, and the remaining three are merely consistent with, rather than suggestive of, a conspiracy.

   To begin, at least three of the "factual enhancements" are nothing more than additional parallel conduct allegations. Plaintiffs' "coordinated pricing efforts" factual enhancement is simply

---

[19] *See Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937-938 (discussing the free-riding theory as applied in the manufacturer/retailer context).

[20] (*See* Compl. ¶ 71) ("[I]f Priceline . . . refused to list Hilton's rooms on its websites, Hilton will be placed at a significant competitive disadvantage.").

the parallel conduct allegations recast in different language. Similarly, their "coercion and enforcement" enhancement is supported by facts showing Defendants independently enforcing their individual RPM agreements (which Plaintiffs do not challenge as unlawful), not an industry-wide conspiracy (which Plaintiffs do challenge). At best, these allegations constitute another form of parallel behavior, although the measures taken to enforce the individual agreements often vary, so the behavior is not exactly parallel. Likewise, the eighth enhancement listed above—other industry players, like Skoosh.com, are restricted from offering lower prices on Hotel Defendant rooms—merely shows that Defendants were honoring the individual RPM agreements. After all, if non-parties to an RPM agreement, like Skoosh, were able to offer lower prices than the "published rate" the Hotel Defendant sets per the first provision in that agreement, then the OTA Defendant would not get the benefit of its bargained-for MFN clause.

Next, the "government investigation" factual enhancement deserves no inference of a conspiracy at all.[21] True, a government investigation or finding of wrongdoing, may constitute a factual enhancement where the investigation or related case involved violations of the same laws and/or the same conduct at issue in the § 1 claim.[22] But "[a]llegations of anticompetitive wrongdoing in Europe" or some other foreign nation, "absent any evidence of linkage between such foreign

---

[21] The Complaint also cites deposition testimony and an opinion from a federal class action involving certain defendants. (Compl. ¶¶ 120-23) (citing *City of San Antonio v. Hotels.com*, No. SA-06-CA-381-OG (W.D. Tex.).) But that case has nothing to do with antitrust law, and is only cited for the references made to rate parity and the parallel business conduct adopted by the defendants involved in that case.

[22] *See, e.g.*, *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 576 (M.D. Pa. 2009) (finding Canadian investigations into same price-fixing conduct enhanced the plausibility of the alleged U.S.-based price-fixing conspiracy); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 324 (2d Cir. 2010) (finding allegations of a conspiracy more plausible in light of the state and federal investigations into the same anticompetitive conduct at issue).

conduct and conduct" at issue, is not relevant to the question of whether a § 1 conspiracy has been properly alleged. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007). Here, the government investigations cited in the Complaint involve European laws, which may prohibit conduct that is lawful under § 1.[23] More importantly, neither investigation appears to concern the industry-wide conspiracy at issue here. The OFT investigated "separate" RPM agreements two OTA Defendants entered into with a single Hotel Defendant. Likewise, Switzerland's Competition Commission investigated three OTA Defendants, but has yet to allege any misconduct and never indicated that the subject of the investigation was some industry-wide conspiracy. Absent some unidentified connection to the unlawful conduct at issue, these government investigations "carr[y] no weight in pleading an antitrust conspiracy claim."[24]

That leaves just three remaining "factual enhancements": (1) inter-firm communications, including pricing discussions, at the EyeforTravel Conferences, (2) price competition preceding the conspiracy, and (3) the OTA Defendants' market power. As explained below, all three enhancements merely detail the "neutral territory" in which the parallel conduct allegations reside. None actually place the ambiguous allegations in a context that raises the suggestion of a conspiracy.

---

[23] (*See* Mot. 41) ("[T]he OFT does not apply the rule of reason to vertical price agreements as required under U.S. law. Instead, it follows the rigid European precedent of subjecting vertical price agreements to 'de facto *per se* illegality.'")

[24] *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (discussing the irrelevance of a Department of Justice investigation, which reveals "nothing at all" about whether the conspiracy actually occurred and may ultimately "be broader or narrower [in scope] than the allegations at issue"); *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 632 & n.2 (E.D. Pa. 2010) (noting significance of "a parallel criminal investigation—an allegation demonstrating that the government believes a crime may have occurred," but rejecting "plaintiff's assertion that allegations of unrelated corporate improprieties in Europe help to bestow plausibility on the allegations of conspiracy").

First, regarding the communications "factual enhancement," the allegations, at best, show that Defendants had an opportunity to conspire, but do not suggest that they actually did conspire. In support of this enhancement, the Complaint puts forth, details surrounding five annual EyeforTravel conferences on dates ranging from 2004 to 2008, as well as various conclusory references to private communications between Defendants.[25] As an initial matter, since the communications at these conferences took place no earlier than 2004, and the conspiracy allegedly formed in 2003, it is not clear these facts are even relevant to the issue at hand. As for the other "private communications," these "ambiguous [and] overly generalized allegations leave open the distinct possibility that Defendants' behavior was entirely normal and legitimate." *In re National Ass'n Music Merchants*, 2012 WL 3637291, at *5 (S.D. Cal. Aug. 20, 2012).

Regardless, even if these communications are relevant, they still fall short of suggesting a conspiracy actually formed. Generally, parallel conduct allegations "plus" well-pled allegations detailing "communication[s] between high-level personnel on pricing policy" are enough to suggest a conspiracy. *In re Plywood Antitrust Litig.*, 655 F.2d 627, 634 (5th Cir. 1981). However, *Twombly* recognized that "just because [a defendant] belonged to the same trade guild [or association] as one of [its] competitors when" the parallel behavior occurs does not, without more, suggest a conspiracy formed.[26] Put differently, the fact that defendants' decision-makers had "[t]he opportunity to meet

---

[25] (*See* Compl. ¶¶ 87-100) (detailing EyeforTravel Conferences); (*id.* ¶ 79) (alleging that the conspiracy "was reached . . . by discussions at industry trade meetings and in private communications where Defendants jointly discussed, urged and agreed to [sic] adoption of rate parity in 'all channels'").

[26] 550 U.S. at 556 n.12; *see also Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010) ("[I]t is well-settled before Twombly that participation in trade organizations provides no indication of conspiracy.").

and conspire" at trade shows, standing alone, "isn't suspicious."[27] Similarly, communications that "suggest a high level of interfirm *awareness*" merely reflects "'conscious parallelism,'" which "is not unlawful in itself." *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 139 (2d Cir. 2013) (quoting *Twombly*, 550 U.S. at 554) (emphasis in original).

Here, the fact that executives of certain Defendants were present at the same annual industry conferences is no more suggestive of a conspiracy than the trade association allegations in *Twombly*. The attendance of these executives merely presents an opportunity to conspire, but the surrounding allegations fail to suggest they actually did conspire. In fact, the presence of non-defendants at the EyeforTravel conferences—including airline representatives and a business school professor (Compl. ¶ 91)—belies the suggestion that a secretive price fixing agreement came out of these meetings.[28]

Moreover, the "pricing discussion" that took place at the EyeforTravel conferences are not suspicious at all. Plaintiffs cherry-pick words like "price" and "rate parity" from topic headings at the conferences in an effort to categorize these as "pricing discussions" among competitors, but a fair reading of these topic headings reveals innocent business-related discussions that one would expect to see at an industry conference. For example, "rate parity" appeared in a topic heading discussing business strategies to "successfully manage revenue across all your distribution channels." (*Id.* ¶ 88.) In another example, Plaintiffs simply misread a topic heading concerning "strategies for restriction free pricing" (*id.* ¶ 91) as meaning "restrictions on pricing." (*Id.* ¶ 92.) These are not the sort of

---

[27] *Music Merchants*, 2012 WL 3637291, at *5; *see also Graphics Processing*, 527 F. Supp. 2d at 1023 ("Attendance at industry trade shows and events is presumed legitimate and is not a basis from which to infer a conspiracy, without more.").

[28] *See Music Merchants*, 2012 WL 3637291, at *2 ("The presence of numerous uninvolved observers at such meetings tends to dispel any specter of illegality.").

signals suggesting an unspoken meeting of the minds seen in cases Plaintiffs rely on.[29] Instead, these discussions reflect interfirm *awareness* regarding different pricing strategies across online booking channels, which, as noted above, may be a sign of conscious parallelism, but not a conspiracy. Moreover, the topic discussions are "at least equally consistent with" the "unconcerted action" narrative discussed before.[30] After all, at the time the discussions took place, the online hotel bookings channel was a relatively new development in this industry, so it was perfectly normal that the leading firms were discussing general strategies to approach this untapped market. In short, Defendants' attendance and discussions at industry conferences, at best, injects more ambiguity into the mix—consistent with the conspiracy allegations, but non-suggestive of an actual agreement.

Second, the price competition preceding the alleged conspiracy "factual enhancement" is supported by allegations showing a gradual change in pricing among firms aware of each other's activities, rather than a suspicious, abrupt change suggesting a conspiracy. As noted in *Twombly*, parallel conduct allegations may be suggestive of an agreement when teamed with "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." 550 U.S. at 556 n.4. Here, Plaintiffs assert that "[p]rior to 2002 and before the OTA Defendants had market power, they competed on price" (Resp. 14), and that sometime between 2002 (when discussions allegedly began) and late 2003 and 2004 (when Defendants began to adopt the RPM agreements) this price competition went away.

_____

[29] *See, e.g., Interstate Circuit*, 306 U.S. at 215 (detailing how distributors reached an implicit agreement after being sent the same letter with the same demands from the movie theater operators).

[30] *Ins. Brokerage*, 618 F.3d at 329-30 (discussing how information-sharing between the alleged conspirators was just as likely a result of independent behavior, and therefore, did not plausibly suggest a conspiracy).

(Compl. ¶¶ 74-75.) This, however, is not the sort of abrupt change in pricing indicative of a conspiracy seen in the cases Plaintiffs cite.[31] Rather, this two-year period in which competitors in the online bookings market adopted similar pricing strategies is the sort of gradual pricing change rejected as unsuspicious by other courts.[32] And while the Complaint may detail an "unprecedented chang[e] in pricing structure," it also points out that OTAs were "virtually unknown" in 1997 (Compl. ¶ 65),  so any change in the early 2000s would likely qualify as unprecedented. Further, a "discernible reason" for this "unprecedented change" exists: individual OTAs and hotels began to gradually adjust in the early 2000s to this newly-developing distribution channel by adopting the same rational business strategies. Thus, the price change enhancement does not suggest a conspiracy.

Lastly, the OTA market power factual enhancement also falls short of pushing these allegations out of neutral territory. The fact that a relatively small group of competitors (the nine OTA Defendants) hold a large share of the OTA-booking market (94% of OTA-booking in 2011)

---

[31] *Interstate Circuit*, 306 U.S. at 218, 222 (discussing how defendant distributors all imposed the terms of the conspiracy during the same season in a "radical departure from the previous business practices of the industry"); *Toys "R" Us*, 221 F.3d at 935 ("[T]he manufacturers' decision to stop dealing with the warehouse clubs [was] an abrupt shift from the past. . . ."); *Starr*, 592 F.3d at 324 (discussing how defendants allegedly raised "wholesale prices from about $0.65 per song to $0.70 per song in or about May 2005, even though earlier that year defendants' costs of providing Internet Music had decreased substantially. . . "); *United States v. Apple, Inc.*, 952 F. Supp. 2d 638, 691 (S.D.N.Y. 2013) ("[O]ver the course of just three days in January 2010 . . . the Publisher Defendants simultaneously switched from a wholesale to an agency model for the distribution of their e-books.").

[32] *See, e.g.*, *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007) (citing *Baby Food Antitrust Litig.*, 166 F.3d at 131-32 for the proposition "that time lags of three to six months between pricing moves 'refute rather than support' allegations of conspiracy"); *In re LTL Shipping Servs. Antitrust Litig.*, No. 08-MD-01895, 2009 WL 323219, at *17 (N.D. Ga. Jan. 28, 2009) (finding that "the time period [in which prices allegedly changed]—from 2003 to 2007—is far too broad for the Court to infer an agreement," and noting that "other cases in which courts inferred agreement based on parallel price changes" involved "a defined and narrow date or date window").

may be a characteristic that is consistent with a conspiracy.[33] But without more, OTA Defendant's

market share, like the ambiguous facts discussed before, merely indicates that a conspiracy *could* have

formed. It certainly does not create the sort of circumstances presented in cases in which a powerful

defendant or group of defendants asserted their market power vertically to induce a horizontal

agreement among a group of competitors.[34] Unlike those cases, the purportedly dominant entities

in this case, OTA Defendants, built up their market share (by 2011) more than seven years after the

conspiracy allegedly formed (2003). And none of the Complaint's other factual allegations show that,

by 2003, the OTA Defendants held the sort of market power or influence over Hotel Defendants

seen in cases like *Toys "R" Us* and *Interstate Circuit*. Accordingly, that OTA Defendants accounted

for 94% of OTA bookings in 2011 is a fact that is merely consistent with the other ambiguous

conspiracy allegations.

In conclusion, the Complaint fails to adequately alleges its § 1 claims, because the well-pled

facts do not plausibly suggest that Defendants entered into an industry-wide conspiracy. As such, the

Court **DISMISSES WITHOUT PREJUDICE** Counts I and II of the Complaint.

B.      *State Antitrust Law Claim (Count III)*

Likewise, the Complaint's state antitrust law claim also warrants dismissal in light of the

inadequately pled conspiracy allegations. Count III is filed pursuant to antitrust statutes in twenty-six

---

[33] *See, e.g., Starr*, 592 F.3d at 325 ("Empirical studies considering many industries have suggested that noncompetitive pricing that may be the result of price coordination is likely to appear when the four leading firms account for some 50 to 80 percent of the market") (quoting Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW § 1431a (2d ed. 2003)) (brackets omitted).

[34] *See, e.g., Interstate Circuit*, 306 U.S. at 215 (two dominant movie theater operators impose conspiracy on distributors); *Toys "R" Us*, 221 F.3d at 936 (major toy retailer coerces distributors to agree to boycott the retailer's competitors).

jurisdictions listed in the Complaint. (Compl. ¶¶ 196-220.) Defendants assert that "[e]ach of these 26 jurisdictions uses federal precedent to interpret that jurisdiction's antitrust laws." (Mot. 42.) The only contention Plaintiffs raise with this claim made by Defendants is that "some states continue to treat resale price agreements as automatically illegal under their own state antitrust protections, notwithstanding" *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007). (Resp. 54.) Plaintiffs do not, however, dispute that each state law requires the same sort of concerted action § 1 requires. Therefore, since the Court already found the price-fixing conspiracy allegations implausible, it must conclude that the Complaint's state antitrust law claim is also inadequately pled. As such, the Court **DISMISSES WITHOUT PREJUDICE** Count III of the Complaint.

C.    *State Consumer Protection Claim (Count IV)*

The Complaint's final count is based primarily on a second, distinct variety of misconduct: Defendants' "lowest" or "best" price guarantees on rooms sold online. Specifically, Defendants allegedly "promised the 'Best' or 'Low Price'" and "informed consumers that [they] would match any low price the consumer found," even though "Defendants knew there were no lower prices and that the series of promises were illusory and deceptive." (Compl. ¶ 224.) "As a result of this deceptive conduct," according to the Complaint, "Plaintiffs did not receive the best price or lowest price and were injured." (*Id.* ¶ 225.) Count IV of the Complaint, therefore, seeks recovery under forty state consumer protection statutes, five of which Plaintiffs voluntarily dismissed in light of a discrete deficiency raised in Defendants' Joint Motion.[35] (*Id.* ¶ 223(a)-(nn).)

---

[35] Defendants sought dismissal of claims brought under consumer protection statutes in five states based on those statutes' bars on class actions. (Mot. 48.) In response, Plaintiffs voluntarily dismissed claims brought under statutes in those five states Defendants identified, including Montana, South Carolina, Louisiana, Georgia, and Tennessee. (Resp. 56 n.265.)

Defendants now move to dismiss Count IV on a number of grounds. (*See* Mot. 43-48.) For now, the Court need only address the issues Defendants raise concerning two of the consumer protection claim's essential elements.

###### 1. Deceptive/Unfair Conduct

As Plaintiffs detail in their brief, each consumer protection statute at issue generally prohibits deceptive and/or unfair conduct. (Resp. 58-59.) Deceptive conduct generally entails "acts likely to mislead a reasonable consumer acting reasonably under the circumstances." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) (discussing N.Y. GEN. BUS. LAW § 349) (quotation marks omitted). Similarly, conduct is generally considered "unfair" based on "'(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers.'" *Osborn v. J.R.S.-I., Inc.*, 949 F. Supp. 2d 807, 813 (N.D. Ill. June 7, 2013) (quoting *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002) in the discussion of 815 ILCS § 505/2).

Defendants contend that the rate guarantees are not deceptive or unfair, because "the named plaintiffs got exactly what they were purportedly promised—the best or lowest price available online." (Mot. 43.) Plaintiffs respond that Defendants' "literal truth" defense does not bar recovery here, because the overall impression created by the rate guarantees is unfair and deceptive to the ordinary reader. (Resp. 56-57.) Specifically, Plaintiffs maintain that the rate guarantees create an overall impression that is (i) deceptive, because even though it "impl[ies] competition that results in the consumers receiving the lowest market price," the "[c]onsumers are not, in fact, receiving the lowest or best price that the market has to offer" (*id.* at 60), and (ii) unfair, in that it has "the effect of hiding the fact that" the RPM agreements ensure no lower price can be offered. (*Id.* at 59.)

- 28 -

Defendants counter that the guarantees "do not imply anything about how the prices are set; rather these statements merely provide assurance to the customer that the prices offered . . . are at least as low as any other published price, and then provide a remedy to the consumer if the price quoted cannot meet that assurance." (Mot. at 44.) The Court finds Plaintiffs' position here more persuasive.

The Supreme Court's discussion of the "literal truth" defense in *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178 (1948) has been "adopted by virtually every court that has considered the matter."[36] *Miller v. Am. Family Publishers*, 663 A.2d 643, 653-54 (N.J. Super. 1995). There, the Court held that:

> Advertisements as a whole may be completely misleading although every sentence separately considered is literally true . . . . That exceptionally acute and sophisticated readers might have been able by penetrating analysis to have deciphered the true nature of the [advertisement's] terms is not sufficient to bar findings of fraud by a factfinding tribunal. Questions of fraud may be determined in light of the effect advertisements would most probably produce on ordinary minds.

*Donaldson*, 333 U.S. at 189-90.

Accordingly, though the best or lowest price guarantees were literally true—consumers did in fact get the lowest or best price available online—a reasonable consumer of an "ordinary min[d]" may, nonetheless, find the advertisements to be deceptive, so long as they have a tendency to mislead. Contrary to Defendants' contentions, a reasonable consumer of ordinary intelligence could plausibly find that the advertisement falsely implies that the lowest or best price offered is being set through Defendants' competitive discounting efforts, rather than contractual assurances. Take, for

---

[36] In their reply, Defendants contend that they have effectively established "that literal truth is a defense under the District of Columbia consumer protection statute." (Reply at 24 n.22.) But the case Defendants cite, *Saucier v. Countrywide Home Loans*, 64 A.3d 428 (D.C. 2013), does not reject the holding in *Donaldson*. Instead, *Saucier* merely states that "a reasonable consumer *generally* would not deem an accurate statement to be misleading. . . ." 64 A.3d at 442 (emphasis added).

example, OTA Defendant Expedia's best price guarantee: "Find a cheaper trip within 24 hours of booking and we'll refund the difference—and give you a travel coupon worth $50." (Compl. ¶ 130(b).) It seems plausible that an ordinary consumer would reasonably infer from this advertisement that Expedia is trolling the online market, looking for the lowest price for a particular room in that 24-hour period, and publishing that rate for the consumer. Expedia even implies that it is putting in its best effort to find the consumer the best price, promising that if it slips up, that consumer gets a refund and a $50 travel coupon. In reality, Expedia's promise is illusory—it has entered into a contract (the RPM agreement) that ensures the rate offered is the same "low" price being offered everywhere else online. Absent a breach of the RPM agreement, Expedia will never have to pay the consumer that refund and a $50 coupon. These allegations, therefore, plausibly show that a reasonable consumer may be misled to believe she was receiving the lowest price available *in a competitive market*.

Similarly, Plaintiffs have plausibly alleged that the rate guarantees qualify as "unfair" under the consumer protection statutes. The rate guarantees unscrupulously promise the best rate without any indication that the particular rate is actually the same as all other rates offered online. And the purpose of the guarantee was primarily, if not purely, commercial. While Defendants posit that the rate guarantees had the laudable goal of assuring consumers they would not have to go searching elsewhere for a better online rate, if this was truly the desired effect, the advertisement would not likely induce consumers to go search elsewhere with the illusory promise of an award if a lower rate is found. Instead, the guarantees were intended to attract more consumers to book at that particular defendant's website, with the promise that the consumer will not find a better price than the "best" being offered on that website. In short, it is not in the public's best interest to allow unscrupulously

misleading advertisements made for commercial gain. Accordingly, the Court finds Complaint's allegations of unfair and/or deceptive conduct on the part of Defendants to be implausible.

### 2.  Proximate Causation

Nevertheless, Count IV of the Complaint cannot survive this Motion, because Plaintiffs fail to plausibly allege that Defendants' well-pled misconduct proximately caused Plaintiffs' injuries. It is undisputed that each consumer protection statute at issue requires, in some form or another, that the defendant's unlawful conduct proximately cause the plaintiff's complained-of-harm.[37]

The sole causation allegations for Plaintiffs' consumer protection claim can be found at paragraph 225 of the Complaint: "As a result of this deceptive conduct [i.e., the rate guarantees] Plaintiffs did not receive the best price or lowest price and were injured." In other words, the Complaint alleges that Defendants' deceptive rate guarantees caused Plaintiffs harm in the form of supra-competitive prices, that is, rates paid above the "best" or "lowest" rate a competitive online market could offer. Defendants contend that these allegations are, first, too conclusory, and second, implausible, "because the Complaint concedes that there were no 'lower or better price[s].'" (Mot. 45) (quoting Compl. ¶¶ 78, 224.) The Court agrees.

Count IV fails to adequately plead proximate causation, because Plaintiffs' alleged injury—payment of supra-competitive prices—has no plausible connection to the misconduct at issue—Defendants' deceptive low or best price guarantees. True, Plaintiffs need not show that the

---

[37] *See, e.g., Martinelli v. Petland, Inc.*, No. 09-CV-529, 2010 WL 376921, at *8 (D. Ariz. Jan. 26, 2010) ("[P]roximate causation is an essential element of claims brought under state consumer protection statutes"); *White v. Wyeth*, 705 S.E.2d 828, 834 & n.8 (W. Va. 2010) (noting that, including West Virginia, twenty-nine state consumer protection statutes, eighteen of which are also alleged here, incorporate a proximate causation requirement through the statutory language "as a result of").

guarantees were the "sole cause of" Plaintiffs' harm. (Resp. 61.) Likewise, the Court agrees that not all consumer protection statutes require Plaintiffs to allege that they relied on the deceptive advertisement in choosing to book rooms with Defendants. (*Id.*) No matter, because the Complaint fails to plausibly allege that the guarantees had *any* discernible effect on the prices Plaintiffs paid.

A proximate causation "deficiency" may be seen more clearly "by removing the [misconduct] from the [P]laintiffs' narrative." *Walters v. McMahen*, 684 F.3d 435, 444 (4th Cir. 2012). Here, take Defendants' rate guarantees away, and each Plaintiff would be stuck paying the exact same price, since, as the Complaint alleges, room prices were the same across the entire online bookings market. Moreover, Plaintiffs readily admit that the rate guarantees effectively delivered on their promise (albeit deceptively) of offering the lowest price *available online*. Thus, while the rate guarantees may be deceptive despite their literal truth, the fact that Plaintiffs got what they were promised further shows that the guarantees had no plausible effect on the price at which rooms were sold online.[38]

Essentially conceding this causation defect, Plaintiffs stress that the rate guarantees cannot be viewed in isolation. (Resp. 61.) Instead, Plaintiffs press the Court to find, when viewing the Complaint "as a whole," that proximate causation is satisfied in light of allegations showing that "Defendants' deceptive scheme cause[d] Plaintiffs to pay supra-competitive prices for hotel rooms." *Id.* But there are at least two problems with the argument Plaintiffs make here.

---

[38] *See Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 154-55 (2002) (finding that plaintiff—who claimed that defendant deceptively advertised the environmental benefits of its gasoline in a misleading way—failed to adequately allege proximate causation, because "[p]laintiff does not allege that he received anything other than what he expected to receive when he purchased defendant's gasoline, i.e., a certain amount of gasoline, with a certain octane level, for the price listed on the pump").

First, the unlawful conduct alleged in support of Count IV—indeed, the only conduct the Court considered in evaluating the first element—is Defendants' rate guarantees, not a "deceptive scheme" which Plaintiffs now attempt to assert for the first time in their brief. As this Court has previously stated, "a plaintiff may not amend its complaint in response to a motion to dismiss." *In re Kosmos Energy Ltd. Sec. Litig.*, No. 3:12-CV-373-B, 2013 WL 3196437, at *14 (N.D. Tex. June 24, 2013).

Second, even considering these new allegations, Plaintiffs' argument would fail, because the Court already found, in discussing the antitrust claims, that the concerted action allegations are implausible. In other words, if Plaintiffs wish to assert an injury stemming from a "scheme," Plaintiffs must first plausibly allege that Defendants actually engaged in such a "scheme." But as detailed above, the allegations just as likely reveal a series of individual, parallel actions taken by each OTA-Hotel Defendant pair. Thus, the Court cannot reasonably conclude that Plaintiffs' injury was caused by Defendants' "scheme" when that scheme was not adequately pled.

Finally, Plaintiffs' comparison here to *Clark v. TAP Pharmaceutical Products, Inc.,* 343 Ill. App. 3d 538 (2003) is off point. Without getting bogged down in the details of that case, it is sufficient to note that defendants there were charged with operating a multi-faceted scheme that resulted in consumers (allegedly) paying inflated prices for a pharmaceutical. The court in *Clark* had to view the defendants' conduct as a whole, because each piece built toward the end goal of deceptively inflating prices, which allowed defendants to pay their physician-customers a kickback while "increas[ing] their own profits and market share." 343 Ill. App. at 542. But here, the deceptive conduct (Defendants' rate guarantees) is entirely distinct from the only conduct that could have possibly caused Plaintiffs' harm (the alleged "scheme"). Take any piece of the scheme in *Clark* away and

plaintiffs' harm (inflated prices) would not be the same; take away the only deceptive conduct alleged here (rate guarantees), and Plaintiffs' injury (inflated prices) would be the exact same.

In conclusion, the Court **GRANTS** Defendants' Motion as to Plaintiffs' consumer protection claims, and **DISMISSES WITHOUT PREJUDICE** Count IV of the Complaint.

## IV.

### DISMISSAL WITHOUT PREJUDICE

Having dismissed each count of the Complaint, the Court now must decide whether to provide Plaintiffs with an opportunity to re-plead their dismissed claims. During the Motion Hearing, counsel for the Hotel Defendants submitted that:

> [T]he complaint should be dismissed with prejudice, because [Plaintiffs] don't have any other facts they can allege. They haven't come to this court and said, we have more facts we can add to the Complaint . . . . they have already amended the Complaint and had the brain trust of all these wonderful plaintiff lawyers who filed 25-plus lawsuits around the country who came together and agreed on a consolidated complaint and gave their best effort, and they can't get there.

(Mot. Hearing 83-84.) While counsel makes a persuasive argument, dismissal with prejudice would be too harsh a sanction for the insufficient pleadings in these circumstances.

A "[d]ismissal with prejudice for failure to state a claim is a decision on the merits [that] essentially ends the plaintiff's lawsuit." *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977). This "drastic remedy" should be used sparingly, *id.*, because cases should ideally be decided "on the basis of the substantive rights involved rather than on technicalities." 5B Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1357 (3d ed. 2004). Thus, this Court follows the "well-established policy that the plaintiff be given every opportunity to state a claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). This policy holds "true even when the

district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading." Wright & Miller, *supra*, § 1357. Indeed, "the cases make it clear that leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim." *Id.*

While it remains unclear whether Plaintiffs will be able to come forth with additional facts to overcome the pleading deficiencies stated herein, the Court reserves judgment for now to allow them an opportunity to re-plead. Though Plaintiffs amended the Complaint once before, this is the Court's first opportunity to judge the sufficiency of the pleadings. In an effort to remain consistent with federal policy, this Court generally affords plaintiffs at least one opportunity to amend following a Rule 12(b)(6) dismissal.[39] This is especially appropriate here given all the uncertainty fleshed out during the briefing and hearing on this Motion. Accordingly, the Court dismisses the Complaint's four counts without prejudice to re-file or amend.

## V.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Joint Motion to Dismiss (doc. 108) and **DISMISSES WITHOUT PREJUDICE** Counts I, II, III and IV of Plaintiffs' Consolidated Amended Complaint (doc. 85). The Court also finds the supplemental motions filed by Choice Hotels (doc. 107) and Sabre Holdings (doc. 110) **MOOT** in light of the Complaint's dismissal.

---

[39] *See* Wright & Miller, *supra*, § 1357 ("A wise judicial practice (and one that is commonly followed) would be to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the district court will be able to determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim for relief.").

If Plaintiffs wish to file a second consolidated amended complaint in an effort to overcome the deficiencies warranting dismissal stated herein, they must do so by moving for leave to amend within <u>thirty (30) days</u> from the date of this Order. This motion shall be accompanied by a synopsis no longer than <u>fifteen (15) pages</u> explaining why the amendments overcome the deficiencies stated herein. If Defendants wish to respond, they must do so within <u>fourteen (14) calender days</u> of Plaintiffs' motion by filing a joint responsive brief no longer than <u>fifteen pages (15)</u>. No further briefing will be permitted. The Court will only extend these deadlines and page-length limitations if the requesting party moves for leave and shows good cause.

Should Plaintiffs move for leave to amend, the Court will determine whether or not the re-pleadings are "futile" in light of the deficiencies warranting dismissal stated in this Order. In reviewing such a motion, the Court will only consider arguments concerning the deficiencies stated herein. Should Plaintiffs overcome these deficiencies, the Court will address the issues it deferred consideration of in this Order and request further briefing, if necessary, at that time.

SO ORDERED.

DATED: February 18, 2014.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE