UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re: | C.A. No. 3:12-cv-3515-B |
| ON-LINE TRAVEL COMPANY (OTC) HOTEL BOOKING ANTITRUST LITIGATION | RELATES TO ALL CASES |

**PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND MEMORANDUM OF LAW**

## I.      INTRODUCTION

Pursuant to FED. R. CIV. P 15(a) and the Court's Memorandum Opinion and Order dated February 18, 2014, Dkt. No. 136, Plaintiffs' hereby move for leave to file the [Proposed] Second Consolidated Amended Complaint attached hereto as Exhibit A.

The most fundamental difference between Plaintiffs' Consolidated Amended Complaint ("CAC") and Plaintiffs' proposed Second Consolidated Amended Complaint ("SCAC") is in the nature of the alleged restraint of trade.  This court characterized the "nub" of the CAC as "the adoption of parallel similar RPM agreements seen across pairs of OTA and Hotel Defendants,"[1] in essence a series of vertical arrangements.  Further investigation and research by Plaintiffs has revealed that the restraints at issue in this industry were naked agreements between rival OTAs to stop competing on price.  As alleged in the SCAC, this scheme between Defendant OTAs was marked by the abrupt cessation of price competition in 2003, after several years of vigorous price competition in the years 1999 – 2002.  No individual OTA could have succeeded in refusing to compete for hotel reservation customers without suffering the loss of a great many price-conscious travelers.

Only after the Defendant OTAs agreed amongst themselves to cease price competition did they begin efforts to stamp out the only remaining possible source of competition:  the hotels themselves.  The SCAC alleges that the "Major Hotel Chains" were coerced by the dominant OTA Cartel into giving up their rights to price selectively between different distribution channels.  Threatened with the loss of a critical distribution channel, hotels agreed not to undercut the Defendant OTAs, and ultimately did the bidding of OTAs in enforcing the OTA's scheme to eliminate price competition for rooms sold by OTAs.  These allegations lead to a

---

[1] Memorandum Opinion and Order ("Opinion"), p. 16.

second fundamental difference between the CAC and the SCAC.  The SCAC names only the

OTAs as Defendants and drops all of the CAC's Hotel Defendants.

Thus the SCAC alleges first and foremost a *per se* price fixing agreement between the

Defendant OTAs, an agreement which caused hotel prices to rise in 2003 and afterwards.  The

SCAC alleges that the "rate parity" agreements are *not* the "nub" of this restraint but rather a

necessary tool to effectuate the underlying agreement not to compete between Defendant OTAs.

The OTA price fixing agreement is plausible both on factual grounds as well as economic

grounds, and Plaintiffs submit that their SCAC satisfies the requirements of the Supreme Court's

decision in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

## II.     SUMMARY OF THE PROPOSED AMENDMENTS

The main substantive amendments in the SCAC are outlined below:

A.     Defendant OTAs competed vigorously on price in the period 1999 – 2002,

resulting in a wide variety of prices available to consumers on the Web.  ¶¶ 57-60.[2]  In 1999,

Travel & Leisure magazine found that "No site consistently gave us the lowest rate."  ¶ 59.  The

October 2012 issue of Travel & Leisure reported that "Discount hotel sites are increasingly

popular, which is helping to hold rates down . . . ."  ¶ 60.

B.     However, in 2003 the vigorous price competition between Defendant OTAs came

to an abrupt halt.  ¶¶ 61-63.  When Travel & Leisure surveyed the same hotel websites in 2003, it

found a very different market:

> When we last tested hotel booking methods in 1999, we often
> found differences of more than $100, but this time around that
> rarely happened.  ¶ 61.

---

[2] "¶ __" referrers to paragraphs in the [Proposed] Second Consolidated Amended Complaint.

These results were confirmed by the Consumers Union in a comprehensive study published in April 2003.  Instead of $100 differences between competitors, it found that price competition had been reduced to "only a few dollars" and that Expedia in particular "edged its nearest competitor by $1 per night."  ¶ 62.  Thus, in the course of a year price competition between Defendant OTAs disappeared.  ¶ 63.

C.     The SCAC alleges that the "rate parity" agreements *followed* the cessation of price competition between the OTA Defendants as a necessary means of stamping out the OTA's last remaining source of price competition:  their hotel room suppliers.  ¶¶ 64-66.

Hotels had been free to undercut the prices charged by OTAs who distributed their rooms to consumers, but were forced to give up that right by the adoption of "rate parity" agreements with OTAs, a pretextual cover for the price-fixing scheme imposed by the Defendant OTAs.  ¶ 68.

D.     Hotels are dropped as named defendants and now referred to as "Major Hotel Chains."  ¶ 5, n.1.  The SCAC alleges that the Defendant OTAs were dominant retailers by 2002 (¶ 60) capable of imposing unreasonable vertical restraints which "forestall innovation in distribution that decreases costs."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893-4 (2007).  Major Hotel Chains later enforced the OTA's MFN clauses which enabled OTAs to enforce their price fixing scheme against upstart rival OTAs.  ¶¶ 91-113.

E.     The SCAC adds a new Count V which alleges that the vertical price-fixing arrangements imposed by the Defendant OTAs are *per se* violation of the state antitrust laws in California.

### III.    ARGUMENT

This memorandum is intended to explain "why the amendments overcome the deficiencies stated" in the court's February 18, 2014 Memorandum Opinion and Order.

Plaintiffs' memorandum begins, however, with a brief review of the applicable standards under FED R. CIV. P. 15(a) and then demonstrates why the SCAC addresses the key deficiencies identified in the Opinion.

## A.      Leave to Amend "Shall Be Freely Given When Justice So Requires"

Rule 15(a) of the Federal Rules of Civil Procedure governs amendments to pleadings. "[A] district court's discretion to deny a litigant leave to amend ... 'is limited because Rule 15 evinces a bias in favor of granting leave to amend.'" *Goldstein v. MCI Worldcom*, 340 F.3d 238, 254 (5th Cir. 2003) (quoting *S. Constructors Group, Inc. v. Dynalectric Co*., 2 F.3d 606, 611 (5th Cir. 1993). *See also Papa Berg, Inc. v. World Wrestling Entm't, Inc*., 2013 WL 6159296, at *3 (N.D. Tex. Nov. 25, 2013) (Boyle, J.) (quoting same).

In the context of the district court's discretion to deny leave to amend, the Fifth Circuit describes "discretion" as "a misleading term, for rule 15(a) severely restricts the judge's freedom, directing that leave to amend 'shall be freely given when justice so requires.'" *Dussouy v. Gulf Coast Inv. Corp*., 660 F.2d 594, 597-98 (5th Cir. 1981). According to the Fifth Circuit, "[t]he policy of the federal rules is to permit liberal amendment to facilitate determination of claims on the merits and to prevent litigation from becoming a technical exercise in the fine points of pleading." *Id*. (citing *Foman v. Davis*, 371 U.S. 178,182 (1962); *Conley v. Gibson*, 355 U.S. 41, 48 (1957); *Sherman v. Hallbauer*, 455 F.2d 1236, 1242 (5th Cir. 1972)). "Thus, unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Dussouy*, 660 F.2d at 598 (citing *Lone Star Motor Import, Inc. v. Citroen Cars Corp.*, 288 F.2d 69, 75 (5th Cir. 1961)).

## B.      The SCAC Alleges A Plausible Horizontal Price Fixing Conspiracy

This court described the "nub" of the CAC as the OTA and Hotel Defendants' "parallel business behavior – the adoption of similar business strategies across pairs of OTA and Hotel

- 4 -

Defendants."  Opinion at 16.  The SCAC alleges a more fundamental and naked price fixing agreement by the OTAs which pre-dated the adoption of any RPM agreements.  ¶¶ 4-5.  The horizontal agreement between OTA Defendants was one in which rival OTAs in 2003 abruptly stopped competing on price after several years of vigorous price competition in the same market. ¶¶ 61-62.  These allegations address the court's conclusion that the "gradual pricing change" alleged in the CAC did "not suggest a conspiracy."  Opinion at 25.

The SCAC alleges precisely the type of "unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason" which the Supreme Court identified as suggestive of an agreement in restraint of trade. *Twombly*, 550 U.S. at 556, n.4.

The SCAC alleges that unlike the Baby Bells in *Twombly*, which never competed in each other's territories, the OTA Defendants had a several year history of vigorous price competition. This price competition, as expected, kept OTA margins in check and kept hotel prices lower than they would have been in the absence of competition.  ¶¶ 59-60.

The OTA's agreement to cease price competition in 2003 came as an unprecedented change in the hotel reservation business.  The abrupt shift in the industry as to price competition is not merely a conclusory assertion, but rather a factual allegation supported by contemporaneous reporting from trusted sources, both within and without the travel industry.

According to the SCAC, the OTA agreement to no longer compete on price is a *per se* antitrust violation separate and apart from any further action the OTAs took to force the adoption of MFN clauses by the Major Hotel Chains.  It is entirely plausible as a matter of economics that the OTAs would recoil from years of vigorous price competition between themselves in order to protect their margins and increase their profits.  But more critically, no individual OTA could

prosper if it *unilaterally* ceased the price competition which had characterized the industry between 1999 and 2002.  The fact that OTA price competition ended in early 2003 can only be explained by the formation of a horizontal price fixing cartel.

**C.    After Their Price Fixing Agreement Was In Place, The OTA Defendants Required The Major Hotel Chains To Stop Price Competition As Well**

Prior to 2003, hotels offered room rates which varied from those offered by their online distributors, the OTA Defendants.  ¶ 61.  Hotels could undercut online prices when it served their interests in filling their hotels with customers.

Only after they ceased to compete on price did the OTA Defendants begin to require the same from the Major Hotel Chains.  By 2003, the OTA Defendants had sufficient market power to force Major Hotel Chains to stop offering lower prices to hotel room buyers.  For example, Marriott announced in 2003 a "sweeping overhaul of its transient pricing, bringing parity to all Marriott distribution channels – offline and online."  ¶ 97d.  Not only did the OTAs terminate the Hotels as the last source of price competition, but they ultimately required the Major Hotel Chains to *enforce* the OTA price fixing agreement.  The MFN and "rate parity" clauses required the Major Hotel Chains to cease doing business with any rival OTA which dared to undercut prices set by the OTA Defendants.

This aspect of the OTA Defendants' scheme was a necessary mechanism to protect the success of their horizontal agreement not to compete on price.  It was not put into place to "effectuate a profitable price discrimination strategy" (Opinion at 16), but was rather a coerced outcome necessitated by the OTA Defendants' agreement not to compete on price.  As with the OTA Defendants' price fixing agreement, the MFN and rate parity clauses represented an unprecedented change in the pricing structure of the hotel room distribution industry, because these types of agreements did not exist prior to 2003.  ¶¶ 66, 97d, 106.  There is no discernable

- 6 -

pro-competitive reason for this change in distribution patterns after a period of free and open price competition between 1999 and 2002.

The SCAC should dispel any lingering ambiguity about the role of the Major Hotel Chains in the OTA Defendants' price fixing scheme. Hotel chains are not defendants in the SCAC because they were coerced by the OTA Defendants into agreeing to enforce the OTAs' price fixing scheme against any OTA which dared to compete on price. ¶¶ 99-103. By 2002 and 2003, the OTA Defendants were dominant distributors of hotel room reservations. ¶¶ 135-139. None of the Major Hotel Chains could risk losing a key distribution channel for their perishable goods, as the lost revenue from an empty hotel room cannot be recouped at a later date. ¶ 99.

As with the OTA Defendants' agreements not to compete on price, the Major Hotel Chains were protected from price competition only because the OTA Defendants had sufficient market power to shift the entire industry into "rate parity." No Major Hotel Chain could have prospered if it unilaterally raised prices by adopting "rate parity" with the OTA Defendants. Competing hotel chains would have gained a price advantage on comparable rooms if OTAs continued to offer discounted rates, rather than agreeing not to compete on price. In the restrained marked, less efficient OTAs can continue to distribute room bookings in the Major Hotel Chains at higher costs to the detriment of consumers and hotels. ¶¶ 141-144.

Whether adjudged as a component of the OTA Defendants' horizontal price fixing conspiracy, or as coerced MFN contracts under the Rule of Reason, the vertical agreements between OTA Defendants and the Major Hotel Chains had a pronounced anticompetitive effect: consumers paid higher prices for hotel rooms. Both intra-brand and inter-brand competition was harmed. ¶ 143.

**D.      The Vertical Agreements Between OTA Defendants and the Major Hotel Chains Are *Per Se* Violations of California Law**

The SCAC adds a cause of action in Count V under the California competition statute, the Cartwright Act.  RPM agreements remain *per se* violations of law in California as California courts, and the California Attorney General, have declined to adopt the federal Rule of Reason standard in *Leegin*.  Cartwright Act, Business & Professions Code section 16720 *et seq*., *Harris v. Capitol Records Distrib. Corp.*, 64 Cal. 2d 454, 463 (1966); *Mailand v. Burckle*, 20 Cal. 3d 367, 377 (1978); *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 369 (2001); *Kunert v. Mission Fin. Servs. Corp.*, 110 Cal. App. 4th 242, 263 (2003).

**E.      The OTA Defendants' Unlawful Price Fixing Agreement Is A Deceptive Scheme Which Injures Consumers**

This court found that the OTA and Hotel "Best Price Guarantees" could violate state consumer protection statutes even if they were literally true.  Opinion 29-31.  However, the court went on to find that the CAC failed to adequately plead causation.  Opinion at 31.  The SCAC addresses this deficiency directly.

The SCAC alleges the Best Price Guarantees are deceptive because they are a necessary part of the OTA Defendants' horizontal price fixing scheme.  ¶¶ 115-125.  The advertised prices are the direct result of a price fixing scheme which has elevated the prices of hotel rooms offered by the Major Hotel Chains.  But for this scheme, advertised, and actual, hotel room prices would be lower.

So if the CAC alleged that only the rate guarantees were deceptive (Opinion at 33), the SCAC makes a different claim.  The rate guarantees are no more than the public manifestation of the underlying horizontal price fixing agreement between the OTA Defendants, and as argued above, these claims are eminently plausible.

- 8 -

The rate guarantees are deceptive because the OTA Defendants have created a fixed price in the marketplace.  ¶¶ 126-128.  The deception causes consumers to pay higher prices for hotel rooms because it masks the absence of price competition.  ¶¶ 91-113.  It deprives consumers of the motivation to even shop around for a better price.  The injury to hotel consumers is a real economic harm and will continue unabated until the OTA Defendants are required to end their illegal price fixing scheme in all of its manifestations.

<h3 style="text-align:center">IV.     CONCLUSION</h3>

The SCAC alleges a horizontal agreement between the OTA Defendants not to compete on price.  This agreement, and the attendant steps the OTA Defendants took to effectuate an industry-wide end to price competition, could not have succeeded if any one OTA acted unilaterally.  The SCAC alleges a set of facts which create plausible collusive claims of antitrust and consumer protection injury.  Plaintiffs' motion for leave to file the SCAC should be granted.

DATED:  March 20, 2014.

HAGENS BERMAN SOBOL SHAPIRO LLP


By: /s/ Steve W. Berman
    Steve W. Berman
George W. Sampson
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
george@hbsslaw.com

Jeff D. Friedman
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
1144 W. Lake Street, Suite 400
Oak Park, IL 60301
Telephone:  (708) 628-4949
Facsimile:  (708) 628-4950
beth@hbsslaw.com

*Lead Counsel for Plaintiffs*

Marc R. Stanley
STANLEY IOLA LLP
3100 Monticello Avenue, Suite 750
Dallas, TX  75205
Telephone:  (214) 443-4300
Facsimile:  (214) 443-0358
marcstanley@mac.com

*Liaison Counsel for Plaintiffs*

- 10 -

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 20, 2014 the foregoing was filed

electronically and served by mail on anyone unable to accept electronic filing.  Notice of this

filing will be sent be e-mail to all parties by operation of the Court's electronic filing system or

by mail to anyone unable to accept electronic filing.  Parties may access this filing through the

Court's system.


_/s/ Steve W. Berman_____
Steve W. Berman