# Exhibit A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re: | C.A. No. 3:12-cv-3515-B |
| ON-LINE TRAVEL COMPANY (OTC) HOTEL BOOKING ANTITRUST LITIGATION | RELATES TO ALL CASES |

**[PROPOSED] SECOND CONSOLIDATED AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    NATURE OF ACTION ....................................................................................1

II.   PARTIES ......................................................................................................5

      A.    Plaintiffs .............................................................................................5

      B.    Defendants .......................................................................................10

III.  AGENTS AND CO-CONSPIRATORS ......................................................12

IV.   JURISDICTION AND VENUE ..................................................................12

V.    SUBSTANTIVE ALLEGATIONS .............................................................13

      A.    The Online Travel Agency Defendants Become Indispensable to the
            Major Hotel Chains and Have Significant Market Power ....................13

      B.    The Online Travel Agency Defendants Use their Dominance to Prevent
            Discounting .........................................................................................15

      C.    The Defendants Enforced the Agreements to Prevent Discounting .....27

      D.    The Price Fixing Scheme Has Purposefully Resulted in "Rate Parity"
            for Rooms Through the Online Travel Agency Defendants – Allowing
            the Online Travel Agency Defendants to Always Guarantee the "Best"
            (Albeit Same) Prices ...........................................................................36

      E.    The Online Travel Agency Defendants Deceive Consumers by
            Advertising "Best Prices" or "Lowest Prices" .....................................52

                  a.    Travelocity's Guaranteed Low Prices.............................52

                  b.    Expedia's Best Price Guarantee....................................53

                  c.    Booking.com Best Price Guarantee ...............................53

                  d.    Hotels.com Price Match Guarantee ...............................53

                  e.    Orbitz Low Price Guarantee ..........................................53

                  f.    Priceline Low Price Guarantee ......................................54

            2.    Major Hotel Chains..........................................................54

                  a.    IHG ...............................................................54

| | b. | Starwood .................................................................... | 55 |

| | c. | Marriott ..................................................................... | 55 |

| | d. | Trump ........................................................................ | 56 |

| | e. | Hilton ........................................................................ | 56 |

| | f. | Kimpton ..................................................................... | 57 |

| | g. | Wyndham ................................................................... | 57 |

| | h. | Carlson (Radisson)..................................................... | 58 |

| | i. | Best Western ............................................................. | 58 |

| | j. | Choice Hotels ............................................................ | 59 |

| | k. | Hyatt.......................................................................... | 59 |

F.     Investigation by Governmental Authorities.............................................61

VI.     THE RELEVANT MARKET AND DEFENDANTS' MARKET POWER...................62

VII.     MARKET EFFECTS OF AND ANTITRUST INJURY DUE TO DEFENDANTS' ANTICOMPETITIVE CONDUCT.................................................................63

VIII.     CLASS ALLEGATIONS .................................................................................65

IX.     TOLLING OF THE STATUTE OF LIMITATIONS, FRAUDULENT CONCEALMENT, EQUITABLE TOLLING AND CONTINUING VIOLATIONS ..................................................................................................68

X.     COUNTS...................................................................................................69

COUNT I  VIOLATION OF 15 U.S.C. § 1 (*Per Se* Agreements to Fix Prices)............................69

COUNT II  VIOLATION OF 15 U.S.C. § 1 (Agreements Unreasonably Restraining Trade)..................................71

COUNT III  VIOLATION OF STATE ANTITRUST LAWS (Brought by State Subclasses for Each State Listed Below) ................................73

COUNT IV  VIOLATION OF STATE CONSUMER PROTECTIONS LAWS .........................75

COUNT V ..........................................................................................................78

RELIEF REQUESTED.............................................................................................79

JURY TRIAL DEMANDED ...................................................................................................79

Plaintiffs, by and through their attorneys, on behalf of themselves and all others similarly situated, bring this Second Consolidated Amended Class Action Complaint and allege, based upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, as follows:

## I.      NATURE OF ACTION

1.      Plaintiffs purchased hotel rooms online directly from one or more of the Online Travel Agency Defendants in the United States.  Plaintiffs bring this action to challenge the Online Travel Agency Defendants' conspiracy among themselves to eliminate price competition in the sale of online hotel rooms.

2.      Industries react to innovation.  Some market participants try to compete using the very efficiencies enabled by invention.  This is exactly what market competition is about, and consumers usually benefit from such competition in the form of lower prices, increased choices, and better quality.  Other market players, however, try to restrain competition to avoid these consumer benefits, hoping to profit more by limiting competition than by winning with a better mouse trap.

3.      This case is about the major players in the online hotel reservation market choosing to restrain competition instead of embracing it.  The internet created huge efficiency gains and created a new distribution channel for increased commerce in wide-ranging industries – including consumers looking to shop for hotel reservations on line.  Making hotel reservations via the internet allowed consumers great advantages, including being able to comparison shop by seeking the lowest prices being offered by different hotels as well as by different online travel agencies.  A consumer could look at a particular hotel's website and compare its prices to several competing online travel agencies that had purchased a block of rooms from the hotel.  In this new world, online travel agencies competed with other online travel agencies and hotels by

- 1 -

offering price discounts.  Between 1999 and 2002, the incumbent Online Travel Agency

Defendants competed vigorously to offer the lowest prices to consumers.

4.      But as the online travel agencies exploited the internet as a new and rapidly

growing distribution channel, a seed was planted in the industry that grew to dislike the idea of

customers being able to shop around efficiently, with almost no transaction costs based simply

on a click of the finger.  Fearing the power of efficient information in the hands of millions of

consumers, the Online Travel Agency Defendants wanted to strip consumers of this power and

restrain the consumers' ability to find lower hotel room prices by comparison shopping.  Thus,

the incumbent online travel agencies who came to dominate the space wanted to protect their

market power against upstart online travel agencies who were willing to accept smaller margins

by offering consumers lower prices for a hotel room.  The incumbent online travel agencies

didn't want this competitive pressure.  In early 2003, a cartel was formed between the largest

online travel agencies in the market for online hotel rooms to end price competition.  Only later

was "Rate Parity" born as a mechanism to end all price competition for hotel room bookings.

5.      As a means of enforcing its price-fixing agreement, the Online Travel Agency

Defendants conspired with each other  to impose an industry-wide Retail Price Maintenance

("RPM") scheme that fixed the price for hotel room reservations at the price the Major Hotel

Chains[1] were publishing for non-packaged hotel rooms.[2]  The scheme included express terms to

set, maintain, and enforce uniform prices based on the published rate for non-packaged hotel

rooms.  The RPM agreements also restrained competition by requiring the Major Hotel Chains to

enforce the RPM agreements with respect to non-defendant, price-cutting online travel agencies,

---

[1] The Major Hotel Chains are IHG, Starwood, Marriott, Tramp, Hilton, Kimpton, Wyndham, Carlson (Radisson), Best Western, Choice, and Hyatt.

[2] A non-package room is a standalone hotel room.  A "packaged room" is a room plus other purchases, such as a room plus airfare.

- 2 -

and/or to prevent non-defendant, price-cutting online travel agencies from discounting hotel room reservations or engaging in the profit-lowering effects of retail price competition for hotel room reservations.  And the RPM agreements provided that the Major Hotel Chains could not offer to sell rooms to any other online travel agencies at a lower price than the one offered to the Online Travel Agency that was a party to the RPM agreements.  The Online Travel Agency Defendants accomplished this by including in the RPM agreements a "Most Favored Nation" ("MFN") clause that prevents the Major Hotel Chains from offering lower published prices on any other website, including the websites of other online travel agencies, and their own websites.

6.     Pursuant to the RPM agreements, the Major Hotel Chains were required to enforce the RPM scheme against non-defendant online travel agencies that competed or attempted to compete with the Online Travel Agency Defendants on price.  Thus, the RPM agreements were part of an anti-competitive scheme under which the Online Travel Agency Defendants leveraged their substantial market power and dominance to induce and/or coerce the Major Hotel Chains into agreeing to do one or more of the following:  (a) impose minimum RPM agreements on the Online Travel Agency Defendants; (b) enforce the Hotel-Online Travel Agency Defendants' Agreements as to all Online Travel Agency Defendants and all online channels; and/or (c) refuse to supply or cut off supply to price-cutting competing online travel agencies.

7.     As a result of a horizontal conspiracy between them, all of the Online Travel Agency Defendants have the same clause in their contracts with the Major Hotel Chains.  As a result, and as intended by the conspiracy, ***none*** of the Online Travel Agency Defendants compete with any of the other Online Travel Agency Defendants on price, ***and*** the retail rates for hotel room reservations are set at the hotel's published rate for non-packaged rooms and thus are

- 3 -

virtually identical among the Online Travel Agency Defendants' websites and the hotel's website for non-packaged room rates at any hotel.  As a result of these agreements, on any given day, a consumer seeking to book a room through any of the Online Travel Agency Defendants or through the hotel's website will receive the exact same rate for that room.  As a result of the agreements, none of the Online Travel Agency Defendants compete for consumers based on price.  Absent an agreement among the Online Travel Agency Defendants not to compete on price, it would be in the best economic interest of a given Online Travel Agency Defendant to compete on price as they had been prior to implementation of the scheme.

8.      Defendant Sabre, which operates Travelocity.com, has admitted that this RPM scheme:  "is a standard industry practice," according to Nancy St. Pierre, as spokeswoman for Sabre Holdings.

9.      Each of the major Online Travel Agency Defendants and Major Hotel Chains prominently advertises that they offer rooms at the "best price" or "lowest price."  Each knows that consumers pay attention to this price description when considering their choice of hotel rooms.

10.     The Defendants' "best price" or "best rate" guarantees are nothing more than a cover for their conspiracy to fix prices, such that the Defendants do not have to compete on price but can offer the "best price" to their customers knowing that all of the Online Travel Agency Defendants and Major Hotel Chains will offer the *same* anti-competitive price.  There is in reality no "best price", but instead consumers are offered a fixed uniform price.

11.     These "best price" or "lowest price" representations, made tens of thousands if not millions of times, as they appear each time a consumer uses the Online Travel Agency Defendants' websites, are deceptive and misleading.  A reasonable consumer would believe that

- 4 -

they were receiving the "best price" or the "lowest price" and not a "fixed price" or a price that was the same as that offered by all other Online Travel Agency Defendants and the hotel itself. This deceptive conduct violates the consumer protection laws of the states identified in Count IV. This deceptive practice results in a reasonable consumer not being in a position to make an informed choice as to the actual best price and/or a price that may be lower if offered through other channels or offered with variations available in packages, and this deception is ongoing.

12. Absent Defendants' anti-competitive and deceptive conduct, Plaintiffs and other Class members would have paid less for each of the hotel rooms purchased during the Class Period. The direct consequence of Defendants' unlawful conduct was that Plaintiffs and other Class members paid overcharges on their purchases of hotel room reservations throughout the Class Period. Plaintiffs thus seek damages and equitable relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, for violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1; and seek damages and equitable relief under state antitrust and consumer protection laws identified in Counts III-V.

## II. PARTIES

### A. Plaintiffs

13. Plaintiff Eric Balk is a resident of Cedar Falls, Iowa. In June 2012, Mr. Balk purchased a room at the Holiday Inn Express Hotel & Suites Bloomington. Mr. Balk purchased the room through Hotels.com. In July 2011, Mr. Balk purchased a room at the Park Plaza Bloomington through Hotels.com. Mr. Balk has been damaged by the conduct alleged herein.

14. Plaintiff Shannon Beaman is a resident of Coatesville, Indiana. Ms. Beaman purchased a room for March 28-29, 2013, at the Residence Inn by Marriott Franklin Cool

- 5 -

Springs through Expedia.  Plaintiff Beaman recalls seeing Expedia's "Best Price Guarantee."

Ms. Beaman has been damaged by the conduct alleged herein.

15.     Plaintiff Richard Bergeron is a resident of Indianapolis, Indiana.  Mr. Bergeron

purchased a room for November 3-4, 2012, at the Chicago Marriott O'Hare through Priceline

and a room for August 25-26, 2012, at the Baymont Inn & Suites Greenwood through Priceline.

Plaintiff Bergeron recalls seeing Priceline's "Best Price Guarantee" for each of his purchases.

Mr. Bergeron has been damaged by the conduct alleged herein.

16.     Plaintiff Andrew Bouchard is a resident of Reno, Nevada.  Mr. Bouchard

purchased the following rooms through Priceline:  November 11-13, 2011, at the Sheraton

Phoenix Airport; November 25-27, 2011, at the Doubletree Collinsville St. Louis; January 20-22,

2012, at the Doubletree Hotel Spokane-City Center; February 17-19, 2012, at the Sheraton Salt

Lake City Hotel; April 12-13, 2012, at the Sheraton Phoenix Airport Tempe; June 9-10, 2012, at

the Courtyard by Marriott Fairfield Napa Valley Area; June 10-11, 2012, at the Ramada Limited

Spokane; June 11-12, 2012, at the Clarion Inn Pocatello; June 23-27, 2012, at the Microtel Inn &

Suites by Wyndham Elkhart; July 28-29, 2012, at the Candlewood Suites Las Vegas; and

November 29-30, 2012, at the Rodeway Inn and Suites Boulder Broker.  Plaintiff Bouchard

recalls seeing Priceline's "Best Price Guarantee" for each of his purchases.  Mr. Bouchard has

been damaged by the conduct alleged herein.

17.     Plaintiff Andres Carullo is a resident of Dallas, Texas.  Mr. Carullo purchased a

room for July 23-24, 2012, at the Hyatt Regency Tampa Downtown through Hotels.com.

Plaintiff Carullo recalls seeing Hotels.com's "Price Match Guarantee."  Mr. Carullo has been

damaged by the conduct alleged herein.

- 6 -

18.     Plaintiff Jeremy Feitelson is a resident of Des Moines, Iowa.  Mr. Feitelson purchased a room for April 8-9, 2013, at the Ramada Limited & Suites – Airport East/Forest Park through Expedia.  Plaintiff Feitelson recalls seeing Expedia's "Best Price Guarantee." Mr. Feitelson has been damaged by the conduct alleged herein.

19.     Plaintiff Eileen Gillespie is a resident of Park Ridge, Illinois.  Ms. Gillespie purchased a room for August 20-21, 2012, at the Marriott Philadelphia Airport through Travelscape.  Plaintiff Gillespie was aware of  Travelscape's "Lowest Price Guarantee" when she purchased the room.  Ms. Gillespie has been damaged by the conduct alleged herein.

20.     Plaintiff Patricia Greenberg is a resident of Los Angeles, California.  In May 2012, Ms. Greenberg purchased a room at the Travelodge Pasadena through Expedia.  Plaintiff Greenberg recalls seeing Expedia's "Best Price Guarantee."  Ms. Greenberg has been damaged by the conduct alleged herein.

21.     Plaintiff Craig Kelly is a resident of Redding, California.  In February 2013, Mr. Kelly purchased a room at the Holiday Inn Express and Suites Fisherman's Warf through Hotels.com.  In or about September 2012, Mr. Kelly purchased a room at the Best Western Hotel Lighthouse through Hotels.com.  Plaintiff Kelly recalls being exposed to and relying on the "Price Match Guarantee."  Mr. Kelly has been damaged by the conduct alleged herein.

22.     Plaintiff Richard Kimowitz is a resident of Hoboken, New Jersey.  Mr. Kimowitz purchased a room for January 10-11, 2013, at The Westin Mount Laurel through Priceline. Plaintiff Kimowitz recalls seeing Priceline's "Best Price Guarantee."  Mr. Kimowitz has been damaged by the conduct alleged herein.

23.     Plaintiff Brent Maness is a resident of San Francisco, California.  Mr. Maness purchased rooms at various Major Hotel Chain hotels through Hotels.com, including in January

- 7 -

2010 at the Radisson Hotel Rapid City, in May 2011 at the Hilton St. Louis Downtown, in November 2012 at the Hyatt Chicago Magnificent Mile, in December 2012 at the Four Points by Sheraton Washington D.C. Downtown, and in December 2012 at the Holiday Inn Express Winnemucca.  Plaintiff Maness recalls being exposed to and relying on the "Price Match Guarantee."  Mr. Maness has been damaged by the conduct alleged herein.

24.     Plaintiff David Piening is a resident of Santa Monica, California.  In August 2012, Mr. Piening purchased a room at the W Chicago City Center through Hotels.com.  Mr. Piening recalls seeing Hotels.com's "Price Match Guarantee."  Mr. Piening has been damaged by the conduct alleged herein.

25.     Plaintiff Kent Plummer is a resident of Omaha, Nebraska.  Mr. Plummer purchased a room for April 15-17, 2011, at the Sheraton Gateway Hotel – Atlanta Airport through Priceline.  Plaintiff Plummer recalls seeing Priceline's "Best Price Guarantee." Mr. Plummer has been damaged by the conduct alleged herein.

26.     Plaintiff Diedra Powell is a resident of Orange County, California.  Ms. Powell purchased the following rooms through Priceline:  February 14-16, 2012, at the Four Points By Sheraton New Orleans Airport; February 16-18, 2012, at the Hyatt Place Atlanta Galleria; June 20-21, 2012, at the Doubletree Hotel Anaheim/Orange County; June 23-25, 2012, at the New Orleans Marriott Metairie at Lakeway; July 15-18, 2012, at the Best Western Cypress Inn And Suites; August 13-17, 2012, at the Crowne Plaza Atlanta Airport; and August 17-19, 2012, at the Hilton Garden Inn New Orleans Airport.  Plaintiff Powell recalls seeing Priceline's "Best Price Guarantee" for each of her purchases.  Ms. Powell has been damaged by the conduct alleged herein.

- 8 -

27.      Plaintiff Marcello Romanelli is a resident of Rego Park, New York.  In March 2010, Mr. Romanelli purchased a room at the Hilton Garden Inn Washington through Expedia. Plaintiff Romanelli recalls seeing Expedia's "Best Price Guarantee."  Mr. Romanelli has been damaged by the conduct alleged herein.

28.      Plaintiff Marsha Smith is a resident of Pembroke Pines, Florida.  In July 2011, Ms. Smith purchased a room at the Courtyard by Marriott in Deerfield, IL through Hotels.com. Ms. Smith has been damaged by the conduct alleged herein.

29.      Plaintiff Alla Stavnitser is a resident of Chicago, Illinois.  Ms. Stavnitser purchased a room for November 1-2, 2009, at the InterContinental Mark Hopkins San Francisco through Orbitz.  Plaintiff Stavnitser recalls seeing and relying on Orbitz's "Low Price Guarantee."  Ms. Stavnitser has been damaged by the conduct alleged herein.

30.      Plaintiff Craig Sterling is a resident of San Diego, California.  Mr. Sterling purchased a room for February 16-17, 2011, at the Grand Hyatt Denver through Priceline. Plaintiff Sterling recalls seeing Priceline's "Best Price Guarantee."  Mr. Sterling has been damaged by the conduct alleged herein.

31.      Plaintiff Elizabeth Stevenson is a resident of Isle of Palms, South Carolina. Ms. Stevenson purchased a room for October 3-4, 2009, at the Marriott Raleigh-Durham through Priceline.  Plaintiff Stevenson recalls seeing Priceline's "Best Price Guarantee."  Ms. Stevenson has been damaged by the conduct alleged herein.

32.      Plaintiff Nikita Turik is a resident of Chicago, Illinois.  In January 2010, Mr. Turik purchased a room at The Westin Beale Street Memphis through Travelocity.com. Plaintiff Turik recalls Travelocity's "Best Price Guarantee."  Mr. Turik has been damaged by the

- 9 -

conduct alleged herein.  Travelocity's arbitration clause was not in effect at the time Mr. Turik purchased the room.

33.     Plaintiff Michael Williamson is a resident of Arlington, Virginia.  In August 2010, Mr. Williamson purchased a room at the Doubletree Hotel Richmond Airport through Booking.com.  Plaintiff Williamson recalls seeing Booking.com's "Best Price Guarantee." Mr. Williamson has been damaged by the conduct alleged herein.

34.     Plaintiff Amy Wittenberg is a resident of Oakland, California.  In April 2008, Ms. Wittenberg purchased a room at the Hampton Inn & Suites Tahoe through Orbitz. Ms. Wittenberg's usual practice is to look for "best price" or "low price" guarantees when reserving hotel rooms, which would include her reservation in April 2008.  Ms. Wittenberg has been damaged by the conduct alleged herein.

**B.      Defendants**

35.     Defendant Expedia, Inc. ("Expedia") is a Delaware corporation with its principal place of business at 333 108th Avenue NE, Bellevue, Washington 98004.  Expedia is the largest online travel agency in the United States.  Expedia accounts for roughly 43% of hotel online travel agency bookings.

36.     Defendant Hotels.com LP ("Hotels.com") is an affiliate of Expedia.  Hotels.com LP is a Texas limited partnership with its headquarters located at 10440 North Central Expressway, Suite 400, Dallas, Texas 75231.

37.     Defendant Travelocity.com LP ("Travelocity") is a Delaware limited partnership with its principal place of business located at 3150 Sabre Drive, Southlake, Texas 76092. Travelocity is owned by Defendant Sabre.

38.     Defendant Booking.com B.V. ("Booking.com") is a company based in Amsterdam, the Netherlands, with its principal place of business at Herengracht 597, 1017 CE,

- 10 -

Amsterdam, Netherlands.  Booking.com B.V. owns and operates Booking.com, the leading

worldwide online room reservation agency by room nights sold, attracting over 30 million

unique visitors each month via the Internet from both leisure and business markets worldwide.

Booking.com B.V. is a wholly owned subsidiary of Priceline Incorporated.

      39.     Defendant Booking.com (USA), Inc. ("Booking USA") is a Delaware corporation

with its primary place of business located at 100 William Street, Suite 750, New York, New

York 10038.  Booking.com (USA), Inc. is a wholly owned subsidiary of Priceline Incorporated.

      40.     Defendant Priceline.com Incorporated ("Priceline") is a Delaware corporation

with its primary place of business located at 800 Connecticut Avenue, Norwalk, Connecticut

06854.  Priceline describes itself as a "leading online travel company" that offers hotel

accommodations at over 295,000 properties worldwide.  Priceline accounts for 11 percent of

online travel agency hotel bookings.

      41.     Defendant Orbitz Worldwide, Inc. ("Orbitz") is a Delaware corporation and its

corporate headquarters are located at 500 W. Madison Street, Suite 1000, Chicago, Illinois

60661.  According to its Form 10-K, Orbitz is one of the largest online travel agencies in the

world.  Orbitz has a global services team that works closely with hotel chains to maintain rate

parity.  Orbitz accounts for 22% of online travel agency hotel bookings.

      42.     Defendant Sabre Holdings Corporation ("Sabre"), incorporated in Delaware, is

headquartered at 3150 Sabre Drive, Southlake, Texas 76092.

      43.     Defendant Travelscape LLC ("Travelscape") is a Nevada LLC with its principal

place of business at 333 108th Avenue N.E., Bellevue, Washington 98004.  Travelscape is a

subsidiary of Expedia.

- 11 -

44.     Expedia, Hotels.com, Travelocity, Bookings.com, Bookings USA, Priceline, Orbitz, Sabre and Travelscape are collectively referred to as the Online Travel Agency ("OTA") Defendants.  Collectively in 2011, Expedia, Orbitz, Priceline and Travelocity accounted for 94% of online travel agency hotel bookings.

### III.     AGENTS AND CO-CONSPIRATORS

45.     Various other persons, firms and corporations not named herein as Defendants have participated as co-conspirators with the Defendants and have performed acts and made statements in furtherance of the conspiracy.  Some of these firms are as yet unidentified.  The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

46.     Whenever this complaint refers to an act, deed or transaction of a corporation or entity, the complaint is alleging that the corporation or entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation or entity's business or affairs.

### IV.     JURISDICTION AND VENUE

47.     Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit and reasonable attorneys' fees for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. Subject matter jurisdiction is proper pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. §§ 1331 and 1337, because the action arises under the laws of the United States.

48.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), in that at least one of the Defendants resides in this judicial district, is licensed to do business or is doing business in this judicial district.

## V.     SUBSTANTIVE ALLEGATIONS

**A.     The Online Travel Agency Defendants Become Indispensable to the Major Hotel Chains and Have Significant Market Power**

49.     As recently as 1997, the concept of an "internet travel company" or online travel agency – an entity organized to effectuate travel plans, reservations and purchases via the worldwide web – was virtually unknown.  In recent years, the online travel industry has seen explosive growth.

50.     Through their web portals, the Online Travel Agency Defendants allow consumers to rent hotel rooms in many different hotels throughout the country and the world.  These companies offer their services to Major Hotel Chains and consumers through several different business models, including the "Agency Model," the "Merchant Model,"[3] and/or the "Wholesale Model."

51.     Under the Agency Model or "Retail Model," Online Travel Agency Defendants charge a "service fee" to hotel operators on a transaction basis for booking customers into rooms at a given hotel, and the consumer pays the hotel for the room directly.  Under the Agency or Retail Model, the hotels should be setting – and the Online Travel Agency Defendants should be requiring – a competitive price for rooms to increase business and compete against other Online Travel Agency Defendants offering the same service.

---

[3] The Agency Model and the Merchant Model are described in the 2002 annual report of Defendant Expedia, Inc. as filed with the Securities and Exchange Commission on Form 10-K on March 31, 2003, and the 2004 Annual Report on Form 10-K as filed with the SEC of IAC/Interactive Corp. (the parent company – at that time – of Expedia.com, Hotwire.com and Hotels.com), p. 9, and the Form 10-K of Orbitz for the year 2012.

52.     Under the Merchant Model, the Online Travel Agency Defendants do not function merely as service providers collecting a fixed transaction fee from the hotels.  Rather, the Merchant Model consists of two independent but related transactions whereby an internet travel company:  (i) first purchases and takes title to inventories of hotel rooms at negotiated rates from the Major Hotel Chains ("wholesale" rates); and (ii) then re-sells the rooms to consumers at higher retail, keeping the difference as profit.  Under this Merchant Model, the Online Travel Agency Defendants should be competing on price by increasing or decreasing the margin added to the wholesale rates to set the retail rate.

53.     The third model is the "Wholesale Model," whereby smaller price-cutting online travel agencies obtain access to rooms through wholesalers.  Wholesalers, or intermediaries between the online travel agencies and the hotels, work directly with Major Hotel Chains to obtain last minute blocks of rooms that need to be filled.  The wholesalers then make those rooms available to smaller online travel agencies at a wholesale rate.  The online travel agencies then, like in the Merchant Model, re-sell the rooms to consumers at higher retail, keeping the difference as profit.  Under this Wholesale Model, the online travel agencies should also be competing on price by increasing or decreasing the margin added to the wholesale rates to set the retail rate.

54.     As early as 2002, the Online Travel Agency Defendants gained a dominant presence in the online sale of rooms.  Just Expedia and its subsidiaries alone account for approximately 45% of the online travel agencies hotel room market.  During the years 2010 and 2012, the Online Travel Agency Defendants' share of online travel agency hotel bookings was roughly 94 percent.

55.     This concentration of market power among the Online Travel Agency Defendants allows them to assert considerable influence over the Major Hotel Chains, whose businesses require access to the Online Travel Agency Defendants' websites and distribution power.  For example, if Priceline (and, in turn, Booking.com) refused to list Hilton's rooms on its websites, Hilton will be placed at a significant competitive disadvantage.  Consumers will be able to view and reserve Hilton's competitors' hotel rooms, but not Hilton's, on Priceline's websites.

56.     Although the Online Travel Agency Defendants have enjoyed a dominant market position, other online travel agencies are willing to provide rooms at discounted rates and pose a threat to the overall success of the Online Travel Agency Defendants.  Online travel agencies willing to accept lower margins or share a portion of their commissions with consumers could provide online rooms to consumers at lower rates than those offered by the Online Travel Agency Defendants.  This, in turn, would have required the Online Travel Agency Defendants to lower their margins or reduce their commissions to match the lower prices offered by discounting online travel agencies or hotels.

**B.     The Online Travel Agency Defendants Use their Dominance to Prevent Discounting**

57.     The Online Travel Agency Defendants were motivated to implement an illegal price fixing scheme in order to eliminate price competition for the online reservation of hotel rooms.

58.     In their initial entry into the online hotel room market, the Online Travel Agency Defendants began to grow market share by discounting rates they offered below the rate published by the hotels.  The Online Travel Agency Defendants became concerned that further discounting by competing online travel agencies could erode their margins.

- 15 -

59.     For example, an article in the June, 1999 issue of Travel & Leisure entitled "Hotel Pricing – Obtaining the Right Rate" found there was a "wide differential" in the rates offered as the 'best available'....  **No site consistently gave us the lowest rate."**[4]  (Emphasis added.)

60.     The October 2002 issue of the same magazine examined "The Top Travel Web Sites."  Travel & Leisure reported that "Travelocity, Orbitz, and Expedia continue to dominate the booking arena, with most of their business coming from airline sales.  **But they are strengthening their focus on cars, cruises, hotels, and packages.**"  (Emphasis added.)  As to hotels, price competition was vigorous, and had the effect of keeping prices low:

> Discount hotel sites are **increasingly popular, which is helping to hold rates down. ...**  A recent search for a room at the Bellagio in Las Vegas left us dizzy:  We found a rate of $379 at Hotels.com. . . we got a room at $229 by calling the hotel directly."[5]  [Emphasis added.]

61.     However, by 2003, Travel & Leisure reported that price competition by Defendant OTAs had abruptly ceased:

> When we last tested hotel-booking methods in 1999, we often found differences of more than $100, **but this time around that rarely happened**.  In two of our tests – at the Grand Hyatt Bali and the Ritz-Carlton, Battery Park – **we were quoted the same nightly rate at every web site and phone number we tried**." [6]  [Emphasis added.]

62.     The results of research by Travel & Leisure magazine were confirmed by a comprehensive study of OTA pricing by the Consumer's Union.  Its April 2003 report entitled "Booking Hotels Online: An In-Depth Examination of Leading Hotel Web Sites" found that OTA prices no longer diverged:

---

[4] Weisel, Al, June 1999, Hotel Pricing - Obtaining the Right Rate, Travel + Leisure.

[5] October 2002, The Top 35 Travel Web Sites, Travel + Leisure.

[6] Kalis, Lisa, June 2003, The Hotel Rate Game, Travel + Leisure.

- 16 -

> Many of the Web Sites provided rates that were only a few dollars lower per night than rates provided by their competitors. Expedia was particularly savvy at this: In several cases that site edged its nearest competitor by less than $1 per night. [7]

63.     Thus, in the course of a year, hotel price competition between Defendant OTAs went from vigorous to non-existent. This abrupt cessation of price competition could not have been in the unilateral best economic interest of any one OTA. If a single OTA attempted to stop price competition, without the agreement of its rivals to do the same, it would quickly lose customers to its competitors willing to continue offering the lowest prices.

64.     Once the Defendant OTAs agreed to stop competing on the basis of price, the OTA Cartel moved to stamp out the last remaining source of price competition: the hotels themselves. The OTA Cartel effectuated this aspect of its scheme by pressuring the Major Hotel Chains into agreeing not to compete with the OTA Defendants on price. The OTA Defendants accomplished this goal by taking away from the Major Hotel Chains the ability of hotels to charge lower rates than what OTAs charged for the identical room. The pretextual cover for this part of the OTA price-fixing scheme is a term the Defendants and the hotel industry came to call "rate parity."

65.     In 2003, in trade press, at industry conferences and on conference calls with stock analysts, internet travel agencies and hotels began to discuss the need for "rate parity." Rate parity is an industry code word for agreeing that no one would compete based on price – there would be no discounting of hotel rooms – there would be parity in the prices offered for a room between the price offered by the hotel and the price offered by any online travel agency.

66.     During the period late 2003 through 2004, the Online Travel Agency Defendants began requiring RPM agreements with Major Hotel Chains. Each of the Online Travel Agency

---

[7] McGee, William J., 24 April 2003, "Booking Hotels Online: An In-Depth Examination of Leading Hotel Web Sites," Consumers Union.

Defendants has required such an agreement, described below, with each of the Major Hotel Chains.

67.      A typical RPM agreement between an online travel agency and a hotel provided at least two restrictive terms.  First, the hotel would agree that it would establish the "Best Available Rate" or "Lowest Rate" for a non-packaged room and publish that rate.  That published rate was the price the internet travel agency could use when selling rooms to consumers.  The second restrictive term provided that the published rates offered by the Online Travel Agency Defendants would be as favorable as the published rate offered to (a) any online travel agency competitor and (b) the rates published on the internet site operated by the hotel itself.

68.      The effect of these agreements was to achieve what the industry called "rate parity" – a euphemism for eliminating price competition.  It was at this time, with rates fixed, that the internet travel agencies and hotels all began advertising "low price guarantees."  They could do so because, as a result of the price-fix or RPM agreements, each hotel and internet travel agency knew that they could offer and promote a "best price" or "lowest price" because no other competitor would offer a lower or better price due to the terms of the RPM agreements.

69.      To facilitate and maintain the agreements, OTA Defendants used industry conferences as a forum to openly discuss pricing strategies, including the "need to use rate parity" and to do so "in all channels."  Such exchanges were not mere reporting of aggregated data that is permissible from an antitrust compliance perspective, but instead were exchange of forward-looking pricing strategies, and were undertaken to discuss and adopt an industry-wide agreement among major online travel agencies and major hotel chains to not compete on price below a hotel's published price.

70.     The change in competition was described by a participant in an industry conference as follows:

> Where did this whole **rate parity** thing start in the first place?  The way I remember it, when the OTAs first came around, they would vary their margins in order to compete with other OTAs.  Later on, when hotel websites became stronger, hotels started undercutting OTAs in order to attract more business.  Suddenly, back in 2003 I started hearing about this new thing called **Rate Parity**, and it started to creep its way into OTA contracts.  In a nutshell, **Rate Parity** means that it is the hotel's responsibility to ensure that the rate to the public for a given hotel room on a given day is selling for the same rate in all channels.  So one channel may be taking 15% of the revenue, another 25%, and another 30%, but the hotel has to adjust their net rates accordingly so that each of those channels can compete with each other on a level playing field in the marketplace.  Is it just me or does that seem like the most insane way to do business??

> I've been ranting about this for seven years, since the first day I heard about **rate parity** basically.  We are the only industry that I know of in which the burden of keeping the retail channels competitive on price falls on the shoulders of the suppliers.  How did we allow this to happen?  Do you think that Best Buy calls up Sony and says "Hey, we want to start making more money on your televisions, but we don't want to raise our prices… so you have to lower yours?"

> I've heard a lot of arguments for **rate parity**.  "If you don't have **rate parity**, it confuses the customer.  The hotel will lose credibility with the consumer…"  Oh really?  If I'm shopping for a Sony television, and Best Buy wants to charge me $2,500 and Target wants to charge me $2,000, I am not going to blame Sony.  They will not lose any credibility with me and I will not be confused.  I will simply think that Best Buy is ripping me off, and that I should buy that television from Target.  Perhaps there are certain customers that would say "Buy a television from Target?  What are you nuts?  I'll pay the extra money to buy from Best Buy because I feel more confident buying from them," which is totally fine.

> So the bottom line is that I think **rate parity** is a farce.  In fact, I think it should be illegal.  Have you ever looked up "Price Fixing" in Wikipedia?  Allow me to save you some time:

- 19 -

"Price fixing is an agreement between participants
on the same side in a market to buy or sell a
product, service, or commodity only at a fixed
price, or maintain the market conditions such that
the price is maintained at a given level by
controlling supply and demand.  The group of
market makers involved in price fixing is
sometimes referred to as a cartel.

Price fixing may be intended to push the price of a product as high
as possible, leading to profits for all sellers, but it may also have
the goal to fix, peg, discount, or stabilize prices.  The defining
characteristic of price fixing is any agreement regarding price,
whether expressed or implied.

Price fixing requires a conspiracy between two or more sellers or
buyers; the purpose is to coordinate pricing for mutual benefit of
the traders.  Sellers might agree to sell at a common target price…"

and it goes on and on… Is there any doubt that **rate parity** is a
euphemism for price fixing?  The funny thing is that since "the
purpose is to coordinate pricing for mutual benefit of the traders,"
it is normally the distributors that are guilty of price fixing.  In the
hotel industry, the distributors have gotten the hotels to do it for
them, even though it is not beneficial for them to do so. [8]

71.     The following examples of meetings where the Defendants were in attendance
make it clear the industry participants were discussing and agreeing on rate parity, prices, pricing
strategy and the need to prevent discounting, and were doing so to maintain and enforce the
terms of the conspiracy.

72.     To put these conference discussions in perspective, antitrust compliance
guidelines from many companies inform employees to avoid discussing price at industry
meetings.  For example, Exxon Mobil's Antitrust and Competition Compliance Guide warns
employees that an "agreement can be inferred from conduct."  The Guide provides that
employees should "avoid conversations with competitors concerning prices … [or] terms of

---

[8] June 24, 2010, ww.hotelinternethelp.com.

sale." "If such a subject arises in the presence of a competitor you must tell everyone present that discussing this matter is improper and see that the subject is immediately dropped."[9]

73.     Similarly, the Pipeline Open Data Standard antitrust compliance guidelines provide that trade programs "must be structured in ways that do not disclose pricing strategies."[10]

74.     The FTC Guide to the Antitrust Laws warns that it is "illegal to use a trade association to control or suggest prices of members.  It is illegal to use information-sharing programs, or standardized contracts, operating hours, accounting, safety codes, or transportation methods, as a disguised means of fixing prices."

75.     Despite standard antitrust compliance advice to avoid price discussions among competitors, Defendants used such gatherings for that purpose and as a disguised means of fixing prices.  The EyeforTravel conferences became a forum where the agreements were confirmed and the need for all participants to hold to the agreement was frequently discussed.[11]  The consequence of these pricing and rate parity discussions was uniformity in the price for on line hotel rooms.  Examples follow.

76.     Multiple Online Travel Agencies, including Defendants Priceline and Sabre, attended and were speakers at EyeforTravel's second annual "Revenue Management and Pricing in Travel USA Conference"[12] that took place May 16-17, 2004, in Las Vegas.

77.     Pricing strategy was freely discussed among all of these companies.  The Agenda explicitly focused on "Rate Parity":

---

[9] http://www.exxonmobil.com/Corporate/Files/news_pub_antitrust.pdf

[10] http://www.pods.org/.../PODS%20Antitrust%20Compliance%20Guidelines...

[11] http://events.eyefortravel.com/travel-distribution-summit-north-america/past-attendees.php (last accessed August 17, 2012).

[12] http://www.hotel-online.com/News/PR2004__2nd/May04_EyeForTravel.html (last accessed August 17, 2012).

**PANEL**
**How can you use revenue management to control price and yield when you distribute your product via multiple direct and indirect channels?**

Is rate parity the only way to successfully manage revenue across all your distribution channels? And how do you reconcile this with a 'lowest internet rate' guarantee now offered by many chains?

Ken Gifford, Corporate Director of Revenue Management, **Omni Hotels**

Apo Demirtas, Senior Director of Revenue Management, **Hilton Hotels Corporation**

Patti Halter, Director of Revenue Management, **Best Western International**

John Redcay, VP Hotel Sales, **Priceline**.

78.     The entry regarding "rate parity" and the inquiry of how this could be reconciled with "lowest price guarantee" is noteworthy in that the Defendants chose uniformly as an industry to continue making such "lowest price guarantees" long after they had agreed to set prices at a uniform level via rate parity. Not one Defendant has disclosed in its advertising and promotional materials that due to "rate parity," there was no true "lowest price" as a reasonable consumer would understand that term. This uniformity of action is evidence of an agreement not to compete based on price.

79.     An EyeforTravel Conference was held on October 3-4, 2005, in Chicago, Illinois and attended by the following who were speakers:

Rob Torres, VP of National Accounts, Expedia

Sylvia Lee, Director of Marketing & Operations, Packaging & Cruises, Travelocity

Eric Hofer, VP, Travelocity Business

Glenn Fogel, SVP International & Corporate Development, Priceline

80.     A session was held at this conference where use of a Most Favored Nation clause was discussed to ensure "consistency across all your distribution channels." A Most Favored Nation clause in this context is the contractual agreement between a hotel and online travel

- 22 -

agency that provides the hotel will not offer a lower price to a competitor of the online travel

agency.  Discussion of such a pricing term is an open signal to all attendees that there will not be

such competition.  There is no pro-competitive reason for competitors to be discussing such

terms.

81.     An EyeforTravel Conference was held on October 4-5, 2006, in Chicago.

Speakers included all of the major OTAs:

> Tracey Weber, COO, **Travelocity**
>
> Dale DeAnne, VP Strategic Account Management and Consulting, **Travelocity Business**
>
> Mark Koehler, SVP Air, **Priceline**
>
> Dean Sivley, COO & General Manager, **Travelport Corporate Solutions (Travelport for Business and Orbitz for Business**)

Attendees included:

> Expedia, Sr. CRM Manager
>
> Expedia, Director of Retention & Loyalty
>
> Expedia, Manager
>
> Expedia, Manager
>
> Expedia, Manager
>
> Expedia, Manager
>
> Expedia, Manager
>
> Expedia, Inc., Director, Ecommerce DirectConnect
>
> Expedia, Inc., Supply Architect
>
> Expedia, Inc., VP, eCommerce systems
>
> Travelocity.com, Director Customer Marketing and Loyalty
>
> Travelocity.com Inc., Director of Product Strategy
>
> Orbitz, Director of Business Strategy
>
> Orbitz, Director, Revenue Management
>
> Orbitz, Director
>
> Orbitz / Travelport, Vice President
>
> Orbitz Worldwide, Product Manager
>
> Orbitz Worldwide, Sr. Manager. Affiliate Relations
>
> Orbitz.com, VP, Packaging

- 23 -

82.     Pricing was a major topic at this conference, including a discussion of "the fundamental principles of revenue management and how they are developing for today's travel," and "how large suppliers are dealing with pricing pressures."  There was an open discussion of the "need" for "rate parity."

> **Session Five - Presentations and Panel:**
>
> **Assessing the Value of Rate-parity policy, distribution strategies & demand Management**
>
> The fragmentation of distribution channels and **the need for rate parity** across these channels requires strategic consideration for travel suppliers.  In this session, find out how large travel suppliers are dealing with pricing pressures attributed to third party distributors.
>
> - Hear distribution strategies from the leading travel suppliers
> - Learn how rate-parity policy decisions are taken and by whom
> - Find out why rate-parity across distribution channels is so important
> - What are the pressures on pricing from a distribution standpoint?
> - How have third party distributors reacted to the consumer shift towards own-brand web-sites?
> - Hear from the most advanced players in the demand management field

83.     This pricing discussion was a disguised means to control and suggest price and was a disguised means of fixing prices.  Instead of openly stating let's all agree to fix prices; the participants disguised their true intent by characterizing their actions as discussing the "need for rate parity" and the benefits of the scheme were reinforced by discussion of "why rate parity … is so important."

84.     At the EyeforTravel "Revenue Management in Travel USA 2007 Conference," the attendees discussed "How do you maintain rate parity and rate integrity in a multi-channel environment", and a bullet point from a session was titled:

> "Understand why rate parity is necessary to convey a clear brand message and instill consumer confidence."

- 24 -

In attendance were:

> Expedia, Director of Pricing
>
> Expedia, Expedia Inc.
>
> Expedia, Pricing Analyst, Packages
>
> Expedia, Regional Director Market Management
>
> Expedia, Revenue Manager
>
> Expedia, Sr. Business Analyst
>
> Travelocity, Director Pricing and Revenue Optimization

85.     The discussion of "why rate parity is necessary" was done for the purpose of

continuing the scheme and served no pro-competitive purpose.

86.     A "Travel Distribution Executive Conference" was held on October 1-2, 2008,

and EyeforTravel coordinated the event.  Speakers included:

> Jay Hubbs, Director of Revenue Management, Expedia Partner Services Group
>
> Chinmai Sharma, VP Revenue Management, Wyndham Hotels and Resorts
>
> Michael Bentley, Director, Analytics and Modeling, Global Revenue Management, InterContinental Hotels Group
>
> Dan Kowalewski, VP Revenue Strategy and Services, Wyndham Hotel Group
>
> Jim Rozell, Senior Director Revenue Optimization, Carlson Hotels Group

Attendees included:

> Expedia, Senior Manager Lodging Connectivity
>
> Expedia Inc., VP Market Management
>
> Travelocity, VP Hotels & Packaging
>
> Travelocity, Sr. Principal Revenue Generation
>
> Booking.com, Affiliate Sales Manager
>
> Booking.com, Manager of Leisure Sales
>
> Booking.com, Area Manager Distribution
>
> Priceline, Director Online Marketing
>
> Priceline, Managing Director, Corporate Development & International
>
> Orbitz Worldwide, SVP Corporate Development
>
> Sabre, Director

- 25 -

Sabre, Marketing Research Analyst

Sabre Holdings Inc., Managing Director, Airline Distribution

Sabre Travel Network, VP Marketing and Planning Solutions

Sabre Travel Network, SVP Global Airline Distribution

Sabre Travel Network, Director Business Development

Sabre Travel Network, Managing Director, Airline Distribution

87.     A session at this conference was held entitled:  "Maintain Revenues and Set the Right Prices During in the Face of Economic Slowdown."  The presentation included a segment entitled:

> With less disposable income and the continuing credit crunch, what else is the revenue manager to do to stop the bleeding and stimulate demand, if not to cut rates?
>
> In the face of an impending recession, hear best practices for managing revenue in a down market and avoid rate erosion over the long term.
>
> What are the dangers of chasing demand by lowering your prices?

88.     Again, this is an industry-only session where the speakers are reinforcing to industry participants why there should be no competition by "lowering your prices."

89.     The foregoing examples make it clear the industry participants and defendants were openly discussing prices, rate parity and pricing strategy and the result of these discussions was uniform prices for non-package hotel rooms.  The words used at these meetings, "rate parity," "lowering your prices," "no discounting," "channel parity," were all code words used to describe the illegal price restraints.

90.     During the years 2009-2012, EyeforTravel continued to organize conferences that were attended by all of the Defendants.  Such conferences occurred on September 19-20, 2011, in Las Vegas and on September 13-14, 2012, in Las Vegas.

C.     **The Defendants Enforced the Agreements to Prevent Discounting**

91.     As a part of their agreement with the Online Travel Agency Defendants, the

Major Hotel Chains, in some instances, threatened other online travel agencies with legal action

and/or refused to allow online travel agencies, such as Skoosh.com, to sell rooms if the online

travel agencies refused to price fix and maintain resale prices at the agreed rate in compliance

with the RPM scheme.  However, the Major Hotel Chains did so because they were required to

by the OTA Defendants.  Further, pursuant to their agreement with the Online Travel Agency

Defendants, in some instances, the Major Hotel Chains required the wholesalers to stop

providing rooms to price-cutting online travel agencies, such as Skoosh.com, if they refused to

price fix and maintain resale prices.

92.     For example, Skoosh has publicly complained that it tried to sell discounted

rooms on its online travel site but was thwarted by the RPM scheme:

> "We were openly discounting and hotels would email, call and
> threaten legal action," Skoosh told the BBC.
>
> "Either we'd have to raise prices or take the hotels off our list,"
> said Dorian Harris from Skoosh.[13]

93.     In fact, Skoosh has claimed that the Agreements have "created a Mafia-style

atmosphere and an intolerable climate for new businesses.  Skoosh has been directly threatened

and, in turn, has defended its right to discount hotel prices."[14]

94.     Skoosh published a letter dated August 31, 2010, from its CEO to Online Travel

Agency Defendant and Skoosh's competitor Booking.com, complaining about Booking.com's

---

[13] http://www.bbc.co.uk/news/business-11330463 (last accessed August 5, 2012).

[14] http://www.tnooz.com/2012/07/31/ news/ regulator-accuses-expedia-booking-com-and-Intercontinental-in-hotel-competition-infringement-probe/ (last accessed August 5, 2012).

enforcement of the Defendant Online Travel Agency-Hotel Agreements.  The letter states, in part:

> Both personally, and even as a direct competitor, I was always a fan of Booking.com.  Yours was one of the better hotel booking sites I always thought, with some innovative features.  However, my rosy picture fast disappeared last winter when Skoosh started being pursued by your business partners insisting that we raise our hotel prices to the same as yours.  I'm hoping you can find the time to address some of the points below and restore my faith in your company.
>
> Some background then.  Earlier this year we started getting some calls from angry and confused hoteliers insisting that we were selling their rooms too cheaply.  I called them back to work out what was going on and they mostly told me that Booking.com had been on to them threatening all sorts of nonsense if they didn't either remove their hotel from Skoosh or force Skoosh to raise its prices.
>
> I wondered how this was all happening so quickly and then I did a little research and found that Booking.com has an active policy of maintaining the same prices for all companies across the internet.  I even found a job ad of yours looking for 'Rate Parity Associates.'  It seems like you've got a whole team out there beavering away to 'find any rate inconsistencies between Booking.com and their competitors.'  They're doing a good job I have to say.  The hoteliers you work with are certainly concerned.  One wrote to ask me to close out their hotel on Skoosh:  'just to avoid the penalty that [Booking.com] is threatening us about.'
>
> Some were less friendly.  Many of the hoteliers wrote letters to me threatening legal action.  One of them had a colleague of yours on one line and me on the other.  It seemed that your colleague was insisting that if we hadn't removed their hotel from Skoosh by the end of the phone call Booking.com would cancel the contract with them.  They were very scared.[15]

95.     The fact that Defendant Booking.com has threatened to cut off the sale of rooms for Major Hotel Chains that do not enforce the RPM scheme is entirely consistent with the Rate Assured Hotel Program implemented by Defendant Sabre (which also owns Defendant

---

[15] http://dorian.skoosh.com/open-letter-to-kees-koolen-ceo-at-booking-com/ (last accessed August 5, 2012).

Travelocity).  Sabre's Rate Assured Hotel Program requires the Major Hotel Chains to enforce the RPM scheme:[16]

For Suppliers

**Sabre Rate Assured™ Hotel Program**

Are you *Rate Assured*?

*Sabre Travel Network* has already begun measuring properties to validate rate parity across properties prior to the official launch.  So make sure your properties are rate compliant!

  (b) If it is determined that a property is not providing rate parity in the program, it will essentially be placed on "Probation" status.
(c) If a property is not providing rate parity in the subsequent measurement, *Sabre* will consider the hotel "In Violation"…

96.     In fact, Sabre, which owns Travelocity, also runs a division called "Sabre Hospitality Solutions," which expressly markets and encourages hotels to adopt rate parity – in effect, the RPM scheme.  *See*, *e.g.*, http://www.sabrehospitality.com/blog/2011-10-27/how-hotels-can-leverage-ota-relationships-without-killing-their-pricing-strategy; http://www.sabrehospitality.com/blog/2011-11-30/three-top-trends-in-hospitality-marketing-and-distribution-to-consider-when-planning-for-2012.

97.     Thus, pursuant to the Defendant Online Travel Agency-Hotel Agreements, the Major Hotel Chains are enforcing the RPM scheme on price-cutting competing online retailers. For example:

     a.     Hilton required Skoosh's supplier in the United States, AlliedTPro, to entirely cut off its contract with Skoosh as a result of Skoosh's discounting and Hilton's

---

[16] http://dorian.skoosh.com/open-letter-to-f-t-c-chairman-jon-leibowitz/ (last accessed August 16, 2012).

enforcement of the Agreements.  AlliedTPro wrote to Skoosh:  "Trust me I would welcome the additional business but cannot risk our contracts with Hilton."[17]

      b.     Trump expressly admitted it was enforcing the Defendant Online Travel Agency-Hotel Agreements, emailing Skoosh:[18]



**From:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓@▓▓▓▓▓▓▓
**Sent:** 10 May 2010 18:27
**To:** Dorian Harris
**Subject:** RE: New inquiry was submitted on Skoosh.com

The simple answer is; if we do not maintain parity with all, we are threatened with poor placement on sites and worst case… removal of hotel from sales sites. That is the way the OTA's operate in USA. Expedia threatens if Travelocity gets lower rate and vice-versa. It is a vicious cycle if we get out of parity.
I think the model in Europe is built to operate more competitively but that is not the model here. (Much as I wish it was the same as Europe!) I hope this helps you understand why we must be strict with what is offered on all websites.
Thanks,

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Trump International ▓▓▓▓▓▓▓

      c.     Intercontinental wrote to Skoosh "demanding that Skoosh either raise[] its rates to the same as the hotels and its other distribution partners (a practice known in the industry as 'rate parity' ***) or remove the hotels entirely from our site."[19]

      d.     In 2003, Marriott announced "a sweeping overhaul of its transient pricing, bringing parity to all Marriott distribution channels – offline and online."[20]  During the Class Period, Marriott was among the Major Hotel Chains threatening Skoosh.com with legal action and/or the withdrawal of their rooms if Skoosh.com did not maintain rate parity.

---

[17] http://dorian.skoosh.com/open-letter-to-f-t-c-chairman-jon-leibowitz/ (last accessed August 15, 2012).

[18] http://dorian.skoosh.com/open-letter-to-f-t-c-chairman-jon-leibowitz/ (last accessed August 16, 2012).

[19] http://dorian.skoosh.com/open-letter-to-william-baer-arnold-porter-llp/ (referring to Holiday Inn New York) (last accessed August 16, 2012).

[20] http://www.businesstravelnews.com/More-News/Marriott-Revamps-Pricing--Offers-Complete-Parity,-Curtails-Fixed-Consortia-Rates/?a=btn (last accessed August 17, 2012).

e.      Starwood enforces the RPM scheme.  "In one email to a hotel discounter, an executive at Starwood, which runs Le Meridien, Westin, W and Sheraton hotels, said: 'Should a wholesaler decide to sell the rooms on a room only basis, he has to make sure that the per contract agreed minimum mark-up is guaranteed.'  The employee said the 'violation' of Starwood's Best Rate Guarantee was 'really serious' and the breach was reported to the Brussels headquarters."[21]

98.      Similarly, Kayak.com, which is a price comparison website, told Skoosh on several occasions that it had to "play the Orbitz game,"[22] *i.e.*, maintain rate parity, or Kayak would no longer publish Skoosh's prices.  Kayak apparently felt pressured to enforce rate parity on behalf of the Online Travel Agency Defendants because, for example, Orbitz accounted for 18.8% of Kayak's total revenues and Expedia and its affiliates accounted for 24.9% of Kayak's total revenues for the nine months ended September 30, 2010.[23]  After Skoosh reported the RPM scheme to governmental authorities, Kayak stopped publishing Skoosh's prices on its price comparison site.

99.      Each of these actions was taken to enforce the scheme.  The Major Hotel Chains enforced the RPM scheme because they feared losing access to the Online Travel Agency Defendants' websites to sell their rooms if they did not.  As one industry consultant explained:

> "I don't know that there's been enough public questioning of this [rate parity] practice," said Ashwin Kamlani, founder of Hotel Internet Help Inc., which helps independent hotels get more sales via cyberspace.

---

[21] http://www.telegraph.co.uk/finance/newsbysector/retailandconsumer/8467755/Hotels-face-inquiry-in-price-fixing-scandal.html (last accessed August 17, 2012).

[22] http://dorian.skoosh.com/open-letter-to-steve-hafner-c-e-o-kayak-com/ (last accessed August 17, 2012).

[23] http://www.businessinsider.com/kayak-ipo-2010-11(last accessed August 17, 2012).

"The hotels enforce rate parity because they fear the consequences
of not maintaining rate parity," he said. "They fear having their
hotel dropped to page 6 or even pulled off their largest producing
[online travel agents] sites, which translates into a potentially
significant loss of revenue."[24]

100.    Blink Booking, a mobile-only hotel booking service, echoed the claims of

competing online travel agencies, saying: "We've long believed that the big online travel agents

have been guilty of denying consumers the best prices – and that hotels' hands are tied by price

parity agreements.  The online travel market may appear to offer plenty of choice and

competition, but the reality is that there are lots of different shop windows selling the same

rooms at the same prices – with those prices agreed through parity deals between the big groups

and the big OTAs [online travel agents]."[25]

101.    Thus, the Online Travel Agency Defendants sought and received agreements from

the Major Hotel Chains that they would only sell to online travel agencies who would not

discount the agreed rates for rooms, even if and when it reduced the Major Hotel Chains' sales

and/or profits by slowing sales of the rooms.

102.    More specifically, the Major Hotel Chains were forced to work with the Online

Travel Agency Defendants to implement and enforce the RPM scheme to ensure that pricing by

competing online travel agencies be restrained.

103.    The Online Travel Agency Defendants sought the agreement of the Major Hotel

Chains to impose and enforce "rate parity" – *i.e.*, restraint on price competition – solely for the

Online Travel Agency Defendants' benefit and not for any legitimate pro-competitive reason.

---

[24] Karin Robinson-Jacobs, "Practice that holds rates steady among Major Hotel Chains, travel
sites coming under fire," Dallas Morning News (Nov. 16, 2010), reprinted at
http://hsmaidfw.blogspot.com/ (last accessed August 15, 2012).

[25] http://www.telegraph.co.uk/finance/newsbysector/retailandconsumer/leisure/
9441235/OFT-alleges-Intercontinental-Hotels-online-deals-broke-competition-law.html (last
accessed August 16, 2012).

- 32 -

104.    The Online Travel Agency Defendants are driven to maintain their product and profit margins, as their margins are threatened by newer, more efficient internet retailers.  That dominant retailers, like the Online Travel Agency Defendants, would react anti-competitively to threats to their pricing freedom, such as those posed by new or more efficient retailers, has been acknowledged by the United States Supreme Court.

105.    An example of the length OTA's would go to prevent competition arises from efforts to force Choice to maintain the non-competition agreements.

106.    In May 2003, Travelocity and Choice announced they had signed an agreement "that will give consumers access to *guaranteed low priced* hotels from Choice Hotels' eight well-known brands via the Travelocity shopping engine.  This is the first merchant hotel agreement Choice Hotels has signed with an online travel site."[26]

107.    Similarly, Choice and Expedia maintained a distribution agreement that expired in May 2007 but was continued by agreement until in or about October 2009.  Throughout the period of the agreement, Choice agreed to and maintained rate parity for on-line hotel listings at Expedia's demand.

108.    In or about October 2009, Choice attempted to end its agreement with Expedia to, *inter alia*, maintain rate parity.  Expedia's response was swift and just as severe as Choice feared:  Expedia dumped Choice hotels from its distribution system and refused to offer Choice hotel rooms to consumers on any of its on-line sites.

---

[26] May 19, 2003, Travelocity Press Release, "Choice Hotels' Brands Added to Travelocity's Guaranteed Low Price Hotel Offerings" (emphasis supplied).  Travelocity allegedly sign a similar agreement with Defendant Orbitz in or around February 2004.  February 4, 2004, Orbitz Press Release, "Orbitz' Expanding Merchant Program Continues Momentum With More Than 7,000".

109.    In October 2009, Expedia, Inc.'s CEO and president Dara Khosrowshahi explained, during the online travel company's third quarter earnings call, why it decided to cease doing business with Choice.[27]  Khosrowshahi stated:  "... As far as the discussions that we've had with Choice, we are not doing business with Choice right now on a chain basis.  We don't have a vast majority of Choice hotels on our side."  He explained:

> it's more than issue of our wanting rate parity and inventory parity … for our customers. *** When our customers come to Expedia, we want them to know that they're getting the best prices and certainly, we are insistent on that.  And to the extent that Choice doesn't want to work under those terms.  We won't be doing business with each other.  Those are the terms that we work with our other strategic partners, they're comfortable where they were comfortable with it.  So, its nothing usual from what I would say is typical practice for us in most of our other OTA competitors so to speak.

110.    Also at that time, Choice issued a public statement, explaining:  "Expedia looked to dramatically alter their agreement with Choice Hotels, asking for full control of our franchisee's room inventory and pricing, including last room availability.  This would, in effect, no longer make Expedia a supplier but rather a revenue manager, which would not be in the best interest of our franchisees."[28]

111.    In response, Expedia sent Choice franchisees a letter, stating it hoped to work with Choice and its franchisees in the future – but only when Choice could agree to rate parity.[29]

112.    But within just weeks, Choice "blinked" and agreed to rate parity in order to ensure access to Expedia's online distribution channel.  According to a joint press release issued

---

[27] October 30, 2009, Travel Industry News & Conferences – EyeforTravel, "Expedia stresses on rate parity and inventory parity for its customer".

[28] October 22, 2009, www.tnooz.com, "Expedia woos Choice Hotels franchisees with letter".

[29] *Id.*

by Choice and Expedia on November 11, 2009, Choice and Expedia entered a new three-year contract that "respects the guiding principles which [Expedia] operates under," *i.e.*, rate parity.[30]

113.    Following the Expedia show-down in 2009, Choice implemented a formal written Internet Distribution Policy. Choice's headquarters explained the policy to its franchisees as follows:



---

[30] November 11, 2009, Press Release, "Expedia and Choice Hotels International Sign New Long-Term Agreement**".

114.    The Supreme Court not only recognized that minimum resale pricing may be imposed by a dominant retailer for that retailer's benefit, but stated that such behavior violates the antitrust laws.  Indeed, the Supreme Court cautioned that:

> Resale price maintenance, furthermore, can be abused by a powerful manufacturer or retailer.  A dominant retailer, for example, might request resale price maintenance to forestall innovation in distribution that decreases costs.  A manufacturer might consider it has little choice but to accommodate the retailer's demands for vertical price restraints if the manufacturer believes it needs access to the retailer's distribution network.  *See* Overstreet 31; 8 P. Areeda & H. Hovenkamp, Antitrust Law 47 (2d ed. 2004) (hereinafter Areeda & Hovenkamp); *cf. Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937-938 (CA7 2000).
>
> ***
>
> As should be evident, the potential anticompetitive consequences of vertical price restraints must not be ignored or underestimated.

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893-94 (2007).

**D.    The Price Fixing Scheme Has Purposefully Resulted in "Rate Parity" for Rooms Through the Online Travel Agency Defendants – Allowing the Online Travel Agency Defendants to Always Guarantee the "Best" (Albeit Same) Prices**

115.    The Defendants' price fixing and its attendant "rate parity" scheme has achieved its illegal goal:  Online Travel Agency Defendants do not compete on the basis of price for rooms.  Rather, all online sales of rooms offered by an Online Travel Agency are at the same rate.

116.    Deposition testimony of Tim Gordon, Senior Vice President, of Priceline makes clear that each of the Online Travel Agency Defendants buys the rooms and sells the rooms to the public at exactly the same price:

> Q.    And in fact, sir, lets take a look at ALL22.  And this is a printout I did back in September for a night's stay at the Hilton in San Antonio .... $219 rate, taxes and then a total. And then if you will look through, I've printed out from the various websites of the defendants, same hotel, same night.

- 36 -

Orbitz has its $219.00 rate.  Cheap Tickets has its $219.00 rate.  Lowest Fare has a $219.00 rate.  Priceline, $219.00 rate.  Travel Now, $219.00.  Expedia, $219.00.  And Hotels.com, $219.00.  Every website lists this room on this night at the exact same room rate.  And you know – you know, based upon the way the contracts work, that doesn't surprise you, does it?

A.    No.

Q.    And why doesn't that surprise you?

A.    Because in general – and I can't be too specific because I don't know the exact terms of this agreement, but in general the contracts require us to take a net rate that they provide and mark it up by a specific amount.  And they require us to mark it up by that amount.

Q.    By that exact amount?

A.    Yes.

Q.    And your understanding is that you have best price guarantee from Hilton where they can offer your competitors more heavy discounts than they cannot offer Priceline, correct?

A.    That is true.

* * *

Q.    All right.  And so given the Most Favored Nations Clause that Hilton has, your understanding would be everybody – all these competitors are being provided this room at the same price and marking it up by the same amount resulting in the same retail rate, correct?

A.    I believe that to be true.

117.    In fact, a federal court in the Western District of Texas recently commented on

the similarity of the business models and pricing structures of the Online Travel Agency

Defendants:

After reviewing the record, it is clear that the Defendants not only engage in a common course of conduct, but that many of their business practices are virtually identical.  These practices include

- 37 -

but are not limited to the manner in which they contract with the
Hotel Defendants, the manner in which they determine and assess
cancellation policies and fees, the manner in which they determine
the mark up and fees to arrive at an acceptable margin and
retail/sell rate; and, the manner in which they calculate, assess and
pay hotel occupancy taxes.  The deposition testimony of the
corporate representatives, standing alone, reflects an amazing
similarity in practice, procedure and corporate methodology among
all of the [Online Travel Agency Defendants].  [Memorandum and
Opinion on Class Certification, *City of San Antonio v. Hotels.com,
et al.*, No. SA-06-CA-381-OG (W.D. Tex) (the "San Antonio Class
Cert Order") at 18-19 (emphasis added).]

118.    The Court determined, based upon deposition testimony, that the margins of each

of the Online Travel Agency Defendants were identical to the other Online Travel Agency

Defendants:

Almost without exception, the net rate and sell rate for a given
room on a given day are the same among the [Online Travel
Agency Defendants] because the Defendants' agreements with the
Hotel Defendants all contain "parity" or "Most Favored Nation"
clauses.  This also makes the [ITC] margins the same.  [*Id.* at 20,
n.21 (citations to deposition testimony omitted).]

119.    As a result of this deliberate desire to avoid price competition, and deprive

consumers of the benefits of such competition, the Online Travel Agency Defendants offer

online rooms for the same price.  In a deposition, Peggy Bianco, Vice President of Global Hotel

Services for Orbitz, testified that Orbitz and competitors like Expedia and Travelocity were

contractually bound to charge the same price for hotel rooms, and that they do not compete on

price.  *City of San Antonio*, Memorandum and Opinion on Class Certification, Dkt. No. 248, at

19 n.18.

120.    The impact of rate parity agreements was confirmed in an article in

Hotelnews.com.  An executive with TPG Hospitality noted the effect of rate parity agreements

on consumers:

> It's sometimes important for guests to see themselves as "getting a win" by securing a reduced rate, but pricing parity prohibits that, according to Furlong.
>
> "I want the option to provide the discount or value-add," she said. "I would do it across all channels with all my partners. I want to be able to do it to all customers, but the brands have us hand tied a little bit (through price parity)."[31]

121.    The article elsewhere noted the effect of the rate parity agreements. "Price parity takes away many opportunities for hoteliers to offer specials and value-adds."

122.    In December 2012, several prominent hotel operators in Scandinavia refused to renew their contracts with Expedia so that they could compete on price:

> "We canceled our contract in September after a series of very bad negotiations meetings where Expedia, in my personal opinion, brings nothing to the table and has a long list of new understandings of our contract," Tretterud said.
>
> "We want to be able to control our prices in all channels – for example, having the lowest price on our Web. That is not possible if you operate with rate parity," Jan Lundborg, VP of revenue management and distribution of Scandic Hotels, wrote via email.

123.    The comments above confirm that there would be price competition absent the rate parity agreements and demonstrate that absent such agreements it would be in the economic interest of hotels to compete.

124.    This rate parity and the effect of the agreements not to compete among Online Travel Agency Defendants and between the Major Hotel Chains and the Online Travel Agency Defendants is demonstrated by examples of hotel rooms available for reservation on the Online Travel Agency Defendants' and Major Hotel Chains' internet sites in major cities across the United States:

---

[31] http://hotelnewsnow.com/Articles.aspx/8501/Revving-up-pricing-tools-requires-maintenance.

Holiday Inn San Diego on the Bay (9/29-9/30) posted 8/7/2012:

| | |
|---|---|
| Expedia Standard | $186 |
| Hotels.com Standard | $186 |
| Orbitz Standard | $186 |
| Priceline Standard | $186 |
| Travelocity.com Standard | $186 |
| Booking.com Standard | $186 |
| Holiday Inn website Standard | $186 |
| Expedia Deluxe | $235 |
| Hotels.com Deluxe | $235 |
| Orbitz Deluxe | $235 |
| Priceline Deluxe | $235 |
| Travelocity.com Deluxe | $235 |
| Booking.com Deluxe | $235 |
| Holiday Inn website Deluxe | $235 |

InterContinental Century City (9/29-9/30) posted 8/7/2012:

| | |
|---|---|
| Expedia Executive Suite | $375 |
| Hotels.com Executive Suite | $375 |
| Orbitz Executive Suite | $375 |
| Priceline Executive Suite | $375 |
| Travelocity.com Executive Suite | $375 |
| Booking.com Executive Suite | $375 |
| Hotel website Executive Suite | $375 |

InterContinental San Francisco (9/29-9/30) posted 8/7/2012:

| | |
|---|---|
| Expedia Deluxe | $333 |
| Hotels.com Deluxe | $333 |
| Orbitz Deluxe | $333 |
| Priceline Deluxe | $333 |
| Travelocity.com Deluxe | $333 |
| Booking.com Deluxe | $333 |
| Hotel website Deluxe | $333 |

San Diego Marriott (9/22-9/23) posted 8/7/2012:

| | |
|---|---|
| Expedia Bayview | $240 |
| Hotels.com Bayview | $240 |

| | |
|---|---|
| Orbitz Bayview | $240 |
| Priceline Bayview | $240 |
| Travelocity.com | $240 |
| Booking.com Bayview | $240 |
| Hotel website | $240 |

LA Marriott Airport (9/29-9/30) posted 8/7/2012:

| | |
|---|---|
| Expedia Deluxe | $119 |
| Hotels.com Deluxe | $119 |
| Orbitz | $119 |
| Priceline | $119 |
| Travelocity.com | No listing |
| Booking.com Deluxe | $119 |
| Hotel website | $119 |

Marriott Marquis San Francisco (9/29-9/30) posted 8/7/2012:

| | |
|---|---|
| Expedia Deluxe | $389 |
| Hotels.com Deluxe | $389 |
| Orbitz Deluxe | $389 |
| Priceline Deluxe | $389 |
| Travelocity.com Deluxe | $389 |
| Booking.com Deluxe | $389 |
| Hotel website | $389 |
| Expedia City View | $414 |
| Hotels.com City View | $414 |
| Orbitz City View | $414 |
| Priceline City View | $414 |
| Travelocity.com City View | $414 |
| Booking.com City View | $414 |
| Hotel website | $414 |

Hilton San Diego (9/22-9/23) posted 8/7/2012:

| | |
|---|---|
| Expedia Bay/City View | $185 |
| Hotels.com Bay/City View | $185 |
| Orbitz Bay/City View | $189 (refundable) |
| Priceline Bay/City View | $185 |
| Travelocity.com Bay/City View | $185 |

- 41 -

| Booking.com Bay/City View | $185 |
|---|---|
| Hotel website | $185 |

Hilton San Francisco (9/29-9/30) posted 8/7/2012:

| Expedia King | $459 |
|---|---|
| Hotels.com King | $459 |
| Orbitz King | $459 |
| Priceline King | $459 |
| Travelocity.com Standard King | $459 |
| Booking.com Standard King | $459 |
| Hotel website | $459 |

Intercontinental Dallas Hotel, 1 King Bed Deluxe, June 1-2, 2013 (posted 4/25/13):

| Expedia.com | $120 |
|---|---|
| Hotels.com | $120 |
| Orbitz.com | $120 |
| Priceline | $120 |
| Travelocity.com | $120 |
| Booking.com | $120 |
| Hotel website | $120 |

W Dallas – Victory, Wonderful Room 1 King Bed, June 1-2, 2013 (posted 4/25/13):

| Expedia.com | $279 |
|---|---|
| Hotels.com | $279 |
| Orbitz.com | $279 |
| Priceline | $279 |
| Travelocity.com | $279 |
| Booking.com | $279 |
| Hotel website | $279 |

Dallas Marriott City Center, 1 King Bed or 2 Double Beds, June 1-2, 2013 (posted 4/25/13):

| Expedia.com | $159 |
|---|---|
| Hotels.com | $159 |
| Orbitz.com | $159 |

| | |
|---|---|
| Priceline | $159 |
| Travelocity.com | $159 |
| Booking.com | $159 |
| Hotel website | $159 |

Hilton Dallas/Park Cities, 1 King Bed, June 1-2, 2013 (posted 4/25/13):

| | |
|---|---|
| Expedia.com | $139 |
| Hotels.com | $139 |
| Orbitz.com | $139 |
| Priceline | $139 |
| Travelocity.com | $139 |
| Booking.com | $139 |
| Hotel website | $139 |

Palomar Dallas, a Kimpton Hotel, King Deluxe, June 1-2, 2013 (posted 4/25/13):

| | |
|---|---|
| Expedia.com | $259 |
| Hotels.com | $259 |
| Orbitz.com | $259 |
| Priceline | $259 |
| Travelocity.com | $259 |
| Booking.com | $259 |
| Hotel website | $259 |

Wyndham Dallas Love Field, Standard King, June 1-2, 2013 (posted 4/25/13):

| | |
|---|---|
| Expedia.com | $103.20 |
| Hotels.com | $103.20 |
| Orbitz.com | $103.20 |
| Priceline | $103.20 |
| Travelocity.com | $103.21 |
| Booking.com | $103.20 |
| Hotel website | $103.20 |

The Park Inn by Radisson Dallas-Love Field (Carlson Hotel), 1 King, June 1-2, 2013 (posted 4/25/13):

| | |
|---|---|
| Expedia.com | $74.25 |
| Hotels.com | $74.25 |

- 43 -

| | |
|---|---|
| Orbitz.com | $74.25 |
| Priceline | $74.25 |
| Travelocity.com | $74.25 |
| Booking.com | $74.25 |
| Hotel website | $74.25 |

Hyatt Regency Dallas, 1 King bed, June 1-2, 2013 (posted 4/25/13):

| | |
|---|---|
| Expedia.com | $149.49 |
| Hotels.com | $149.49 |
| Orbitz.com | $149.49 |
| Priceline | $149.49 |
| Travelocity.com | $149.49 |
| Booking.com | $149.49 |
| Hotel website | $149.49 |

Crowne Plaza Hotel, Chicago O'Hare, Deluxe Room, June 1-2, 2013 (posted 4/26/13):

| | |
|---|---|
| Expedia.com | $98 |
| Hotels.com | $98 |
| Orbitz.com | $98 |
| Priceline | $98 |
| Travelocity.com | $98 |
| Booking.com | $98 |
| Hotel website | $98 |

Aloft Chicago O'Hare, King Bed, June 1-2, 2013 (posted 4/26/13):

| | |
|---|---|
| Expedia.com | $129 |
| Hotels.com | $129 |
| Orbitz.com | $129 |
| Priceline | $129 |
| Travelocity.com | $129 |
| Booking.com | No listing |
| Hotel website | $129 |

JW Marriott Chicago, One King/Two Double, June 8-9 (posted 4/26/13):

| | |
|---|---|
| Expedia.com | $289 |
| Hotels.com | $289 |

- 44 -

| | |
|---|---|
| Orbitz.com | $289 |
| Priceline | $289 |
| Travelocity.com | $289 |
| Booking.com | $289 |
| Hotel website | $289 |

Trump International Hotel & Tower Chicago, Deluxe King, June 8-9 (posted 4/26/13):

| | |
|---|---|
| Expedia.com | $525 |
| Hotels.com | $525 |
| Orbitz.com | $525 |
| Priceline | $525 |
| Travelocity.com | $524.50 |
| Booking.com | $525 |
| Hotel website | $525 |

Hilton Rosemont Chicago O'Hare, 1 King Bed, June 8-9 (posted 4/26/13):

| | |
|---|---|
| Expedia.com | $99 |
| Hotels.com | $99 |
| Orbitz.com | $99 |
| Priceline | $99 |
| Travelocity.com | $99 |
| Booking.com | $99 |
| Hotel website | $99 |

Hotel Monaco Chicago, a Kimpton Hotel, King Deluxe, June 8-9 (posted 4/26/13):

| | |
|---|---|
| Expedia.com | $329.11 |
| Hotels.com | $329.11 |
| Orbitz.com | $328.75 |
| Priceline | $328.41 |
| Travelocity.com | $326.57 |
| Booking.com | $329 |
| Hotel website | $329 |

Super 8 Chicago Northlake O'Hare South, 1 King Bed, June 8-9 (posted 4/26/13):

| | |
|---|---|
| Expedia.com | $56.09 |

- 45 -

| | |
|---|---|
| Hotels.com | $56.09 |
| Orbitz.com | $59.83 |
| Priceline | No listing |
| Travelocity.com | $56.10 |
| Booking.com | No listing |
| Hotel website | $56.09 |

Best Western Grant Park, One King, June 15-16 (posted 4/26/13):

| | |
|---|---|
| Expedia.com | $269.99 |
| Hotels.com | $269.99 |
| Orbitz.com | $269.99 |
| Priceline | $269.99 |
| Travelocity.com | $269.99 |
| Booking.com | $269.99 |
| Hotel website | $269.99 |

Comfort Inn O'Hare, Standard King, June 15-16 (posted 4/26/13):

| | |
|---|---|
| Expedia.com | $129.99 |
| Hotels.com | $129.99 |
| Orbitz.com | $129.99 |
| Priceline | $129.48 |
| Travelocity.com | $129.99 |
| Booking.com | No listing |
| Hotel website | $129.99 |

Hyatt Rosemont, 1 King Bed, June 15-16 (posted 4/26/13):

| | |
|---|---|
| Expedia.com | $119 |
| Hotels.com | $119 |
| Orbitz.com | $119 |
| Priceline | $119 |
| Travelocity.com | $119 |
| Booking.com | $119 |
| Hotel website | $119 |

Intercontinental at Doral Miami, King Bed Deluxe, June 8-9 (posted 4/26/13):

| | |
|---|---|
| Expedia.com | $119 |
| Hotels.com | $119 |

- 46 -

| | |
|---|---|
| Orbitz.com | $119 |
| Priceline | $119 |
| Travelocity.com | $119 |
| Booking.com | $119 |
| Hotel website | $119 |

Four Points by Sheraton Miami Beach, Standard King Bed Non-Refundable, June 8-9 (posted 4/26/13):

| | |
|---|---|
| Expedia.com | $179 |
| Hotels.com | $179 |
| Orbitz.com | $179 |
| Priceline | $179 |
| Travelocity.com | $179 |
| Booking.com | $179 |
| Hotel website | $179 |

JW Marriott Marquis Miami, Deluxe Room Non-Refundable, June 8-9 (posted 4/26/13):

| | |
|---|---|
| Expedia.com | $212 |
| Hotels.com | $212 |
| Orbitz.com | $212 |
| Priceline | $212 |
| Travelocity.com | $212 |
| Booking.com | $212 |
| Hotel website | $212 |

Doral Golf Resort & Spa Miami (Trump), 1 King Bed, June 8-9 (posted 4/26/13):

| | |
|---|---|
| Expedia.com | $159 |
| Hotels.com | $159 |
| Orbitz.com | No listing |
| Priceline | $159 |
| Travelocity.com | $159 |
| Booking.com | $159 |
| Hotel website | $159 |

Hilton Miami Airport, 1 King Bed, June 8-9 (posted 4/27/13):

| | |
|---|---|
| Expedia.com | $129 |

- 47 -

| | |
|---|---|
| Hotels.com | $129 |
| Orbitz.com | $129 |
| Priceline | $129 |
| Travelocity.com | $129 |
| Booking.com | $129 |
| Hotel website | $129 |

EPIC Miami, a Kimpton Hotel, 1 King Bed City View, September 26-27, 2012 (posted on 9/5/2012):

| | |
|---|---|
| Expedia.com | $199 |
| Hotels.com | $199 |
| Orbitz.com | $199 |
| Priceline | $199 |
| Travelocity.com | $199 |
| Booking.com | $199 |
| Kimpton website | $199 |

Days Inn – Miami International Airport, 1 King Bed, June 8-9 (posted 4/27/13):

| | |
|---|---|
| Expedia.com | $119 |
| Hotels.com | $119 |
| Orbitz.com | $119 |
| Priceline | $119 |
| Travelocity.com | $119 |
| Booking.com | $119 |
| Hotel website | $119 |

Country Inn & Suites By Carlson Miami Kendall, 1 King, June 8-9 (posted 4/27/13):

| | |
|---|---|
| Expedia.com | $103.20 |
| Hotels.com | $103.20 |
| Orbitz.com | $103.20 |
| Priceline | $103.20 |
| Travelocity.com | No listing |
| Booking.com | $103.20 |
| Hotel website | $103.20 |

Best Western Atlantic Beach Resort,1 King, June 8-9 (posted 4/27/13):

- 48 -

| | |
|---|---|
| Expedia.com | $139.50 |
| Hotels.com | $139.50 |
| Orbitz.com | $139.50 |
| Priceline | $139.50 |
| Travelocity.com | $139.50 |
| Booking.com | $139.50 |
| Hotel website | $139.50 |

Comfort Inn & Suites Miami Airport, 1 King Bed, June 8-9 (posted 4/27/13):

| | |
|---|---|
| Expedia.com | $95.95 |
| Hotels.com | $95.95 |
| Orbitz.com | $95.95 |
| Priceline | $95.95 |
| Travelocity.com | $95.95 |
| Booking.com | $95.95 |
| Hotel website | $95.95 |

Hyatt Regency Miami, 1 King Bed, June 8-9 (posted 4/27/13):

| | |
|---|---|
| Expedia.com | $169 |
| Hotels.com | $169 |
| Orbitz.com | $169 |
| Priceline | $169 |
| Travelocity.com | $169 |
| Booking.com | $169 |
| Hotel website | $169 |

Intercontinental Boston, Deluxe One King Bed City View, June 8-9 (posted 4/27/13):

| | |
|---|---|
| Expedia.com | $336 |
| Hotels.com | $336 |
| Orbitz.com | $336 |
| Priceline | $336 |
| Travelocity.com | $336 |
| Booking.com | $336 |
| Hotel website | $336 |

Westin Boston Waterfront, Traditional King Bed, June 8-9 (posted 4/27/13):

| | |
|---|---|
| Expedia.com | $224.10 |
| Hotels.com | $224.10 |
| Orbitz.com | $224.09 |
| Priceline | $224.10 |
| Travelocity.com | $224.10 |
| Booking.com | $224.10 |
| Hotel website | $224.10 |

Marriott Boston Copley Place, Waterview Room, June 8-9 (posted 4/27/13):

| | |
|---|---|
| Expedia.com | $449 |
| Hotels.com | $449 |
| Orbitz.com | $449 |
| Priceline | No Listing |
| Travelocity.com | $449 |
| Booking.com | $449 |
| Hotel website | $449 |

Hilton Boston Back Bay, Standard King, June 8-9 (posted 4/27/13):

| | |
|---|---|
| Expedia.com | $339 |
| Hotels.com | $339 |
| Orbitz.com | $339 |
| Priceline | $339 |
| Travelocity.com | $339 |
| Booking.com | $339 |
| Hotel website | $339 |

Ramada Inn Boston, One Queen, June 8-9 (posted 4/27/13):

| | |
|---|---|
| Expedia.com | $199 |
| Hotels.com | $199 |
| Orbitz.com | $199 |
| Priceline | $199 |
| Travelocity.com | $197.42 |
| Booking.com | $199 |
| Hotel website | $199 |

Country Inn & Suites By Carlson, Brockton (Boston), 1 King Bed, June 8-9 (posted 4/27/13):

- 50 -

| | |
|---|---|
| Expedia.com | $101.13 |
| Hotels.com | $101.14 |
| Orbitz.com | $101.14 |
| Priceline | $101.13 |
| Travelocity.com | $101.15 |
| Booking.com | No listing |
| Hotel website | $101.14 |

Best Western University Hotel – Boston/Brighton, Double-Double, June 8-9 (posted 4/27/13):

| | |
|---|---|
| Expedia.com | $249 |
| Hotels.com | $249 |
| Orbitz.com | $249 |
| Priceline | $249 |
| Travelocity.com | $249 |
| Booking.com | $249 |
| Hotel website | $249 |

Comfort Inn & Suites Boston/Airport, 1 Queen Suite, June 8-9 (posted 4/27/13):

| | |
|---|---|
| Expedia.com | $189 |
| Hotels.com | $189 |
| Orbitz.com | $189 |
| Priceline | $189 |
| Travelocity.com | $187.49 |
| Booking.com | $189 |
| Hotel website | $189 |

Hyatt Regency Boston, 1 King Bed, June 8-9 (posted 4/27/13):

| | |
|---|---|
| Expedia.com | $269 |
| Hotels.com | $269 |
| Orbitz.com | $269 |
| Priceline | $269 |
| Travelocity.com | $269 |
| Booking.com | No listing |
| Hotel website | $269 |

125.    The examples above demonstrate that rate parity results from the price fixing scheme, and that there is no competition based on price.  To make sure that prices are the same, the Online Travel Agency Defendants employ "market managers" who "monitor closely a hotel's rates across all channels, and if a preferential rate was given to one over the other that hotel could face dire penalties."[32]  The examples above demonstrate the effectiveness of the price fixing enforcement efforts.

**E.    The Online Travel Agency Defendants Deceive Consumers by Advertising "Best Prices" or "Lowest Prices"**

126.    As a result of the "success" of the price fixing scheme, the Online Travel Agency Defendants are confident that all of the prices listed between them for the same room will be identical.  Thus, they each offer a near identical "best price" guarantee – knowing it is the *only* price available even among competitors.  Examples follow:

**a.    Travelocity's Guaranteed Low Prices**



(http://leisure.travelocity.com/Promotions/0,,TRAVELOCITY|4818|mkt_main,00.html)

(http://leisure.travelocity.com/Promotions/0,,TRAVELOCITY|4818|mkt_main,00.html)

Guaranteed Best Price: If you find a lower rate, we'll pay the difference and send you $50.

---

[32] HotelNewsNow.Com., June 25, 2012, Does rate parity limit revenue managers?

- 52 -

### b. Expedia's Best Price Guarantee



We're so confident you'll find the best price for your trip here on Expedia that we guarantee it. Find a cheaper trip within 24 hours of booking and we'll refund the difference-and give you a travel coupon worth $50.

### c. Booking.com Best Price Guarantee

## Best Price Guaranteed

We promise that when you book with us, you'll get the lowest possible price for your room. Guaranteed.

### d. Hotels.com Price Match Guarantee

## Price Match

The hotels.com Price Match Guarantee protects your pocket book and takes the worry out of booking a hotel room. After you book with hotels.com, if you find a lower publicly available rate online for the same dates, hotel, and room category, we will match the price and refund you the difference.

### e. Orbitz Low Price Guarantee



## Orbitz Low Price Guarantee

Look for our hotel and car rates backed by our Low Price Guarantee. We're so confident they're the lowest online, we're willing to put money on it.

**Hotel Low Price Guarantee Terms and Conditions:**

If you book a qualifying prepaid hotel rate on the Orbitz Web site, and then find the same room, in the same hotel, for the same dates, at a lower price online, before taxes and fees, we'll **refund the difference** and give you a **$50 discount** on a future hotel booking.

- 53 -

### f.    Priceline Low Price Guarantee



### 2.    Major Hotel Chains

127.   The Major Hotel Chains also make similar promises.

### a.    IHG



     

We're so sure the best prices for our hotels are found on our websites that we were the first to offer the most powerful price guarantee ever by a global travel company. Find a lower price elsewhere and your first night is free.  That's our Best Price Guarantee and just one of many benefits you get with the Book With Us Advantage.

### b.  Starwood



### c.  Marriott



### d.  Trump



### e.  Hilton



» **Best Rates**  |  Terms and Conditions  |  Submit a Claim

Just book through any Hilton Family website, reservation center or hotel directly.

In fact, we promise that if you find a lower rate through any other booking channel, we'll match that rate you found plus:

> For hotels in the U.S.A., Puerto Rico, Canada or Mexico, we'll give you a $50 American Express® Gift Cheque. Terms and Conditions.

> For hotels outside the U.S., Puerto Rico, Canada or Mexico, we'll take US $50 off of your bill. Terms and Conditions.

No matter where your destination is, if you have found a better rate through another booking channel, submit a claim and our Guest Assistance team will determine eligibility and contact you.

- 56 -

### f.    Kimpton



**THE REAL DEAL:**

**Find a lower rate online than what we offer on our own websites?**
(aka Kimpton's Best Rate Guarantee)

We all know The Real Deal when we see it. It's legit. It has substance (ie: no tacky seams or pleather involved).

Let us elaborate... You're a savvy traveler who needs the most for less, so you shop around. But we want you to know that our rates are the same or better than rates for our hotels on other websites. **If you find a bookable rate online for our hotels that is lower than what we offer on our own websites**, we'll make it right. What's more, we'll throw in some "fun money" just for your trouble.

**Kimpton's Real Deal includes:**

- Our promise to match any lower rate you find for our hotels online*
- $25 food and beverage credit per stay, just because!

So now what? If you find a better bookable rate for one of our hotels on another website, and you don't see the same rate or better on our own websites, just ring us up. Tell us where you found it and we'll match the rate on the spot. It's that easy.

### g.    Wyndham



# Wyndham.com Booking Advantage: Best Rate Guarantee



**BOOK WHERE THE BEST RATE IS GUARANTEED OR YOU GET 10% OFF!**

When you book online at Wyndham.com or via our central reservation telephone number, 1-800-337-0550, we GUARANTEE you will get the best rate. How can we guarantee this? Simple.
If you find a lower, publicly available rate on another website for the same hotel accommodation and date, we'll match the competing rate plus give you a 10% discount.*

What is a lower rate*?

• The lower rate on another website must be for the same hotel, for the same date(s), for the same room type, for the same number of guests, in the same currency and must be publicly available for booking via the Internet.

What do I do if I find a lower rate*?

• Fill out and submit the online claim form to our Customer Service department.

How long do I have to submit the online claim form to get my rate adjusted and the 10% discount?

• Submit the online claim form to Customer Service within one business day of booking and two business days prior to arriving at the hotel.

### h.    Carlson (Radisson)



### i.    Best Western

**Best Western® Low Rate GUARANTEED! Program
Terms & Conditions**

Best Western Low Rate, Guaranteed!  Program ("Program"):  If a consumer finds a lower published rate on the internet, excluding taxes and fees, at any Best Western branded hotel outside of the United States, Canada, or the Caribbean Islands than the rate published on www.bestwestern.com, Best Western International, Inc. ("Best Western") will honor the competing rate and provide a 10% discount for each night of the reservation.  The Program is subject to the following terms and conditions:

- If a lower Internet rate is found, Best Western will honor the competing rate (under the terms and conditions) and provide a 10% discount for each night of the reservation.  If, in the meantime, the lower rate has become available in the Best Western system this rate will be applied and the 10% discount will not apply.

### j.    Choice Hotels



### k.    Hyatt



128.    These "best price" or "price guarantees" also appeared on websites in the form as set forth below.  Thus, they each offer a near identical "best price" guarantee – knowing it is the *only* price available even among competitors.  Examples confirm this fact.

- 59 -

<u>Hotels.com "Price Match Guarantee"</u>

"The hotels.com Price Match Guarantee protects your pocket book and takes the worry out of booking a hotel room. After you book with hotels.com, if you find a lower publicly available rate online for the same dates, hotel, and room category, we will match the price and refund you the difference.

And unlike some of our competitors, we will match the price right up to the time of the property's cancellation deadline, whether that is three days after you made the reservation or three months.  So stop worrying and start booking."

<u>Expedia.com "Best Price Guarantee"</u>

We're so confident you'll find the best price for your trip here on Expedia that we guarantee it.  Find a cheaper trip within 24 hours of booking and we'll refund the difference-and give you a travel coupon worth $50.

Expedia's Best Price Guarantee covers virtually every part of your trip:  flights, hotels, vacation packages, cruises, rental cars, and activities:  Here's how to tell if your Expedia reservation qualifies:

- Are travel dates the same?

- Is the hotel, room type and rate plan and cancellation policy the same?

- Is the airline, class, fare and cancellation policy the same?

- Is the car class and cancellation policy the same?

- Is the cruise line, cabin, class, fare, and cancellation policy the same?

- Does each part of your package match?

- Is the other fare from a U.S.-based website and quoted in dollars?

<u>Travelocity.com "Best Price Guarantee"</u>

"We guarantee the best price.  If you find a lower price online, we won't just match it, we'll also give you $50 off your next trip."

010326-13  675346 V1

<u>Orbitz.com</u>

 "      You book a flight or hotel

Book a flight or prepaid hotel room on Orbitz and we immediately start tracking to see if another customer books the same itinerary at a lower price.

 They book it for less

If another Orbitz customer books your same itinerary for less, we'll issue credits -- or Orbucks -- for 110% of the difference.  Amounts range from $5 to $250 per airline ticket or $5 to $500 per hotel booking.

 You get hotel credit, automatically

No need to call, email or fill out forms.  We'll deposit Orbucks into your "My Account," which you can redeem about three days after your qualifying trip is complete."

129.    At an EyeforTravel 2007 USA Conference, executives for Travelocity recognized that "in the USA best rate guarantees have proved to be very popular."[33]

**F.    Investigation by Governmental Authorities**

130.    This price-fixing conspiracy is evidently not confined to the United States.  The British Office of Fair Trade ("OFT") recently issued a "Statement of Objections" alleging that Expedia, Inc. infringed competition through the very same price fixing agreements with respect to British hotel rooms.  The *Telegraph* reported that Expedia admitted that "it has engaged in cartel conduct on breach of the law," and is "providing information on its rivals under a 'leniency deal'" with the British authorities.

---

[33] Bullet point from panel presentation of "Pricing Strategy," Rich Saleh of Travelocity was a Panel Member.

131.    The British revelations leave no room for doubt:  the Online Travel Agency Defendants are entering into contracts with the Major Hotel Chains in this country and to the same anti-competitive effect.  The Agreements are part of an anti-competitive scheme under which the Online Travel Agency Defendants leveraged their substantial market power and dominance to induce the Major Hotel Chains into agreeing to do one or more of the following: (a) impose minimum RPM agreements on competing Online Travel Agency Defendants; (b) enforce the RPM agreements as to the Online Travel Agency Defendants; and/or (c) cut off supply to price-cutting online travel agencies.

132.    On December 11, 2012, Switzerland's Competition Commission announced that it was investigating Booking.com, a subsidiary of Priceline, Expedia and Hotels.com.  The Commission stated that it suspects that the rate parity agreements "could constitute illegal restraints."

## VI.    THE RELEVANT MARKET AND DEFENDANTS' MARKET POWER

133.    Plaintiffs in Counts I and III allege a *per se* violation of the antitrust laws.  For this reason, there is no need to plead a relevant product or geographic market.

134.    To the extent it is required for Counts I and III, Plaintiffs allege that the relevant product market in this case is the direct online sale of hotel room reservations, which includes bookings through any of the Defendants' websites.  The online booking penetration rate in the United States is nearly 60%.  (Orbitz 10-K p. 35.)

135.    Online reservations have unique functional characteristics which make them attractive to travelers.  They permit travelers to easily search many different hotel types and locations in their desired areas.  Many online travel agency websites also have reviews provided by consumers with which to evaluate different properties.  There is a distinct group of travelers who want to book hotel rooms online.  The Defendants recognize this market in the RPM

- 62 -

agreements when they define the Most Favored Nations clause to cover any online services that books hotel rooms.  These agreements do not require that the Most Favored Nations clause apply to room prices made outside of the online market – *i.e.*, to telephone or walk up reservations.

136.    Within the larger online hotel booking market, the Online Travel Agency Defendants have been dominant distributors since 2002.  The Online Travel Agency Defendants today have 94% of online travel agency hotel bookings.  The Online Travel Agency Defendants at all relevant times possessed market power in the relevant market.

137.    Online travel agency websites permit one-stop shopping for airline, hotel and car rental reservations.  No hotel website provides this functionality.  There is no other service or group of companies that offer the functionality of online shopping.

138.    Hotel websites only provide listings for a single Defendant's properties. Traditional travel agents, such as American Express, charge consumers a hefty booking fee of $35 or more.

139.    Consumers prefer the ease of internet hotel bookings, which has led to the explosive growth of the online hotel room booking market.

140.    The relevant geographic market in this case is the United States.

### VII.    MARKET EFFECTS OF AND ANTITRUST INJURY DUE TO DEFENDANTS' ANTICOMPETITIVE CONDUCT

141.    The overall effect of Defendants' anti-competitive, exclusionary scheme has been to substantially foreclose and impair competition (and the threat of such competition) from lower-priced room reservations.  As alleged above, had the Defendants not improperly foreclosed or stifled actual or potential competitors from competing in the market for online room reservations, other actual or potential rival retailers would have achieved much greater sales than they actually did (or threatened to do), given the lower prices that they charged (or

could have charged upon entry), and would have posed a far greater competitive threat to the

Defendants.  Additionally, absent the Defendants' exclusionary conduct, barriers to entry to the

market would have been lower, which:  (a) would have made it easier for existing or new

competitors to enter or expand their positions in the market for online room reservations, and

(b) would have caused existing or potential competitors to be attracted to the online room

reservation market because of the supra-competitive prices that the Defendants were charging.

As a result, absent the Defendants' misconduct, the Defendants would have rationally perceived

that there was a greater threat of potential competition in the relevant market if the Defendants

did not reduce their supra-competitive prices.

142.    The presence of unfettered competition from actual or potential competitors,

which were selling lower-priced rooms, would have forced the Defendants to lower the prices for

their rooms in order to remain competitive and/or to counter a perceived threat of additional

entry.

143.    In the absence of the agreements Online Travel Agency Defendants and the Major

Hotel Chains would have competed based on room price.  The price fixing scheme alleged herein

harmed inter-brand as well as intra-brand competition.

144.    During the relevant period, Plaintiffs and the other members of the Class

purchased hotel rooms directly from the Defendants.  As a result of the Defendants alleged

illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated

prices for the hotel rooms they purchased.  Plaintiffs would have been able to, *inter alia*,

purchase less-expensive hotel rooms had potential competitors been able to engage in unfettered

competition.  The prices that Plaintiffs and the other Class members paid for hotel rooms during

the Class Period were greater than the prices that Plaintiffs and the Class members would have

- 64 -

paid absent the illegal conduct alleged herein because:  (1) the prices of all online hotel rooms

were higher due to the Defendants' illegal conduct; and (2) Class members were deprived of the

opportunity to purchase hotel rooms from the Defendants' competitors at lower prices.  Thus,

Plaintiffs and the Class have, as a consequence, sustained damages in the form of overcharges.

## VIII.   CLASS ALLEGATIONS

145.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this

class action on behalf of themselves and all members of the following class (the "Class"):

> All persons throughout the United States who during the period
> January 1, 2003, through the present, paid for a room reserved
> from any of Defendants' online websites.  Expressly excluded are
> (i) room reservations made as part of a package deal; or (ii) room
> reservations made without disclosure of the name of the hotel until
> after paying for the room reservation.[34]

146.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this

class action on behalf of themselves and all members of the following subclasses (the "State

Subclasses"):

> All persons and entities who, in the states set forth in Counts III,
> IV, or V, paid for a room reserved through one of the Online
> Travel Agency Defendants online websites.  Expressly excluded
> are (i) room reservations made as part of a package deal; or
> (ii) room reservations made without disclosure of the name of the
> hotel until after paying for the room reservation.

147.    Plaintiffs believe that the Class and State Subclasses include thousands of

consumers and businesses across the United States, though the exact number and the identities of

the Class members are currently unknown.

148.    The members of the Class and State Subclasses are so numerous that joinder of all

Class members is impracticable.

---

[34] Plaintiffs on information and belief allege that the scheme also involved packaged rooms
and may amend to include such rooms at a later date.

010326-13  675346 V1

149.     Common questions of law and fact exist as to all members of the Class and State Subclasses and predominate over any questions affecting solely individual members of the Class and State Subclasses.  Nearly all factual, legal, and statutory relief issues raised in this Complaint are common to each of the members of the Class and State Subclasses and will apply uniformly to every member of the Class and State Subclasses.  Among the questions of law and fact common to the Class and State Subclasses members are:

a.      whether Defendants engaged in agreements, contracts, combinations, and conspiracies, which had the purpose and/or effect of unreasonably restraining competition and limiting purchaser access to competing and lower-priced hotel rooms;

b.      whether Defendants unreasonably restrained trade;

c.      whether Defendants' anti-competitive contracts, combinations, and conspiracies have caused Plaintiffs and the other members of the Class and State Subclasses to suffer antitrust injury in the nature of overcharges;

d.      whether the internet travel agencies' promotion or advertisement of prices as "best price" or "low price" or by use of similar terms violates state consumer protection laws;

e.      whether Defendants' unlawful conduct caused Plaintiffs and other members of the Class and State Subclasses to pay more for the hotel rooms than they otherwise would have paid;

f.      the appropriate Class-wide measure of damages;

g.      whether, and in what amount, Plaintiffs and the other Class and State Subclasses are entitled to recover treble damages, court costs, and attorneys' fees; and

h.      whether Defendants' anti-competitive conduct is continuing, thus entitling the Class and State Subclasses to injunctive relief to promote unrestrained trade and free and fair competition.

150.    Plaintiffs' claims are typical of the claims of other members of the Class and State Subclasses because Plaintiffs and every member of the Class and State Subclasses have suffered similar injuries as a result of the same practices alleged herein.  Plaintiffs have no interest adverse to the interests of the other members of the Class and State Subclasses.

151.    Plaintiffs will fairly and adequately represent and protect the interests of the Class and State Subclasses.  Plaintiffs have retained able counsel with extensive experience in class action litigation.  The interests of Plaintiffs are coincident with, and not antagonistic to, the interests of the other Class and State Subclasses members.

152.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

153.    Plaintiffs and other members of the Class have suffered damages as a result of Defendants' unlawful and wrongful conduct.  Absent a class action, Defendants will retain substantial funds received as a result of their wrongdoing, and such unlawful and improper conduct shall, in large measure, go unremedied.  Absent a class action, the members of the Class will not be able to effectively litigate these claims and will suffer further losses, as Defendants will be allowed to continue such conduct with impunity and retain the proceeds of their ill-gotten gains.

154.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.

Moreover, because the damages suffered by individual members of the Class are relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  The Class is readily definable, and prosecution of this action as a class action will eliminate the possibility of repetitious litigation.  There will be no difficulty in the management of this action as a class action.

## IX.     TOLLING OF THE STATUTE OF LIMITATIONS, FRAUDULENT CONCEALMENT, EQUITABLE TOLLING AND CONTINUING VIOLATIONS

155.     Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

156.     Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims sued upon herein until immediately prior to commencing this civil action.

157.     Any applicable statutes of limitation have been tolled by Defendants' affirmative acts of fraudulent concealment and continuing misrepresentations, as the facts alleged above reveal.

158.     Because of the self-concealing nature of Defendants' actions and their affirmative acts of concealment, Plaintiffs and the Class assert the tolling of any applicable statutes of limitations affecting the claims raised herein.

159.     Defendants continue to engage in the deceptive practice, and consequently, unwary consumers are injured on a daily basis by Defendants' unlawful conduct.  Therefore, Plaintiffs and the Class submit that each instance that Defendants engaged in the conduct complained of herein and each instance that a member of the Class purchased a hotel room constitutes part of a continuing violation and operates to toll the statutes of limitation in this action.

160.    Defendants are estopped from relying on any statute of limitations defense because of their unfair or deceptive conduct.

161.    Defendants' conduct was and is, by its nature, self-concealing.  Still, Defendants, through a series of affirmative acts or omissions, suppressed the dissemination of truthful information regarding their illegal conduct, and have actively foreclosed Plaintiffs and the Class from learning of their illegal, anti-competitive, unfair and/or deceptive acts.  These affirmative acts included concealing the price-fixing scheme by boldly claiming that each Defendant offered the "Best" or "Low Price" and would match any lower price thus giving the impression that there was competition based on price.

162.    By reason of the foregoing, the claims of Plaintiffs and the Class are timely under any applicable statute of limitations, pursuant to the discovery rule, the equitable tolling doctrine, and fraudulent concealment.

## X.    COUNTS

### COUNT I

### VIOLATION OF 15 U.S.C. § 1
#### (*Per Se* Agreements to Fix Prices)

163.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein and this Count is asserted against the Online Travel Agency Defendants.

164.    The price fixing agreements, and the scheme in restraint of trade, have harmed competition and caused the prices for hotel rooms to be higher than they would have been without the horizontal agreement between the Online Travel Agency Defendants.

165.    The agreement not to compete on price by the Online Travel Agency Defendants is a horizontal *per se* price fixing agreement.

166.     The attendant industry-wide agreements with the Major Hotel Chains to maintain "rate parity" were specifically intended to protect the Online Travel Agency Defendants from price competition.  Thus, Defendants agreed to restrain competition by mandating higher price levels, and thereby neutering the competition, or by eliminating the price cutting entirely.  This scheme achieved its goals, and thereby substantially inflated prices to consumers like Plaintiffs.

167.     The Online Travel Agency Defendants did not act unilaterally or independently, or in their own economic interests, when:

a.     entering into the agreements;

b.     requiring the Major Hotel Chains' acquiescence to, and compliance with, the terms of the "rate parity" Agreements; or

c.     seeking to have all Online Travel Agency Defendants charge minimum resale prices.

168.     The price fixing agreements and rate parity agreements, and their enforcement, constitute contracts, combinations and conspiracies that substantially, unreasonably, and unduly restrain trade in the relevant market(s), and harmed Plaintiffs and the Class thereby.

169.     The Defendants possess market power.

170.     There is no legitimate, pro-competitive business justification for these agreements or any of them that outweighs their harmful effect.  Even if there were some conceivable justification, the Agreements are broader than necessary to achieve such a purpose.

171.     Plaintiffs and members of the Class were injured in their business or property by the collusion and conspiracy alleged above which facilitated, enabled, assisted or furthered Defendants' substantial foreclosure and exclusion of competition in the relevant market(s).

172.    Without limiting the generality of the foregoing, Plaintiffs and the other members of the Class have been forced to pay higher prices for rooms than they would have paid in the absence of Defendants' unlawful conduct.

## COUNT II

## VIOLATION OF 15 U.S.C. § 1

### (Agreements Unreasonably Restraining Trade)

173.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.  This Count is brought in the alternative if the conduct at issue is not a *per se* violation.

174.    The RPM Agreements, and the scheme in restraint of trade, have harmed competition in the relevant market and caused prices to be higher in the relevant market then the prices would have been without the RPM agreements and the horizontal agreement between the Online Travel Agency Defendants.

175.    The RPM agreements and the industry-wide agreements to maintain "rate parity" were specifically intended to protect the Defendants from price competition.  Thus, Defendants agreed to restrain competition by mandating higher price levels, and thereby neutering the competition, or by eliminating the price cutting entirely.  This scheme achieved its goals, and thereby substantially inflated prices to consumers like Plaintiffs.

176.    The Online Travel Agency Defendants did not act unilaterally or independently, or in their own economic interests, when:

      a.    entering into the agreements;

      b.    requiring the Major Hotel Chains' acquiescence to, and compliance with, the terms of the "rate parity" agreements; or

c.      seeking to have all Online Travel Agency Defendants charge minimum resale prices.

177.    The RPM agreements and rate parity agreements, and their enforcement, constitute contracts, combinations and conspiracies that substantially, unreasonably, and unduly restrain trade in the relevant market(s), and harmed Plaintiffs and the Class thereby.

178.    These agreements cover a sufficiently substantial percentage of relevant market(s) to harm competition.

179.    The Defendants are liable for the creation, maintenance, and enforcement of the Agreements under a "quick look" and/or rule of reason standard.

180.    The Defendants possess market power.

181.    These agreements harm intra-brand and inter-brand competition by artificially raising and stabilizing prices.

182.    There is no legitimate, pro-competitive business justification for these agreements or any of them that outweighs their harmful effect.  Even if there were some conceivable justification, the Agreements are broader than necessary to achieve such a purpose.

183.    Plaintiffs and members of the Class were injured in their business or property by the collusion and conspiracy alleged above which facilitated, enabled, assisted or furthered Defendants' substantial foreclosure and exclusion of competition in the relevant market(s).

184.    Without limiting the generality of the foregoing, Plaintiffs and the other members of the Class have been forced to pay higher prices for rooms than they would have paid in the absence of Defendants' unlawful conduct.

## COUNT III

## VIOLATION OF STATE ANTITRUST LAWS

### (Brought by State Subclasses for Each State Listed Below)

185.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

186.    All Defendants engaged in violation of the following state law.

187.    By reason of the foregoing, Defendants have violated ARIZONA REVISED STATUTES §§ 44-1401, *et seq*.

188.    By reason of the foregoing, Defendants have violated CALIFORNIA BUSINESS AND PROFESSIONS CODE §§ 16720, *et seq*.

189.    By reason of the foregoing, Defendants have violated DISTRICT OF COLUMBIA CODE ANNOTATED §§ 28-4501, *et seq*.

190.    By reason of the foregoing, Defendants have violated the Florida Deceptive and Unfair Trade Practices Act, FLA. STAT. §§ 501.201, *et seq*.

191.    By reason of the foregoing, Defendants have violated the Illinois Antitrust Act, ILLINOIS COMPILED STATUTES, §§ 740 Ill. Comp. Stat. 10/1, *et seq*.

192.    By reason of the foregoing, Defendants have violated IOWA CODE §§ 553.1, *et seq*.

193.    By reason of the foregoing, Defendants have violated KANSAS STATUTES ANNOTATED §§ 50-101, *et seq*.

194.    By reason of the foregoing, Defendants have violated MARYLAND CODE ANN., COM. LAW §§ 11-204(a) and (b), *et seq*.

- 73 -

195.     By reason of the foregoing, Defendants have violated the MAINE REVISED STATUTES 10 M.R.S. §§ 1101, *et seq.*

196.     By reason of the foregoing, Defendants have violated MICHIGAN COMPILED LAWS ANNOTATED §§ 445.771, *et seq.*

197.     By reason of the foregoing, Defendants have violated MINNESOTA ANNOTATED STATUTES §§ 325D.49, *et seq.*

198.     By reason of the foregoing, Defendants have violated MISSISSIPPI CODE ANNOTATED §§ 75-21-1, *et seq.*

199.     By reason of the foregoing, Defendants have violated NEBRASKA REVISED STATUTES §§ 59-801, *et seq.*

200.     By reason of the foregoing, Defendants have violated NEVADA REVISED STATUTES ANNOTATED §§ 598A.010, *et seq.*

201.     By reason of the foregoing, Defendants have violated NEW MEXICO STATUTES ANNOTATED §§ 57-1-1, *et seq.*

202.     By reason of the foregoing, Defendants have violated NEW HAMPSHIRE REVISED STATUTES §§ 356:1, *et seq.*

203.     By reason of the foregoing, Defendants have violated NEW YORK GENERAL BUSINESS LAWS §§ 340, *et seq.*

204.     By reason of the foregoing, Defendants have violated NORTH CAROLINA GENERAL STATUTES §§ 75-1, *et seq.*

205.     By reason of the foregoing, Defendants have violated NORTH DAKOTA CENTURY CODE §§ 51-08.1-01, *et seq.*

206.    By reason of the foregoing, Defendants have violated OREGON REVISED STATUTES §§ 646.705, *et seq.*

207.    By reason of the foregoing, Defendants have violated SOUTH CAROLINA'S UNFAIR TRADE PRACTICES ACT, S.C. CODE ANN. §§ 39-5-10, *et seq.*

208.    By reason of the foregoing, Defendants have violated SOUTH DAKOTA CODIFIED LAWS §§ 37-1-3.1, *et seq.*

209.    By reason of the foregoing, Defendants have violated TENNESSEE CODE ANNOTATED §§ 47-25-101, *et seq.*

210.    By reason of the foregoing, Defendants have violated UTAH CODE ANNOTATED §§ 76-10-911, *et seq.*

211.    By reason of the foregoing, Defendants have violated VERMONT STAT. ANN. 9 §§ 2451, *et seq.*

212.    By reason of the foregoing, Defendants have violated WEST VIRGINIA CODE §§ 47-18-1, *et seq.*

213.    By reason of the foregoing, Defendants have violated WISCONSIN STATUTES §§ 133.01, *et seq.*[35]

## COUNT IV

## VIOLATION OF STATE CONSUMER PROTECTIONS LAWS

214.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

---

[35] A demand letter will be sent under Massachusetts General Law Annotated Chapter 93A, *et seq.* and CAL. BUS. & PROF. CODE § 17500, *et seq.*, and an amendment adding claims under that law will be made in 30 days if necessary.

215.    This Count is asserted against all Defendants on behalf of State Subclasses for each state listed below.

216.    The claim by each Defendant that the room prices are "best price" or "low price" are misleading and deceptive in violation of the following statutes:

a.      ALASKA STAT. § 45.50.471(12);

b.      ARKANSAS CODE ANN. § 4-88-108;

c.      ARIZONA REV. STAT. § 44-1522(A);

d.      CAL. CIV. CODE § 1750, *et seq*., for injunctive relief only until an amendment is filed;

e.      CAL. BUS. & PROF. CODE § 17200, *et seq*.;

f.      CAL. BUS. & PROF. CODE § 17500, *et seq*.;

g.      COLO. REV. STAT. ANN. § 6-1-105(1)u;

h.      Connecticut CUTPA;

i.      6 DEL. CODE § 2513(a);

j.      D.C. CODE § 82-3904(f);

k.      Florida § 501.204;

l.      GA. CODE ANN. § 1001-393;

m.      HAW. REV. STAT. ANN. § 481A-3;

n.      IDAHO CODE ANN. § 48-601;

o.      815 ILCS 505/2;

p.      Iowa 714(h) (the Attorney General has given permission to file a class action);

q.      KAN. STAT. ANN. § 50-626(b);

r.      KY. REV. STAT. ANN. § 367.160;

s.      LA. REV. STAT. ANN. § 51-1405;

- 76 -

t.      ME. REV. STAT. ANN. § 5207;

u.      MD. CODE ANN. § 13-301(3);

v.      MASS. GEN. LAWS ANN. ch. 93A § 2;[36]

w.      MICH. COMP. LAWS § 445.903(1);

x.      MINN. STAT. ANN. § 325F.68;

y.      MO. REV. STAT. § 407.020(1);

z.      MONT. CODE ANN. § 30-14-103;

aa.     NEB. REV. STAT. § 59-1602;

bb.     N.H. Rev. Stat. Ann. § 358-A:2;

cc.     N.J. STAT. ANN. § 56:8-2;

dd.     N.M. STAT. ANN. § 57-12-3;

ee.     N.Y. GEN. BUS. LAW § 349;

ff.     N.C. GEN. STAT. ANN. § 75-1.1;

gg.     N.D. CERT. CODE § 51-15-02;

hh.     OKLA. STAT. ANN. tit. 15 § 752(13);

ii.     R.I. GEN LAWS §6-13.1-2;

jj.     S.C. CODE ANN. § 39-5-20;

kk.     TENN. CODE ANN. § 47-18-109(a)(1);

ll.     UTAH STAT. ANN. tit. 9 §2453l;

mm.     REV. CODE WASH. 19.86.020; and

nn.     W. VA. CODE § 46A-6-102(7)(M).

---

[36] This law is not formally alleged at this time.  A 93A demand letter has been mailed, so this is simply a placeholder in the event defendants do not offer settlement within 30 days.  Plaintiffs will amend to add this claim if needed at that point.

217.    Each of these Defendants not only promised the "Best" or "Low Price" but also informed consumers that the Defendants would match any low price the consumer found.  Of course, Defendants knew there were no lower prices and that the series of promises were illusory and deceptive.

218.    The advertisement of "best price" or "lowest price" or similar promises were relied upon by consumers who expected the terms to have the meaning a reasonable consumer would attach to such promises.  As a result of this deceptive conduct Plaintiffs did not receive the best price or lowest price and were injured.

219.    A reasonable consumer would be mislead by these best price guarantees.  As a result of the deceptive scheme consumers believed they were receiving the best price and would not have known there was no online best price but a uniform price.  If the Online Travel Agency Defendants had not enforced this scheme consumers would have been able to (1) actually find the best price, (2) been alerted to look to alternate distribution channels to find the "best price" or to consider package deals, and (3) but for the scheme to conceal the lack of a true best price there would have been competition based on price and consumers could have bought cheaper rooms. This deceptive conduct is ongoing, and consumers are being misled each day.

## COUNT V

220.    This Count is asserted by the Plaintiffs who purchased a room online in the State of California.

221.    Each Online Travel Agency Defendant entered into a resale price maintenance agreement with the Major Hotel Chains.  Such agreements are *per se* illegal in the state of California and violate Cartwright Act, Business & Professions Code section 16720 *et seq.*, *Harris* v. *Capitol Records Distrib. Corp.*, 64 Cal. 2d 454, 463 (1966); *Mailand v. Burckle*, 20

- 78 -

Cal. 3d 367, 377 (1978); *Chavez* v. *Whirlpool Corp.*, 93 Cal. App. 4th 363, 369 (2001); *Kumert*

v. *Mission Fin. Servs. Corp.*, 110 Cal. App. 4th 242, 263 (2003).

222.     Absent such agreements, Online Travel Agency Defendants would have offered

discounts and there would have been price competition among Online Travel Agency Defendants

and between Online Travel Agency Defendants and the Major Hotel Chains.

223.     Without limiting the generality of the foregoing, Plaintiffs and the other members

of the Class have been forced to pay higher prices for rooms than they would have paid in the

absence of Defendants' unlawful conduct.

### RELIEF REQUESTED

**WHEREFORE**, Plaintiffs, on their behalf and on behalf of the Class, pray for judgment,

as follows:

A.     For an Order certifying this case as a class action against Defendants and

appointing Plaintiffs as Representatives of the Class;

B.     For money damages against Defendants and in favor of Plaintiffs and the Class on

all claims asserted in this Complaint as allowed by statute;

C.     For costs of suit incurred herein;

D.     For prejudgment interest to the extent allowed by law;

E.     For penalties as allowed by law;

F.     For permanent injunctive relief to enjoin further violations of the law; and

G.     For such other and further relief as this Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues triable of right by jury.

DATED:  _____.

HAGENS BERMAN SOBOL SHAPIRO LLP


By: */s/ Steve W. Berman*                          
    Steve W. Berman
George W. Sampson
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
george@hbsslaw.com

Jeff D. Friedman
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
1144 W. Lake Street, Suite 400
Oak Park, IL 60301
Telephone:  (708) 628-4949
Facsimile:  (708) 628-4950
beth@hbsslaw.com

*Lead Counsel for Plaintiffs*

Marc R. Stanley
STANLEY IOLA LLP
3100 Monticello Avenue, Suite 750
Dallas, TX  75205
Telephone:  (214) 443-4300
Facsimile:  (214) 443-0358
marcstanley@mac.com

*Liaison Counsel for Plaintiffs*

- 80 -

Nancy Kaboolian
Natalie S. Marcus
ABBEY SPANIER, LLP
212 East 39th Street
New York, NY  10016
Telephone:  (212) 889-3700
nkaboolian@abbeyspanier.com
nmarcus@abbeyspanier.com

Ruthanne Gordon
Michael C. Dell'Angelo
Candice J. Enders
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
Telephone:  (215) 875-3000
Facsimile:  (215) 875-4604
rgordon@bm.net
mdellangelo@bm.net
cenders@bm.net

Christian M. Sande
CHRISTIAN SANDE LLC
310 Clifton Avenue, Suite 300
Minneapolis, MN  55403-3218
Telephone:  (612) 387-1430
Facsimile:  (612) 677-3078
christian@christiansande.com

Irwin B. Levin
Scott D. Gilchrist
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN  46204
Telephone:  (317) 636-6481
Facsimile:  (317) 636-2593
ilevin@cohenandmalad.com
sgilchrist@cohenandmalad.com

- 81 -

Kit A. Pierson
Meghan M. Boone
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699
kpierson@cohenmilstein.com
mboone@cohemnilstein.com

Steven N. Williams
Elizabeth Tran
Joanna LiCalsi
COTCHETT, PITRE & MCCARTHY, LLP
840 Malcolm Road
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile: (650) 697-0577
swilliams@cpmlegal.com
etran@cpmlegal.com
jlicalsi@cpmlegal.com

Greg L. Davis
Dan W. Taliaferro
DAVIS & TALIAFERRO, LLC
7031 Halcyon Park Drive
Montgomery, AL  36117
Telephone:  (334) 832-9080
gldavis@knology.net
danwtaliaferro@msn.com

John Emerson
EMERSON POYNTER LLP
The Museum Building
500 President Clinton Avenue, Suite 305
Little Rock, AR  72201
Telephone:  (501) 907-2555
Facsimile:  (501) 907-2556

Joseph T. Lukens
Richard D. Schwartz
FARUQI & FARUQI, LLP
101 Greenwood Avenue, Suite 600
Jenkintown, PA  19046
Telephone:  (215) 577-5770
Facsimile:  (215) 577-5771
jlukens@faruqilaw.com
rschwartz@faruqilaw.com

Douglas A. Millen
Donald L. Sawyer
FREED KANNER LONDON &MULLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL  60015
Telephone:  (224) 632-4500
Facsimile: (224) 632-4521
doug@fklmlaw.com
dsawyer@fklmlaw.com

David Freydin
Timothy A. Scott
THE FREYDIN LAW FIRM LLP
8707 Skokie Blvd, Suite 305
Skokie, IL  60077
Telephone:  (847) 972-6157
Facsimile:  (866) 897-7577
david.freydin@freydinlaw.com
timothy.scott@freydinlaw.com

Brian P. Murray
Lee Albert
GLANCY BINKOW & GOLDBERG LLP
122 East 42nd Street, Suite 2920
New York, NY  10168
Telephone:  (212) 682-5340
bmurray@glancylaw.com
lalbert@glancylaw.com

Adam C. Belsky
Sarah Crowley
Terry Gross
GROSS BELSKY ALONSO LLP
One Sansome Street, Suite 3670
San Francisco, CA  94104
Telephone:  (415) 554-0200
Facsimile:  (415) 544-0201
adam@gba-law.com
sarah@gba-law.com
terry@gba-law.com

Vincent J. Esades
Renae Diane Steiner
HEINS MILLS &OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN  55403
Telephone:  (612) 338-4605
Facsimile:  (612) 338-4692
vesades@heinsmill
rsteiner@heinsmills.com

J. Barton Goplerud
HUDSON, MALLANEY, SHINDLER
    & ANDERSON, P.C.
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA  50265
Telephone:  (515) 223-4567
Facsimile:  (515) 223-8887
jbgoplerud@hudsonlaw.net

Joseph R. Saveri
JOSEPH SAVERI LAW FIRM
505 Montgomery Street
Suite 625
San Francisco, CA 94111
Telephone:  415-500-6800
Facsimile:  415-395-9940
jsaveri@saverilawfirm.com

Laurence D. King
Linda M. Fong
KAPLAN FOX & KILSHEIMER LLP
350 Sansome Street, Suite 400
San Francisco, CA  94104
Telephone:  (415) 772-4700
Facsimile:  (415) 772-4707
lking@kaplanfox.com
lfong@kaplanfox.com

Justin B. Farar
KAPLAN FOX & KILSHEIMER LLP
11111 Santa Monica Blvd., Suite 620
Los Angeles, CA  90025
Telephone:  (310) 575-8670
Facsimile:  (310) 575-8697
jfarar@kaplanfox.com

Ralph B. Kalfayan
Vic A. Merjanian
KRAUSE KALFAYAN BENINK
     & SLAVENS, LLP
550 W. C Street, Suite 530
San Diego, CA  92101
Telephone:  (619) 232-0331
Facsimile:  (619) 232-4019
rkalfayan@kkbs-law.com
vmerjanian@kkbs-law.com

Roger L. Mandel
State Bar No. 12891750
William C. McMurrey
State Bar No. 13811100
LACKEY HERSHMAN, L.L.P.
3102 Oak Lawn Avenue, Suite 777
Dallas, TX  75219-4241
Telephone:  (214) 560-2201
Facsimile:  (214) 560-2203

Mark Lavery
LAVERY LAW FIRM LLC
733 Lee, Suite 202
Des Plaines, IL  60016
Telephone:  (847) 813-7771
mtllaw@gmail.com

Howard J. Sedran
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA  19106-3697
Telephone:  (215) 592-1500
Facsimile:  (215) 592-4663
hsedran@lfsblaw.com

Daniel J. Mogin
THE MOGIN LAW FIRM, P.C.
707 Broadway, Suite 1000
San Diego, CA  92101
Telephone:  (619) 687-6611
Facsimile:  (619) 687-6610
dmogin@moginlaw.com

Laurence D. Paskowitz
THE PASKOWITZ LAW FIRM, P.C.
208 East 51st Street, Suite 380
New York, NY  10022
Telephone:  (212) 685-0969
lpaskowitz@pasklaw.com

Jayne A. Goldstein
Pomerantz LLP
1792 Bell Tower Lane
Suite 203
Weston, FL 33326
Telephone:  (954) 315-3454
Facsimile:   (954) 315-3455
Jagoldstein@pomlaw.com

Yvonne Ballesteros
PRICE WAICUKAUSKI & RILEY, LLC
Hammond Block Building
301 Massachusetts Avenue
Indianapolis, IN  46204
Telephone:  (317) 633-8787
Facsimile:  (317) 633-8797
yballesteros@price-law.com

Garrett D. Blanchfield
REINHARDT WENDORF & BLANCHFIELD
E1250 First National Bank Bldg.
332 Minnesota Street
St. Paul, MN  55101
Telephone:  (651) 287-2100
Facsimile:  (651) 287-2103
g.blanchfield@rwblawfirm.com

Ronen Sarraf
Joseph Gentile
SARRAF GENTILE LLP
450 Seventh Avenue, Suite 1900
New York, NY  10123
Telephone:  (212) 868-3610
Facsimile:  (212) 918-7967
ronen@sarrafgentile.com
joseph@saffafgentile.com

Guido Saveri
R. Alexander Saveri
Geoffrey C. Rushing
Cadio Zirpoli
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA  94111
Telephone:  (415) 217-6810
Facsimile:  (415) 217-6813
guido@saveri.com
rick@saveri.com
grushing@saveri.com
cadio@saveri.com

Joseph P. Guglielmo
SCOTT+SCOTT LLP
405 Lexington Avenue, 40th Floor
New York, NY  10178
Telephone:  (212) 223-6444
Facsimile:  (212) 223-6334
jguglielmo@scott-scott.com

Christopher M. Burke
Walter W. Noss
John T. Jasnoch
SCOTT+SCOTT LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
cburke@scott-scott.com
wnoss@scott-scott.com
jjasnoch@scott-scott.com

Eugene A. Spector
Jeffrey J. Corrigan
Jay S. Cohen
SPECTOR ROSEMAN KODROFF
    & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300 or (888) 844-5862
Facsimile: (215) 496-6611
espector@srkw-law.com
jcorrigan@srkw-law.com
jcohen@srkw-law.com

Brett Cebulash
Kevin Landau
TAUS CEBULASH & LANDAU LLP
80 Maiden Lane, Suite 1204
New York, NY 10038
Telephone: (212) 931-0704

Reginald Von Terrell
The Terrell Law Group
Post Office Box 13315, PMB #148
Oakland, CA 94661
Telephone: 510-237-9700
Facsimile: 510-237-4616
reggiet2@aol.com

010326-13  675346 V1

Christopher T. Micheletti
Demetrius X. Lambrinos
ZELLE HOFMANN VOELBEL
    & MASON LLP
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
Telephone:  (415) 693-0700
Facsimile:  (415) 693-0770
cmicheletti@zelle.com
dlambrinos@zelle.com

*Attorneys for Plaintiffs*