UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In re:                                      §
                                            §
**ONLINE TRAVEL COMPANY (OTC)**             §    **Consol. Civil Action No. 3:12-cv-3515-B**
**HOTEL BOOKING ANTITRUST**                 §
**LITIGATION**                              §
                                            §

<u>MEMORANDUM OPINION AND ORDER</u>

After the Court dismissed their Consolidated Amended Complaint ("CAC"), Plaintiffs filed

this Motion for Leave (doc. 137) seeking to assert a Second Consolidated Amended Complaint

("SCAC"), which they contend "alleges a set of facts which create plausible collusive claims of

antitrust and consumer protection injury." (Doc. 137, Pl.'s Mot. 9.) For reasons discussed below, the

Court concludes that Plaintiffs have not overcome the CAC's pleading deficiencies or otherwise

shown that leave should be granted. As such, the Court **DENIES** Plaintiffs' Motion for Leave.

**I.**

**BACKGROUND**

A.     *The CAC and February 18 Order*

Plaintiffs, a group of online hotel room booking consumers, originally brought these

consolidated actions against twelve major hotel chains (the "Hotel Defendants")[1] and nine online

travel agencies (the "OTA Defendants").[2] As previously detailed, Plaintiffs' initial complaint, the

---

[1] The SCAC refers to the Hotel Defendants as the "Major Hotel Chains," because as seen below, Plaintiffs dropped them as named defendants in their repleadings. But for clarity, the Court uses "Hotel Defendants" to remain consistent with the terminology in its February 18 Order.

[2] The CAC also named EyeforTravel, Ltd. as a defendant, but the SCAC dropped the travel industry news company for unexplained reasons.

CAC, asserted three antitrust law claims[3] charging "Defendants with engaging in an industry-wide conspiracy to uniformly adopt resale price maintenance agreements, containing most favored nation clauses, in an effort to eliminate price competition among hotel room booking websites." (Doc. 136, Mem. Op. & Or. ("February 18 Order") at 1.) The CAC also contained one "state consumer protection law claim, which allege[d] that Defendants deceptively published 'best price' or 'lowest price' guarantees on their website while knowing that 'best' price was the same fixed rate offered across all hotel booking websites." (*Id.*)

On February 18, 2014, this Court issued an order ("February 18 Order") granting Defendants' Joint Motion to Dismiss and dismissing without prejudice all four counts of the CAC. Though Defendants raised a variety of pleading issues, the Court limited its analysis to the two "shortcomings dispositive to [Defendants' Joint] Motion." (*Id.* at 10.)

First, the Court dismissed Plaintiffs' three antitrust law claims based on the CAC's failure to "plausibly allege an industry-wide conspiracy to restrain competition in the online hotel bookings market." (*Id.* at 11.) The Court reasoned that "the real 'nub' of the" implausible conspiracy was "Defendants' parallel business behavior—the adoption of similar [resale price maintenance] agreements seen across pairs of OTA and Hotel Defendants"—which were neither "suspicious [n]or suggestive of an agreement." (*Id.* at 16.) In addition, the Court concluded that none of the CAC's supposed "'factual enhancements' [] place[d] the ambiguous parallel conduct allegations in a context that raises the suggestion of a conspiracy." (*Id.* at 19.) Second, the Court next dismissed Plaintiffs' consumer protection claim in light of the CAC's failure to plausibly allege proximate causation. (*Id.*

---

[3] The first two of these claims, Counts I and II of the CAC, were filed under § 1 of the Sherman Act, 15 U.S.C. § 1, while the third, Count III, was filed pursuant to various state antitrust laws.

at 31-34.) Though the CAC properly alleged Defendants' underlying misconduct, the Court found dismissal warranted, because Plaintiffs failed to plausibly connect their "alleged injury—payment of supra-competitive prices— . . . to the misconduct at issue—Defendants' deceptive low or best price guarantees." (*Id.* at 31.)

While the Court dismissed each claim, it concluded that "dismissal with prejudice would be too harsh a sanction for the insufficient pleadings in these circumstances." (*Id.* at 34.) Notwithstanding Defendants' "persuasive argument" for a prejudicial dismissal, the Court, "[i]n an effort to remain consistent with federal policy," found it prudent to allow Plaintiffs an opportunity to amend following this first judicial review of their pleadings. (*Id.* at 34-35.) Accordingly, the Court ordered that "[i]f Plaintiffs wish to file a second consolidated amended complaint in an effort to overcome the deficiencies warranting dismissal stated herein, they must do so by" filing a motion for leave to amend and supporting brief in accordance with the scheduling and briefing instructions provided. (*Id.* at 36.) In ruling on this anticipated motion for leave, the Court noted that it would "only consider arguments concerning the deficiencies stated herein," and that if Plaintiffs overcame these deficiencies, the Court would "address the [pleading] issues it deferred consideration of." (*Id.*)

B.      *Plaintiffs' Motion for Leave and SCAC*

In accordance with the February 18 Order, Plaintiffs filed a timely Motion for Leave (doc. 137) and supporting brief, along with their proposed SCAC (doc. 137-1), on March 20, 2014.

To their credit, Plaintiffs appear to have made some significant changes to their antitrust claims in the SCAC. Most noticeably, rather than allege an industry-wide conspiracy to fix prices, the SCAC drops the Hotel Defendants as defendants and asserts "first and foremost a *per se* price fixing agreement between Defendant OTAs, an agreement which caused hotel prices to rise in 2003

and afterwards." (Pl.'s Mot. 2.) In support of this new theory, Plaintiffs emphasize new allegations that the OTA Defendants "competed vigorously on price in the period 1999-2002" until "an abrupt halt" in price competition came in 2003 as a result of the horizontal OTA conspiracy. (*Id.*) They also highlight allegations "that the 'rate parity' agreements," also known as resale price maintenance ("RPM") agreements, "*followed* the cessation of price competition between the OTA Defendants as a necessary means of stamping out the OTA's last remaining source of price competition: their hotel room suppliers." (*Id.* at 3.) Likewise, Plaintiffs note allegations "that the Defendant OTAs were dominant retailers by 2002 capable of imposing unreasonable vertical restraints." (*Id.* (internal citation omitted).) From this, Plaintiffs argue that "the 'rate parity' agreements are *not* the 'nub' of [the SCAC] but rather a necessary tool to effectuate the underlying agreement not to compete between Defendant OTAs." (*Id.* at 2.) Plaintiffs also made one noticeable change to address proximate causation for their consumer protection claim—namely, the SCAC explicitly ties harm to the alleged price-fixing scheme, rather than the rate guarantees alone. (*Id.* at 8.)

Based on these new allegations, Plaintiffs assert mostly the same legal claims as before. Similar to the CAC, the SCAC's first two counts allege that the OTA Defendants violated § 1 of the Sherman Act, 15 U.S.C. § 1, by entering into a *per se* unlawful horizontal agreement to fix prices (Count I) and RPM agreements that unreasonably restrained trade (Count II). (*See* SCAC ¶¶ 163-184.) Likewise, Counts III and IV charge the OTA Defendants with violating the same state antitrust and consumer protection statutes cited in the CAC. (*See id.* ¶¶ 187-213, 216.) While Count V is new, it charges the OTA Defendants with violating the same California antitrust laws identified in Count III, with one difference—Count V explicitly asserts that the vertical agreements between each OTA and hotel are *per se* antitrust law violations in California. (*See id.* ¶ 221.)

-4-

The OTA Defendants filed a timely Opposition to Plaintiffs' Motion for Leave (doc. 142) on April 3, 2014. The OTA Defendants also provided a redline version of the SCAC (doc. 142-1) showing the precise differences between the CAC and SCAC. Arguing that "Plaintiffs' proposed SCAC adds no facts to overcome the deficiencies identified in the" February 18 Order, the OTA Defendants ask the Court to deny Plaintiffs' Motion for Leave. (Doc. 142, Def.'s Resp. 2.) Having thoroughly considered the parties' filings and relevant law, the Court, for the reasons that follow, agrees with the OTA Defendants that Plaintiffs should not be afforded leave to assert their SCAC.

## II.

## ANALYSIS

The Federal Rules of Civil Procedure provide that courts "should freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a)(2). That said, courts have "discretion to den[y] leave to amend if," among other reasons, the "amendment would be futile." *Johnson v. Teva Pharm. USA, Inc.*, 758 F.3d 605, 610 (5th Cir. 2014) (citing *Briggs v. Mississippi*, 331 F.3d 499, 508 (5th Cir. 2003)). Leave to amend may be denied as futile "if a complaint as amended is subject to dismissal." *Simmons v. Sabine River Auth. Louisiana*, 732 F.3d 469, 478 (5th Cir. 2013) (citation omitted). Thus, the Court may deny Plaintiffs' Motion for Leave as futile if the SCAC, like the CAC, is subject to dismissal for failure to state a plausible claim under Rule 12(b)(6).[4] The Court takes up this issue below with respect to the SCAC's five claims and new supporting allegations.

A.    *Horizontal Conspiracy Amendments (Count I)*

The Court previously dismissed Plaintiffs' federal antitrust law claims—brought pursuant to

---

[4] See the February 18 Order for a discussion of the Rule 12(b)(6) legal standard applied herein.

§ 1 of the Sherman Act—after concluding that the industry-wide conspiracy alleged in the CAC was implausible under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). The Court concluded that the CAC's allegations, like those in *Twombly*, failed to plausibly suggest a price-fixing conspiracy for two related reasons.

First, the Court, in its February 18 Order, found that the parallel conduct allegations, which formed "the real 'nub' of the" CAC—"the adoption of similar RPM agreements seen across pairs of OTA and Hotel Defendants"—were "not suspicious or suggestive of an agreement." (February 18 Order at 16.) Rather, "like in *Twombly*," the Court reasoned, "common economic experience and the [CAC] itself offer[ed] a natural or 'obvious' explanation for" Defendants' parallel behavior; specifically, these sources revealed that both hotels and OTAs were individually driven to "ente[r] into the same two-term RPM agreements." (*Id.*) Second, the Court then addressed the "factual enhancements" Plaintiffs put forth in an attempt to distinguish this case from *Twombly,* and found that none combined with the "ambiguous parallel conduct allegations" to produce a plausible conspiracy assertion. (*Id.* at 19.) Of the nine supposed "enhancements," the Court rejected two as conclusory and non-suggestive,[5] three as "nothing more than additional parallel conduct allegations,"[6] and one as "irrelevant."[7] The final three asserted enhancements,[8] while genuinely

---

[5] (*See* February 18 Order at 17-18 (rejecting the "common motive to eliminate price competition in the online market" enhancement and the "without a conspiracy, the RPM agreements went against Defendants' business interests" enhancement).)

[6] (*Id.* at 19-20 (referring to allegations of "coordinated pricing efforts," "coercion and enforcement," and "other industry players would like to offer lower prices, but cannot due to the restrictive agreements").)

[7] (*Id.* at 19, 20-21 (discussing the "government investigations" allegations).)

[8] (*See id.* at 21 ("That leaves just three remaining 'factual enhancements': (1) inter-firm communications, including pricing discussions, at the EyeforTravel Conferences, (2) price competition

"factual," were also deficient, because they "merely detail[ed] the 'neutral territory' in which the parallel conduct allegations reside," without "actually plac[ing] the ambiguous allegations in a context that raises the suggestion of a conspiracy." (*Id.* at 21.)

Plaintiffs say the SCAC overcomes these deficiencies through allegations of "a more fundamental and naked price fixing agreement [among] the OTAs which pre-dated the adoption of any RPM agreements." (Pl.'s Mot. 5.) Plaintiffs argue that this "fundamental" change to their conspiracy allegations is supported by new details in the SCAC as to how "rival OTAs in 2003 abruptly stopped competing on price after several years of vigorous price competition in the same market." (*Id.*) And this "abrupt shift," Plaintiffs contend, "is not merely a conclusory assertion, but rather a factual allegation supported by contemporaneous reporting from trusted sources." (*Id.*) These amendments, according to Plaintiffs, render their § 1 conspiracy claim "entirely plausible as a matter of economics" and common sense. (*Id.* at 5-6.)

The OTA Defendants counter that no matter how the amendments are characterized, "Plaintiffs' fundamental theory remains unchanged and Plaintiffs plead no new facts that could alter the Court's reasoning and conclusion." (Def.'s Resp. 3-4.) Despite Plaintiffs' suggestion that the SCAC is based on a "new" theory, Defendants maintain that "[t]he asserted OTA conspiracy supposedly was carried out through the same parallel conduct" alleged before. (*Id.* at 4.) And like the CAC, the SCAC, according to Defendants, fails "to provide 'factual enhancements' that place the parallel conduct in a context suggesting a conspiracy." (*Id.*) The Court agrees and thus concludes, as follows, that Plaintiffs once again fail to allege a plausible § 1 conspiracy.

---

preceding the conspiracy, and (3) the OTA Defendants' market power.").)

1.     The SCAC Centers on the Same Parallel Conduct Alleged in the CAC

Plaintiffs claim that "[t]he most fundamental difference between" the SCAC and the CAC

is that the 'nub' of the alleged conspiracy is no longer "'the adoption of parallel similar RPM

agreements seen across pairs of OTA and Hotel Defendants,'" but rather, "naked agreements

between rival [OTA Defendants] to stop competing on price." (Pl.'s Mot. 1 (quoting February 18

Order at 16).) But such assertions merely obscure that the alleged horizontal conspiracy between

OTAs is not new at all, and in fact, relies on the same underlying conduct that formed the "nub" of

the CAC—ambiguous, parallel market behavior.

While Plaintiffs claim their "new" conspiracy is fundamentally different than before, the

reality is that it isn't even new—the CAC also alleged a horizontal agreement between the OTA

Defendants that supposedly held together the then-at-issue conspiracy among the OTA and Hotel

Defendants.[9] But even if it is not the same exact conspiracy alleged before, the SCAC's horizontal

conspiracy is substantively identical to the industry-wide conspiracy. To illustrate, each conspiracy

constitutes (i) a circumstantially-alleged agreement to fix prices on single hotel rooms sold

online—i.e., a conspiracy to fix *intra*-brand pricing competition[10]—(ii) that only manifests itself in

---

[9] (*See* February 18 Order at 5 (citing CAC ¶ 79) ("Holding this wider conspiracy together . . . the OTA Defendants entered into a horizontal agreement not to compete with each other."); *see also* February 18 Order at 10 ("Plaintiffs clarified that their antitrust claims are based on the industry-wide conspiracy, rather than either of the two individual sub-agreements holding the broader scheme together.").)

[10] (*See, e.g.*, SCAC ¶ 115 ("The Defendants' price fixing and its attendant 'rate parity' scheme has achieved its illegal goal: [OTA] Defendants do not compete on the basis of price for [single] rooms."); *see also id.* ¶¶ 57, 68, 89, 103, *compare with* CAC ¶¶ 73, 78, 102, 116, 119.) The Court need not accept the SCAC's conclusory, unexplained allegations regarding the alleged conspiracy's supposed impact on inter-brand competition. (*See* SCAC ¶ 143 ("In the absence of the agreements [OTA] Defendants and the [Hotel Defendants] would have competed based on room price. The price fixing scheme alleged herein harmed inter-brand as well as intra-brand competition."); *id.* ¶ 181 ("These agreements harm intra-brand and inter-brand competition by artificially raising and stabilizing prices.").)

the market through the conspirators' alleged parallel activities, including their parallel RPM agreements and adoption of parallel prices for single hotel rooms.[11]  Indeed, Plaintiffs even rely on the same exact hotel room pricing charts used in the CAC—showing an absence of intra-brand competition, but vigorous inter-brand competition between Hotel Defendants—as "examples" of "the effect of the agreements not to compete among [OTA] Defendants and between the [Hotel Defendants] and the [OTA] Defendants." (SCAC ¶ 124, *compare with* CAC ¶ 128.)

Plaintiffs, nevertheless, argue that these recycled allegations are suggestive this time around, because of allegations that (1) the parallel RPM agreements "*followed* the cessation of price competition between the OTA Defendants as a necessary means of stamping out" the Hotel Defendants as a "source of price competition," and (2) the OTA Defendants drove the industry's adoption of similar RPM agreements, "imposing the unreasonable vertical restraints" on the hotels, who are no longer named as co-defendants. (Pl.'s Mot. 3.) But neither of these efforts to re-frame the parallel conduct allegations offer anything suggestive to Plaintiffs' ambiguous assertions.

First, allegations that the OTA Defendants agreed to set parallel prices prior to adopting parallel RPM agreements are neither new nor suggestive. As an initial matter, the CAC similarly alleged in vague terms that conspirators agreed to stop competing on price in the online hotel bookings *before* they began forming and enforcing parallel RPM agreements in late 2003.[12] But even

---

[11] (*See, e.g.*, SCAC ¶ 7 ("As a result of a horizontal conspiracy between them, all of the [OTA] Defendants have the same clause in their contracts with the [Hotel Defendants]. As a result, and as intended by the conspiracy, none of the [OTA] Defendants compete with any of the other [OTA] Defendants on price, and the retail rates for hotel room reservations are set at the hotel's published rate for non-packaged rooms and thus are virtually identical among the [OTA] Defendants' websites and the hotel's websites for non-packaged room rates at any hotel."), *compare with* CAC ¶ 7.)

[12] (*Compare* SCAC ¶ 4 ("In early 2003, a cartel was formed between the largest [OTAs] in the market for online hotel rooms to end price competition. Only later was 'Rate Parity' born as a mechanism to

-9-

if the SCAC's timing allegations are new, they still fail to suggest a conspiracy actually formed. For one, the SCAC's timeline of events is vague,[13] and though specificity is not required, such vague assertions "'leave open the distinct possibility that Defendants' behavior was entirely normal and legitimate.'"[14] This is especially true here, given that the vagueness relates to conclusory assertions of an "abrupt" halt in price competition, while the SCAC's detailed allegations, discussed *infra*, actually suggest that prices gradually narrowed over an extended period. Also discussed *infra*, sources quoted in the SCAC reported competing rates for OTA-booked hotel rooms in June 2003—*after* a May 2003 press release, cited in the SCAC, announced a restrictive vertical agreement between one Hotel-OTA Defendant pair.[15] In other words, the SCAC alleges that at least one OTA negotiated an RPM agreement *before* the OTAs supposedly stopped competing—in direct contradiction to its vague allegations that the RPM agreements followed the abrupt halt in hotel rate competition among OTAs. Thus, Plaintiffs' "new" timeline is too vague and contradictory to render their parallel conduct allegations suggestive.

    Second, Plaintiffs' removal of the Hotel Defendants as co-conspirators similarly fails to

---

end all price competition for hotel room bookings."), *and id.* 64-66, *with* CAC ¶ 75 ("The exact date the conspiracy . . . is believed to have started in 2003."), *and id.* ¶ 76 ("During the period late 2003 and 2004, the [OTA] Defendants began entering into RPM agreements with [the Hotel Defendants].").)

    [13] The conspiracy allegedly formed in "early 2003" and then at some unidentified point in 2003—or in the words of the SCAC, "in the course of a year"—the OTA Defendants supposedly stopped competing on price. (SCAC ¶¶ 4, 63.) Thereafter, the OTA Defendants allegedly "began requiring RPM agreements" in parallel fashion starting "[d]uring the period late 2003 through 2004. (*Id.* ¶ 17.)

    [14] (February 18 Order at 22 (quoting *In re National Ass'n Music Merchants*, 2012 WL 3637291, at *5 (S.D. Cal. Aug. 20, 2012)).)

    [15] (*See* SCAC ¶ 106 ("In May 2003, Travelocity and Choice announced they had signed an agreement 'that will give consumers access to guaranteed low priced hotels from Choice Hotels' eight well-known brands via the Travelocity shopping engine.") (citation and emphasis omitted).)

suggest a price-fixing conspiracy. At best, this amendment eliminates an inherent contradiction in the CAC's theory—hotels are no longer simultaneously victims and willing participants in the scheme. However, the CAC's industry-wide conspiracy was not dismissed because it contained an unexplained contradiction; it was dismissed because of its factually neutral allegations. This deficiency is not overcome by Plaintiffs' mere re-configuration of the culpable actors—a change that adds nothing new or suggestive to the mix. Dropping the Hotel Defendants does not even create a novel dynamic, as the CAC also alleged that "the [OTA] Defendants levered their substantial market power and dominance to induce and/or coerce the Hotel Defendants into agreeing to" sign and enforce "minimum RPM agreements." (CAC ¶ 6, *compare with* SCAC ¶ 6.)

Simply put, without incorporating any "further circumstance pointing toward a meeting of the minds," the re-framed parallel conduct allegations "sta[y] in neutral territory." *Twombly*, 550 U.S. at 557. Like before, an "obvious" alternative narrative of innocent, business-driven behavior is, at minimum, equally likely to explain the OTA Defendants' parallel activities re-cast in the SCAC. And none of Plaintiffs' re-packaged assertions undermine this alternative explaination or otherwise suggest the OTA Defendants acted pursuant to a mutual understanding. At best, they bring Plaintiffs "close to stating a claim, but without" more, Plaintiffs' § 1 conspiracy again falls "short of the line between possibility and plausibility . . . ." *Id.* (citation and bracket omitted).

2.    The Amended "Factual Enhancements" Fail to Suggest a Conspiracy

Thus, just as before, the Court reaches the point in its analysis where it must ask whether Plaintiffs' amended "'factual enhancements' [] place the ambiguous parallel conduct allegations in a context that raises the suggestion of a conspiracy." (February Order at 19.) This time, Plaintiffs emphasize just a couple of the nine enhancements previously asserted. (*See* Pl.'s Mot. 2-3, 5-6.) None

of the amended enhancements, however, "actually place the ambiguous allegations in a context that raises the suggestion of a conspiracy." (February 18 Order at 21.)

First, Plaintiffs chiefly rely on amendments purportedly showing that "the OTA Defendants had a several year history of vigorous price competition," until they agreed "to cease price competition in 2003." (Pl.'s Mot. 5.) This allegedly "unprecedented" and "abrupt shift in the industry as to price competition is not merely a conclusory assertion," according to Plaintiffs, "but rather a factual allegation supported by contemporaneous reporting from trusted sources" (*id.*), including excerpted *Travel & Leisure* articles published in June 1999, October 2002, and June 2003, as well as a April 2003 "study . . . by the Consumer Union."[16] (SCAC ¶¶ 59-62.) Despite Plaintiffs' contentions, however, an examination of the factual allegations underlying these assertions reveals that the SCAC does not in fact plead any "abrupt" or otherwise suggestive change in pricing competition.

While the SCAC alleges, in conclusory fashion,[17] that "price competition by Defendant OTAs [] abruptly ceased" in 2003, (*id.* ¶¶ 61, 63), it not only fails to identify when this supposedly abrupt end to price competition occurred, it also claims the change took place over "the course of a year." (*Id.* ¶ 63.) This year-long change is no more abrupt than the CAC's asserted "two-year

---

[16] The SCAC also quotes a June 2010 blog post labeled as "a participant in an industry-conference" describing "[t]he change in competition." (SCAC ¶ 70.) This 2010 blog is presumably not the "contemporaneous reporting" Plaintiffs reference, and indeed, their Motion never cites the excerpted source, much less explain its relevance. As such, there is no need to further address this new source, which the OTA Defendants aptly describe as "a blog posting offering one anonymous individual's opinion that 'rate parity provisions in Hotel-OTA distribution agreements are similar to 'price-fixing.'" (Def.'s Resp. 6.)

[17] Allegations such as an "abrupt shift" or "unprecedented change" are conclusory, because "they incorporate Plaintiffs' own judgment about whether the time was suspiciously short" or whether they occurred "in ways that would suggest they were the product of a conspiracy." *Music Merchants*, 2012 WL 3637291, at *5 (explaining why the allegations "relatively short" and "substantially similar" are conclusory).

-12-

period in which competitors . . . adopted similar pricing strategies," as both scenarios depict "the sort of gradual pricing change rejected as unsuspicious by other courts."[18]

Moreover, Plaintiffs' "trusted sources" do not actually support their assertions that price competition was "vigorous" in 1999 and 2002 during pre-conspiracy times, and then came to an "abrupt halt" in 2003. (*See id.* ¶¶ 59-62.) For starters, while the first "trusted source" does indeed show that competition was vigorous in 1999,[19] the second does not report that price competition was similarly rampant in 2002; actually, this source says almost nothing about the degree of competition in the hotel bookings market in 2002—the year before the conspiracy allegedly formed.[20] Even worse, the next source, a 2003 *Travel & Leisure* article, merely notes that prices "rarely" varied to the degree they did when the authors "last tested hotel-booking methods in 1999"—not that price competition "abruptly ceased" as the SCAC claims. (*Id.* ¶ 61 (emphasis omitted).) Likewise, the last source, a 2003 Consumer Union study, simply observed that "[m]any of the Web Sites provided rates that were only a few dollars lower per night than rates provided by their competitors"—not that OTA-

---

[18] (February 18 Order at 25) (citing *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 131-32 (3d Cir. 1999) for the proposition "that time lags of three to six months between pricing moves 'refute rather than support' allegations of conspiracy"); *In re LTL Shipping Servs. Antitrust Litig.*, No. 08-MD-01895, 2009 WL 323219, at *17 (N.D. Ga. Jan. 28, 2009) (holding "the time period [in which prices allegedly changed]—from 2003 to 2007—is far too broad for the Court to infer an agreement," while noting "other cases in which courts inferred agreement based on parallel price changes" involved "a defined and narrow date or date window")).)

[19] (*See* SAC ¶ 59 ("For example, an article in the June, 1999 issue of Travel & Leizure entitled 'Hotel Pricing—Obtaining the Right Rate' found there was a 'wide differential' in the rates offered as the 'best available'. . . . No site consistently gave us the lowest rate.'") (alterations in original, emphasis omitted).)

[20] (*See* SAC ¶ 60 (quoting an article "The Top Travel Web Sites" from the October 2002 issue of *Travel & Leisure:* "'Discount hotel sites are increasingly popular, which is helping to hold rates down. . . . A recent search for a room at the Bellagio in Las Vegas left us dizzy: We found a rate of $379 at Hotels.com . . . we got a room at $229 by calling the hotel directly.'") (alterations in original, emphasis omitted).)

offered rates "no longer diverged." (*Id.* ¶ 62.) And these are just the excerpted portions of the Plaintiffs' "trusted sources";[21] as Defendants point out, the SCAC selectively quotes its 2003 sources to obscure that neither truly reported "any 'halt' in competition."[22] In fact, the SCAC omits that the Consumer Union study actually concluded that, in 2003, "[t]he level of competition [was] quite high among the integrated travel Web sites, as rates were very closely matched."[23]

This all goes to show that, its conclusory assertions aside, the SCAC does not plead a "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernable reason." *Twombly*, 550 U.S. at 556 n.4 (citations and quotation marks omitted). Like before, to the extent the price change detailed in the SCAC is "unprecedented," it is not suspicious, because "any change in the early 2000s"—while OTAs were still in their infancy—"would likely qualify as unprecedented." (February 18 Order at 25.) Similarly, the allegations continue to provide a "'discernible reason' for this 'unprecedented change'": prices began to gradually narrow "in the early 2000s" as OTAs adjusted "to this newly-

---

[21] Note that the Court is "entitled" under Federal Rule of Evidence 201 "to take notice of the full contents of the published articles referenced in the [SCAC], from which the truncated quotations were drawn." *Twombly*, 550 U.S. at 568 n.13.

[22] (Def.'s Resp. 6.) For example, the SCAC quotes the 2003 *Travel & Leizure* article as reporting that "two" of the hotels studied—only one of which is located in the United States—"quoted the same nightly rate at every Web site and phone number" tested. (SCAC ¶ 61.) But the SCAC does not mention that the article found prices varied for the other eight hotels tested, and in fact, the few OTA Defendants mentioned in the article are reported to have offered prices varying by as much as $40-80 for three of the four U.S.-based hotels observed. *See* Lisa Kalis, *The Hotel Rate Game*, Travel & Leisure, June 2003, *available at* http://www.travelandleisure.com/articles/the-rate-game.

[23] William J. McGee, *Booking Hotels Online: An In-Depth Examination of Leading Hotel Web Sites* at 25, Consumer WebWatch (Apr. 2003), *available at* http://consumersunion.org/wp-content/uploads/2013/05/booking-hotels-online.pdf.

-14-

developing distribution channel by adopting the same rational business strategies."[24] (*Id.*) The Court, therefore, has no reasonable basis to conclude that Plaintiffs' amended price change allegations suggest the OTA Defendants entered into a price-fixing conspiracy.

Second, Plaintiffs also emphasize that "[t]he SCAC alleges that the Defendant OTAs were dominant retailers by 2002," which Plaintiffs argue is suggestive, because it shows the OTA Defendants were "capable of imposing unreasonable vertical restraints" on the hotels. (Pl.'s Mot. 3.) The only new supporting facts on this point are drawn from the 2002 *Travel & Leisure* article discussed above, which did indeed "repor[t] that 'Travelocity, Orbitz, and Expedia continue to dominate the booking arena.'" (SCAC ¶ 60.) Importantly, however, the article noted that "'most of [the OTAs'] business'" enabling their apparent dominance "com[es] from airline sales." (*Id.*) While the article also observed that the OTAs were "strengthening their focus on cars, cruises, hotels, and packages'" and that "'[d]iscount hotel sites are increasingly popular,'" nowhere does it indicate that the OTA Defendants were *dominant in the hotels booking market.* (*Id.*) Therefore, like the CAC, "none of the [SCAC's] factual allegations show that, by 2003, the OTA Defendants held the sort of market power or influence over Hotel Defendants seen in cases" Plaintiffs compare these circumstances to.[25] (February 18 Order at 26.) As such, these factual allegations only demonstrate "a characteristic that

---

[24] The SCAC admits as much, quoting an observation in the Consumer Union's study regarding Expedia's "'savvy'" business strategy in 2003 of "'edg[ing] its nearest competitor by less than $1 per night.'" (SCAC ¶ 62.) This strategy, which improves an OTA's margins, contrasts with the reported tendency of OTAs in 1999 to edge competitors with unnecessarily large discounts, often as much as $100. (*See id.* ¶ 59.)

[25] *See, e.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893-94 (2007) ("A dominant retailer, for example, might request resale price maintenance to forestall innovation in distribution that decreases costs. A manufacturer might consider it has little choice but to accommodate the retailer's demands for vertical price restraints if the manufacturer believes it needs access to the retailer's distribution network.") (citing by analogy *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937-38 (7th Cir. 2000)).

is consistent with a conspiracy[,] [b]ut without more, OTA Defendant's market share . . . merely indicates that a conspiracy *could* have formed." (*Id.*)

Finally, Plaintiffs made no significant changes to its other "enhancements," each of which remains non-suggestive of a conspiracy. A redline comparison[26] of the CAC and SCAC reveals just one additional set of factual amendments not already discussed, which the SCAC describes as "[a]n example of the length OTA's would go to prevent competition." (SCAC ¶ 105.) In reality, these allegations merely detail how negotiations played out between Expedia and Choice Hotels when their individual distribution agreement ended in October 2009, with Choice deciding to re-sign in November 2009 after Expedia stopped advertising the Hotel's rooms. (*See id.* ¶¶ 107-113.) This narrative of a single OTA's legitimate efforts to procure a more favorable business deal from a hotel is certainly not suggestive of an agreement. Nor are the rest of the SCAC's conspiracy allegations, which do not materially differ from the assertions the Court found insufficient in its February 18 Order. Therefore, Plaintiffs' "well-pled facts," once again, "do not plausibly suggest that Defendants entered into [a] [] conspiracy." (*Id.* at 26.)

In conclusion, Plaintiffs' allegations, as amended, fail to plausibly allege a price-fixing conspiracy. Consequently, the Court finds that Plaintiffs have not demonstrated that they are entitled leave to re-assert their *per se* § 1 claim.

B.     *Claims Derivative of Horizontal Conspiracy Amendments (Counts II, III & IV)*

Count I of the SCAC is not the only amended claim that depends on Plaintiffs' implausible conspiracy allegations. Defendants notify the Court that two of the SCAC's "claims are wholly

---

[26] (*See* Doc. 142-1, Def.'s App. 1-95.)

derivative of the deficient assertion of a horizontal OTA conspiracy," including Count III filed pursuant to various state antitrust laws and Count IV filed under a number of state consumer protection statutes. (Def.'s Resp. 10.) In addition, as explained below, Count II similarly relies on the SCAC's implausible horizontal conspiracy allegations.

As to Count III, Plaintiffs identify no amendments to this state antitrust law cause of action, which the Court previously dismissed based on the fact that the parties did not "dispute that each state law requires the same sort of concerted action § 1 requires." (February 18 at 27.) Though Plaintiffs did amend Count II so that the RPM agreements now represent the unlawful "concerted action" for that § 1 claim, the SCAC makes clear that Count III hinges liability on the same alleged behavior as Count I. (*See* SCAC ¶ 133 ("Plaintiffs in Counts I and III allege a *per se* violation of the antitrust laws.").) Thus, like before, "since the Court already found the [horizontal] price-fixing conspiracy allegations implausible, it must conclude that the [SCAC's] state antitrust law claim is also inadequately pled." (February 18 Order at 27.)

In regards to Count IV, the Court previously dismissed Plaintiffs' state consumer protection claim based on its implausible proximate causation allegations. (*See id.* at 31-34.) The Court reasoned that "Plaintiffs' alleged injury—payment of supra-competitive prices—ha[d] no plausible connection to the misconduct at issue—Defendants' deceptive low or best price guarantees." (*Id.* at 31.) The Court rejected Plaintiffs' attempt to salvage its claim by asserting "for the first time in their brief" that the real "unlawful conduct" at issue is "a 'deceptive scheme.'" (*Id.* at 33.) Among its stated reasons, the Court noted that it could not "reasonably conclude that Plaintiffs' injury was caused by Defendants' 'scheme' when that scheme was not adequately pled." (*Id.*) Here, Plaintiffs argue that the SCAC overcomes these proximate causation deficiencies by explicitly resting the SCAC's

consumer protection claim on "the underlying horizontal price fixing agreement between the OTA Defendants."[27] But again, "the Court already found, in discussing [Count I], that the concerted action allegations are implausible." (*Id.*) And since Plaintiffs make no further arguments as to why their amendments overcome the CAC's proximate causation deficiencies, the Court concludes, once again, that Plaintiffs have failed to plausibly allege a consumer protection claim.

With respect to Count II, the Court additionally finds this claim deficient, because it also relies on the implausible conspiracy allegations. Because its industry-wide conspiracy contained vertical restraints—which are typically judged under the rule of reason—and horizontal restraints—which are generally considered *per se* unlawful—the CAC asserted a *per se* § 1 claim, and a rule of reason § 1 claim in the alternative, based on the same underlying conspiracy. (*See id.* at 8.) This allowed the Court to analyze the CAC's § 1 claims together to determine whether their shared conspiracy allegations were plausible. (*See id.* at 10-11.) In contrast, Plaintiffs now separately assert the horizontal and vertical restraints in Counts I and II of the SCAC, respectively, as the unlawful accords at issue for these two § 1 claims. So unlike before, the implausibility of the SCAC's horizontal conspiracy allegations does not defeat Count II's first element, which instead turns on the plausibility of Plaintiffs' vertical agreement allegations. Nonetheless, the Court again finds Count II deficient, because of the claim's continued reliance on Plaintiffs' implausible conspiracy allegations.

Plaintiffs themselves recognize that Count II's theory for why the RPM agreements violate § 1 depends on allegations that the OTA Defendants acted pursuant to a pre-conceived agreement.

---

[27] (Pl.'s Mot. 8 ("So if the CAC alleged that only the rate guarantees were deceptive [], the SCAC makes a different claim. The rate guarantees are no more than the public manifestation of the underlying horizontal price fixing agreement between OTA Defendants, and as argued above, these claims are eminently plausible."); *see also* SCAC ¶ 219.)

-18-

For example, Plaintiffs highlight allegations "that the Defendant OTAs were dominant retailers by 2002 [] capable of imposing unreasonable vertical restraints," not just for individual purposes, but as a "means of stamping out the" hotels as a "source of price competition" for the OTAs and "to enforce their price fixing scheme against upstart rival OTAs." (Pl.'s Mot. 3.) Further acknowledging that Count II incorporates elements of horizontal action, Plaintiffs argue that the RPMs violate § 1 "[w]hether adjudged as a component of the OTA Defendants' horizontal price fixing conspiracy, or as [collectively] coerced MFN contracts under the Rule of Reason."[28] (Id. at 8.) Count II itself notes that it is not presenting the RPM agreements as unlawful stand-alone accords; rather it asserts that the vertical restraints are unreasonable because the OTAs collectively extracted them from hotels.[29] And tellingly, nearly every Count II allegation mentioning the RPMs contains a reference to the OTA Defendants' "scheme" or "conspiracy" as well. (See SCAC ¶¶ 174, 175, 176, 185.) So in sum, Count II's theory as to how the vertical agreements unreasonably restrained commerce is that the agreements were imposed on hotels pursuant to a mutual understanding among the OTAs, and Plaintiffs offer no plausible theory of liability for Count II in the alternative. Consequently, the Court again concludes that Count II fails in light of the federal antitrust claim's continued reliance on implausible conspiracy allegations.[30]

---

[28] Notably, Plaintiffs express no such confusion as to analyzing Count V, which makes no mention of the horizontal conspiracy and focuses solely on the unlawfulness of the RPM agreements. (See Pl.'s Mot. 8 ("RPM Agreements remain per se violations of law in California . . . ."); SCAC ¶¶ 220-23.)

[29] (See SCAC ¶ 71 ("The [OTA] Defendants did not act unilaterally or independently, or in their own economic interests, when [among other things] entering into the agreements [or] requiring the [Hotel Defendants'] acquiescence to, and compliance with, the terms of the 'rate parity' agreements . . . .").)

[30] To the extent Count II is not derivative of the horizontal conspiracy allegations, the Court denies Plaintiffs leave to add this claim for the same reasons, discussed below, it denies Plaintiffs leave to assert that the standalone RPM agreements are illegal under Count V.

C.      *Per Se Unlawful Vertical Restraint Amendments (Count V)*

Plaintiffs seek leave to add one final claim, Count V, which asserts that the OTA Defendants'

"RPM agreements remain *per se* violations of law in California as California courts, and the California

Attorney General, have declined to adopt the federal Rule of Reason standard in *Leegin*." (Pl.'s Mot.

8 (citations omitted).) Thus, unlike Count II, Count V asserts that these vertical restraints, as

standalone agreements, are illegal—regardless of whether the OTA Defendants acted pursuant to

a conspiracy or their own individual interests.[31]

The OTA Defendants respond with a few reasons for why the Court should deny Plaintiffs

leave to add any claim "based on purportedly unlawful vertical 'resale price maintenance' agreements

between individual hotels and OTAs." (Def.'s Resp. 10.) Most importantly, they assert that

"Plaintiffs abandoned" any such claim by stating in their response to Defendants' motion to dismiss

"that they are not challenging the individual vertical distribution agreements on a standalone basis."

(*Id.* at 10-11.) Since Plaintiffs made this decision consciously "and present no new facts to explain

why they should be permitted to change course now," the OTA Defendants ask the Court to deny

leave pursuant to its discretion to reject "attempts to assert claims seriatim in an inefficient manner

that delays proceedings and wastes judicial resources." (*Id.* at 12.) The Court, as follows, agrees with

the OTA Defendants that Plaintiffs should not be granted leave under these circumstances.

As mentioned, "[a] motion to amend ordinarily should be granted absent some justification

for refusal." *Whitley v. Hanna*, 726 F.3d 631, 648 (5th Cir. 2013) (*Foman v. Davis*, 371 U.S. 178, 182

---

[31] (*See* SCAC ¶ 221 ("Each [OTA] Defendant entered into a resale price maintenance agreement with the [Hotel Defendants]. Such agreements are per se illegal in the state of California and violate Cartwright Act, Business & Professions Code section 16720 et seq. . . .").)

(1962)). Up until now, the Court has only considered the futility justification for denying leave. Other relevant considerations include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed or undue prejudice to the opposing party by virtue of allowance of the amendment." *Id.* (citing *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 386 (5th Cir. 2003)) (alterations omitted). Additionally, "[a] litigant's failure to assert a claim as soon as he could have is properly a factor to be considered in deciding whether to grant leave to amend." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 864 (5th Cir. 2003). Similarly, the Fifth Circuit has affirmed lower court decisions denying leave to amend where parties "attempted to present theories of recovery *seriatim* to the district court." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 254 (5th Cir. 2003) (citing *S. Constructors Grp. Inc. v. Dynalectric Co.*, 2 F.3d 606, 611 (5th Cir. 1993)).

Here, the Court finds "substantial reason[s] to deny leave to amend" with respect to Count V of the SCAC. *S. Constructors*, 2 F.3d at 612. To begin, Count V is riddled with potential legal deficiencies, most of which Plaintiffs never address in their Motion for Leave. First, the OTA Defendants re-assert the "agency defense" to RPM liability—which the Court deferred discussion of in its February 18 Order—as a reason for finding the vertical agreement allegations inadequate. (*See* Def.'s Resp. 11-12.) Plaintiffs responded to this defense in their motion to dismiss briefing by arguing that the Defendants' supporting cases[32] are distinguishable in light of the CAC's horizontal

---

[32] (*See* Doc. 133, Pl.'s Resp. Mot. Dismiss 33 (discussing *Day v. Taylor*, 400 F.3d 1272 (11th Cir. 2005); *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215 (8th Cir. 1987); *Illinois Corp. Travel, Inc. v. Am. Airlines, Inc.*, 806 F.2d 722 (7th Cir. 1986)).) Plaintiffs also argued in a footnote that while the "Agency Model" described in the CAC would seemingly be deficient under the agency defense, the "Merchant Model" would not, because its allegations are not conclusory. (*See id.* at 27 n.118.) Even if this argument sufficed, the allegations leave unclear whether the California-based Plaintiffs—the only ones with standing under Count V—purchased rooms from OTAs under the Merchant Model, or the admittedly deficient Agency Model.

conspiracy allegations, which the Court has since found implausible. And now, even though they are seeking to assert a claim based solely on the vertical agreements, Plaintiffs never address why their claim overcomes the agency defense to RPM liability in their Motion for Leave. Second, another potential deficiency Defendants previously raised is that Plaintiffs' claim may be time-barred under the applicable statute of limitations. While Plaintiffs previously argued fraudulent concealment, that argument would seemingly carry less weight for Count V than it would for Plaintiffs' circumstantially-alleged conspiracy claims. Third, Count V may also be deficient in that the RPM agreements may not be *per se* unlawful in California following *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007). Plaintiffs summarily argue this point in their Motion for Leave while relying on California authority predating *Leegin*.[33] But as Defendants noted before, lower courts have diverged on this issue following *Leegin*,[34] leaving the law in California unclear. That leads to a fourth and final potential justification for dismissal—whether the Court can and should follow the "general rule" in this Circuit and decline jurisdiction over an uncertain state law claim where, as here, "the federal claims to which [it] is pendent are dismissed." *Enochs v. Lampasas Cnty.*, 641 F.3d 155, 161 (5th Cir. 2011) (citing *Parker & Parsley Pet. Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992)).

Plaintiffs' failure to address some of the above issues in their Motion for Leave is at least somewhat understandable in light of the Court's instructions that it would "only consider arguments

---

[33] (*See* Pl.'s Mot. 8 (citing *Harris v. Capitol Records Distrib Corp.*, 64 Cal. 2d 454, 463 (1966); *Mailand v. Burckle*, 20 Cal. 3d 367, 377 (1978); *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 369 (2001); *Kunert v. Mission Fin. Servs. Corp.*, 110 Cal. App. 4th 242, 263 (2003)).)

[34] (*See* Doc. 121, Def.'s Reply Supp. Mot. Dismiss 23 n.21 ("Plaintiffs rely on dicta from *Darush v. Revision LP*, No. CV 12-10296 GAF (AGRx), 2013 WL 1749539 (C.D. Cal. Apr. 10, 2013), and ignore a more recent California state court decision that squarely addressed and rejected the *per se* rule with respect to vertical price restraints. *See Kaewsawang v. Sara Lee Fresh, Inc.*, No. BC360109 (Super. Ct. Los Angeles Cnty., May 6, 2013).").)

concerning deficiencies stated" in the February 18 Order. (February 18 Order at 36.) But even if this counsels against a futility finding for present purposes, the deficiencies discussed above, at the very least, help show the undue delay and unfair prejudice that would follow if Plaintiffs were granted leave to assert a claim they previously said they were not pursuing.[35] Consider what would likely transpire if Plaintiffs were permitted to move forward on Count V. To start, the Court would need to request and consider more briefing on the above deficiencies, since the issues, at least as they relate to Count V, are not adequately addressed in the prior filings. This would subject the OTA Defendants to yet another round of briefing on the sufficiency of the pleadings, even though they put most of these deficiencies squarely on the table long ago, only to have Plaintiffs sidestep each issue by focusing the Court on their implausible conspiracy allegations. Then, assuming the Court resolves these deficiencies in their favor, Plaintiffs may very well seek leave again, perhaps even to re-assert some of the above-dismissed claims premised on this new theory, given that the majority of the SCAC is dedicated to their implausible horizontal conspiracy theory.

The above illustration exemplifies why there exists a "policy against allowing litigants to assert their claims in a series." *S. Constructors*, 2 F.3d at 612. While the Court would never "punish" a litigant simply because he or she failed to assert a claim as promptly as possible, Plaintiffs here "deliberately chose to delay" adding a vertical restraint claim until after the Court found their initial theory implausible. *Rosenzweig*, 322 F.3d at 864-65. The Fifth Circuit has admonished litigants before for "this kind of 'wait and see' approach to requesting leave to amend," especially where, as here, an "'ostensibly sophisticated [] class action counsel'" is involved. *Goldstein*, 340 F.3d at 255 n.6 (citing

---

[35] (*See* Doc. 113, Pl.'s Resp. to Mot. Dismiss 27 ("Defendants' attempt to cabin Plaintiffs' allegations as purely vertical completely ignores the totality of Plaintiffs' allegations.").)

*Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002)). It has also made clear that "a 'busy district court need not allow itself to be imposed upon by the presentation of theories seriatim.'" *Rosenzweig*, 322 F.3d at 865 (quoting *Freeman v. Continental Gin Co.*, 381 F.2d 459, 469 (5th Cir. 1967)). Such are the circumstances of this case. As such, the Court, in its discretion, denies Plaintiffs' request for leave to assert Count V—a single state antitrust claim premised on a theory that Plaintiffs previously said they were not pursuing.

## III.

## CONCLUSION

For the foregoing reasons, the Court finds substantial justifications for denying Plaintiffs leave to file their proposed SCAC. Accordingly, the Court **DENIES** Plaintiffs' Motion for Leave (doc. 137). A final judgment dismissing this matter will follow shortly after this Order is issued.

**SO ORDERED.**
Dated: October 27, 2014.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE